**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROYAL MILE COMPANY, INC.,** ) | |
| **PAMELA LANG** and ) | |
| **COLE'S WEXFORD HOTEL, INC.,** ) | Case No. 2:10-cv-01609-JFC |
| on their own behalf and on behalf of all ) | |
| others similarly situated, ) | Judge Joy Flowers Conti |
| ) | |
| Plaintiffs, ) | *Related to Case 2:09-cv-480-JFC* |
| ) | |
| v. ) | |
| ) | |
| **UPMC** and ) | |
| **HIGHMARK, INC.,** ) | |
| ) | |
| Defendants. ) | |

**AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Royal Mile Company, Inc. and Pamela Lang and Cole's Wexford Hotel, Inc., by their undersigned counsel, file this ***Amended Class Action Complaint and Jury Demand*** on their own behalf and on behalf of all members of the Plaintiff class hereinafter defined, seeking redress against Defendants UPMC and Highmark, Inc.

**Introduction**

1.     This is a class-action lawsuit to recover damages suffered by Plaintiffs, purchasers of health insurance coverage from Defendant Highmark, Inc., who were charged and forced to pay excessive, above-market premiums for such insurance coverage as a direct - and intended - result of a sustained and orchestrated conspiracy between Defendant UPMC, the area's largest health-care provider, and Defendant Highmark, Inc., the area's largest health insurance provider.  As chronicled below at greater length and in painstaking detail, from 2002 until at least mid-2008 these

Defendants conspired, agreed and acted in an organized, orchestrated and deliberate fashion to control, divide and/or monopolize both the market for medical care and the market for health insurance in the Greater Pittsburgh area and to their exclusive benefit, all in violation of the federal antitrust laws and other laws and all to the great and direct economic harm of Plaintiffs.  By this action, Plaintiffs seek to recover all damages suffered as a result of Defendants' illegal and anticompetitive conduct, together with all other damages provided by law, including but not limited to treble damages, punitive damages, attorneys' fees and costs.

## Parties

2.      Plaintiff Royal Mile Company, Inc. is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

3.      Plaintiff Pamela Lang is an adult individual residing in the Commonwealth of Pennsylvania.

4.      Plaintiff Cole's Wexford Hotel, Inc. is a Pennsylvania corporation with its principal place of business located at 161 Church Road, Wexford, PA 15090.

5.      These named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, namely, all subscribers/purchasers/insureds who purchased health insurance coverage from Defendant Highmark, Inc. and whose policies were in effect at any time on or after December 1, 2006.

6.      Defendant UPMC is a Pennsylvania "nonprofit" corporation with its principal place of business in Pittsburgh, Pennsylvania.

7.     Defendant Highmark, Inc. is Pennsylvania "nonprofit" corporation with its principal place of business in Pittsburgh, Pennsylvania.

## Jurisdiction, Standing and Venue

8.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

9.     This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a).

10.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

11.     Plaintiffs have standing to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

12.     Venue is proper in the Western District of Pennsylvania by virtue of 28 U.S.C. § 139l(b) because all parties reside in the Western District of Pennsylvania.

## Class Action Allegations

13.     Plaintiffs bring this action as a class action on behalf of all persons, whether natural or fictitious, who purchased health insurance coverage from, or otherwise paid any premiums or portion thereof to, Defendant Highmark, Inc. and whose policies were in effect at any time on or after December 1, 2006 (the "Class Period"). As such, Plaintiffs are direct purchasers of the product at issue, in the relevant market, and therefore suffered cognizable antitrust injury and have standing to sue. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Blue Shield of Virginia v. McCready*, 457 U.S. 465

(1982) (direct purchasers not only have standing to sue but are the "preferred plaintiffs" in private treble damage litigation).

14.     Furthermore, as set forth in greater detail below, Highmark and UPMC engaged in a vertical conspiracy relating to the provision of health care (from UPMC) and health care insurance coverage (from Highmark), all of which were the product of and affected by the vertical conspiracy.  As such, Plaintiffs have standing to assert claims against both Highmark and UPMC.

15.     Plaintiff Royal Mile Company, Inc. is a member of the Plaintiff class. Royal Mile Company purchased health insurance coverage from Highmark, Inc., providing coverage for its employees, during the Class Period.

16.     Plaintiff Pamela Lang is a member of the Plaintiff class.  Lang purchased health insurance coverage from Highmark, Inc., providing coverage for herself and her family, during the Class Period.

17.     Plaintiff Cole's is a member of the Plaintiff class.  Plaintiff Cole's, during the relevant period, purchased group health insurance coverage for its employees.  Defendant Highmark assigned both a group number and client number to Plaintiff Cole's and said numbers are 08316412 and 036351, respectively.  Plaintiff Cole's purchased its group health insurance policy directly from Highmark and paid Highmark directly by check on a monthly basis for the health insurance premiums.

18.     The Plaintiff class is believed to include millions of members and is therefore so numerous that joinder of all members would be impracticable.  The precise number of class members, and the identity of each member, can be readily determined from the records of Defendant Highmark, Inc.

19.     There are questions of law and fact common to all members of the Plaintiff class, and such common questions will predominate over any questions that affect or might affect only individual members of the class in the disposition of this action.  Such common questions of law and fact include:

(a)     whether Defendants violated the federal antitrust laws by the acts alleged herein;

(b)     whether Defendants' conduct resulted in antitrust harm to the members of the Plaintiff class, including but not limited to harm in the form of excess, above-market or supracompetitive premium rates charged by Defendant Highmark, Inc.;

(c)     whether Defendants acted willfully or recklessly in conspiring as alleged herein; and

(d)     whether the members of the class have sustained economic damages and, if so, what is the proper measure of such damages.

20.     A class action is superior to any other available method for the fair and efficient adjudication of the controversy between the class and Defendants.

21.     The claims of the named Plaintiffs are typical of the claims of the class.

22.     The Plaintiff class representatives will fairly and adequately assert and protect the interests of the class as required by Fed. R. Civ. P. 23.  In particular:  (1) the undersigned attorneys will vigorously and adequately represent the interests of the class; (2) the class representatives have no conflict of interest in maintaining a class action; and (3) the class representatives have adequate financial resources to assure that the interests of the class will not be harmed.

23.     The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and adjudications with respect to individual members of the class which might as a practical matter be dispositive of the

interests of the other members of class, or would substantially impair or impede their ability to protect such interests.

24.     Defendants have acted and refused to act on grounds generally applicable to the class, further making class-action adjudication appropriate.

## General Factual Allegations

25.     At least since 2002, Pittsburgh's dominant hospital system, UPMC, and its dominant health insurer, Highmark, have conspired to reduce competition and to raise prices at the expense of the community's employers, consumers, and patients, including specifically the members of the Plaintiff class.  During that period, Highmark and UPMC have conspired to protect one another from competition, enhancing and insuring their respective monopolies.  UPMC's most senior executives have openly said that they want to destroy their primary competitor, West Penn Allegheny Health System, Inc., and have relentlessly worked to achieve, maintain and enhance a monopoly position in high-end tertiary and quaternary care services.  Highmark's senior officials have admitted repeatedly that Highmark and UPMC had an agreement whereby Highmark would withdraw its commitment to and refuse any significant financial support or assistance for West Penn Allegheny in exchange for UPMC's agreement that it would protect Highmark's near monopoly position in the health insurance market.

26.     UPMC agreed to protect Highmark by refusing to contract on reasonable terms with any competing health insurer or to sell its health insurance affiliate to any competing health insurer, thus relegating major national insurers such as United, Coventry, and Aetna to marginal participation (at best) in the Pittsburgh market.  In

exchange, Highmark agreed to restrict UPMC's hospital primary competitor, West Penn Allegheny, by shuttering its low-cost Community Blue product, attempting to block West Penn Allegheny's efforts to refinance its debt, and paying inflated reimbursement rates to UPMC while maintaining depressed rates for UPMC's competitors, especially West Penn Allegheny.  Highmark has in turn passed on the costs of UPMC's rates to employers, consumers, and patients by charging higher premiums.  Since the conspiracy's formation in 2002, and at least through 2007, UPMC and Highmark have enjoyed record profits – and an increasingly exploited Pittsburgh community - and specifically members of the Plaintiff class - has suffered skyrocketing health care costs.

27.     One of the conspiracy's principal aims was to cripple West Penn Allegheny, the sole surviving competitor to UPMC in sophisticated tertiary and quaternary care.  Ever since West Penn Allegheny rose from the ashes of the bankruptcy of the Allegheny Health, Education, and Research Foundation ("AHERF") – an effort supported by community leaders in order to counter the danger that a dominant UPMC would raise prices – UPMC has pursued a relentless campaign to drive West Penn Allegheny out of business.  Indeed, UPMC CEO Jeffrey Romoff has stated publicly that competition in health care does not work and that West Penn Allegheny has no future. See "Romoff Questions West Penn's Long-Term Viability," Pittsburgh Business Times (October 21, 2002).

28.     In Summer 2002 UPMC offered a secret deal to Highmark aimed at the weakening of West Penn Allegheny: UPMC agreed to ensure Highmark's continued dominance in the health insurance sector, ***thus allowing Highmark to raise without constraint the premiums it charged to members of the Plaintiff class***.  In exchange,

UPMC not only demanded and received huge lump sum capital injections and substantially higher payment rates, but it also demanded that Highmark join in the campaign to hobble its sole viable competitor, West Penn Allegheny.

29.     Even though Highmark previously supported West Penn Allegheny with a $125 million loan because it recognized the benefits of hospital competition for the community and itself, it reversed course in exchange for UPMC's agreement not to allow its health plan to compete against Highmark and to block other insurers from achieving a foothold in Pittsburgh, thus conceding to Highmark a virtual monopoly. As part of its conspiracy with UPMC, Highmark systematically tilted the playing field against West Penn Allegheny. Despite West Penn Allegheny's clear cost advantages over UPMC, Highmark's agreement with UPMC led to Highmark's withdrawal of Community Blue, Highmark's low-cost insurance product that directed care to West Penn Allegheny to keep premiums down and health care affordable. See "Highmark Pulling Plug on Lower Cost Health Plan," Pittsburgh Post-Gazette (March 27, 2003).

30.     As part of its conspiracy with UPMC, Highmark also kept its reimbursements to West Penn Allegheny at artificially depressed rates with the purpose of furthering UPMC's plan to drive West Penn Allegheny out of business and deny it access to the resources needed to invest in new facilities, technology, and equipment. Highmark's depressed reimbursement rates to West Penn Allegheny were in stark contrast to the excessively high rates paid to UPMC. By keeping West Penn Allegheny's rates down, Highmark was able to subsidize its overpayments to UPMC. Highmark also agreed with UPMC that Highmark would restrict its grants to West Penn Allegheny and

would refuse to cooperate with any restructuring of West Penn Allegheny's finances, including Highmark's loan.

31.     In Fall 2005, Highmark's Board Chairman admitted point blank to West Penn Allegheny's CEO and Chairman of the Board of Directors that Highmark was colluding with UPMC and that what Highmark was doing with UPMC was "probably illegal."

32.     This strategy is entirely consistent with UPMC's plan to prevent new capital from coming into West Penn Allegheny while at the same time driving up West Penn Allegheny's costs so that it is unable to act as a constraint on UPMC's ever-increasing demands for monopoly profits.  UPMC has taken every opportunity to injure West Penn Allegheny, including recruiting physicians with the express goal of injuring West Penn Allegheny, denying West Penn Allegheny access to patient referrals and other cooperation from independent community hospitals, and disparaging West Penn Allegheny to the investment community.

33.     The conspiracy has taken a severe toll on West Penn Allegheny.  Despite providing equal or better care than UPMC at a lower cost to the community, Highmark agreed to withdraw its financial support of West Penn Allegheny, including keeping its reimbursement rates depressed.  Moreover, the conspirators have artificially blocked and stunted West Penn Allegheny's natural growth as the high-quality and low-cost leader, resulting in lost patient volume, growth, and earnings to West Penn Allegheny.  Those earnings are critical to West Penn Allegheny's charitable mission to improve the extent, scope, and quality of health care available to the Pittsburgh community.  Meanwhile, as a result of the conspiracy between UPMC and Highmark, UPMC has posted profits that are

dramatically disproportionate to its size.  For example, for fiscal year 2006, UPMC's net income was $512 million, while West Penn Allegheny's net income was $21 million. Although UPMC is five times as large as West Penn Allegheny, its profits were 25 times those of West Penn Allegheny's.  Similarly, Highmark's surplus rose from $2.8 billion in 2005 to $3.5 billion in 2007.

34.     As set forth below, the acts in furtherance of the conspiracy continued at least through Summer 2008.

35.     UPMC's and Highmark's conduct in the Pittsburgh area was the subject of at least two ongoing government investigations by the United States Department of Justice, Antitrust Division, and the Pennsylvania Insurance Department.

36.     The effects of the illegal conspiracy have continued to the present day.


**UPMC's Failed Attempts to Stop the Emergence of West Penn Allegheny**

37.     West Penn Allegheny was formed by a combination in August 2000 of The Western Pennsylvania Healthcare System, comprised of The Western Pennsylvania Hospital ("West Penn") and Suburban General Hospital, and the Pittsburgh-based hospitals formerly affiliated with AHERF, including Allegheny General Hospital ("AGH"), Allegheny Valley Hospital (now the Alle-Kiski Medical Center), Forbes Regional Hospital (now The Western Pennsylvania Hospital – Forbes Regional Campus), and Canonsburg General Hospital.  AGH was the flagship hospital of AHERF and is a highly sophisticated tertiary and quaternary care teaching hospital.  At the time of the merger, West Penn was a smaller tertiary care facility.

38.     The merger arose from AHERF's bankruptcy in 1998.  The West Penn Board of Directors, which included some large area employers, sought to preserve AGH as a strong competitor because of concern that, if AGH failed, there would be few healthcare options for consumers.

39.     From the outset, UPMC attempted to sabotage the formation and operation of West Penn Allegheny.  A vice president for UPMC told physicians that it intended to turn AGH into a "parking lot."  UPMC Board members and employees unsuccessfully lobbied AGH Board members and local officials to oppose the West Penn-AGH merger.

40.     Stymied in these efforts, UPMC attempted unsuccessfully to intervene in the Orphans' Court proceedings regarding the creation of West Penn Allegheny. Similarly, UPMC filed a frivolous lawsuit against the Pennsylvania Department of Insurance to block Highmark from providing financial assistance to West Penn Allegheny.

41.     UPMC also interfered with West Penn Allegheny's initial bond offering. UPMC, which had no legitimate role in the offering, retained its own consulting firm, Reynolds & Co., to develop a competing analysis of the West Penn-AGH merger that predicted the new West Penn Allegheny system would fail on the basis of numerous false and misleading statements about West Penn Allegheny's finances.  UPMC disseminated this report to potential purchasers of West Penn Allegheny bonds and to credit rating agencies, as well as to the news media.  See "UPMC Study Sees Big Risks in Merger," Pittsburgh Post-Gazette (June 16, 1999).  UPMC officials also took the extraordinary step of meeting personally with potential investors to try to dissuade them from investing in West Penn Allegheny bonds.  West Penn Allegheny's investment bankers advised West

Penn Allegheny that they had never before seen a competitor engage in a "reverse road show" of this kind.

42.     UPMC coerced Vanguard, a money management firm, to avoid purchasing any West Penn Allegheny bonds by threatening to cut off all of its business ties with Vanguard.  UPMC similarly coerced Scudder, another money management firm, to refrain from buying $30 million of West Penn Allegheny bonds.  Nevertheless, West Penn Allegheny was eventually able to place its bond offering, though at a less favorable rate than it otherwise would have achieved without UPMC's predatory interference.

43.     UPMC also began a campaign of raiding key members of the AGH medical staff in order to injure West Penn Allegheny.  AGH, like all hospitals, relies on physicians on its medical staff to direct patients to its facilities for their services.  Put differently, the primary way that a hospital distributes its services is through a physician's admission of patients.  Given the high fixed costs of hospitals and the consequent need to maintain a steady volume of patients to remain financially afloat, the role of a physician in sending patients to a facility is absolutely crucial.

44.     UPMC engaged in a campaign to "cherry pick" the key physicians who provided most of AGH's profits through a campaign of bribes and inducements with the avowed purpose of burying West Penn Allegheny.  By way of early example:

•       In September 1999, UPMC hired Dr. Joseph Maroon, AGH's Chief of Neurosurgery, and four other neurosurgeons.  UPMC lured Maroon by offering a substantially higher salary and by agreeing to purchase two parcels of land from Dr. Maroon for in excess of $6 million, even though their market value was well below this number (Maroon had purchased the properties for less than $300,000 in 1988 and 1991).

•       UPMC hired AGH chief oncologist Dr. Stanley Marks and the remaining 30 medical and radiation oncologists who practiced at AGH.  UPMC offered extremely large salaries to the Marks group, and further agreed to pay $2 million

for certain land owned by Marks – again well above fair market value.  UPMC's offer was contingent upon the oncologists switching hospitals before West Penn Allegheny completed its financing – a clear sign that the purpose of hiring Marks and paying excessive amounts for his real estate holdings was the destruction of AGH.  AGH could not afford to match UPMC's offer, and suffered a severe setback in its oncology program.

•       UPMC raided AGH's hand surgeons, who generated 2,000 to 3,000 admissions per year.

•       UPMC raided invasive cardiologists on the AGH Medical Staff.  UPMC paid one of these physicians in excess of $1 million per year, even though the MGMA median salary for invasive cardiologists in the Pittsburgh area at that time was less than $400,000.

45.     In addition, UPMC raided multiple gastroenterologists, pulmonologists and primary care physicians from the AGH Medical Staff.

46.     UPMC required that each raided AGH physician agree to become a UPMC employee, even though certain of these physician previously operated their own practices.  Turning formerly independent physicians into employees tightened UPMC's control over their future conduct, including their ability to refer patients to non-UPMC facilities and, because of non-compete agreements, their ability to return to AGH.

47.     UPMC repeatedly admitted to AGH physicians that UPMC intended to "bury" AGH and to turn it into a nursing home.  UPMC bluntly told AGH physicians that UPMC wanted to hire them in order to damage AGH.

48.     Given these statements, it is clear that UPMC hired AGH's physicians for the express purpose of choking off AGH's access to patients from these admitting physicians, crippling AGH financially and destroying it as a competitor.

49.     Upon information and belief, the amount of reimbursement that UPMC received for these physicians was below the cost of the inflated compensation packages used to lure them away from the AGH Medical Staff.  In fact, by July 2001, UPMC's

physician division was "losing about $1 million a week." See "UPMC Health Plan Grows Amid Feuding," Pittsburgh Tribune-Review (July 1, 2001).  This money-losing strategy could only be in UPMC's self-interest if UPMC hoped to recoup these losses by driving AGH out of business.

50.     Upon information and belief, UPMC intended to bid physician compensation levels up to artificially inflated levels solely in order to prevent West Penn Allegheny from being able to recruit and retain qualified physicians.

51.     Nor was UPMC's predatory conduct limited to AGH.  At approximately this same time, UPMC raided the entire oncology department of West Penn Allegheny's Alle-Kiski Medical Center ("AKMC") and the practice of a primary care physician with strong ties to AKMC.  Again, UPMC's intent in these raids, in which UPMC paid exorbitant compensation far above market levels, was to try to kill West Penn Allegheny as a competitor.

52.     The most outrageous instance of physician raiding occurred in early 2002 when UPMC attempted to close AGH by poaching its entire anesthesiology staff. Without qualified anesthesiologists, a hospital cannot perform surgical procedures, maintain an emergency department, or treat inpatients who might require surgery.  Thus, if UPMC could steal all of AGH's anesthesiology staff, it would close AGH.

53.     At that time, AGH was a party to an exclusive contract for anesthesiology services with Allegheny Anesthesia Associates ("AAA").  AAA employed all of AGH's 37 anesthesiologists and 60 certified registered nurse anesthetists ("CRNAs").  UPMC approached AAA and offered to hire away the entire group for a substantial increase in salary, above not only their reimbursement from AGH but also well above what UPMC

paid its own anesthesiologists.   UPMC offered a guaranteed three-year contract with salaries in excess of $400,000 to each of the AAA anesthesiologists, regardless of their experience or qualifications, even though UPMC paid its own anesthesiologists between $200,000 and $350,000.

54.     This offer was not made to meet the needs of UPMC, which lacked sufficient operating room volume to absorb these new anesthesiologists.   UPMC's own internal analysis showed that this raid on AGH's anesthesiology staff would be unprofitable.    UPMC's Tony Detre, Vice President Business Development, told physicians that UPMC's raid on AAA was designed solely to run AGH out of business.

55.     UPMC was forced to raise all of its existing anesthesiologist salaries (at a cost of $8 million), without sufficient volume to keep its now excessive anesthesiology staff fully employed.   The AAA group subsequently fractured and its various members left UPMC – yet further proof that UPMC had no valid business need to hire them.

56.     UPMC has made similar predatory physician raids to drive out other competitors.   For example, in 2000, UPMC acquired the Russellton Medical Group and forced those physicians to resign their staff privileges at Citizens General Hospital, for which they were a key source of patients.   This raid was a major factor in Citizens General's closure in November 2000.

57.     Similarly, UPMC precipitated the 2002 closure of St. Francis Medical Center through predatory raiding of key members of that hospital's medical staff.

58.     These predatory hiring and recruitment practices have been unique to UPMC in the Pittsburgh area.   No other hospital system has attempted systematically to deprive West Penn Allegheny of vital physicians, much less to do so by offering over-

market salary increases or by hiring in practice specialties where the extra staffing was unnecessary and unprofitable (as in the AAA transaction).

**Highmark's Initial Support of West Penn Allegheny**

59.    Before the Summer of 2002, West Penn Allegheny had a strong relationship with Highmark.  As the region's dominant health insurer, Highmark was understandably concerned about the potential failure of AGH in the wake of the AHERF bankruptcy.  The loss of a key hospital competitor in Pittsburgh would dramatically increase UPMC's negotiating leverage over Highmark, forcing Highmark to offer increased compensation to UPMC.

60.    Consistent with its self-interest, Highmark provided a $125 million subordinated loan to West Penn Allegheny to help finance the West Penn-AGH merger in 2000.

61.    Highmark executives also attended "road show" meetings with West Penn Allegheny executives to promote West Penn Allegheny's initial bond offering to potential investors.

62.    Similarly, in early 2002, Highmark provided a $42 million grant to West Penn Allegheny.

63.    While Highmark was helpful to West Penn Allegheny in the late 1990s and early 2000s, Highmark and UPMC were at loggerheads.  Frustrated with UPMC's intransigence and demands, Highmark formed the Community Blue product in the late 1990s, a managed care product whose limited provider network sent business to AGH and other non-UPMC hospitals.  UPMC did not participate in the Community Blue

network because its costs were too high.  In pleadings filed in 2001 in the Children's Hospital merger litigation discussed below, UPMC represented that "West Penn Allegheny serves as the core of Highmark's narrow network products."  Community Blue was marketed as a low-cost insurance option to appeal to small employers who lacked the resources to self-insure.  Community Blue grew to over 200,000 members.

64.    UPMC in turn launched the UPMC Health Plan, a competing health insurance company.  Former UPMC Executive Vice President John Paul stated that UPMC formed its own health insurance arm because of its inability to negotiate what he deemed a "fair rate" with Highmark.  Mr. Paul expressed UPMC's desire not to be "at the mercy of Highmark."  See "UPMC's Battle Against Highmark's Role in the Allegheny Bailout," Physician's News Digest (May 1999).

65.    UPMC Health Plan's network focused on UPMC's own facilities.  To this day, UPMC Health Plan has refused to include the West Penn Allegheny hospitals in its network of participating providers on more than a very limited basis, although UPMC Health Plan has permitted every other hospital in Allegheny County to participate in its network.  Moreover, UPMC Health Plan has repeatedly and improperly refused to pay West Penn Allegheny for out-of-network, medically necessary emergency care services routinely provided by West Penn Allegheny to UPMC Health Plan members.

66.    True to form, UPMC resorted to unlawful tactics to attack Highmark's Community Blue product by disseminating false information to the media.  Fed up, in 2001, Highmark successfully sued UPMC for false and misleading advertising about Community Blue.  See Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160 (3d Cir.

2001).  One of the misleading advertising claims was that Community Blue did not afford access to two "world-renowned physicians" raided from AGH, Drs. Marks and Maroon.

67.    The mutual antagonism between Highmark and UPMC in the early 2000s was also starkly displayed in Highmark's 2001 lawsuit to enjoin UPMC's acquisition of Children's Hospital of Pittsburgh as a violation of federal antitrust law.  See generally Highmark, Inc., et al. v. UPMC Health System, Civ. A. No. 01-1114 (W.D. Pa.) (the "Merger Litigation").

68.    In its Complaint in the Merger Litigation, Highmark predicted that UPMC would impose inflated prices by bundling pediatric services with non-pediatric services because "[UPMC] presently holds leading or dominant positions in virtually all segments of the market for hospital services, with the exception of pediatric services.  To provide coverage for pediatric services in Allegheny and surrounding counties, it is essential for health plans to provide access to Children's.  With control of Children's, [UPMC] can insulate its non-pediatric services from competition by tying or bundling them together with services from Children's."

69.    Highmark concluded in its Complaint that "[UPMC] is likely to use its market power, arising from the Takeover, to raise prices and reduce health care choice in Allegheny and surrounding counties."

70.    Though Highmark and UPMC ultimately settled the Merger Litigation, it is clear that Highmark was familiar, from its own experience, with UPMC's predatory tactics.  Highmark expressly pointed out in its Complaint that UPMC's behavior for the five years preceding the Merger Litigation "demonstrates a specific intent and willingness by [UPMC] to exploit market power whenever possible."

71.     UPMC struck back by accusing Highmark of anticompetitive conduct.  In its Answer and Affirmative Defenses in the Merger Litigation, UPMC alleged that:

> Highmark is a monopolist in the health care financing market in Western Pennsylvania and a monopsonist in the health care services market in Western Pennsylvania.  Highmark uses its powers as a monopolist and a monopsonist to dictate prices for health care providers (like [UPMC]) in all relevant markets.

72.     In particular, UPMC alleged that Highmark's promotion of its low-cost Community Blue product constituted "predatory pricing" because Highmark had the temerity to demand discounts from UPMC so it could offer the community a low-priced, affordable health insurance option.

**The Highmark-UPMC Conspiracy to Entrench One Another's Market Power**

73.     As early as 1998, UPMC CEO Romoff had told the press that UPMC offered a "truce" to Highmark: "'Let's call a truce,' Romoff recalled UPMC saying to Highmark officials during the board meetings in January.  'You delay putting Community Blue out and we will not sign an agreement with an outside insurer.'"  See Pittsburgh Business Times, Sept. 21, 1998.

74.     In a brief filed on September 17, 2001 in the Merger Litigation, Highmark clearly recognized that the purpose of UPMC's "truce" proposal was to restrain healthcare competition in this community:

> Defendant [UPMC] asserts that the Takeover is justified because Highmark has allegedly engaged in anticompetitive behavior.  Remarkably, as an example of such behavior, Defendant cites Highmark's rejection of Defendant's overtures to attempt to form a "super" monopoly for the provision of health care in Western Pennsylvania in which UPMCHS, the leading provider of hospital services, and Highmark, the leading health insurer, would combine forces.

75.     In the Summer of 2002, Highmark finally agreed to Romoff's proposal to eliminate competition and create a "super monopoly."   During that time, there were frequent meetings between Highmark executives, including at least Ken Melani, and UPMC executives, including at least UPMC Executive Vice President John Paul.   These discussions led to the formation of a broad, and illegal, agreement between Highmark and UPMC to restrain health care competition in the Pittsburgh community.

76.     As part of this overall agreement, the two parties entered into a new multi-year participating provider agreement, with reimbursement rates for UPMC that were much higher than those previously negotiated for West Penn Allegheny.   In particular, Highmark agreed to increase the rates it pays to UPMC hospitals by 21% during the first year of the agreement, and 7% per year thereafter.

77.     In addition, Highmark agreed to provide just over $230 million to UPMC to build a new hospital facility for UPMC's Children's Hospital of Pittsburgh, $70 million of which was a grant while the remainder was a low-interest loan.

78.     UPMC agreed that it would not use the huge cash payments that it received from Highmark to strengthen UPMC Health Plan.   It agreed to erect a "firewall" between UPMC and UPMC Health Plan, so that none of the money that Highmark paid to UPMC could be used to benefit the Health Plan.

79.     Highmark agreed with UPMC not to offer a health plan that did not include UPMC as an in-network provider.   This agreement eliminated competition between UPMC and other hospitals, principally West Penn Allegheny, for preferred provider status in Highmark's health plans.   This competition for preferred provider status (and the attendant increase in patient volume) is how, in a competitive market,

health insurers induce hospitals to provide deep discounts which the health insurer can in turn use to offer low-priced insurance products to employers.

80.     Highmark also agreed with UPMC to stop providing assistance and support to West Penn Allegheny, to tilt the playing field unfairly in UPMC's favor through discriminatory reimbursement and grant-making, refusal of consent to West Penn Allegheny's refinancing, and to discontinue Community Blue.

81.     All of these actions were contrary to what normally would be in Highmark's self-interest as a health insurer.   Absent the conspiracy, it was not in Highmark's interest to withdraw its support of UPMC's only real remaining competition or to pay higher reimbursement rates to UPMC, either directly or indirectly through special grants and subsidies.   As shown by its pre-conspiracy conduct, Highmark recognized that, to the contrary, it had a strong interest in preserving hospital competition and preserving West Penn Allegheny to act as a counterweight to UPMC.

82.     The *quid pro quo* for Highmark's agreement was that UPMC agreed to protect Highmark from competition in the health insurance sector.   First, UPMC agreed not to grow or market the UPMC Health Plan, including an agreement not to pursue large group contracts that have been Highmark's traditional mainstay.

83.     After reaching its new agreement with Highmark, UPMC CEO Jeff Romoff announced a decision that UPMC Health Plan would no longer grow at a meeting of all employees of UPMC Health Plan.   Romoff began by reporting that in the negotiations with Highmark, UPMC had won the war, because Highmark would close Community Blue, while UPMC would be allowed to keep its Health Plan.   Romoff said that Highmark had paid double for the Health Plan, by paying all the money that UPMC

demanded while allowing the Health Plan to continue to exist.  Romoff then said that the UPMC Health Plan had grown large enough.  Essentially, Romoff directed that the UPMC Health Plan stop competing against Highmark for new business.

84.     Romoff implemented this decision by taking two steps that completely stopped the growth of UPMC Health Plan.  First, he cut the Health Plan's advertising budget from $12 million to $2 million, and combined it with the Medical Center's advertising budget (thus eliminating all Health Plan-specific advertising).  Second, he increased the UPMC hospitals' prices to the Health Plan by 26%, and directed the Health Plan to immediately increase its prices to its customers by 26%.  These actions ensured that UPMC Health Plan did not compete with Highmark for the customers who had to replace the low-priced Community Blue insurance when Highmark shut it down, as Highmark and UPMC had agreed.

85.     As a result, UPMC Health Plan's commercial enrollment declined from more than 675,000 members in 2002 to less than 280,000 members in 2006 (despite the fact that all of the approximately 50,000 UPMC employees and their dependents are automatically members of the UPMC Health Plan).  See Monica G. Noether, "Competitive Analysis of the Proposed Consolidation Between Highmark, Inc. and Independence Blue Cross in the Commonwealth of Pennsylvania," at 65 (Oct. 14, 2008).

86.     Second, although at least one health insurer was interested in purchasing it, UPMC agreed not to sell the UPMC Health Plan to any actual or potential competitor of Highmark.

87.     Third, UPMC agreed with Highmark that UPMC would refuse to contract at competitive rates with non-Highmark health insurance plans.  Lacking a competitive

contract with UPMC, no major national health insurance provider, including Aetna, United, Coventry, and CIGNA, has been able to crack 10% commercial market share in the six-county Pittsburgh metropolitan area.

88.     UPMC's refusal to contract competitively has blocked the entry and growth of several large national health insurers because it is extremely difficult for a new market entrant to build an adequate and marketable provider network without reasonable access to UPMC's facilities, especially in oncology, obstetrics, and mental health. Employers in the Pittsburgh area typically require their health plans to provide access to UPMC facilities.  Without a competitive contract with UPMC, Highmark rivals like United cannot offer an attractive health insurance product to employers.

89.     UPMC's refusal to contract with Highmark's rivals was recently confirmed by an analysis of the Pennsylvania health insurance market conducted by the Pennsylvania Insurance Department. As part of its review of the proposed merger between Highmark and Independence Blue Cross, the Insurance Department retained LECG, an economic consulting firm, to assess the competitive landscape for health insurance in the Commonwealth of Pennsylvania.  In its Report dated September 10, 2008, LECG expressly noted UPMC's failure to contract competitively with Highmark's rivals:

> [O]ne area of competitive concern raised in our interviews with market participants in western Pennsylvania involves key gaps in provider networks for some of Highmark's main competitors and potential competitors, such as Health America and United.  According to Highmark data, both Health America and United do not have contracts with two of the flagship UPMC hospitals located in the Pittsburgh area, UPMC Presbyterian and UPMC Shadyside.  Some market participants have indicated concern that limitations in contracting with UPMC derive from a previous agreement between Highmark and UPMC.

90.     The success of the conspiracy can be seen in the conspirators' successful exclusion of United Healthcare from the Pittsburgh market.  United is one of the nation's largest health insurers, with reported revenues in excess of $80 billion for its 2008 fiscal year.

91.     In 2005 and 2006, United attempted to enter the Pittsburgh market.  As a well-capitalized company with a strong track record of success in many markets across the United States, United had the financial strength and insurance expertise to pose a serious threat to Highmark's dominant market position.

92.     As part of its conspiracy with Highmark, UPMC refused to contract on competitive terms with United.  In particular, UPMC refused to offer reasonable contract terms to access UPMC's two flagship hospitals, Presbyterian and Shadyside.  UPMC also refused United's overtures to purchase the UPMC Health Plan.

93.     Unable to offer area employers a health insurance product with the key UPMC facilities in-network on competitive terms, United has been unable in the last four years to achieve even a 10% market share.

94.     UPMC's refusal to contract at competitive rates with any other health insurer can only be explained by its illegal conspiracy with Highmark.  Such contracting would normally be in UPMC's self-interest, both to ensure that multiple insurers competed for access to UPMC facilities (thus improving UPMC's bargaining power) and to attract whatever incremental volume these plans could offer.

95.     UPMC has also allowed its commercial health insurance business to languish since Summer 2002.  This refusal to compete with Highmark, and attendant sacrifice of millions of dollars of potential profits, only makes sense in return for

Highmark's increased and discriminatory reimbursement rates for UPMC and its assistance to UPMC in its campaign to cripple West Penn Allegheny.

96.     As part of the conspiracy, Highmark discontinued the Community Blue product.  Highmark agreed with UPMC to "sunset" Community Blue within twelve months, by switching each employer group to another product when its current Community Blue contract expired.  Community Blue was in fact shut down by January 2004, and is now out of business.  Combined with UPMC's agreement to stop competing against Highmark with a low-priced health insurance product, the termination of Community Blue ended health insurance price competition in the Pittsburgh community and forced employers and families - including members of the Plaintiff class - into buying Highmark's remaining, far more expensive health insurance products.

97.     Ken Melani, President and CEO of Highmark, attempted to conceal the real reason for this action by falsely telling the press that Highmark needed to cut administrative costs.  Dr. Melani also erroneously claimed that Community Blue did not save employers money.  See "Highmark Pulling Plug on Lower Cost Health Plan," Pittsburgh Post-Gazette (March 27, 2003).  Indeed, Dr. Melani's statement about Community Blue after Highmark entered into its conspiracy with UPMC contradicted his pre-conspiracy sworn testimony in the false advertising litigation that a "key feature" of Community Blue was "that a group of hospitals have agreed to take additional discounts which allow us to price the product cheaper in the marketplace than many of our other products."

98.     Not only did Dr. Melani's statements contradict Highmark's previous, multi-year marketing campaign for Community Blue as a low-cost alternative, but small

business groups in the region expressed their dismay at losing a low-cost health insurance option. In fact, the Pittsburgh Post-Gazette reported that "family coverage at companies with coverage through Community Blue and with employees averaging 40 years of age will rise roughly 40 percent." See "Highmark Pulling Plug on Lower Cost Health Plan," Pittsburgh Post-Gazette, March 27, 2003.

99. Highmark's decision to end the then-growing, low-cost Community Blue product, which gave Highmark a competitive advantage over the UPMC Health Plan and other health insurers in pursuing the business of cost-conscious employers, can only be explained as necessary to achieve the benefits of the conspiracy with UPMC. In fact, upon information and belief, Highmark engaged in no internal discussion or analysis that led to the closing of Community Blue. Following its agreement with UPMC, Highmark's senior management simply announced to its employees managing Community Blue, without any prior warning or explanation, that the product would be discontinued.

100. Contrary to the deeply discounted Community Blue network agreements between Highmark and West Penn Allegheny, UPMC's charges are high. A study released by the Pennsylvania Health Care Cost Containment Council in June 2007 found that, for admissions in 2005, UPMC Presbyterian and UPMC Shadyside received an average of $34,803 for coronary artery bypass graft surgery, while AGH received only $23,715 on average. The same study found, though, that AGH performed better than UPMC's hospitals, with a lower readmission rate. See "Hospital Chief 'Shocked' at Disparity in Payments," Pittsburgh Post-Gazette (June 17, 2007); see also "UPMC Was Paid Thousands More for Cardiac Surgery," Pittsburgh Post-Gazette (June 14, 2007);

"Health Care Costs Report Illustrates Disparities, Could Lead to Change," The Butler Eagle (June 20, 2007).

101.    Highmark could pass on these higher costs to Plaintiffs without fear that employers and consumers could turn to other, lower-cost insurers because of UPMC and Highmark's agreement to exclude rival insurers from the Pittsburgh market.

102.    Highmark also publicly supported UPMC's 2006 acquisition of Mercy Hospital, another action contrary to its self-interest, as the merger strengthened UPMC's bargaining leverage and reduced hospital competition.   The Mercy transaction additionally shifted thousands of Mercy employees and their dependents from Highmark's insurance products to UPMC's Health Plan, which covers all UPMC employees.   Highmark's response to the Mercy transaction was in marked contrast to Highmark's reaction to UPMC's acquisition of Children's Hospital of Pittsburgh in 2001, when Highmark sued to stop the transaction.   In fact, in 2006, Highmark declined to provide Mercy Hospital any assistance to maintain Mercy as an independent competitor. This again contrasted with Highmark's behavior before the conspiracy, when it extended significant assistance to preserve AGH as a counterweight to UPMC.

103.    Highmark and UPMC have both become significantly more profitable since Summer 2002.   From 2000 through 2002 – when Community Blue competed against UPMC Health Plan's UPMC-centered health insurance product – both UPMC and Highmark saw their net income drop precipitously.

104.    Beginning in mid-2002 both companies' earnings soared.   UPMC's net income rose from $23 million in 2002 to over $618 million by 2007.   In fact, between 2003 and 2004 (the first full year of the conspiracy), UPMC's net income soared by more

than 300%. By 2006, UPMC CEO Jeffrey Romoff was earning in excess of $3 million per year and UPMC had an eight-figure advertising budget. See "Nonprofit Hospitals, Once for the Poor, Strike It Rich," The Wall Street Journal (April 4, 2008); see also "UPMC Earning Nearing New High," Pittsburgh Post-Gazette (May 9, 2007); "UPMC Posts Record $618 Million Profit," Pittsburgh Post-Gazette (August 24, 2007).

105.    Highmark saw a similar rapid growth in profits, as its net income increased from less than $50 million in 2001 to approximately $398 million in 2006. By the end of 2005, Highmark's surplus (i.e., assets in excess of legally required reserves to pay claims) exceeded $2.8 billion; by 2007, it exceeded $3.5 billion.

106.    These profits were made on the backs of the region's increasingly overcharged employers. In 2004, Highmark raised premiums overall by as much as 15%, and many small business' premiums increased by over 20%. Indeed, in May 2004, Highmark increased health insurance premiums for Allegheny County's employees by a whopping 75%.

107.    In fact, Highmark's financial statements attributed its approximately 200% jump in net income between 2003 and 2004 to an approximately $265 million increase in premium revenue.

108.    These premium increases were well above national averages. The Pittsburgh Post-Gazette reported that health care industry consultants "said increases in this market are higher than the national average, as much as 20 percent this year, partly because of a new contract between Highmark Blue Cross Blue Shield and UPMC Health System, the region's largest hospital group." See "Can't Afford to Be Sick; More

Workers Pinched as Firms, Facing Soaring Health-Care Costs, Shift Some of the Burden onto Employees," Pittsburgh Post-Gazette (June 8, 2003).

109.    Indeed, after the conspiracy went into effect and Highmark shuttered the low-cost Community Blue product, small employers in the Pittsburgh area found their premiums rising to the point that their health insurance costs were as much as 25 percent above the national average.  See "Employers' Health Premiums Rose 11.2 Percent in 2004, Survey Shows," Pittsburgh Post-Gazette (September 10, 2004).

110.    According to data contained within cost surveys conducted by the Agency for Healthcare Research and Quality, Center for Financing Access and Cost Trends, of the United States Department for Health and Human Services, from 2002-2006 health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and health insurance premiums for Pittsburgh families rose approximately 51%.  The comparable numbers for the Philadelphia region over the same time were 40% and 36%, respectively; for the Cleveland area, 37% and 25%, respectively; and for the Baltimore area, 22% and 27% respectively.

111.    UPMC knew full well that, by entering into the conspiracy and protecting Highmark from competition, Highmark would ratchet up health care premiums to employers and consumers.  In pleadings filed in the Merger Litigation in the year before the conspiracy was formed, UPMC admitted that "[w]ithout competition, Highmark has had no incentive to pass on to consumers the significant discounts it extracts from providers in the form of less expensive health benefit plans.  Instead, Highmark is free to, and does, charge inflated premiums to consumers for its broad network products."

112.    Despite its nonprofit status, UPMC knowingly conspired with Highmark to inflate health care costs so that it could unlawfully increase its profits.

113.    The purpose, objective, intent and effect of the Defendants' conduct described herein (both individually and collectively) was to preclude the entry of low-cost competitors from the market.  Such non-rate anticompetitive activity directly caused increased costs for health care and health care insurance in the marketplace, which costs were born (directly and indirectly) by Plaintiffs.


**The Impact of the Illegal Conspiracy and UPMC's Individual Anti-Competitive Behavior on Highmark's Policy Holders and UPMC's Health Care Consumers**

114.    As a result of the illegal conspiracy between Highmark and UPMC, and as a result of UPMC's individual illegal anti-competitive behavior, Highmark's health insurance policy holders, including the class plaintiffs and class members in this action, have been forced to pay inflated, above-market rates for health insurance that would otherwise not exist but for such conspiracy and individual behavior.

115.    Because UPMC sought illegally to monopolize the relevant health care market, it was able to inflate the prices it charged for its health care services and those charges were passed on, in addition to Highmark's own inflated premiums, to the Plaintiffs and class members in this action.

116.    Highmark and UPMC engaged in a vertical conspiracy as described herein, from which Plaintiffs purchased health care (from UPMC) and health care insurance coverage (from Highmark), all of which were the product of and affected by the vertical conspiracy.  As such, Plaintiffs have standing to assert claims against both Highmark and UPMC.

**The Impact of the Illegal Conspiracy Upon West Penn Allegheny**

117.    UPMC demanded as part of the conspiracy that Highmark stop providing support to West Penn Allegheny.  West Penn Allegheny has therefore been a direct target and victim of the illegal conspiracy.

118.    As part of the conspiracy, in the years since 2002, Highmark repeatedly obstructed West Penn Allegheny's efforts to refinance its subordinated loan from Highmark, even though Highmark would incur no or minimal additional costs under the refinancing proposals.  In fact, by early 2004, Highmark had written off a substantial portion of the loan in its financial statements.

119.    In 2003, Highmark refused West Penn Allegheny's request to restructure Highmark's loan to provide for level debt service and to reduce the rising interest rate to 5%, based upon unspecified supposed concerns of Highmark's legal counsel.  This explanation was pretextual and false and designed to conceal the real basis for Highmark's decisions, which were now being driven by its illegal conspiracy with UPMC.

120.    In 2004, West Penn Allegheny asked Highmark to restructure the loan to eliminate West Penn Allegheny's debt service obligation through 2010, when West Penn Allegheny's bonds were callable, in order to free up cash.  Highmark refused again, falsely stating that Highmark's loan to West Penn Allegheny was on the same terms as Highmark's loans to UPMC and to Jameson Health System.

121.    In April 2005, West Penn Allegheny proposed to issue $125 million of new bonds to be purchased by Citigroup.  The proceeds would have been used to pay off the Highmark loan, and the interest and payment terms on the bonds would have been

more favorable to West Penn Allegheny than the terms of the Highmark loan.  Citigroup, as owner of the new bonds, would have had the right to "put" these bonds back to Highmark in the event of a breach of certain financial covenants by West Penn Allegheny. Highmark would have received an annual fee in exchange for the put right.  Highmark would have incurred no additional financial exposure, although its consent was required.

122.    Highmark refused to consent to the proposal.  Highmark executives told West Penn Allegheny that Highmark rejected West Penn Allegheny's restructuring proposals out of fear of retaliation by UPMC.  Highmark said that if it did anything that is perceived to be helpful to West Penn Allegheny, UPMC would either sign a provider agreement with rival health insurer United or sell its health plan to United.  Highmark further told West Penn Allegheny that it was under a "constant barrage" from UPMC, and that UPMC's CEO was "obsessed" with driving West Penn Allegheny out of business.

123.    In September 2005, West Penn Allegheny proposed to issue $35 million of subordinated debt on parity with Highmark's loan to West Penn Allegheny.  While this proposal required Highmark's consent, it would result in no change to the terms of the loan and no financial detriment to Highmark.  Despite initially supporting this proposal, Highmark refused to provide the necessary consent out of fear of retaliation by UPMC.

124.    In a September 27, 2005 telephone call with West Penn Allegheny, Dr. Melani, Highmark's Chief Executive Officer, said that he had just received a letter from UPMC describing all the ways that West Penn Allegheny may seek assistance from Highmark, including forgiveness of Highmark debt or the issuance of additional debt on parity with Highmark.    According to Dr. Melani, UPMC told Highmark to not

accommodate West Penn Allegheny and again raised the threat of United's potential entry into the market and potential relationships between UPMC and United.

125.    The next day Dr. Melani informed West Penn Allegheny that Highmark declined to consent to the proposed restructuring because any adjustment of the loan would lead UPMC either to contract with United or sell the UPMC Health Plan to United.

126.    After Highmark's rejection of the loan restructuring proposal in April 2005, West Penn Allegheny attempted to approach Highmark about restructuring the loan through board-to-board contacts.  Thus, the Chairman of the Board of Directors of West Penn Allegheny reached out to his counterpart, Robert Baum, Chairman of the Board of Directors of Highmark.  The two men discussed West Penn Allegheny's request to restructure the loan in a series of telephone conversations in the Summer of 2005.  During these calls Mr. Baum was sympathetic to West Penn Allegheny's position, but expressed concern that UPMC would retaliate against any loan restructuring by facilitating United's entry into the Pittsburgh market.  Nevertheless, Mr. Baum requested an in-person meeting with West Penn Allegheny's management and an opportunity to view its facilities.

127.    The meeting was scheduled for November 1, 2005.  During the morning of November 1, 2005, West Penn Allegheny's Board Chairman picked up Mr. Baum in front of the Highmark Building and the two drove over to Allegheny General Hospital.  During the car ride, West Penn Allegheny's Board Chairman again raised with Mr. Baum why Highmark would not consent to restructure the loan.  While agreeing that the loan restructuring made business sense for both Highmark and West Penn Allegheny, Mr.

Baum expressed concern that UPMC would retaliate either by contracting with United or by selling its health plan to United.

128.     After they arrived at the facility, Mr. Baum received a tour of Allegheny General Hospital.  After the tour, he met over lunch in the hospital boardroom with West Penn Allegheny's Board Chairman and CEO.

129.     During lunch, West Penn Allegheny's Board Chairman and CEO again raised the question of restructuring the Highmark loan to West Penn Allegheny and directly expressed the view to Mr. Baum that Highmark should not allow UPMC to participate in its decision making with respect to West Penn Allegheny.  In response, Mr. Baum praised AGH's operations but said that Highmark could not assist West Penn Allegheny because UPMC would respond by either selling the UPMC Health Plan or contracting with United.

130.     Mr. Baum then shrugged his shoulders and added that Highmark's arrangement with UPMC was, in his words, "probably illegal."

131.     This was not a statement made lightly or the view of an unsophisticated man.  Mr. Baum's business career spans thirty-five years, he has a Ph.D. in Management and Organization, and since 2002 he has been a faculty member at the Smith School of Business at the University of Maryland.  His *curriculum vitae* is available at http://www.rhsmith.umd.edu/management/pdfs_docs/faculty/CV_RobertBaum.pdf.

132.     In Summer 2008, Mr. Baum again called West Penn Allegheny's Board Chairman and asked him to lunch.  Mr. Baum subsequently canceled the meeting per the instruction of Highmark's counsel.

133.    In 2006 Highmark rejected another proposal to restructure the debt service on the loan to West Penn Allegheny.  Dr. Melani conceded this time, after years of misrepresentation, that Highmark's loans to UPMC and Jameson are on far more generous terms.

134.    At the same time that Highmark's executives admitted to West Penn Allegheny that they were participating in an admittedly "probably illegal" conspiracy with UPMC, UPMC made similar admissions to United.  For example, a UPMC employee told a United employee in November 2005 that:

•    At an internal meeting with UPMC CEO Jeff Romoff and others, Romoff emphatically said he wants West Penn Allegheny Hospital System destroyed.

•    At the same meeting, Romoff stated that a senior UPMC executive had scheduled a meeting with Ken Melani to discuss West Penn Allegheny Hospital System.  The UPMC executive was tasked with reminding Dr. Melani that the goal of their conspiracy was to keep United out of western Pennsylvania, and supporting West Penn Allegheny only provided United with some presence in the region.

•    Because the Laborers Union chose United as its health insurer, UPMC intended to cancel all contracts with third-party "rental networks."  Rental networks permit health plans to access hospitals in the rental network at discounted rates even if those health plans lack a direct contract.  By terminating its agreements with rental networks, UPMC would ensure that the Laborers would have no access to Presbyterian and Shadyside hospitals, except at prices that were well above competitive levels and many times UPMC's costs for providing services.

135.    As a result of Highmark's agreement with UPMC to refuse any consent to West Penn Allegheny's proposed refinancing, West Penn Allegheny was not able to refinance any of its debt until Spring 2007.  In the meantime, it incurred artificially inflated financing costs.

136.    Besides artificially inflating West Penn Allegheny's financing costs, Highmark agreed with UPMC as part of the conspiracy to discriminate against West Penn Allegheny in reimbursement rates and grants.

137.    UPMC's new contract with Highmark in Summer 2002 created a large gap between the reimbursement rates that Highmark paid to UPMC and to West Penn Allegheny for the same services at equally sophisticated levels.

138.    West Penn Allegheny has repeatedly protested to Highmark that there is no basis to provide much greater reimbursement to UPMC for providing the exact same services to the same patient population at comparably sophisticated teaching hospitals.

139.    Despite Highmark's CEO's statements to West Penn Allegheny that it was willing to renegotiate its contracts with West Penn Allegheny, Highmark repeatedly refused to increase West Penn Allegheny's rates to be competitive with those of UPMC.

140.    When West Penn Allegheny requested improved reimbursement rates in 2005 and 2006, Highmark CEO Dr. Melani said he could not increase West Penn Allegheny's rates because of Highmark's agreement with UPMC to block United's entry into the Pittsburgh market.

141.    This rate discrimination was a double bonanza for the conspirators: Highmark enjoyed large profits by holding payments to West Penn Allegheny at depressed levels while it raised premiums to consumers and employers, and UPMC saw its competitive position improved as its only viable rival was slowly starved of resources needed to grow and thrive.

142.    Since the conspiracy's formation, the cumulative amount of Highmark's rate discrimination has exceeded $100 million.

143.    For example, as part of Highmark's conspiracy with UPMC, Highmark
has systematically underpaid West Penn Allegheny for emergency care services.  After
the closure of Citizens General Hospital, AKMC opened the Citizens Ambulatory Care
Center on the Citizens General site to continue operation of the Citizens General
emergency room.  This was done at the request of community residents concerned about
the lack of nearby emergency services.  Highmark, however, refused to reimburse this
care at ER rates.

144.    In Spring 2006, AKMC executives complained to Highmark that this
emergency care was not being properly reimbursed.  This led to a meeting between
AKMC and a Highmark Vice President.  At this meeting, the Highmark Vice President
agreed that it was important for the community for the Citizens Ambulatory Care Center
to remain open, but declined to provide full reimbursement for these emergency care
services because of "issues" with UPMC St. Margaret Hospital.

145.    Instead of receiving compensation through proper reimbursement rates,
the Highmark Vice President urged AKMC to apply for a grant from Highmark to fund
the Citizens Ambulatory Care Center.  AKMC duly applied for a grant.  Highmark
rejected the grant application in its entirety.

146.    Highmark also discriminated against West Penn Allegheny in the award of
grants to improve the quality of medical care in the Pittsburgh medical community.  For
example, in November 2005, Highmark launched a program to provide grant dollars to
improve the implementation of information technology in health care.  The program
provided for grants of $7000 per physician, with an aggregate limit of $500,000 per
health system.  Only two health systems in Western Pennsylvania employed enough

physicians to be limited by the $500,000 cap: UPMC and West Penn Allegheny. Highmark waived the cap in UPMC's case, awarding a grant of $8 million. Highmark consistently refused to raise the cap for West Penn Allegheny until 2008, when it did so under pressure from the Department of Justice's ongoing investigation.

147.    Unsurprisingly, Highmark's decision to fatten UPMC with inflated grants and reimbursement led to UPMC's net income rising from $23 million in 2002 to over $618 million by 2007 and to West Penn Allegheny struggling to break even.

148.    Highmark did not agree to properly narrow the reimbursement gap between West Penn Allegheny and UPMC until Summer 2008, when it acted under the pressure of the Department of Justice's continuing investigation of Highmark's and UPMC's illegal conspiracy.

149.    Highmark also leaked confidential information provided by West Penn Allegheny to UPMC. For example, in the Fall of 2006, Highmark leaked confidential financial information about West Penn Allegheny to UPMC, which in turn leaked a distorted version of the information to credit-rating agencies and to the business media in an attempt to destroy investor confidence in West Penn Allegheny.


**UPMC's Predatory and Anticompetitive Conduct**

150.    UPMC has engaged in a relentless campaign of anticompetitive, predatory conduct since at least 1999, and continuing through the present day, in an attempt to monopolize the Allegheny County market for acute inpatient hospital services and/or for tertiary and quaternary care services. UPMC's campaign has had five main prongs: (1) as described above, as part of the conspiracy with Highmark, UPMC secured Highmark's

cooperation in raising West Penn Allegheny's costs, withdrawing from its earlier willingness to provide financial support and providing an artificially inflated advantage in reimbursement revenues to UPMC; (2) UPMC has restricted West Penn Allegheny's ability to cooperate with, and secure referrals from, independent community hospitals; (3) UPMC has tried to starve West Penn Allegheny of necessary patient referrals by raiding key admitting physicians, as well as raiding physicians such as anesthesiologists who are necessary for hospital operation; (4) UPMC has bid physician salaries to artificially inflated, supracompetitive levels; and (5) UPMC has interfered with West Penn Allegheny's bond offerings.

151.    UPMC has also used its market power to coerce third parties, including the Veterans Administration Pittsburgh Healthcare System (the "VA"), which is staffed in significant part by residents from UPMC.

152.    UPMC doctors had previously performed liver transplants for the VA, but the VA began to avoid using UPMC doctors due to concerns over both (1) UPMC's diversion of livers intended for VA patients to UPMC, and (2) UPMC's pressure on the VA to have VA liver transplants take place at UPMC Presbyterian rather than at the VA's own (far less costly) facilities.

153.    In 2007, a UPMC transplant physician dissatisfied with UPMC decided to leave UPMC with the intention of joining the West Penn Allegheny liver transplant unit after the expiration of his UPMC non-compete obligations. The VA was prepared to hire him for liver transplant surgery while he waited for his non-compete agreement to expire and had, in the past, hired other physicians with local non-competes on the basis that the VA and other local hospitals were not in competition for the VA patients. UPMC

complained to the VA that the doctor would be violating his non-compete agreement. The VA's chairperson responded to UPMC that the non-compete agreement would not cover the VA.

154.    In response, UPMC threatened to remove all of its residents from the VA's facilities if it decided to hire the transplant doctor.  In other words, solely to hurt West Penn Allegheny, UPMC was willing to sacrifice the health care needed by veterans.

155.    The VA decided that it could not hire the doctor in light of this threat from UPMC and West Penn Allegheny was forced to compensate the doctor for the term of his non-compete even though he was not permitted to perform any medical procedures or lose his services.

**Government Investigations of UPMC's and Highmark's Illegal Conduct**

156.    Beginning in at least January 2007, the Antitrust Division of the United States Department of Justice conducted an investigation of UPMC and Highmark's illegal conspiracy.

157.    In addition, the Pennsylvania Insurance Department announced on July 17, 2009 that it was launching an investigation into whether Highmark has engaged in illegal anticompetitive practices.[1]

158.    In a subsequent article, the Pittsburgh Post-Gazette reported that the Pennsylvania Insurance Commissioner said that the investigation of Highmark "could

---

[1]    Pursuant to the Pennsylvania Unfair Insurance Practices Act, 40 Pa. Stat. § 1171.4 *et seq.*, insurers, including Defendant Highmark, Inc., are specifically prohibited from employing unfair practices in the insurance industry.  Section 1171.5(4) of the act defines one unfair practice as "Entering into any agreement to commit, or by any concerted action committing, any act or boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of or monopoly in the business of insurance."

bleed into an examination" of Highmark's "links" to UPMC.  See "State to Probe Blue Cross, Blue Shield Insurance," Pittsburgh Post-Gazette (July 18, 2009).

159.   These are not the first government investigations of UPMC's and Highmark's anticompetitive practices.

160.   In May 2007, the Pennsylvania Attorney General sued to enjoin UPMC's acquisition of Mercy Hospital as a violation of federal antitrust law.  See Commw. of Pennsylvania v. Catholic Health East, et al., Civ. A. No. 07-708 (W.D. Pa.).   In its Complaint, the Attorney General alleged that:

> Unless prevented, this combination is likely to substantially lessen or eliminate competition in the provision of tertiary Inpatient Acute Care hospital services, as well as the provision of medical and ancillary services associated with those hospitals.  Further, this combination would reduce the number of competitive alternatives available to health care consumers and enable UPMC to raise prices with no competitive constraint, resulting in higher prices for all Inpatient Acute Care hospital services in the Relevant Geographic Market [defined as "all or parts of the counties of Allegheny, Beaver, Butler, Fayette, Washington, and Westmoreland"].  These higher prices will be borne by health care purchasers, particularly Health Plans, employers, and unions, and will likely result in an increase in prices that individual consumers pay for health insurance coverage. Health Plans currently have difficulty marketing a product in Allegheny, Beaver, Butler, Fayette, Washington, and Westmoreland Counties without at least some UPMC facilities in their network.  Post-acquisition, a Health Plan offering a product in Allegheny, Beaver, Butler, Fayette, Washington, and Westmoreland Counties will have only one choice of Tertiary Care Health Care Provider other than UPMC.  UPMC's dominance in primary and secondary Acute Care hospital services will also increase as a result of this acquisition, which will further reduce the ability to market a product without UPMC facilities.

161.   The Attorney General alleged that, in the "Relevant Geographic Market" it defined, in 2005 and 2006 UPMC possessed a 45% market share in all acute care inpatient services and a 60% market share Tertiary Care services.  The Attorney General alleged that a post-merger entity would have a 52% share in all acute care inpatient services and a 74% market share in Tertiary Care services.

162.    The Attorney General explained that UPMC had denied access to tertiary care facilities to all health insurers except Highmark:

> The availability or non-availability of key healthcare facilities, such as hospitals, has a significant effect on the viability of a Health Plan.  Access to certain hospitals is an important factor for employers choosing a Health Plan.  Within the Relevant Geographic Market, many Health Plans do not have access to UPMC Presbyterian/Shadyside and are only able to cover Tertiary Care services provided at [Mercy] and [West Penn Allegheny].  .   .   .   The largest Health Plan in the Relevant Geographic Market does offer UPMC Tertiary Care services at UPMC Presbyterian/Shadyside, and enjoys a substantial market share advantage over the nearest competing Health Plan.

163.    UPMC settled the Attorney General's lawsuit through the entry of a Consent Decree.

164.    Regulators have been similarly apprehensive regarding Highmark.  The Pennsylvania Department of Insurance recently declined to approve Highmark's proposed merger with Independence Blue Cross out of concern that a post-merger company would stifle competition for health insurance in the Commonwealth of Pennsylvania.

**UPMC's Market Power**

165.    Hospital services in the Pittsburgh metropolitan area are dominated by UPMC.  In the 1990s, UPMC began to acquire smaller, independent hospitals.  UPMC currently owns 20 tertiary, specialty, and community hospitals.  UPMC's key facilities include:

•      UPMC-Presbyterian, UPMC-Shadyside, and UPMC-Mercy, the only other tertiary and quaternary care facilities in Pittsburgh besides West Penn Allegheny's Allegheny General Hospital and Western Pennsylvania Hospital.

•      Children's Hospital of Pittsburgh, the only specialized pediatric inpatient facility in the Pittsburgh area.

• Magee Women's Hospital of UPMC, the largest obstetrical care facility in Western Pennsylvania.

166. With the exception of burn treatment, UPMC possesses a market share in excess of 50% in every tertiary and quaternary care service line in the six-county Pittsburgh metropolitan region. For example, UPMC's oncology share, including its joint ventures and satellite cancer centers, is approximately 80%.

167. Besides UPMC and West Penn Allegheny, there are several small community hospital systems in Allegheny County and the adjoining counties: Excela Health, a four-hospital system; Heritage Valley Health System, a two-hospital system; Butler Health System, which owns Butler Memorial Hospital; St. Clair Hospital; Ohio Valley General Hospital; Armstrong County Memorial Hospital; Jefferson Regional Medical Center; and The Washington Hospital.

168. None of these systems offers sophisticated tertiary and quaternary care and none poses any threat to UPMC's dominance. None of the community hospital systems registers above single digit market shares in any service line in the six-county metropolitan area.

169. The relevant product market for health care services is acute care inpatient services. In the alternative, the relevant product market is high-end tertiary and quaternary acute care inpatient services.

170. The relevant geographic market is Allegheny County. Approximately 95% of county residents stay within the county for acute inpatient care. There is accordingly a clear and unequivocal demand by county residents to access care locally.

171.    The relevant geographic market is defined to be the area in which a dominant player can exercise market power by forcing consumers in that area to accept price increases against their will.  If there is evidence that a dominant company was able to force a price increase upon a group of captive and unwilling customers, then the area in which those customers were exploited is the relevant geographic market.

172.    Upon information and belief, UPMC has imposed such a price increase upon commercial health care payors (like United and Aetna) in Allegheny County since reaching its truce with Highmark in 2002.

173.    In addition, Pennsylvania health insurance regulations provide that a health plan "shall provide for at least 90% of its enrollees in each county in its service area, access to covered services that are within 20 miles or 30 minutes travel from an enrollee's residence or work in a county designated as a metropolitan statistical area (MSA) by the Federal Census Bureau .  .  .  ." 28 Pa. Admin. Code § 9.679(d).  There is no feasible way to comply with this regulation for Allegheny County residents without including UPMC in the plan's network of participating providers, especially given UPMC's dominance in certain service lines such as oncology, psychiatry, and behavioral health.

174.    In fact, health insurers cannot create a marketable, adequate network of participating providers for employers in Allegheny County without reasonable access to UPMC's facilities because of UPMC's dominance in numerous specialties, including mental health and oncology, and because, as described above, UPMC controls the contracting decisions of almost every nominally independent community hospital in Allegheny County except those owned by West Penn Allegheny.

175.   UPMC's successful exclusion of numerous health insurers from the Allegheny County market is proof of its market power.

176.   UPMC's market share in Allegheny County, excluding government payors, exceeds 55% whether measured by bed capacity or admission volume.  This is more than double West Penn Allegheny's market share, and no other hospital system in Allegheny County exceeds single digits.  See also "UPMC, Highmark Head and Shoulders Above Other Local Health Care Institutions," Pittsburgh Post-Gazette (March 20, 2007); "UPMC Earnings Nearing New High," Pittsburgh Post-Gazette (May 9, 2007); "UPMC Posts Record $618 Million Profit," Pittsburgh Post-Gazette (August 24, 2007).

177.   This market share understates UPMC's true market power, as UPMC, through its joint ventures with nominally independent community hospitals, controls the contracting decisions of almost every hospital in Allegheny County except those owned by West Penn Allegheny.

178.   There are substantial barriers to entering the relevant market, including the large capital costs required to construct and continually maintain and upgrade a hospital, the need to recruit and pay a large medical staff, the need to negotiate contracts with third-party payors, and the need to mount a marketing campaign to draw patients already familiar with UPMC's facilities.  These barriers are particularly daunting in light of Allegheny County's declining population.

179.   Since the formation of West Penn Allegheny there has been no entry of a new competitor in the relevant market.  By contrast, numerous competitors in that time have either folded or been acquired by UPMC.

180.    UPMC has grown its market power through a series of anticompetitive acquisitions.  Most recently, UPMC purchased Mercy Hospital in 2006.  Mercy was the only sophisticated tertiary care facility in Pittsburgh not owned by UPMC or West Penn Allegheny.  With UPMC's acquisition of Mercy, West Penn Allegheny is now the last remaining competitor for many of the most sophisticated and expensive hospital services.

**Highmark's Market Power**

181.    Highmark likewise possesses market power.  The relevant product market is health care financing and administration for private employers and individuals, including indemnity insurance, managed care products such as HMO, PPO, or POS plans, and third-party administration of employer self-funded health plans.

182.    The relevant geographic market is Allegheny County.  As noted above, health insurance companies are legally required to make services available within 20 miles or 30 minutes travel from an enrollee's residence or work, which necessitates the formation of localized networks of providers.

183.    Indeed, in testimony before the Pennsylvania Insurance Commissioner regarding the proposed IBC-Highmark merger, Dr. Barry Harris, Highmark's economic consultant, stated that "the relevant geographic markets for commercial health insurance in Pennsylvania are local or regional and not statewide." Transcript of July 10, 2008 Hearing at 121.  Dr. Harris further testified that "from the standpoint of the market for health insurance, most sellers, that is insurers, market locally for the obvious reason that purchasers, that is employers, are interested in purchasing health insurance products that will serve their employees in proximity to where they work and live." Id. at 122.

184.    In addition, as noted above, patients seeking medical care generally prefer to receive treatment close to where they work or live, and employers commonly require managed care companies to offer a network that contains a certain number of health care providers within a specified distance of each employee's home.  As a result, virtually all managed care companies establish provider networks in the localities where employees live and work, and they compete on the basis of their local provider networks.

185.    Highmark's market share in the relevant market has exceeded 60% continuously from January 1, 2000 to the present.  Former UPMC Executive Vice President John Paul stated publicly that Highmark is "an insurer that clearly dominates 70-80% of the commercial market" and "it's pretty obvious they control finance of health care in western Pennsylvania."  See "UPMC's Battle Against Highmark's Role in the Allegheny Bailout," Physician's News Digest (May 1999).

186.    The second-largest competitor in the relevant market is the UPMC Health Plan, with approximately 20% market share.  However, a significant portion of the commercial enrollees in the UPMC Health Plan are UPMC employees and their dependents, who are automatically enrolled in the UPMC Health Plan.

187.    No other competitor has achieved even 10% market share during this time period, including such major national companies as Aetna, United, CIGNA, and Coventry.

188.    Through its conspiracy with UPMC, Highmark has erected a substantial barrier to entering the market as rival health insurers cannot contract with UPMC at competitive rates.

189.    Upon information and belief, Highmark has imposed artificially inflated price increases upon private employers and individuals in the relevant market since reaching its truce with UPMC in Summer 2002.

190.    As part of its review of the proposed merger between Highmark and IBC, the Pennsylvania Insurance Department retained the firm of LECG as its expert economic consultant.  In its Report, LECG states that "our analysis indicates" that Highmark has "substantial market power" in western Pennsylvania.

191.    The LECG Report further notes that there are substantial barriers to the entry of new competitors:

> Our review of the evidence in this case supports the contention that potential competitors do face entry barriers with respect to health insurance in Pennsylvania, particularly in western and southeastern Pennsylvania.  While competitors have made limited inroads against the dominant Blue providers in those areas, both IBC and Highmark remain dominant in southeastern and western Pennsylvania, respectively.  Based on our interviews of market participants and other evidence, there are a number of barriers to entry – including the provider cost advantage enjoyed by the dominant firms in those areas and the strength of the Blue brand in those areas.  In addition, those areas have also been characterized by an extensive amount of exit or retrenchment of competitors.

**Causes of Action**

**Count I – Violations of Section 1 of the Sherman Act**
**(Against UPMC and Highmark)**

192.    Plaintiffs incorporate the foregoing allegations by reference as if fully restated herein.

193.    UPMC and Highmark have entered into an illegal agreement to restrain trade by protecting and reinforcing one another's market power.  Under this agreement, UPMC has agreed to block the entry or expansion of rival health insurers for the benefit

of Highmark, enabling Highmark to raise premiums charged to the members of the Plaintiff class, in exchange for Highmark's agreement to favor UPMC with discriminatory reimbursement rates and grants – and no diminution in patient volume. UPMC agreed to protect Highmark from competition and to act to exclude potential competitors from the market.   In turn, Highmark agreed to protect UPMC from competition and to raise the costs for operation of UPMC's primary competitor, West Penn Allegheny.

194.    The illegal conspiracy continued until at least Summer 2008.  As detailed above, Highmark and UPMC engaged in numerous overt acts in furtherance of the conspiracy during the limitations period.

195.    As UPMC and Highmark are horizontal competitors in the market for health care insurance, financing and administration for private employers and individuals, their agreement constitutes a *per se* unlawful market allocation agreement.

196.    In the alternative, this agreement is unlawful under the rule of reason.  It has raised prices and excluded competition in both of the relevant markets alleged above, including specifically the market for health insurance.   There are no procompetitive justifications or benefits for Highmark and UPMC's collusion.

197.    As detailed above, Plaintiffs have been damaged by this illegal conspiracy.

**Count II – Conspiracy to Monopolize in Violation of
Section 2 of the Sherman Act
(Against UPMC and Highmark)**

198.    Plaintiffs incorporate the foregoing allegations by reference as if fully restated herein.

199.     UPMC and Highmark agreed to work together to create two monopolies – a monopoly for UPMC in the market for acute inpatient services and/or high-end tertiary and quaternary acute care inpatient services in Allegheny County and a monopoly for Highmark in the market for health care financing and administration for private employers and individuals in and around Allegheny County.

200.     The illegal conspiracy continued until at least Summer 2008.  As detailed above, Highmark and UPMC engaged in numerous overt acts in furtherance of the conspiracy during the limitations period.

201.     Both UPMC and Highmark have a specific intent to monopolize – an intent that they acted on repeatedly.  Indeed, UPMC CEO Mr. Romoff has publicly stated his belief that competition in health care does not work.  UPMC executives have also stated that they want to turn AGH into a nursing home or a parking lot.

202.     UPMC has engaged in numerous overt acts in furtherance of the conspiracy to monopolize, including, without limitation, refusing to contract on competitive terms with competitors of Highmark, refusing to grow or sell its health insurance business, creating a network of joint ventures with community hospitals in order to control those facilities' ability to contract with rivals of Highmark, and engaging in predatory conduct designed to eliminate West Penn Allegheny as a competitor.

203.     Highmark has also engaged in numerous overt acts in furtherance of the conspiracy to monopolize, including, without limitation, discriminating in reimbursement rates and grants in favor of UPMC and refusing to consent to West Penn Allegheny's requests to restructure and/or refinance Highmark's loan to West Penn Allegheny.

204.     As detailed above, Plaintiffs have been damaged by this illegal conspiracy.

**Count III – Willful Acquisition and Maintenance of a Monopoly in
the Relevant Market for Healthcare Services in Violation
of Section 2 of the Sherman Act
(Against UPMC)**

205.    Plaintiffs incorporate the foregoing allegations by reference as if fully

restated herein.

206.    UPMC has monopoly power in the market for acute inpatient services

and/or high-end tertiary and quaternary acute care inpatient services in Allegheny County.

This monopoly power is evidenced by, among other things:

    a.    UPMC's ability to coerce Highmark into the within described
          conspiracy to control, allocate and monopolize both the medical
          services health insurance markets in Allegheny County;
    b.    UPMC's ability to impose price increases upon other commercial
          healthcare payors and/or  effectively exclude them from the health
          insurance market in Allegheny County;
    c.    UPMC's ability to control contracting decisions of almost every
          hospital in Allegheny County except those owned by West Penn
          Allegheny; and
    d.    UPMC's ability to preclude new competitors from entering   the
          healthcare delivery market in  the relevant market.

207.    UPMC has abused and continues to abuse its monopoly power in order to

maintain and enhance its market dominance by unreasonably restraining trade, thus

artificially inflating the cost of healthcare to consumers.

208.    UPMC's conduct constitutes unlawful monopolization and unlawful anti-

competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act,

and such violation and the effects thereof are continuing and will continue unless

injunctive relief is granted.

209.    As a direct and proximate result of UPMC's continuing violations of

Section 2 of the Sherman Act, Plaintiffs and other members of the class have suffered

injury in damages in an amount to be proven at trial.   These damages consist of having

paid higher health insurance premiums, than they would have paid but for the Sherman Act violations.

210.    Plaintiffs and other class members seek money damages from UPMC for its violations of Section 2 of the Sherman Act.

## Count IV – Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Section 2 of the Sherman Act (Against Highmark)

211.    Plaintiffs incorporate the foregoing allegations by reference as if fully restated herein.

212.    Highmark has monopoly power in the market commercial health insurance for individuals and groups in Allegheny County. This monopoly power is evidenced by, among other things:

      a.    Highmark's ability to coerce UPMC to not contract with Highmark's rival health insurers at competitive rates and thereby preclude competition;

      b.    Highmark's ability to impose artificially inflated price increases on private employers and individuals in the relevant market while at the same time increasing its market share.

213.    Highmark has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

214.    Highmark's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

215.    As a direct and proximate result of Highmark's continuing violations of Section 2 of the Sherman Act, Plaintiffs and other members of the class have suffered injury in damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums, than they would have paid but for the Sherman Act violations.

216.    Plaintiffs and other class members seek money damages from Highmark for its violations of Section 2 of the Sherman Act.

### Count V – Willful Attempted Monopolization in Violation of Section 2 of the Sherman Act (Against UPMC)

217.    Plaintiffs incorporate the foregoing allegations by reference as if fully restated herein.

218.    UPMC has attempted to monopolize the market for health care in and around Allegheny County.

219.    UPMC has a specific intent to monopolize – an intent that it acted on repeatedly.

220.    As detailed above, UPMC has engaged in predatory conduct in support of this goal, including, without limitation, entering into an illegal market allocation agreement with Highmark and supporting Highmark in its own anticompetitive campaign and attempts to monopolize.

221.    UPMC's illegal and anticompetitive predatory conduct continues to the present day. As detailed above, it has engaged in numerous acts of predatory conduct during the limitations period.

222.    There is a dangerous probability that UPMC will achieve monopoly power. Not only does UPMC already possess substantial market share and market power, but it has taken steps to prevent the entry of new competitors into the market.

223.    As detailed above, Plaintiffs have been damaged by this illegal conspiracy.


**Count VI -  Willful Attempted Monopolization in Violation of
Section 2 of the Sherman Act
<u>(Against Highmark)</u>**

224.    Plaintiffs incorporate the foregoing allegations by reference as if fully restated herein.

225.    Highmark has attempted to monopolize the market for health care financing and administration for private employers and individuals in and around Allegheny County.

226.    Highmark has a specific intent to monopolize – an intent that it acted on repeatedly.

227.    As detailed above, Highmark has engaged in predatory conduct in support of this goal, including, without limitation, entering into an illegal market allocation agreement with UPMC and supporting UPMC in its own anticompetitive campaign and attempts to monopolize.

228.    Highmark's illegal and anticompetitive predatory conduct continues to the present day.  As detailed above, it has engaged in numerous acts of predatory conduct during the limitations period.

229.    There is a dangerous probability that Highmark will achieve monopoly power.  Not only does Highmark already possess substantial market share and market power, but it has taken steps to prevent the entry of new competitors into the market.

230.    As detailed above, Plaintiffs have been damaged by this illegal conspiracy.

## Count VII – Tortious Interference with Existing and
## Prospective Business Relations
## (Against UPMC)

231.    Plaintiffs incorporate the foregoing allegations by reference as if fully restated herein.

232.    UPMC has tortiously interfered with Plaintiffs' existing and prospective contractual relations with Highmark, including but not limited to the campaign to discontinue the Community Blue program.

233.    UPMC acted without justification or privilege.

234.    Plaintiffs have been damaged by UPMC's tortious interference, resulting in artificially inflated premium costs.

235.    UPMC's conduct is outrageous, malicious, wanton, willful, and oppressive. Plaintiffs are therefore entitled to an appropriate award of punitive damages.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that judgment be entered in favor of the Plaintiff class and against Defendants as follows:

(a)    Certify a Plaintiff class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     Award compensatory damages, treble damages and punitive damages in favor of the Plaintiff class and against Defendants, jointly and severally, in an amount to be proven at trial, including all interest thereon;

(c)     Award plaintiffs and the class reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Award such further relief as the Court deems appropriate.

### Demand for Jury Trial

Plaintiffs demand a trial by jury on all issues triable by jury.

DEL SOLE CAVANAUGH STROYD LLC

/s/ Arthur H. Stroyd, Jr.
Arthur H. Stroyd, Jr., Esquire
Pa. I.D. No. 15910
astroyd@dscslaw.com

Stephen J. Del Sole, Esquire
Pa. I.D. No. 73460
sdelsole@dscslaw.com

Patrick K. Cavanaugh, Esquire
Pa. I.D. No. 72960

Matthew T. Logue, Esquire
Pa. I.D. No. 87416
mlogue@dscslaw.com

William S. Stickman IV, Esquire
Pa. I.D. No. 200698

200 1st Avenue, Suite 300
Pittsburgh, PA  15222
Tel:     412-261-2393

/s/ Scott M. Hare
Scott M. Hare, Esquire
Pa. I.D. No. 63818

The Frick Building Suite 1806
437 Grant Street
Pittsburgh, PA  15219

Tel:     412-338-8632


/s/ Andrew M. Stone
Andrew M. Stone, Esquire
Pa. I.D. No. 35176

Stone Law Firm, LLC
The Frick Building Suite 1806
437 Grant Street
Pittsburgh, PA  15219

Tel:     412-391-2005

Counsel for Plaintiffs

Date:   August 16, 2012