## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROYAL MILE COMPANY, INC.,** **PAMELA LANG**, and **COLE'S WEXFORD HOTEL, INC.,** on their own behalf and on behalf of all others similarly situated, | Civil Action No. 2:10-cv-01609-JFC Judge Joy Flowers Conti |
| Plaintiffs, | |
| v. | **ELECTRONICALLY FILED** |
| **UPMC** and **HIGHMARK INC.,** | |
| Defendants. | |

### PLAINTIFFS' RESPONSE TO UPMC'S SUPPLEMENTAL BRIEF REGARDING THE APPLICABILITY OF THE CO-CONSPIRATOR EXCEPTION TO SECTION 2 CLAIMS AGAINST UPMC

Plaintiffs Royal Mile Company, Inc., Pamela Lang, and Cole's Wexford Hotel (collectively, "Royal Mile"), by undersigned counsel, respectfully submit this supplemental brief in response to UPMC's Supplemental Brief filed July 13, 2013 regarding the co-conspirator exception to the indirect purchaser rule. [D.E. 213]. The Court authorized and ordered the filing of this brief at the July 1, 2013 hearing. [*See* Transcript of July 1, 2013 Hearing ("7/1/13 Hr'g Tr.", attached as Exhibit A) at 20:4 – 20:22; 38:24 – 39:1].

### ARGUMENT

### I.     THE CO-CONSPIRATOR EXCEPTION APPLIES TO ALL OF ROYAL MILE'S CLAIMS AGAINST UPMC.

In its supplemental brief, UPMC contends that "the co-conspirator exception does not extend to non-conspiracy claims." [D.E. 213 at 1]. It reasons that, "by definition, any *co-conspirator* exception should apply only to a *conspiracy* claim." [*Id.* at 2 (emphasis in original)].

UPMC does not offer a single case as authority for this proposition.  By contrast, there is at least one case in which the co-conspirator exception has been applied to allow both conspiracy *and non-conspiracy* claims brought by an indirect purchaser to proceed.  *See Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428 (D. Del. 2011).  UPMC claims this case "cannot support Plaintiffs' argument" because the *Wallach* court "did not address the non-conspiracy Section 2 claim independently," because "no defendant in *Wallach* ever argued that the co-conspirator exception is inapplicable to a non-conspiracy claim."  [D.E. 213 at 2].  This is simply an attempt to argue that *Wallach* is not persuasive, but does not change the fact that *Wallach* supports Plaintiffs' position, and UPMC has not identified any case supporting its position.

*Wallach* applied the co-conspirator exception to *all* of the plaintiff's Sherman Act claims, which included Section 2 claims that did not reference the underlying conspiracy.  *See Wallach*, 814 F. Supp. 2d at 434–38 (applying the exception after explaining that the defendants raised the indirect purchaser rule as one of multiple "overarching claims that would result in the dismissal of *all* counts" (emphasis added)); *see also* Amended Class Action Complaint at 53–54, *Wallach v. Eaton Corp.*, No. 10-260-SLR (D. Del. July 16, 2010), ECF No. 25 (attached as Exhibit B) (alleging Section 2 violation without reference to the underlying conspiracy).  Eaton Corporation argued in its motion to dismiss that "*all*" of Wallach's claims should be dismissed under the indirect purchaser rule, including the Section 2 claim that was not brought as a conspiracy claim.  *See* Opening Brief In Support Of Defendant Eaton Corporation's Motion To Dismiss The Amended Class Action Complaint at 14, *Wallach v. Eaton Corp.*, No. 10-260-SLR (D. Del. September 17, 2010), ECF No. 35 (attached as Exhibit C) (emphasis added).  The court rejected this argument, holding that "plaintiffs have sufficiently pled facts to suggest that defendant middlemens' . . . involvement in the conspiracy was truly complete, i.e., the middlemen could be

2

barred from suit by the complete involvement defense." *Wallach*, 814 F. Supp. 2d at 437–38. That the court did not "independently" discuss the applicability of the co-conspirator exception to the Section 2 claim does not make its ruling any less applicable.

It follows from *Wallach* that a non-conspiracy Section 2 claim *can* fall within the co-conspirator exception. Indeed, in that case, it did. It likewise does in this case. Where there is an underlying conspiracy in which the middleman is a "substantially equal" participant, then the middleman would be barred from bringing an antitrust claim against the upstream seller based on the same set of facts. *See Wallach*, 814 F. Supp. 2d at 437–38. We are aware of no case holding that a court considering both conspiracy claims and non-conspiracy claims must, in considering the non-conspiracy claims, blind itself completely from the conspiracy claim and treat the conspiracy as irrelevant. The Court is not required to do that. Rather, the Court should recognize that Highmark would be barred by the "complete involvement" defense from bringing any of the antitrust claims brought by Plaintiffs, and therefore the co-conspirator exception applies, just as it did in *Wallach*.

## II.   PLAINTIFFS' SAC FALLS SQUARELY WITHIN THE THIRD CIRCUIT'S GUIDANCE ON THE ALLEGATIONS NEEDED TO SATISFY THE CO-CONSPIRATOR EXCEPTION.

UPMC contends that the Third Circuit's guidance in the *Howard Hess* cases demonstrates why the co-conspirator exception cannot extend to Plaintiffs' Section 2 claims in Counts III and V. [D.E. 213 at 1]. Under *Howard Hess*, a plaintiff can invoke the co-conspirator exception if it: (1) joins the middleman and the upstream seller as defendants; (2) alleges a conspiracy between the middleman and the upstream seller; and (3) alleges sufficient facts to plausibly show that the middleman's involvement in the conspiracy was "truly complete," such that the middleman would be barred from recovering from the upstream seller by the complete

involvement defense.  *Howard Hess Dental Supply Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 376, 79–80 (3d Cir. 2005) ("*Howard Hess I*").

Plaintiffs' SAC easily satisfies all three of these requirements:  it joins the middleman (Highmark) and the upstream seller (UPMC) as defendants; it alleges a conspiracy between the middleman (Highmark) and the upstream seller (UPMC); and it alleges sufficient facts to plausibly show that the involvement of the middleman (Highmark) in the conspiracy was "truly complete," such that the middleman (Highmark) would be barred from recovering from the upstream seller (UPMC) by the complete involvement defense.

To be sure, Counts III and V of the SAC allege that UPMC, but not Highmark, violated Section 2 of the Sherman Act.  [SAC at ¶¶ 238–43, 250–56].[1]  But Counts III and V are not, as UPMC suggests, "without conspiracy allegations," [D.E. 213 at 2], and they cannot be considered in isolation from the rest of the allegations in the SAC.  To the contrary, these two Counts expressly incorporate all of "the foregoing allegations" in the SAC, which consist of extensive allegations regarding the conspiracy between UPMC and Highmark.  [*Id.* ¶¶ 238, 250].  The conspiracy between UPMC and Highmark is integral to the entire SAC, including the Section 2 violations, because it demonstrates and depends upon the market power wielded by both UPMC and Highmark, and the *quid pro quo* agreement they made to illegally enhance each other's monopolies and market power.  UPMC's *quid pro quo* conspiracy with Highmark enhanced its ability to exercise monopoly power in the market for health care services.  [*See id.* ¶¶ 239, 253].  For example, "one of the conspiracy's principal aims was to cripple West Penn Allegheny, the sole surviving competitor to UPMC in sophisticated tertiary and quaternary care."

_____

[1] Similarly, Counts IV and VI claim that Highmark engaged in unlawful monopolization and attempted monopolization in violation of Section 2 of the Sherman Act.  [*See* SAC at ¶¶ 244–49, 257–63].

[*Id.* ¶ 27].  UPMC relied on Highmark to freeze out West Penn Allegheny from these markets, thus illegally enhancing UPMC's monopoly power.  [*See, e.g.*, *id.* ¶¶ 28–33].  It was unlawful under Section 2 of the Sherman Act for UPMC to maintain or attempt to achieve that monopoly.

As explained more fully in Royal Mile's brief in opposition to UPMC's motion to dismiss, the co-conspirator exception permits Royal Mile to recover damages from UPMC because Royal Mile was the first purchaser harmed by the anticompetitive conduct.  [*See* D.E. 119 at 12].  As required by the Third Circuit in *Howard Hess I*, Royal Mile joined its direct seller, Highmark, as a defendant and alleged facts showing that Highmark was "complete[ly] involve[d]" in an anticompetitive conspiracy with UPMC to exclude each other's competitors and establish bilateral monopolies.  *Howard Hess I*, 424 F.3d at 369–70, 379–81.  Given these allegations (which the Court must accept as true), Highmark would be barred by the complete involvement defense from bringing its own monopolization or attempted monopolization claims against UPMC.  Because Royal Mile is the first non-culpable party from outside the conspiracy, Royal Mile is the only party that can recover damages from UPMC for this anticompetitive conduct.  *See id.* at 382 (recognizing that "every Court of Appeals that has decided the issue has held that antitrust plaintiffs who were involved in a conspiracy at a requisite level are barred from suing"); *see also Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 259 (3d Cir. 2010) ("*Howard Hess II*") ("As we explained in *Hess I*, the Plaintiffs could come within *Illinois Brick*'s coconspirator exception only if the Dealers were precluded from asserting claims against Dentsply because their participation in the conspiracy was 'truly complete.'").  As such, there is no threat of "duplicative liability" or "risk of inefficient enforcement of the antitrust laws."  *See Howard Hess I*, 424 F.3d at 381.

The conspiracy alleged in the SAC entrenched the market power of *both* Highmark and UPMC, enabling UPMC to maintain (or attempt to establish) an unlawful monopoly in violation of Section 2 of the Sherman Act.  [*See generally* SAC at ¶¶ 73–113].  As in *Wallach*, the co-conspirator exception should apply to permit *all* of Royal Mile's antitrust claims against UPMC.

### III.   UPMC'S SUPPLEMENTAL BRIEF ATTEMPTS TO RE-ARGUE ITS ASSERTION THAT THE SAC FAILS TO ALLEGE FACTS SHOWING HIGHMARK'S COMPLETE INVOLVMENT.

Finally, UPMC argues that even if the co-conspirator exception applies to Counts III and V, those counts should be dismissed because Plaintiffs have not adequately satisfied the pleading requires set forth in the *Hess* cases.  [D.E. 213 at 4].  That is both an improper attempt to re-brief issues already briefed, and also is not correct.

A full and fair reading of the SAC can leave no doubt that the SAC alleges that Highmark's involvement in the conspiracy was "substantially equal" to UPMC's.  [*See, e.g.*, SAC at ¶¶ 25–26, 30–31, 87–88, 96, 99, 245].  The clear and overarching theme of the SAC is that Highmark and UPMC, the most powerful players in each of their respective markets, entered into a *quid pro quo* conspiracy to protect each other's monopoly positions.  [*See, e.g.*, *id.* ¶¶ 25, 74–75].  UPMC points to the allegation that UPMC "coerced Highmark."  [D.E. 213 at 6 (quoting SAC at ¶ 239(a))].  But UPMC ignores the fact that the SAC also alleges that Highmark had "monopoly power," as evidenced by "(a) Highmark's history of *coercing UPMC* to not contract with Highmark's rival health insurers at competitive rates and thereby preclude competition," [SAC at ¶ 245(a) (emphasis added)], and "(b) Highmark's ability to impose artificially inflated price increases on private employers and individuals in the relevant market while at the same time increasing its market share" [*Id.* ¶ 245(b)].  These allegations establish that Highmark was, *at a minimum*, a "complete, voluntary, and substantially equal" participant in

6

the conspiracy with UPMC (if not the principal instigator), and would therefore be precluded from bringing *any* antitrust claim against UPMC based on these facts because of the complete involvement defense.  *See Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994) ("It is not essential to the [complete involvement] defense that the [intermediary] actually helped author or create the policy, although such facts would be highly probative, as long as the [intermediary] was substantially responsible for maintaining and otherwise effectuating the policy.").  Royal Mile is the first party from outside the conspiracy harmed by this anticompetitive conduct, and it is the only party that could recover antitrust damages from UPMC.[2]

## CONCLUSION

For the foregoing reasons, the Court should reject UPMC's renewed effort to argue that Counts III and V should be dismissed.

Dated: July 22, 2013

/s/ Arthur H. Stroyd, Jr.
Arthur H. Stroyd, Jr. (Pa. No. 15910)
Steven J. Del Sole (Pa. No. 73460)
Patrick K. Cavanaugh (Pa. No. 72960)
Benjamin J. Sweet (Pa. No. 87338)
Edwin J. Kilpela, Jr. (Pa. No. 201595)
DEL SOLE CAVANAUGH STROYD LLC
200 1st Avenue, Suite 300
Pittsburgh, PA 15222
Tel: 412-261-2393

Respectfully submitted,

/s/ Hamish Hume
Hamish Hume (*pro hac vice*)
Kathleen Kiernan (*pro hac vice*)
Evan E. North (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax: 202-237-6131
hhume@bsfllp.com

---

[2] It is notable that UPMC has, apparently, abandoned its previous argument that Plaintiffs are required to allege that Highmark had "greater culpability" than UPMC.  [D.E. 96 at 11].  As counsel for Royal Mile argued at the hearing, there is absolutely no authority establishing such a standard.  Rather, as UPMC now appears to concede, the standard is satisfied by allegations showing that Highmark was a "substantially equal" participant in the conspiracy.  *See Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994); *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 437–38 (D. Del. 2011).

Fax: 412-261-2110
astroyd@dscslaw.com

Andrew M. Stone (Pa. No. 35176)
STONE LAW FIRM, LLC
The Frick Building, Suite 1806
437 Grant Street
Pittsburgh, PA 15219
Tel: 412-391-2005
Fax: 412-391-0853
astone@stone-law-firm.com

Scott M. Hare (Pa. No. 63818)
The Frick Building, Suite 1806
437 Grant Street
Pittsburgh, PA 15219
Tel: 412-338-8632
Fax: 412-338-6611
scott@scottlawpgh.com

kkiernan@bsfllp.com
enorth@bsfllp.com

David Stone (*pro hac vice*)
Jason Spiro (*pro hac vice*)
David Harrison (*pro hac vice*)
STONE & MAGNANINI LLP
150 JFK Parkway
Short Hills, NJ 07078
Tel: 973-218-1111
Fax: 973-218-1106
dstone@stonemagnalaw.com
jspiro@stonemagnalaw.com
dharrison@stonemagnalaw.com

*Attorneys for Plaintiffs Royal Mile Company, Inc., Pamela Lang, and Cole's Wexford Hotel*