## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**ROYAL MILE COMPANY, INC.,**
**PAMELA LANG** and
**COLE'S WEXFORD HOTEL, INC.,**
on their own behalf and on behalf of all
others similarly situated,

       Plaintiffs,

       **v.**

**UPMC and HIGHMARK, INC.**,

       Defendants.

**Case No. 10-1609**

## OPINION

**CONTI, Chief District Judge**

### I.    Introduction

Pending before the court are two motions to dismiss the second amended complaint, which was filed by plaintiffs Royal Mile Company, Inc., Pamela Lang, and Cole's Wexford Hotel, Inc. (collectively "plaintiffs"). The first motion to dismiss was filed by defendant University of Pittsburgh Medical Center ("UPMC"). (ECF No. 95.) The second motion to dismiss was filed by defendant Highmark, Inc. ("Highmark"). (ECF No. 188.)  The resolution of the motions to dismiss turns on whether the filed rate doctrine precludes the antitrust claims as pleaded by plaintiffs and whether plaintiffs' claim for tortious interference with existing and prospective contractual relations against UPMC is barred by the applicable statute of limitations. Because the factual allegations of the second amended complaint implicate the filed rate doctrine and plaintiffs' claim for tortious interference with existing and prospective contractual relations on the face of the second amended complaint is time barred, the second amended complaint must be dismissed. The dismissal, however, is without prejudice and plaintiffs may seek leave to file a

third amended complaint within thirty days of the entry of the order dismissing the second amended complaint.

## II.     Procedural History

On December 2, 2010, plaintiffs initiated this antitrust action by filing a complaint alleging (1) UPMC and Highmark engaged in anticompetitive conduct in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, and (2) UPMC tortuously interfered with plaintiffs' existing and prospective business relations in violation of Pennsylvania common law. (ECF No. 1.) On August 16, 2012, plaintiffs filed an amended complaint against UPMC and Highmark. (ECF No. 77.) On September 17, 2012, UPMC and Highmark each filed a motion to dismiss that complaint and a brief in support of their motions alleging plaintiffs failed to state a claim for relief. (ECF Nos. 77, 78, 80, 81.)

On October 4, 2012, plaintiffs filed a motion seeking preliminary approval of a settlement with Highmark, certification of class, and appointment of class counsel (the "motion for preliminary approval of class settlement"). (ECF No. 88.)  On October 9, 2012, plaintiffs filed the second amended complaint against UPMC and Highmark asserting the following counts:

- **Count I**: conspiracy in restraint of trade or commerce in violation of § 1 of the Sherman Act against Highmark and UPMC;

- **Count II**: conspiracy to monopolize in violation of § 2 of the Sherman Act against Highmark and UPMC;

- **Count III**: willful acquisition and maintenance of a monopoly in the relevant market for healthcare services in violation of § 2 of the Sherman Act against UPMC;

- **Count IV**: willful acquisition and maintenance of a monopoly in the relevant market for private health insurance in violation of § 2 of the Sherman Act against Highmark;

- **Count V**: willful attempted monopolization in violation of § 2 of the Sherman Act against UPMC;

- **Count VI**: willful attempted monopolization in violation of § 2 of the Sherman Act against Highmark; and

- **Count VII**: tortious interference under Pennsylvania law with existing and prospective business relations against UPMC.

(ECF No. 90 at 55-62.) On October 23, 2012, UPMC filed a motion to dismiss the second amended complaint, which is a subject of this opinion. (ECF No. 95.) On October 26, 2012, Highmark filed a motion to dismiss the second amended complaint. (ECF No. 98.) On November 15, 2012, Highmark filed a motion to withdraw its motion to dismiss in light of the pending motion for preliminary approval of class settlement. (ECF No. 104.) On November 16, 2012, the court granted Highmark's motion to withdraw its motion to dismiss.  (ECF No. 105.)

On December 4, 2012, plaintiffs filed their response in opposition to UPMC's motion to dismiss. (ECF No. 119.)  On December 19, 2012, UPMC with leave of court filed a reply brief with respect to its motion to dismiss the second amended complaint. (ECF No. 124.) On January 16, 2013, UPMC filed a brief in opposition to plaintiff's motion for preliminary approval of settlement with Highmark. (ECF No. 130.) On January 16, 2013, plaintiffs and Highmark each filed a motion to strike UPMC's brief in opposition to plaintiffs' motion for preliminary approval of class settlement. (ECF Nos. 133, 145.)

On January 17, 2013, the court determined that the appointment of a special master was necessary to review the proposed settlement terms between plaintiffs and Highmark and to make recommendations about whether the fairness, reasonableness, and adequacy requirements for approval were met. On the same day, UPMC filed a brief in opposition to plaintiffs' and Highmark's motions to strike. (ECF No. 138.)  On January 18, 2013, plaintiffs' filed a motion to

withdraw their motion for preliminary approval of class settlement asserting that "[r]ecently disclosed information demonstrates that the value attributed to the proposed class settlement was illusory because of Defendant Highmark Inc.'s ("Highmark") *undisclosed* prior agreements with, and commitments to, UPMC and government bodies." (ECF No. 142 at 1) (emphasis in original.) On January 28, 2013, Highmark filed a response in opposition to plaintiffs' motion to withdraw their motion for preliminary approval of class settlement asserting there were insufficient grounds to permit plaintiffs to withdraw their motion because, among other things, the settlement provided "significant economic benefit to the class." (ECF No. 147 at 10.) On February 23, 2013, plaintiffs with leave of court filed a reply brief in support of their motion to withdraw the motion for preliminary approval of class settlement. (ECF No. 151.) On February 25, 2013, Highmark with leave of court filed a sur-reply brief in opposition to plaintiffs' motion to withdraw. (ECF No. 152.) On April 3, 2013, the court determined a special master should be appointed to prepare a report and recommendation about the value of the proposed settlement between plaintiffs and Highmark. On April 30, 2013, the matter was referred to a special master. (ECF No. 177.)

On May 1, 2013, Highmark filed a notice of withdrawal of its opposition to plaintiffs' motion to withdraw preliminary approval of class settlement. (ECF No. 178.) Highmark asserted the Pennsylvania Insurance Department ("PID") approved an affiliation agreement between Highmark and West Penn Allegheny Health System ("WPAHS" or "West Penn Allegheny"). (ECF No. 178 ¶ 1.) Highmark explained that as a condition to the PID's approval of the affiliation agreement it would not do the following:

(1)     employ[] most favored nations provisions ("MFNs") in [its] contracts with insurers or providers, respectively (Conditions 5 and 6), [or]

> (2)     contract[] with a provider in a manner that prohibits or limits Highmark's
>          ability to offer insurance products that tier or steer consumers to lower
>          cost providers ("consumer choice initiatives") (Condition 20).

(ECF No. 178.) With respect to the pending motion for preliminary approval of class settlement,

Highmark noted:

> Highmark's acceptance of the PID's conditions means that the putative class, as
> well as the consumers of Western Pennsylvania, will realize the benefits of
> Highmark's settlement promises wholly apart from the proposed settlement. Thus,
> Highmark no longer objects to plaintiffs' withdrawal from the settlement and
> therefore does not believe there is a need to go forward with the contemplated
> proceedings before Special Master Town. Doc. No. 177.

(ECF No. 178 ¶ 6.) On May 5, 2013, the court granted plaintiffs' motion to withdraw their

motion for preliminary approval of class settlement and certification of the class. (ECF No. 185.)

On May 17, 2013, Highmark filed a renewed motion to dismiss the second amended

complaint for failure to state a claim, which is a subject of this opinion. (ECF No. 188.) On June

7, 2013, plaintiffs filed a response in opposition to Highmark's motion to dismiss for failure to

state a claim.  (ECF No. 195.) On June 26, 2013, Highmark with leave of court filed a reply in

support of its motion to dismiss. (ECF No. 207.)

On July 1, 2013, the court heard oral argument on the pending motions to dismiss.[1] The

---

[1] UPMC in its motion to dismiss and brief in support argues the second amended complaint is
"procedurally improper" under Federal Rule of Civil Procedure 15 because plaintiffs did not
request and receive leave of court prior to filing the second amended complaint. (ECF No. 95 ¶
1; ECF No. 96 at 7.) UPMC argues in light of the motion for preliminary approval of settlement
that was pending at the time UPMC filed its motion to dismiss the second amended complaint,
plaintiffs' claims do not satisfy the joinder requirement because "Highmark's presence [in the
lawsuit] is a collusive sham." (ECF No. 96 at 13.) The court at the hearing on the pending
motions to dismiss commented:

> The first issue I want to take up with respect to UPMC is the issue concerning
> Rule 15 and whether there was a violation of Rule 15 in filing the second
> amended complaint. And also there's the improper joinder issue, but I think that's

court ordered supplemental briefing with respect to plaintiffs' argument that the co-conspirator exception to the bar on indirect purchaser suits is applicable to plaintiffs' nonconspiracy claims asserted under § 2 of the Sherman Act. (H.T. 7/1/13 (ECF No. 235) at 60-61.) On July 11, 2013, UPMC filed its supplemental brief with respect to that issue. (ECF No. 213.) On July 22, 2013, plaintiffs filed their brief in response to UPMC's supplemental brief. (ECF No. 219.) On July 30, 2013, plaintiffs with leave of court filed a supplemental brief addressing decisions cited at the hearing on July 1, 2013 with respect to the applicability of the filed rate doctrine to plaintiffs' claims. (ECF No. 222.) On August 2, 2013, UPMC filed a reply to plaintiff's response with respect to the co-conspirator exception to the bar on indirect purchaser suits. (ECF No. 226.) On August 8, 2013, Highmark with leave of court filed a response to plaintiffs' supplemental brief addressing decisions cited at the hearing on July 1, 2013, with respect to the applicability of the filed rate doctrine to plaintiffs' claims. (ECF No. 229.) On August 21, 2013, UPMC with leave of court filed a response to plaintiffs' supplemental brief addressing decisions cited at the hearing on July 1, 2013, with respect to the applicability of the filed rate doctrine to plaintiffs' claims. (ECF No. 234.)

The motions to dismiss the second amended complaint filed by UPMC and Highmark

---

moot now because the settlement is no longer in place between Highmark and the plaintiffs. So, that is moot.

The question on Rule 15, the Court has flexibility under Rule 15 and, as pointed out, leave would be freely given. I don't want to elevate substance over form. This is the type of situation where leave would have been given and so I think that is moot.

(H.T. 7/1/13 (ECF No. 235) at 3-4.) Counsel for UPMC declined to be heard further with respect to those issues. (Id. at 4.) The court having decided those issues on the record at the hearing will not address them in this opinion.

having been fully briefed are now ripe to be decided by the court.

### III.      Factual Background[2]

Plaintiffs in the second amended complaint allege that in the summer of 2002, UPMC, the largest healthcare provider in the relevant market, and Highmark, the largest healthcare insurer in the relevant market, conspired to maintain their respective monopolies in Western Pennsylvania. Plaintiffs contend the UPMC-Highmark conspiracy caused them and all other persons similarly situated antitrust injury in the form of "illegally-inflated premiums" in violation of the Sherman Act. (ECF No. 90 ¶ 224.)

### A.   The relationship between UPMC and Highmark prior to the conspiracy

In the late 1990s and early 2000s, Highmark and WPAHS, UPMC's primary hospital competitor, had a strong relationship. (ECF No. 90 ¶ 59.) Highmark and UPMC during that time "were at loggerheads." (Id. ¶ 63.) Highmark developed Community Blue, a low-cost insurance option marketed "to appeal to small employers who lacked the resources to self-insure," in response to UPMC's "intransigence and demands" in contract negotiations with Highmark. (Id.) Plaintiffs allege "UPMC did not participate in the Community Blue network because [the] costs were too high." (Id.) UPMC in response to Community Blue formed UPMC Health Plan, Inc. ("UPMC Health Plan"), an insurance company to compete against Highmark. (Id. ¶¶ 64, 66.) UPMC, according to plaintiffs, resorted to unlawful tactics to compete against Community Blue,

---

[2] The factual background is derived from the factual allegations in the second amended complaint, which are accepted as true for purposes of deciding the motions to dismiss. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) ("When considering a Rule 12(b)(6) motion, courts accept as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiffs.").

e.g., disseminating false and misleading information with respect to Community Blue to the media. (<u>Id.</u> ¶ 66.) In 2001, Highmark successfully sued UPMC for false and misleading advertising about Community Blue. (<u>Id.</u>)

UPMC Health Plan's network "focused" on UPMC facilities, but included all hospitals in Allegheny County in its network. (ECF No. 90 ¶ 65.) UPMC Health Plan's network included the facilities of WPAHS "on…a very limited basis." (<u>Id.</u> ¶¶ 25, 26, 65.) Plaintiffs allege "UPMC Health Plan has repeatedly and improperly refused to pay West Penn Allegheny for out-of-network, medically necessary emergency care services routinely provided by West Penn Allegheny to UPMC Health Plan members." (<u>Id.</u> ¶ 65.) According to plaintiffs: "The mutual antagonism between Highmark and UPMC in the early 2000s was also starkly displayed in Highmark's 2001 lawsuit to enjoin UPMC's acquisition of Children's Hospital of Pittsburgh as a violation of federal antitrust law." (<u>Id.</u> ¶ 67.)

## B.   The UPMC-Highmark conspiracy begins

In 1998, Jeff Romoff, chief executive officer of UPMC, "told the press that UPMC offered a 'truce' to Highmark." (ECF No. 90 ¶ 73.) He told the Pittsburgh Business Times that he said to Highmark: "You delay putting Community Blue out and we will not sign an agreement with an outside insurer." (<u>Id.</u> ¶ 73.) Highmark acknowledged Romoff's offer of a truce in a brief submitted on Highmark's behalf during the litigation mentioned <u>supra</u> with respect to Children's Hospital.[3] (<u>Id.</u> ¶ 74.) Plaintiffs allege Highmark in the summer of 2002 agreed to Romoff's

---

[3] According to plaintiffs, Highmark in the brief commented, in pertinent part:

> Defendant [UPMC] asserts that the Takeover is justified because Highmark has allegedly engaged in anticompetitive behavior. Remarkably, as an example of such behavior, Defendant cites Highmark's rejection of Defendant's overtures to attempt to form a "super" monopoly for the provision of health care in Western

proposal to create a "super monopoly" and discussions "between Highmark executives, including at least Ken Melani, [Highmark's chief executive officer,] and UPMC executives, including at least UPMC Executive Vice President John Paul…led to the formation of a broad, and illegal, agreement between Highmark and UPMC to restrain health care competition in the Pittsburgh community."[4] (Id. ¶ 75.)

### C. The UPMC-Highmark Conspiracy

Plaintiffs allege that, since 2002 and at least through the summer of 2008, UPMC and Highmark conspired to protect their respective monopoly power in the medical care and health insurance markets by reducing competition and raising prices.[5] (ECF No. 90 ¶¶ 1, 25, 34.) According to plaintiffs, UPMC and Highmark "fraudulently concealed their conspiracy to attempt to and/or actually monopolize the health insurance and health care delivery markets in Western Pennsylvania." (Id. ¶ 217.) The agreement between UPMC and Highmark was a "vertical conspiracy, which constitute[d] a 'bilateral monopoly,' [and]…allowed UPMC to impose monopoly rents upon the market by overcharging Highmark, knowing that Highmark would in turn abuse its monopoly status and pass on the excessive monopoly rents to its subscribers, the Plaintiff class." (ECF No. 90 ¶ 156.) According to plaintiffs:

---

Pennsylvania in which UPMCHS, the leading provider of hospital services, and Highmark, the leading health insurer, would combine forces.

(ECF No. 90 ¶ 74.)

[4] Plaintiffs allege that in the fall of 2005, the board chairman of Highmark admitted to the board chairman of WPAHS "that Highmark was colluding with UPMC and that what Highmark was doing with UPMC was "probably illegal." (ECF No. 90 ¶ 31.)

[5] Plaintiffs allege various government agencies have investigated "UPMC's and Highmark's Illegal Conduct." (ECF No. 90 ¶ 181-89.)

> The purpose, objective, intent and effect of the Defendants' conduct described herein (both individually and collectively) was to preclude the entry of low-cost competitors from the market. Such non-rate anticompetitive activity directly caused increased costs for health care and health care insurance in the marketplace, which costs were born (directly and indirectly) by Plaintiffs.

(ECF No. 90 ¶ 113.) Plaintiffs allege that as a result of the conspiracy,

> Highmark's health insurance policy holders, including the class plaintiffs and class members in this action, have been forced to pay inflated, above-market rates for health insurance that would otherwise not exist but for such conspiracy and individual behavior.

> Because UPMC sought illegally to monopolize the relevant health care market, it was able to inflate the prices it charged for its health care services and those charges were passed on, in addition to Highmark's own inflated premiums, to the Plaintiffs and class members in this action.

(Id. ¶¶ 114-15.)

### 1.    Allegations with respect to UPMC

#### a.  UPMC's market power

Plaintiffs allege "[w]ith the exception of burn treatment, UPMC possesses a market share in excess of 50% in every tertiary and quaternary care service line in the six-county Pittsburgh metropolitan region." (ECF No. 90 ¶ 191.) Plaintiffs describe the health care services market in the Pittsburgh, Pennsylvania region as follows:

> Besides UPMC and West Penn Allegheny, there are several small community hospital systems in Allegheny County and the adjoining counties: Excela Health, a four-hospital system; Heritage Valley Health System, a two-hospital system; Butler Health System, which owns Butler Memorial Hospital; St. Clair Hospital; Ohio Valley General Hospital; Armstrong County Memorial Hospital; Jefferson Regional Medical Center; and The Washington Hospital.

> None of these systems offers sophisticated tertiary and quaternary care and none poses any threat to UPMC's dominance. None of the community hospital systems registers above single digit market shares in any service line in the six-county metropolitan area.

(Id. ¶¶ 192-93.) According to plaintiffs, "UPMC's market share in Allegheny County, excluding

government payors, exceeds 55% whether measured by bed capacity or admission volume. This is more than double West Penn Allegheny's market share, and no other hospital system in Allegheny County exceeds single digits." (Id. ¶ 201.) UPMC's market power is underestimated by the percentage of market share it owns because "UPMC, through its joint ventures with nominally independent community hospitals, controls the contracting decisions of almost every hospital in Allegheny County except those owned by West Penn Allegheny." (Id. ¶ 202.)

According to plaintiffs, "in the exercise of its monopoly power, UPMC reroutes patient care for a variety of services, including routine or commodity services from lower-cost to higher-cost providers within its network, resulting in increased costs of care." (ECF No. 90 ¶ 173.) Plaintiffs allege:

> Such utilization-driven cost increases are possible only because of the monopoly UPMC enjoys, and represent monopoly rent, which is directly passed along by insurers, including Highmark, to subscribers, including the Plaintiff class.
> …
> Indeed, the majority of the increase in the reimbursements charged by UPMC to Highmark over the past ten years has resulted from UPMC's exercise of monopoly power through utilization choices rather than contractual rate increases under its contracts with Highmark. Such utilization-driven increased costs have been estimated to exceed $100 million per year, which costs were and are passed along to the Plaintiff class, all to the continuing harm of the Plaintiff class.

(Id. ¶ 173.)

Plaintiffs define the relevant markets with respect to its antitrust claims against UPMC as follows:

> The relevant product market for health care services is acute care inpatient services. In the alternative, the relevant product market is high-end tertiary and quaternary acute care inpatient services.
> …
> The relevant geographic market is Allegheny County. Approximately 95% of county residents stay within the county for acute inpatient care. There is accordingly a clear and unequivocal demand by county residents to access care locally.

(<u>Id.</u> ¶¶ 194-96.) Plaintiffs assert there are "substantial barriers" to entering the foregoing relevant markets, "including the large capital costs required to construct and continually maintain and upgrade a hospital, the need to recruit and pay a large medical staff, the need to negotiate contracts with third-party payors, and the need to mount a marketing campaign to draw patients already familiar with UPMC's facilities." (<u>Id.</u> ¶ 203.) Since the formation of WPAHS, new competitors have not entered the foregoing relevant markets. (<u>Id.</u> ¶ 204.) WPAHS is "the last remaining competitor for many of the most sophisticated and expensive hospital services." (<u>Id.</u> ¶ 205.)

### b. **UPMC's scheme of anticompetitive conduct**

Plaintiffs allege that, since 1999, UPMC "engaged in a relentless campaign of anticompetitive, predatory conduct…in an attempt to monopolize the Allegheny County market for acute inpatient hospital services and/or for tertiary and quaternary care services." (ECF No. 90 ¶ 175.) UPMC's campaign involved "five main prongs:"

(1) as part of the conspiracy with Highmark, UPMC secured Highmark's cooperation in raising West Penn Allegheny's costs, withdrawing from its earlier willingness to provide financial support and providing an artificially inflated advantage in reimbursement revenues to UPMC;

(2) UPMC has restricted West Penn Allegheny's ability to cooperate with, and secure referrals from, independent community hospitals;

(3) UPMC has tried to starve West Penn Allegheny of necessary patient referrals by raiding key admitting physicians, as well as raiding physicians such as anesthesiologists who are necessary for hospital operation;

(4) UPMC has bid physician salaries to artificially inflated, supracompetitive levels; and

(5) UPMC has interfered with West Penn Allegheny's bond offerings.

(ECF No. 90 ¶ 175.)[6] Plaintiffs allege UPMC attempted to "stop the emergence of West Penn Allegheny" from the formation of WPAHS in August 2000.[7] (ECF No. 90 ¶ 37.) UPMC according to plaintiffs took the following actions to destroy WPAHS:

- "UPMC Board members and employees unsuccessfully lobbied AGH Board members and local officials to oppose the West Penn-[Allegheny General Hospital ("AGH")] merger." (ECF No. 90 ¶ 39.)

- "UPMC attempted unsuccessfully to intervene in the Orphans' Court proceedings regarding the creation of West Penn Allegheny." (Id. ¶ 40)

- "UPMC filed a frivolous lawsuit against the Pennsylvania Department of Insurance to block Highmark from providing financial assistance to West Penn Allegheny." (Id.)

- UPMC interfered with West Penn Allegheny's initial bond offering by retaining its own consulting firm to develop a competing analysis with respect to the formation of WPAHS that predicted it would fail based upon numerous false and misleading statements about the finances of WPAHS. (Id. ¶ 40.) UPMC disseminated the analysis to potential purchasers of WPAHS bonds, credit rating agencies, and news media. (Id.) Officials from UPMC met with the potential investors of WPAHS to try to dissuade them from investing in the WPAHS bonds. (Id.)

- UPMC ran "a campaign of raiding key members of the AGH medical staff in order to injure West Penn Allegheny." (Id. ¶¶ 43-45.) UPMC "cherry

_____

[6] Plaintiffs allege: "UPMC has also used its market power to coerce third parties, including the Veterans Administration Pittsburgh Healthcare System (the "VA"), which is staffed in significant part by residents from UPMC." (ECF No. 90 ¶ 176-80.)

[7] Plaintiffs allege:

West Penn Allegheny was formed by a combination in August 2000 of The Western Pennsylvania Healthcare System, comprised of The Western Pennsylvania Hospital ("West Penn") and Suburban General Hospital, and the Pittsburgh-based hospitals formerly affiliated with AHERF, including Allegheny General Hospital ("AGH"), Allegheny Valley Hospital (now the Alle-Kiski Medical Center), Forbes Regional Hospital (now The Western Pennsylvania Hospital – Forbes Regional Campus), and Canonsburg General Hospital.

(ECF No. 90 ¶ 37.)

pick[ed]" physicians from AGH "through a campaign of bribes and inducements with the avowed purpose of burying West Penn Allegheny." (Id. ¶ 44.) UPMC as part of this campaign "intended to bid physician compensation levels up to artificially inflated levels solely in order to prevent West Penn Allegheny from being able to recruit and retain qualified physicians." (Id. ¶ 50.)

- UPMC offered to hire all anesthetists employed by Allegheny Anesthesia Associates ("AAA"), which had an exclusive contract to provide its anesthesiology services to AGH. (Id. ¶ 53.) UPMC "offered to hire away the entire group for a substantial increase in salary, above not only their reimbursement from AGH but also well above what UPMC paid its own anesthesiologists." (Id.) According to plaintiffs, "[t]his offer was not made to meet the needs of UPMC, which lacked sufficient operating room volume to absorb these new anesthesiologists." (Id. ¶ 54.)

(ECF No. 90 ¶ 32.) Plaintiffs assert that UPMC's conspiracy with Highmark "artificially blocked and stunted West Penn Allegheny's natural growth as the high-quality and low-cost leader, resulting in lost patient volume, growth, and earnings to West Penn Allegheny." (Id. ¶ 33.)

### c.  UPMC's promises to Highmark pursuant to the conspiracy

According to plaintiffs, "UPMC abuses its monopoly and/or dominant market share to impose anticompetitive contract terms upon Highmark and other insurance providers" and to "set rates essentially at any level it desires, without regard to competition." (Id. ¶¶ 155, 164.)[8] In response to Highmark's promises and actions pursuant to the conspiracy, UPMC agreed to protect Highmark from competition in the health insurance sector. (ECF No. 90 ¶ 82.) UPMC agreed to refuse to deal reasonably with or sell coverage under products offered by the UPMC Health Plan to Highmark's competitors. (Id. ¶¶ 25-26.) As a result of UPMC's refusal to deal

---

[8] Plaintiffs allege: "UPMC's unilateral ability to set rates wherever it desires, and its ability to favor certain insurers over others, is evidence of the extraordinary market power that UPMC exercised and continues to exercise, and results in antitrust injury and damages, market injury and damages, and class injury and damages." (ECF No. 90 ¶ 170.)

reasonably with Highmark's competitors, major national insurers, such as "United Healthcare," "Coventry," and "Aetna,"[9] were relegated to marginal participation in the health insurance market in Pittsburgh, Pennsylvania; indeed, "no major national health insurance provider…has been able to crack 10% commercial market share in the six-county Pittsburgh metropolitan area." (Id. ¶¶ 26, 87.) Plaintiffs allege "UPMC has imposed such a price increase upon commercial health care payors (like United and Aetna) in Allegheny County since reaching its truce with Highmark in 2002." (Id. ¶ 197.) Plaintiffs explain:

> UPMC's refusal to contract competitively has blocked the entry and growth of several large national health insurers because it is extremely difficult for a new market entrant to build an adequate and marketable provider network without reasonable access to UPMC's facilities, especially in oncology, obstetrics, and mental health. Employers in the Pittsburgh area typically require their health plans to provide access to UPMC facilities. Without a competitive contract with UPMC, Highmark rivals like United cannot offer an attractive health insurance product to employers.
>
> …
>
> In addition, Pennsylvania health insurance regulations provide that a health plan "shall provide for at least 90% of its enrollees in each county in its service area, access to covered services that are within 20 miles or 30 minutes travel from an enrollee's residence or work in a county designated as a metropolitan statistical area (MSA) by the Federal Census Bureau . . . ." 28 Pa. Admin. Code § 9.679(d). There is no feasible way to comply with this regulation for Allegheny County residents without including UPMC in the plan's network of participating providers, especially given UPMC's dominance in certain service lines such as oncology, psychiatry, and behavioral health.
>
> …
>
> In fact, health insurers cannot create a marketable, adequate network of participating providers for employers in Allegheny County without reasonable access to UPMC's facilities because of UPMC's dominance in numerous specialties, including mental health and oncology, and because, as described above, UPMC controls the contracting decisions of almost every nominally independent community hospital in Allegheny County except those owned by West Penn Allegheny.

---

[9] Plaintiffs in the second amended complaint refer to Highmark's competitors as "United Healthcare," "Coventry," "Aetna," and "CIGNA." The court in this opinion will, therefore, refer to Highmark's competitors by those names.

(ECF No. 90 ¶¶ 88, 198-99.)[10]

### 2. **Allegations with respect to Highmark**

#### a. **Highmark's market power**

According to plaintiffs, "Highmark's market share in the relevant market has exceeded 60% continuously from January 1, 2000 to the present."[11] (ECF No. 90 ¶ 210.) Plaintiffs allege the relevant product market with respect to their antitrust claims against Highmark "is health care financing and administration for private employers and individuals, including indemnity insurance, managed care products such as HMO, PPO, or POS plans, and third-party administration of employer self-funded health plans." (ECF No. 90 ¶ 206.) The relevant geographic market is Allegheny County. (Id. ¶ 207.)

─────────────────────────

[10] According to plaintiffs, the effect of UPMC's unwillingness to deal reasonably with outside insurers was confirmed by the report dated September 10, 2008, prepared for the PID, which stated:

> [O]ne area of competitive concern raised in our interviews with market participants in western Pennsylvania involves key gaps in provider networks for some of Highmark's main competitors and potential competitors, such as Health America and United. According to Highmark data, both Health America and United do not have contracts with two of the flagship UPMC hospitals located in the Pittsburgh area, UPMC Presbyterian and UPMC Shadyside. Some market participants have indicated concern that limitations in contracting with UPMC derive from a previous agreement between Highmark and UPMC.

(ECF No. 90 ¶ 89.) Plaintiffs offer by way of further example the exclusion of United Healthcare, "a well-capitalized company with a strong track record of success in many markets across the United States," from the health insurance market in Pittsburgh, Pennsylvania. (Id. ¶¶ 90-93.)

[11] According to the second amended complaint, a report prepared for the Pennsylvania Insurance Department provides that Highmark has "substantial market power" in Western Pennsylvania. (ECF No. 90 ¶ 215.)

Highmark's biggest competitor in the foregoing relevant markets is UPMC Health Plan, which possesses a twenty percent market share.[12] (Id. ¶ 211.) Plaintiffs allege that from January 1, 2000 to the present "[n]o other competitor has achieved even 10% market share" in the relevant markets. (Id. ¶ 212.) Pursuant to Highmark's conspiracy with UPMC, "Highmark has erected a substantial barrier to entering the market as rival health insurers cannot contract with UPMC at competitive rates." (Id. ¶ 213.)

### b. **Highmark's promises to UPMC pursuant to the conspiracy**

Highmark pursuant to its conspiracy with UPMC engaged in various acts that "were contrary to what normally would be in Highmark's self-interest as a health insurer." (Id. ¶ 81.) Highmark, prior to its agreement with UPMC, supported WPAHS by, among other things: making a $125 million loan to WPAHS in 2000; attending "road show" meetings with WPAHS executives to promote the initial bond offerings of WPAHS; and giving a $42 million grant to WPAHS in 2002. (Id. ¶¶ 29, 60, 61, 62.) UPMC pursuant to the conspiracy and as part of its scheme to destroy WPAHS and maintain its monopoly demanded "that Highmark stop providing support to West Penn Allegheny." (ECF No. 90 ¶ 117.) Highmark in exchange for UPMC's support withdrew its commitment to WPAHS and refused to give WPAHS any significant financial support or assistance. (Id. ¶¶ 25-26.) Highmark "repeatedly obstructed West Penn Allegheny's efforts to refinance its subordinated loan from Highmark, even though Highmark would incur no or minimal additional costs under the refinancing proposals. In fact, by early 2004, Highmark had written off a substantial portion of the loan in its financial statements." (Id.

---

[12] Plaintiffs allege "a significant portion of the commercial enrollees in the UPMC Health Plan are UPMC employees and their dependents, who are automatically enrolled in the UPMC Health Plan." (ECF No. 90 ¶ 211.)

¶ 118; see id. ¶¶ 119-35.) Plaintiffs allege that "[a]s a result of Highmark's agreement with UPMC to refuse any consent to West Penn Allegheny's proposed refinancing, West Penn Allegheny was not able to refinance any of its debt until Spring 2007. In the meantime, it incurred artificially inflated financing costs." (Id. ¶ 135.)

Plaintiffs allege that "UPMC's new contract with Highmark in Summer 2002 created a large gap between the reimbursement rates that Highmark paid to UPMC and to West Penn Allegheny for the same services at equally sophisticated levels." (ECF No. 90 ¶ 137.) UPMC and Highmark entered "into a new multiyear participating provider agreement, with reimbursement rates for UPMC that were much higher than those previously negotiated for West Penn Allegheny." (Id. ¶ 76.) Plaintiffs allege "Highmark repeatedly refused to increase West Penn Allegheny's rates to be competitive with those of UPMC" and "[s]ince the conspiracy's formation, the cumulative amount of Highmark's rate discrimination has exceeded $100 million."[13] (Id. ¶¶ 139, 142.) Plaintiffs allege:

> This rate discrimination was a double bonanza for the conspirators: Highmark enjoyed large profits by holding payments to West Penn Allegheny at depressed levels while it raised premiums to consumers and employers, and UPMC saw its competitive position improved as its only viable rival was slowly starved of resources needed to grow and thrive.

(ECF No. 90 ¶ 141.) Indeed, UPMC agreed to permit Highmark "to raise without constraint the premiums it charged to members of the Plaintiff class," and UPMC in exchange received "huge

---

[13] Plaintiffs allege that "[w]hen West Penn Allegheny requested improved reimbursement rates in 2005 and 2006, Highmark CEO Dr. Melani said he could not increase West Penn Allegheny's rates because of Highmark's agreement with UPMC to block United's entry into the Pittsburgh market." (ECF No. 90 ¶ 140.) Plaintiffs by way of further example of how the rate discrimination harmed WPAHS allege "Highmark has systematically underpaid West Penn Allegheny for emergency care service" and "discriminated against West Penn Allegheny in the award of grants to improve the quality of medical care in the Pittsburgh medical community." (Id. ¶¶ 143, 146.)

lump sum capital injections and substantially higher reimbursements." (Id. ¶ 28.) Highmark in

contrast to its weakening support of WPAHS agreed to increase the rates it paid to UPMC

hospitals by 21% during the first year of the conspiracy, and 7% per year thereafter.[14] (Id. ¶ 76.)

Plaintiffs allege "Highmark could pass on these higher costs to Plaintiffs without fear that

employers and consumers could turn to other, lower-cost insurers because of UPMC and

Highmark's agreement to exclude rival insurers from the Pittsburgh market." (Id. ¶ 101.)

Highmark also agreed to provide more than $230 million to UPMC to build a new hospital for

UPMC's Children's Hospital of Pittsburgh. (Id. ¶ 77.)

Highmark, pursuant to the conspiracy, agreed to not offer a health plan unless it included

UPMC as an in-network provider. (ECF No. 90 ¶ 79.) According to plaintiffs, "[t]his agreement

eliminated competition between UPMC and other hospitals, principally West Penn Allegheny,

for preferred provider status in Highmark's health plans." (Id. ¶ 79.) Highmark agreed to "no

tiering, no steering" provisions in its contracts with UPMC hospitals, i.e., Highmark was

precluded from

> offering products with benefit designs that incentivized beneficiaries to use non-
> UPMC hospitals or from 'tiering' the hospitals based on cost or quality factors
> that would cause the beneficiary to pay a higher co-pay or deductible and/or a
> higher percentage of copayment for services at the UPMC hospital as opposed to
> other hospitals.

(ECF No. 90 ¶¶ 80, 158.) According to plaintiff, the "no tiering, no steering provisions" imposed

upon Highmark by UPMC caused the following harm:

> Such "No-Tiering-No-Steering" provisions preclude price competition among

---

[14] According to plaintiffs: "Highmark did not agree to properly narrow the reimbursement gap
between West Penn Allegheny and UPMC until Summer 2008, when it acted under the pressure
of the Department of Justice's continuing investigation of Highmark's and UPMC's illegal
conspiracy." (ECF No. 90 ¶ 148.)

providers, causing higher costs for the insurance companies and ultimately higher
insurance premiums paid by patient-subscribers (including the Plaintiff class).

…

Such "No-Tiering-No-Steering" provisions cause the monopoly rents imposed by
UPMC to be passed through to patient-subscribers (including the Plaintiff class).

(ECF no. 90 ¶¶ 159-60.)[15] Highmark also agreed to eliminate Community Blue, its low-cost

health insurance program that did not include UPMC in its network.[16] (Id.) "Community Blue

was in fact shut down by January 2004, and is now out of business." (Id. ¶ 96.) In response to the

financial support Highmark provided to UPMC, UPMC promised it would not use the cash

payments received from Highmark to strengthen UPMC Health Plan. (Id. ¶ 78.)

### 3.  Profits from the UPMC-Highmark conspiracy

According to plaintiffs:

Since the conspiracy's formation in 2002, and at least through 2007, UPMC and
Highmark have enjoyed record profits – and an increasingly exploited Pittsburgh
community – and specifically members of the Plaintiff class - has suffered
skyrocketing health care costs.

(Id. ¶¶ 78, 103-05.) The "record profits" enjoyed by UPMC and Highmark "were made on the

backs of the region's increasingly overcharged employers" via premium increases "well above

the national averages." (Id. ¶¶ 106-08.) Plaintiffs allege:

---

[15] Plaintiffs allege Romoff "has admitted that 'No-Tiering-No-Steering' provisions result in
increased costs to consumers," and that such an admission is a concession "that a prohibition
against tiering and steering will increase costs." (ECF No. 90 ¶¶ 161, 163.) According to
plaintiffs, "as such, UPMC has admitted the antitrust injury resulting from its "No-Tiering-No-
Steering" provisions." (Id. ¶ 163.)

[16] According to plaintiffs, Ken Melani, president and chief executive officer of Highmark,
"attempted to conceal the real reason for this action by falsely telling the press that Highmark
needed to cut administrative costs." (ECF No. 90 ¶ 97.) Plaintiffs allege "[n]ot only did Dr.
Melani's statements contradict Highmark's previous, multi-year marketing campaign for
Community Blue as a low-cost alternative, but small business groups in the region expressed
their dismay at losing a low-cost health insurance option." (Id. ¶ 98.)

20

> Indeed, after the conspiracy went into effect and Highmark shuttered the low-cost Community Blue product, small employers in the Pittsburgh area found their premiums rising to the point that their health insurance costs were as much as 25 percent above the national average. See "Employers' Health Premiums Rose 11.2 Percent in 2004, Survey Shows," Pittsburgh Post-Gazette (September 10, 2004).

(ECF No. 90 ¶ 109.)

## IV.    Standard of Review

A motion to dismiss tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and sufficient "to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully....Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556) (internal citation omitted).

Two working principles underlie Twombly. Iqbal, 556 U.S. at 678. First, with respect to mere conclusory statements, a court need not accept as true all the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. Iqbal, 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. (quoting FED. R. CIV. P. 8(a)(2)). A court considering a motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679.

The court may grant a plaintiff leave to amend a complaint under Federal Rule of Civil Procedure 15, which provides: "The court should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15. Rule 15, however, "does not permit amendment when it would be futile. Futility "'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'" Kenny v. United States, Civ. No. 10-4432, 2012 WL 2945683, at *4 (3d Cir. July 19, 2012) (citing Burch v. Milberg Factors, Inc., 662 F.3d 212, 231 (3d Cir. 2011)).

"The standard for deciding whether claims are futile for the purpose of granting leave to amend a complaint is the same as a motion to dismiss." Markert v. PNC Fin. Servs. Group, Inc., 828 F.Supp.2d 765, 771 (E.D. Pa. 2011). "[I]f the court determines that plaintiff has had multiple opportunities to state a claim but has failed to do so, leave to amend may be denied." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 2010).

## V.    Discussion

### A.  Filed Rate Doctrine (counts I-VI)

Plaintiffs in counts I-VI of the second amended complaint assert claims against Highmark and UPMC under sections 1 and 2 of the Sherman Act. "[T]o establish an antitrust claim, plaintiffs typically must prove (1) a violation of antitrust laws,[17] (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages." In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 19 n.18 (1st Cir. 2008). Highmark and UPMC argue that plaintiffs failed to set forth sufficient factual allegations to meet the third element. They argue plaintiffs did not plead a proper measure of damages in the second amended

---

[17] For a plaintiff to properly allege a plausible antitrust violation under § 1, he or she must set forth factual allegations to show "(1) 'that the defendant was a party to a contract, combination ... or conspiracy' and (2) 'that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.'" Burtch, 662 F.3d at 221 (quoting In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010)).

For a plaintiff to properly allege an antitrust violation under § 2, he or she must set forth factual allegations to show the defendant's "'(1) [] possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Race Tires Am., Inc., Hoosier Racing Tire Corp., 614 F.3d 57, 75 (3d Cir. 2010) (quoting Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992)).

complaint as a matter of law because plaintiffs' measure of damages is barred by the filed rate doctrine.[18]

The filed rate doctrine "'bars antitrust suits based on rates that have been filed and approved by federal agencies'" and state agencies. McCray v. Fidelity Nat'l Title Ins. Co., 682 F.3d 229, 236 (3d Cir. 2012) (quoting Utilimax.com, Inc. v. PPL Engery Plus, LLC, 378 F.3d 303, 306 (3d Cir. 2004)).

> When the filed rate doctrine applies, it is rigid and unforgiving. Indeed, some have argued that it is unjust. *See, e.g.,* Fax Telecommunicaciones Inc. v. AT & T, 138 F.3d 479, 491 (2d Cir.1998); Ting v. AT&T, 319 F.3d 1126, 1131 (9th Cir.2003). It does not depend on "the culpability of the defendant's conduct or the possibility of inequitable results," nor is it affected by "the nature of the cause of action the plaintiff seeks to bring." Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d Cir.1998). It applies whenever a claim would implicate its underlying twin principles of "preventing carriers from engaging in price discrimination as between ratepayers" and "preserving the exclusive role of federal agencies in approving rates." Id.

Simon II, 694 F.3d at 205. Highmark and UPMC assert Highmark filed the rates it charged to plaintiffs with the PID, and, therefore, plaintiffs' claims based upon those rates are barred under the filed rate doctrine set forth in Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156 (1922), and its progeny.

In Keogh, the Court held a shipper could not maintain an antitrust lawsuit based upon rates charged by railroad carriers who allegedly conspired together to fix freight transportation

---

[18] The measure of damages for plaintiffs' claim for tortuous interference with contractual relations asserted under Pennsylvania common law against UPMC is based upon Highmark's "artificially inflated premium costs." (ECF No. 90 ¶ 268.) UPMC does not argue that claim is barred by the filed rate doctrine. UPMC argues this court should not exercise supplemental jurisdiction over that claim and it is untimely because it was filed after the expiration of the applicable two-year statute of limitations. (ECF No. 96 at 19; ECF No. 124 at 9-10.) UPMC's arguments with respect to plaintiffs' claim for tortuous interference with existing and prospective contractual relations will be addressed in part D infra.

rates because "every rate complained of had been duly filed by the several carriers with the Interstate Commerce Commission." Keogh, 260 U.S. at 160. The shipper argued that competition was eliminated pursuant to the conspiracy, which caused the increase in his rates. Id. at 161. The shipper sought damages measured by the difference between the rates charged pursuant to the conspiracy and the rates charged prior to the conspiracy going into effect. Id. at 160. The Court dismissed the lawsuit identifying four reasons for its decision:

- First, the Court reasoned that the rates charged to the shipper were determined by the Interstate Commerce Commission to be "reasonable and nondiscriminatory," and it would be improper for the court to hold the carriers liable based upon approved legal rates. Keogh, 260 U.S. at 162-63.

- Second, the Court held that to permit the shipper to recover the difference between the rate charged and a hypothetical lower rate would defeat the purpose of Congress to prevent rate discrimination by "operat[ing] to give [the shipper] a preference over his trade competitors."[19] Id. at 163.

- Third, the Court found the shipper's injury was based upon hypothesis. Id. at 163.

   The Court explained:

   > The burden resting upon the plaintiff would not be satisfied by proving that some carrier would, but for the illegal conspiracy, have maintained a rate lower than that published. It would be necessary for the plaintiff to prove, also, that the hypothetical lower rate would have conformed to the requirements of the Act to Regulate Commerce. For unless the lower rate was one which the carrier could have maintained legally, the changing of it could not

---

[19] The Court rejected the argument that to avoid discriminatory rates all shippers injured may sue to recover based upon the difference in rates. Keogh, 260 U.S. at 164. The Court reasoned that it was "highly improbable" all courts and juries would provide each shipper "the same measure of relief." Id.

> conceivably give a cause of action. To be legal a rate must be nondiscriminatory.
>
> …
>
> But it is the Commission which must determine whether a rate is discriminatory; at least, in the first instance….But by no conceivable proceeding could the question whether a hypothetical lower rate would under conceivable conditions have been discriminatory, be submitted to the Commission for determination. And that hypothetical question is one with which plaintiff would necessarily be confronted at a trial.

Id. at 164.

- Fourth, the Court refused to award damages under those circumstances because the alleged damages, based upon a hypothetical rate that should have been charged, were "purely speculative." Id. at 164.  The Court explained:

> [R]ecovery cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted. These damages must be proved by facts from which their existence is logically and legally inferable. They cannot be supplied by conjecture. To make proof of such facts would be impossible in the case before us. It is not like those cases where a shipper recovers from the carrier the amount by which its exaction exceeded the legal rate. Southern Pacific Co. v. Darnell-Taenzar Co., 245 U. S. 531, 38 Sup. Ct. 186, 62 L. Ed. 451. Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers. Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate might not have benefited him. Every competitor was entitled to be put-and we must presume would have been put-on a parity with him. And for every article competing with excelsior and tow, like adjustment of the rate must have been made. Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him. The benefit might have gone to his customers, or conceivably, to the ultimate consumer.

Id. at 164-65.

The Court, based upon the foregoing rationale, affirmed the decision of the Court of Appeals for

the Seventh Circuit dismissing the shipper's claims against the carriers. Id. at 165.

The Court applied the principles set forth in Keogh in Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409 (1986). In Square D, a class of shippers sued motor carriers and the ratemaking bureau for conspiring to fix rates for transporting freight. Square D, 476 U.S. at 412. The shippers requested treble damages measured by the difference between the rates they paid and rates they would have paid "in a freely competitive market." Id. at 413. The district court relied on Keogh and dismissed the shippers' claims for damages. Id. at 414. The court of appeals affirmed the district court's decision with respect to the filed rates. Id. The shippers appealed to the Supreme Court of the United States. Id. at 410. The Supreme Court declined to distinguish Keogh from the case before it based upon the rates that were charged to the shippers not being "challenged in a formal ICC hearing before they were allowed to go into effect." Id. at 417. The Court in Square D noted that the rates were "duly submitted, lawful rates under the Interstate Commerce Act in the same sense that the rates filed in Keogh were lawful," and the shippers under those circumstances were precluded from maintaining "a treble-damages antitrust action." Id. at 418.

In In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144, 1159 (3d Cir. 1993), the Third Circuit Court of Appeals held the filed rate doctrine does not preclude claims for damages based upon non-rate anticompetitive conduct. In that case, several groups of plaintiffs sued railroad companies alleging the railroad companies conspired "to eliminate competition and monopolize the transportation and handling of iron ore." Id. at 1152. The plaintiffs alleged:

> Railroad officials orally agreed that leases of railroad docks or facilities should be examined or modified to frustrate the efforts of non-railroad docks to handle ore from self-unloaders. They also agreed to refuse to provide competitively-priced

> inland rail service, i.e., to publish commodity line haul rates for moving ore from such docks. Finally, it was agreed that railroad docks should assess the same handling charges for unloading ore from bulkers as from self-unloaders, regardless of the extent of service performed.
>
> …
>
> To effectuate the goal of market preclusion, the railroads used coercion to enforce adherence to the agreement to foreclose competition from private docks. B & LE and its co-conspirators did indeed restrict the lease and sale of railroad-owned dock property and boycotted non-railroad docks. These activities eliminated much of the economic incentives to use self-unloaders. By impeding the progress of the private dock system, the railroads were also effective in foreclosing competition from trucks.

Id. at 1153. The issue before the court of appeals relevant to this case was whether the plaintiffs' claims for treble damages based upon allegations that the railroads "conspired to preclude competition in which ICC-approved rates played a role in thwarting market entry" were barred under Keogh and Square D. Id. at 1158.

With respect to the steel company-plaintiffs, the district court in Lower Lake Erie dismissed their claims for damages based upon rates filed by the railroads and "any damage claims that would require estimating what rates the ICC would have accepted, an estimation forbidden by *Keogh*." Lower Lake Erie, 998 F.2d at 1158. The district court permitted two of the steel company-plaintiffs' claims against the railroads to proceed. Id. The district court described those claims as follows:

> "(1) [a claim] that [the steel companies] could have paid lower dock-handling rates (sooner) to the private docks than they did to the railroad docks if the railroads had not retarded the development of the self-unloader industry; and
>
> (2) [a claim] that [the steel companies] could have paid lower land transport rates (sooner) to the truckers, had the railroads not restrained competition by that industry and monopolized linehauling from their docks."

Lower Lake Erie, 998 F.2d at 1158 (quoting In re Lower Lake Erie Iron Ore Antitrust Litig., 759 F.Supp. 219, 234 (E.D. Pa. 1991)). The district court reasoned that with respect to those claims,

28

the "plaintiffs' damages [did] not depend on proof of price-fixing by defendants, which <u>Keogh</u> would bar, but on proof that defendants conspired to exclude low cost competitors from the market, which does not implicate the ICC's exclusive jurisdiction and therefore is not barred by *Keogh*." <u>Lower Lake Erie</u>, 998 F.2d at 1158. The district court also determined that one of the plaintiffs' "claims for damages emanating from the delay in the construction and use of [its] own dock facilities" was not barred under <u>Keogh</u>. <u>Id.</u> at 1159. The district court noted that to bar such a claim "would overextend *Keogh's* reach and could produce a rule that one who pays for services governed by ICC tariffs is foreclosed from asserting that antitrust violations prevented use of a less expensive, equivalent service." <u>Id.</u>

The Court of Appeals for the Third Circuit affirmed the decision of the district court with respect to the steel company-plaintiffs holding "the district court correctly characterized [the railroads'] anti-competitive activity as market preclusion, and <u>Keogh's</u> protective rule cannot apply to forbid recovery for the resulting economic detriment." <u>Lower Lake Erie</u>, 998 F.2d at 1159. The court of appeals held:

> As the Supreme Court has succinctly stated, *Keogh* merely prevents private shippers from sustaining an award of treble damages by claiming that ICC-approved rates were the product of an antitrust violation. *Square D*, 476 U.S. at 422, 106 S.Ct. at 1929. That statement of *Keogh's* protection does not preclude liability based on non-rate anticompetitive activity. Indeed, the steel companies' case involves damage claims based on non-rate activity that targeted potential low-cost competitors.

<u>Lower Lake Erie</u>, 998 F.2d at 1159. The court acknowledged "that the success of anticompetitive non-rate activity would coincidentally implicate rates," but noted the rates charged by the railroad in that case were "ancillary" to the steel company-plaintiffs' claims. <u>Id.</u> The court instructed:

> It is fully consistent with *Keogh*…to accept these rates as lawful and nonetheless

to conclude that through non-rate activities, particularly the restriction on the sale or lease of dock space and the refusal to deal with potential competitors, the railroads effectively retarded entry of lower cost competitors to the market. The instrument of damage to the steel companies was the absence of the lower-cost combination. In contrast, the Supreme Court in *Keogh* made it clear that "the instrument by which *Keogh* is alleged to have been damaged is rates approved by the Commission." 260 U.S. at 161, 43 S.Ct. at 49.

*Lower Lake Erie*, 998 F.2d at 1159. The court stressed that the plaintiffs in <u>Lower Lake Erie</u> met their burden by showing "the railroads conspired to protect their stronghold in the ore transport market by blocking entry by low-cost competitors, not that the railroads charged an unlawful rate." <u>Id.</u> This was in contrast to the shipper's burden in <u>Keogh</u>—which the Court found the shipper could not meet—to prove that but for the conspiracy a carrier would have charged him a lower rate **and** the lower rate would have been approved by the ICC. <u>Id.</u>

Plaintiffs argue the filed rate doctrine does not bar their claims because plaintiffs' claims are based upon non-rate anticompetitive activity and a large number of the challenged rates were not filed with the PID. (ECF Nos. 119; 195.) The court will address each of these arguments below.

1. **Whether plaintiffs failed to allege a claim for damages based upon non-rate anticompetitive conduct.**

Plaintiffs argue they alleged a "market-exclusion-type" conspiracy, and, therefore, their claims pursuant to the court's decision in <u>Lower Lake Erie</u> are not barred by the filed rate doctrine. (ECF No. 195 at 12.) They contend their claims do not implicate the reasonableness of Highmark's rates or the PID's ratemaking process. (<u>Id.</u>) Highmark and UPMC argue in response that the injury alleged by plaintiffs in the second amended complaint is that the premiums they paid for Highmark's health insurance were inflated, and, therefore, the resolution of plaintiffs' claims requires the court to determine the rate Highmark would have charged to plaintiffs absent

30

the UPMC-Highmark conspiracy. (ECF No. 189 at 11; ECF No. 96 at 10.) According to UPMC

and Highmark, plaintiffs' claims under those circumstances are barred by <u>Keogh</u>.

Plaintiffs in the second amended complaint allege: (1) Highmark and UPMC conspired

together "to reduce competition" and "raise prices at the expense of the community's employers,

consumers, and patients, including specifically the members of the Plaintiff class," (ECF No. 90

25); (2) UPMC pursuant to the conspiracy "refus[ed] to contract on reasonable terms with any

competing health insurer or to sell its health insurance affiliate to any competing health insurer,"

(<u>id.</u> ¶ 7); (3) Highmark in response agreed "to restrict UPMC's hospital primary competitor,

West Penn Allegheny" and to pay UPMC excessive reimbursement rates, (<u>id.</u>); and (4) Plaintiffs

were injured by the UPMC-Highmark conspiracy because it enabled Highmark "to raise without

constraint the premiums it charged to members of the Plaintiff class," (<u>id.</u> ¶ 28). Plaintiffs'

measure of damages is based upon paying Highmark higher rates than they otherwise would

have paid absent the conspiracy, i.e., plaintiffs request damages in the amount of the difference

between the approved rates they paid Highmark and the rates they would have paid Highmark

absent the conspiracy. Plaintiffs did not allege damages based upon rates they would have paid

Highmark's low-cost competitors in the health insurance market; indeed, there are no allegations

in the second amended complaint that any of Highmark's competitors would have charged

plaintiffs a lower rate or would support a reasonable inference with respect to what rates

Highmark's competitors would have charged plaintiffs during the relevant time period. To

determine what Highmark's rates would have been absent the conspiracy requires a fact-finder

hypothetically to consider what rates the PID would have approved for Highmark as reasonable

and nondiscriminatory. Based upon the allegations contained in the second amended complaint,

plaintiffs failed to assert a claim for damages based upon non-rate anticompetitive conduct. To

31

the extent plaintiffs rely upon the difference between rates charged by Highmark that were approved by the PID and rates Highmark would have charged and which require the approval of the PID, their claims are barred by <u>Keogh</u>.

**2.   Whether all rates Highmark charged to plaintiffs were approved by the PID.**

Plaintiffs argue that under 40 PA. CONS. STAT. § 3803(c) and (d), insurers are required to file rates for individual[20] health insurance policies but are not required to file rates for group health insurance policies. (ECF Nos. 119; 195.) Royal Mile and Cole's Wexford Hotel are businesses that purchase group policies. Plaintiffs argue claims based upon rates charged to Royal Mile and Cole's Wexford Hotel are, therefore, not barred under the filed rate doctrine because they were not filed or required to be filed with the PID. (<u>Id.</u>) Plaintiffs acknowledge section 3803 requires health maintenance organizations ("HMOs") to file rates for group policies, but argue there is no allegation in the second amended complaint that plaintiffs were members of HMO plans. (<u>Id.</u>)

Highmark argues it was required under section 3803 to file all rates with the PID. (ECF No. 207 at 9.) Section 3803(d) provides:

> (d) Certain group rates exempt.--Except as provided in subsection (e), an insurer shall not be required to file with the department rates for accident and health insurance policies which it proposes to issue on a group basis in this Commonwealth.

40 PA. CONS. STAT. § 3803(d). Plaintiffs are correct that insurers under this section are not

---

[20] To the extent claims are asserted against defendants in this case based upon the reasonableness of rates paid by individuals, e.g., Pamela Lang, those claims are barred by the filed rate doctrine. 40 PA. CONS. STAT. § 3801.303 ("Each insurer shall file with the department rates for individual accident and health insurance policies which it proposes to use in this Commonwealth except those rates which, in the opinion of the commissioner, cannot practicably be filed before they are used.").

required to file rates for group health insurance policies. Section 3803(e), however, provides an exception to that exemption and is entitled "Required group rate filings." Section 3803(e) instructs that the "initial base rate for existing hospital plan corporations, professional health services plan corporations and HMOs shall be the rate or the rating formula currently on file and approved by the [PID]." 40 PA. CONS. STAT. § 3803(e)(1). Under this provision, hospital plan corporations, professional health services plan corporations, and HMOs must file their group rates with the PID. Id. Highmark contends it is both a hospital plan corporation and a professional health services plan corporation, and it was, therefore, required to file its group rates which with the PID. (ECF No. 207 at 9.)

Plaintiffs in the second amended complaint do not allege that Highmark is a hospital plan corporation or a professional health services plan corporation. Highmark in its reply brief requests the court take judicial notice of Highmark's certification issued by the PID as evidence of Highmark's status as a hospital plan corporation and a professional health services plan corporation. (ECF No. 207 at 9-10 n.3; ECF No. 207-1.) Courts in resolving a motion to dismiss may consider facts that are subject to judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (noting the court may consider "matters of which a court may take judicial notice" in resolving a Rule 12(b)(6) motion to dismiss) (quoted by Feingold v. Graff, 516 F. App'x 223, 225 (3d Cir. 2013)). The certificate, signed by the insurance commissioner for the PID, provides that Highmark "is duly organized under the laws of the Commonwealth of Pennsylvania as a Hospital Plan Corporation and a Professional Health Services Plan Corporation." (ECF No. 207-1 at 2.) Plaintiffs do not oppose Highmark's request for judicial notice or its assertion that Highmark is required to file group rates because it is a hospital plan corporation and a professional health services plan corporation. (ECF No. 220.)

33

Federal Rule of Evidence 201 provides:

> **(b) Kinds of Facts That May Be Judicially Noticed**. The court may judicially notice a fact that is not subject to reasonable dispute because it:
>
>> **(1)** is generally known within the trial court's territorial jurisdiction; or
>>
>> **(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

FED. R. EVID. 201(b). Highmark's status as a hospital plan corporation and a professional health services plan corporation can be accurately and readily determined by the certification issued by the PID. Highmark's status in this regard cannot be reasonably questioned and is not disputed by plaintiffs in this case. The court based upon the foregoing will take judicial notice that Highmark is a hospital plan corporation and a professional health services plan corporation. Highmark was, therefore, required under section 3803(e)(1) to file its group rates with the PID.

Plaintiffs argue that even if Highmark was required to file its group rates with the PID, the filed rate doctrine does not bar claims based upon those rates because those group rates "may be increased by up to 10 percent annually without triggering a new rate-filing requirement, so long as the rates being charged are not 15 percent higher than the 'base rate' as set forth in the statute." (ECF No. 195 at 15 (quoting 40 PA. CONS. STAT. § 3803(e).) Highmark argues the filed rate doctrine is applicable to bar plaintiffs' claims for damages based upon group rates it charged plaintiffs because "when the PID approved the generally applicable base rates and rate formulas, by statute, it also expressly approved a range (plus or minus 15% of those base rates) that Highmark was permitted to use for a specific group." (ECF No. 207 at 11.)

The issue before the court is whether the filed rate doctrine is applicable to bar claims for damages based upon rates charged pursuant a statutory scheme that mandates an insurer file a base rate with the insurance department for approval and provides the insurer discretion to

charge rates within a specified range of the base rate without filing those rates with the insurance department. The filed rate doctrine applies when a plaintiff's claim implicates *either* of the doctrine's underlying principles of

> (1) "preventing carriers from engaging in price discrimination as between ratepayers," and (2) "preserving the exclusive role of ... agencies in approving rates ... by keeping courts out of the rate-making process," a function that "regulatory agencies are more competent to perform."

McCray, 682 F.3d at 241 (quoting Marcus, 138 F.3d at 58-59). The first principle, known as the "non-discrimination strand," "recognizes that 'victorious plaintiffs would wind up paying less than non-suing ratepayers.'" McCray, 682 F.3d at 242 (quoting Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 21 (2d Cir. 1994)). The nondiscrimination strand is not implicated in this case because plaintiffs are suing defendants "on their own behalf and on behalf of all others similarly situated." (ECF No. 90 at 1); McCray, 682 F.3d at 242. It is, therefore, "unlikely that a victory would allow [plaintiffs] to pay less than other ratepayers." McCray, 682 F.3d at 242.

The second principle is known as the "nonjusticiability strand" and recognizes that:

> "(1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set ... rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." Sun City Taxpayers' Assoc. v. Citizens Utils. Co., 45 F.3d 58, 62 (2d Cir.1995).

McCray, 682 F.3d at 242. Plaintiffs argue the rates charged by Highmark were not *filed* with the PID and, therefore, the resolution of their claims does not require the court to interfere with the ratemaking authority of the PID. The requirements for rate approval relevant to Highmark's group rates are set forth by the Pennsylvania legislature in section 3803(e). That section mandates certain insurers, i.e., hospital plan corporations, professional health services plan corporations and HMOs, receive from the PID approval for their group policy base rates and

provides that "[r]ates developed for a specific group which do not deviate from the base rate or base rate formula by more than 15% may be used without filing with the department." 40 PA. CONS. STAT. 3803(e)(4). In other words, the PID when it approves the base rate for a group it approves a *range of rates* the insurer is permitted to charge that group.

The PID's approval of a base rate and the rates within a fifteen-percent range of the base rate renders the rates legally enforceable and assures they are not "excessive, inadequate or unfairly discriminatory." 40 PA. CONS. STAT. 3803(e)(1); <u>Keogh</u>, 260 U.S. at 162-63 (holding a plaintiff may not establish antitrust injury based upon the payment of rates found to be legally enforceable by an administrative agency). This court cannot interfere with the determination of the PID about the rates charged by Highmark. In other words, a determination by the PID that the rates charged by Highmark were not "excessive, inadequate or unfairly discriminatory" is not subject to review by this court or a jury and neither the court nor a jury may select a hypothetical rate that the PID would have approved for Highmark in the absence of the UPMC-Highmark conspiracy.

A primary concern of the nonjusticiability strand is "preventing courts from engaging in the ratemaking process." <u>McCray</u>, 682 F.3d at 242. The court having to calculate the legal rate but for the defendant's antitrust violations "alone is enough to implicate the nonjusticiability principle." <u>Id.</u>; <u>In re N.J. Title Ins. Litig.</u>, 683 F.3d at 457 ("[T]he nonjusticiability strand recognizes that federal courts are ill-equipped to engage in the rate making process, which does not depend on whether agencies actually use their superior expertise."). As discussed <u>supra</u>, plaintiffs' measure of damages in the second amended complaint is the difference between the approved rates charged by Highmark and the rates Highmark would have charged but for the UPMC-Highmark conspiracy. To make that determination a court would need to second guess

36

the PID's approval of the rates charged by Highmark and select a hypothetical rate the PID would have approved for Highmark in the absence of the conspiracy. See Keogh, 260 U.S. at 160 ("The burden resting upon the plaintiff would not be satisfied by proving that some carrier would, but for the illegal conspiracy, have maintained a rate lower than that published. It would be necessary for the plaintiff to prove, also, that the hypothetical lower rate would have conformed to the requirements of the Act to Regulate Commerce."). The nonjusticiability strand is, therefore, implicated by plaintiffs' claims for damages in the second amended complaint.

The rationale in Korte v. Allstate Insurance Company, 48 F.Supp.2d 647, 651 (E.D. Tex. 1999), is persuasive and supports the application of the filed rate doctrine to the group rates approved by the PID in this case. In Korte, the court held the filed rate doctrine is applicable "where a state agency determines reasonable rates pursuant to a statutory scheme." Id. The plaintiffs in that case sued the defendant automobile insurance provider for, among other things, overcharging the plaintiffs "to subsidize [the defendant's] state-required risk pool of insureds." Id. at 649. The plaintiffs sought damages from the defendant measured by "the difference between the amount they were charged for their car insurance and the amount they would have been charged if [the defendant's] filed rates had not been 'excessive for the risks to which they apply.'" Id. (quoting the plaintiff's complaint in that case). The defendant argued the filed rate doctrine barred plaintiffs' claims because they were based upon rates filed with the Texas Department of Insurance ("TDI"). Korte, 48 F.Supp.2d at 650-51. The plaintiffs argued the filed rate doctrine did not apply to bar their claims because the TDI did not approve all rates charged by the defendant. Id. at 651.

In Korte, article 5.101 of the Texas Insurance Code required the insurance commissioner to select a base rate and permitted insurers to charge a rate within a "flexibility band" of that base

37

rate without prior approval of that rate from the TDI. Korte, 48 F.Supp.2d at 651. The court defined "flexibility band" as "the range of rates from 30 percent below to 30 percent above, inclusive, the benchmark rates set by the commissioner by line, within which an insurer during a set period relative to a particular line, may increase or decrease rate levels by classifications without prior approval by the commissioner." Id. at 652 n.9 (citing TEX. INS. CODE, art. 5.101 § 2(3)). The insurer within thirty days of the effective date of the base rate selected by the commissioner was required to file its proposed rates with the TDI, and "if the proposed rates [were] within the range of rates authorized by the flexibility band, [those] rates [took] effect without prior approval from the TDI." Id. at 652. The plaintiffs in Korte argued the filed rate doctrine did not bar their claims because the rates charged by the defendant were not determined by the TDI; rather, the TDI determined only the benchmark rate, which the plaintiffs did not question. Id. at 650.

The court determined the plaintiffs' argument was without merit based upon the principles underlying the filed rate doctrine. Korte, 48 F.Supp.2d at 652. The court acknowledged "'[t]he considerations underlying the [filed rate] doctrine ... are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to ensure that regulated companies charge only those rates of which the agency has been made cognizant.'" Id. at 652 (quoting Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577-78 (1981)). The court commented "that although the commissioner does not establish the actual rates, but only the benchmark rate, the rates filed within the flexibility band are effective and presumed to be valid." Korte, 48 F.Supp.2d at 652. The court held that under those circumstances, the plaintiffs could not "deny the effect of the filed rates" and the filed rate doctrine barred their claims because they "implicate[d] the reasonableness of the filed rates." Id.

38

Plaintiffs argue <u>Korte</u> is distinguishable from the facts of this case because the commissioner in <u>Korte</u> selected the base rate and the insurers were required to file rates charged within the flexibility band with the insurance department.[21] (ECF No. 222 at 8.) Plaintiffs argue "[f]iling and charging rates within a 'flexibility band' is not the same thing as charging but not filing rates within a band." (<u>Id.</u>) Regardless whether the rates within a permissible range set forth by statute are filed with the regulatory agency, the agency's approval of the filed base rate and rates within fifteen percent of that range renders those rates—actually filed or not—legally enforceable rates. The court under those circumstances cannot interfere with the authority of the PID, which authorized those rates as not excessive, inadequate, or discriminatory.

---

[21] Plaintiffs also distinguish <u>Korte</u> because it was not an antitrust action and "there was no contention in that case that anticompetitive activity had corrupted the market forces that were supposed to determine what rates were charged within the 'flexibility band.'" (ECF No. 222 at 9.) One might assert that this argument supports plaintiffs' contention that the filed rate doctrine does not bar their claims because they alleged the UPMC-Highmark conspiracy excluded Highmark's competitors from the market. <u>See</u> <u>Lower Lake Erie Iron Ore Antitrust Litig.</u>, 998 F.2d 1144, 1159 (3d Cir. 1993). The applicability of the filed rate doctrine, however, is not based upon culpable conduct by the defendant. <u>H.J. Inc. v. Northwestern Bell Tel. Co.</u>, 954 F.2d 485, 489, 492 (8th Cir. 1992) (rejecting the plaintiffs' argument "that the filed rate doctrine does not apply in the face of fraudulent conduct" because "the [defendants'] underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations."); <u>Simon v. Keyspan Corp.</u>, 785 F.Supp.2d 120 (S.D.N.Y. 2011) ("<u>Simon I</u>"). "Thus, '[a]pplication of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results.'" <u>Simon I</u>, 785 F.Supp.2d at 138 (quoting <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 58 (2d Cir. 1998)). The filed rate doctrine applies when its principles are implicated by a measure of damages based upon rates approved by an administrative agency. The PID approved the rates, i.e., the range of rates, charged by Highmark in this case, and plaintiffs are requesting damages based upon the difference between the approved rates Highmark charged and a hypothetical rate Highmark should have charged absent the UPMC-Highmark conspiracy. Plaintiffs' claims for damages are, therefore, barred under <u>Keogh</u>.

The outcome may be different if the PID did not require the filing of a base rate and mandate that rates charged more than fifteen percent above or below the base rate be filed. See Town of Norwood, Mass. V. New England Power Co., 202 F.3d 408, 419 (1st Cir. 2000) ("Of course, if [the defendant's] rates were truly left to the market, with no filing requirement or FERC supervision at all, the filed rate doctrine would by its terms no longer operate."). As discussed supra, however, the rates charged by Highmark within the fifteen-percent range of the base rate were authorized by the PID. The PID authorized the base rate as being not excessive, inadequate, or discriminatory and knew pursuant to the statutory scheme that a range of fifteen percent was being authorized. Similarly, in Korte, the TDI knew the range of rates insurers could charge pursuant to the statutory scheme when it selected the base rate. The TDI did not, therefore, require additional authorization of rates that were charged within the flexibility band. The court in that case did not interfere with the province of the TDI and held the filed rate doctrine applied to bar the plaintiff's claims. This court likewise cannot interfere with the judgment of the PID that the rates charged by Highmark were reasonable, including the fifteen percent range, and are, therefore, legal rates. Based upon the foregoing, the nonjusticiability principle of the filed rate doctrine is clearly implicated in this case by plaintiffs' measure of damages based upon the approved rates Highmark charged for its individual and group policies.

UPMC and Highmark cite Simon v. Keyspan Corp., 785 F.Supp.2d 120 (S.D.N.Y. 2011) ("Simon I"), and Simon II in support of their argument that the filed rate doctrine applies to claims based upon rates charged but not directly approved by a regulatory agency pursuant to a statutory scheme. At issue in those decisions was the wholesale electricity market in New York, New York ("New York City"). Simon II, 694 F.3d at 196; Simon I, 785 F.Supp.2d at 123. Congress empowered the Federal Energy Regulation Commission ("FERC") with the authority

40

to set rates for the sale of electricity and determine whether the wholesale rates were "'just and reasonable' and not unduly discriminatory or preferential." Simon I, 785 F.Supp.2d at 124-25 (quoting 16 U.S.C. § 824e). FERC provided two methods for rates to be authorized as legally enforceable rates: (1) FERC-approved market auctions administered by the New York Independent System Operator ("NYISO") and (2) market-based rate tariffs "that each seller must file and have approved by FERC as a condition to selling capacity and wholesale electricity, whether such sales are made through market auctions or through independently negotiated contracts." Simon I, 785 F.Supp.2d at 126. The market-based auction process is described as follows:

> In order to determine the price at which producers can sell their capacity, NYISO has established an auction system that results in a market-based rate ("MBR"). Producers submit bids indicating the amount of capacity they can produce and the lowest per unit price at which they are willing to sell. The bids are then "stacked" from lowest to highest price until the total demand for capacity has been met. The point at which demand is met determines the market price for installed capacity and every producer stacked below that price point can sell its full capacity for the market price. The producer whose bid set the price can sell as much of its capacity as is necessary to meet demand. The rest remains unsold. Any producer that bid higher than the market price cannot sell its capacity.

Simon II, 694 F.3d at 199. With respect to the market-based rate tariffs:

> The MBR Tariffs authorize a seller to determine its prices for both capacity and wholesale electricity, subject to the conditions set forth in the MBR Tariff, the NYISO Tariff, and FERC's other rules and regulations. FERC will approve an MBR Tariff only if a seller complies with extensive FERC filing and related requirements and can demonstrate that it either lacks market power or has market power that has been adequately mitigated such that it cannot unjustly or unreasonably impact market prices.

Simon I, 785 F.Supp.2d at 126.

The plaintiff, a retail consumer of electricity in New York City, sued KeySpan Corporation ("Keyspan"), a producer of wholesale electricity that colluded with its competitor to

increase prices in the relevant market, and Morgan Stanley Capital Group Inc., a financial firm

that facilitated that agreement. <u>Simon II</u>, 694 F.3d at 198. The district court held that the

plaintiff's claims were barred under the filed rate doctrine because they "impermissibly [sought]

to challenge as unreasonable the filed rates KeySpan offered in the wholesale auctions." <u>Simon I</u>,

785 F.Supp.2d at 138. The court explained:

> *First*, the prices offered by KeySpan in the capacity auctions were authorized
> under the NYISO Tariff that FERC approved and issued pursuant to its authority
> under the Federal Power Act. The NYISO Tariff set the rates that KeySpan could
> offer in the capacity auctions. *Second*, any rates charged by KeySpan pursuant to
> its FERC-approved authority under its separate MBR Tariff, either in the
> wholesale auctions for capacity or in contracts for wholesale electricity, were also
> unassailable as a "filed rate" protected by the filed rate doctrine.
>
> In sum, the FERC-authorized rates that KeySpan offered in the capacity auctions
> have the force of federal law and can only be altered or refunded through
> adjudicatory proceedings that must be commenced before FERC pursuant to rules
> established under the Federal Power Act. Plaintiff's claims impermissibly seek to
> challenge those rates and must, therefore, be dismissed under the filed rate
> doctrine. Accordingly, the filed rate doctrine serves as an alternative ground in
> which to dismiss all of plaintiff's claims, based on both federal and state law.

<u>Simon I</u>, 785 F.Supp.2d at 139.

The plaintiff appealed the decision of the district court. The Court of Appeals for the

Second Circuit noted that with respect to the filed rate doctrine: "The only issue we must decide

is whether the filed rate doctrine can apply beyond the rates set directly by an agency to [market-

based rates] set by a regulatory auction scheme." <u>Simon II</u>, 694 F.3d at 206. The plaintiff urged

the court "to limit the filed rate doctrine to cases where the regulatory agency itself chose or

approved the rate." <u>Id.</u> The court noted that the plaintiff's proposed approach had "some appeal."

<u>Id.</u> at 207. Because FERC did not directly set the rate, it "did not specifically determine that the

rate was reasonable," and "KeySpan's alleged conduct undermined the competitive market

scheme FERC and NYISO had created." Id. The court ultimately rejected the plaintiff's approach, however, because "FERC [had] chosen to exercise its rate-setting authority in this market by establishing as MBR auction process….[and] [d]espite leaving the final price to auction, FERC exercised tight control over the rate by imposing price caps on the major producers." Id. The court held: "We conclude that the filed rate doctrine applies on these facts— where the regulator created a process for setting rates, reviewed the resulting rates, and, after investigation, determined that the anti-competitive behavior did not undermine its process and that the resulting rates were reasonable." Simon II, 694 F.3d at 208. The court in reaching its decision commented: "Although we have not previously addressed whether the filed rate doctrine applies to MBRs, other circuits that have addressed the issue have concluded that the doctrine applies with equal force to MBRs." Id. at 206. The court cited, among other decisions, the decision of the Third Circuit Court of Appeals in Utilimax, in which the court held the filed rate doctrine applied to rates authorized by FERC in the market-based auction process at issue in the Simon decisions. Id.; Utilimax, 378 F.3d at 306.

    Highmark argues the Simon decisions, the outcome of which is supported by Utilimax, "stand for the proposition that there are a wide variety of regulatory regimes that fall within the filed rate doctrine while still affording some pricing discretion to the defendant; the Pennsylvania regime does not have to fit some precise statutory formula for the doctrine to apply." (ECF No. 229 at 5.) Similarly, UPMC argues: "the filed rate doctrine does not merely protect a specific rate, but 'bars all claims—state and federal—that attempt to challenge [the terms of a tariff] that a federal agency has reviewed.'" (ECF No. 234 at 2-3) (quoting Simon I, 784 F,Supp.2d at 138.) Plaintiffs argue that the Simon decisions are not applicable to this case because (1) the regulatory agency following the market-based auctions actually determined the legally enforceable rate; and

(2) unlike the statutory scheme in this case, the statutory scheme in the <u>Simon</u> decisions provided "tight[] controls" on the auction process, including mechanisms for investigating and remedying "any fraud, deceit, or market manipulation in the bidding process." (ECF No. 222 at 4.)

The <u>Simon</u> decisions, while distinguishable from the present case because they concerned a statutory scheme different from the one in issue in this case, support the proposition that the filed rate doctrine may apply to bar claims based upon rates authorized by a regulatory agency pursuant to a statutory scheme that provides the defendant some discretion with respect to setting rates. In <u>Simon</u>, KeySpan, pursuant to a statutory scheme, exercised discretion with respect to the bid it submitted at the auction. FERC and NYISO exercised control over that process by, among other things, setting a bid cap which limited the bid KeySpan could submit to the auction.

Highmark in this case pursuant to the statutory scheme has discretion to charge rates within a certain range of the base rate. The PID exercised control over Highmark by requiring Highmark to file a base rate for approval. As discussed <u>supra</u>, when the PID approved the base rate, it approved all rates within fifteen percent of the base rate as not excessive, inadequate, or discriminatory. The argument that the PID did not "directly" approve Highmark's rates and, therefore, the filed rate doctrine does not bar claims based upon those rates lacks merit because the PID was aware of the statutory scheme and acted pursuant to it when it approved Highmark's base rate and the rates within fifteen percent of the base rate. This court under those circumstances cannot engage in ratemaking to determine the rates the PID would have approved but for the UPMC-Highmark conspiracy. The court in accordance with the nonjusticiability strand must defer to the institutional competence of the PID, which determined the rates charged by Highmark were not excessive, inadequate or unfairly discriminatory, and cannot engage in the ratemaking process to determine what rates Highmark should have charged to Royal Mile and

Cole's Wexford Hotel. To the extent plaintiffs seek recovery based upon payment of individual or group rates to Highmark, their claims are barred by the filed rate doctrine. It follows that plaintiffs failed to set forth a legally cognizable measure of damages in the second amended complaint with respect to their antitrust claims, i.e., counts I-VI. Those claims will be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

### 3.  Leave to amend

Plaintiffs at the hearing with respect to defendants' motions to dismiss requested leave to amend if the court dismissed the second amended complaint based upon the application of the filed rate doctrine. (H.T. 7/1/13 (ECF No. 235) at 38.) As the court discussed supra, plaintiffs' asserted measure of damages in the second amended complaint is the difference between the approved rate Highmark charged them and the hypothetical rate Highmark would have charged them but for the UPMC-Highmark conspiracy. Plaintiffs argue their damages may also be determined by calculating the difference between the rate Highmark charged them and the rate Highmark's competitors would have charged them had they been able to enter the market in the absence of the UPMC-Highmark conspiracy. (H.T. 7/1/13 (ECF No. 235) at 23) ("Our damages could also be measured by looking at a but for premium we would have paid to a competitor who would have entered the market had there not been a conspiracy.") Based upon the factual allegations in the second amended complaint, plaintiffs did not assert that measure of damages. The court will grant plaintiffs' request for leave to amend to the extent they can assert a claim for damages that is not barred by Keogh.

The court cautions that a claim for damages based upon the difference between the rates Highmark charged plaintiffs and the rates Highmark's competitors would have charged them had the competitors been able to enter the market in the absence of the UPMC-Highmark conspiracy

45

may be also barred by <u>Keogh</u> if the court would have to assess what hypothetical rate those competitors would have charged <u>and</u> if that rate would have needed to be approved by the PID.[22] Plaintiffs argue their claims are not barred by the filed rate doctrine because their damages are based upon the difference between the approved rates charged and the rates of Highmark's lower-cost competitors, e.g., "Aetna, United, CIGNA, and Coventry." (ECF No. 90 ¶ 212.) If Highmark's competitors were required to file their rates with the PID, that measure of damages based upon rates Highmark's competitors could have charged plaintiffs in the absence of the UPMC-Highmark would be barred by <u>Keogh</u> and is distinguishable from the measure of damages sought by the steel company-plaintiffs in <u>Lower Lake Erie</u>.

The measure of damages in <u>Lower Lake Erie</u> was the difference between the approved rates charged by the railroads to the steel company-plaintiffs and the lower rates the steel company-plaintiffs could have paid to the railroads' lower-cost competitors, i.e., the privately owned docks and trucking companies whose rates were not subject to approval by a governmental agency. To calculate damages in <u>Lower Lake Erie</u> the court compared legally approved rates charged by the railroads with rates charged by <u>unregulated</u> docks and trucking companies. Under those circumstances, the steel company-plaintiffs were not required to prove what those unregulated entities would have charged but for the railroads' anticompetitive conduct <u>and</u> that the ICC would have approved those hypothetical rates. The court, therefore, was not required to engage in the ratemaking process, and the steel company-plaintiffs could

---

[22] Whether claims based upon this measure of damages would be barred by Keogh depends in large part upon whether Highmark's competitors were required to file their rates with the PID or were exempt from the filing requirement under section 3803(d). This court is also not aware whether those competitors had approved rates which were lower than Highmark's approved rates.

sustain their burden of proving lower-cost options that were precluded by the railroads' anticompetitive conduct.

In Goldwasser v. Ameritech Corp., Civ. No. 97-6788, 1998 WL 60878 (N.D. Ill. Feb. 4, 1998), the plaintiffs alleged the defendant telephone service company, which controlled more than ninety percent of the relevant markets, "effectively fenced-out competitors from the local telephone service market, thus preserving [the defendant's] monopoly power and its ability to extract supracompetitive prices from consumers." Goldwasser, 1998 WL 60878, at *5. The defendant argued, among other things, that the plaintiffs' claims were barred under Keogh because "no matter what the underlying conduct that [the plaintiffs] complain of, [the plaintiffs] are merely seeking recovery for [the defendant's] overcharge for local telephone services." Id. at * 4. The plaintiffs, like the plaintiffs in this case, cited to Lower Lake Erie and argued the filed rate doctrine did not bar their claims because they were based upon the defendant's non-rate anticompetitive activity. Id. at *5. The court rejected the plaintiffs' argument finding that rate making was implicated for the competitors and Lower Lake Erie was distinguishable on that basis. The court explained:

> In *Lower Lake Erie*, the alleged anticompetitive activity sought to exclude an entirely new alternative means of competition—shipping by truck instead of rail—which would have otherwise been available to the consumer steel company plaintiffs. The court explained that "the question of hypothetical lower rates [was] ancillary" since the excluded trucking competitors would not have been subjected to the same rate-setting regulatory review. *Id.* at 1160. Thus, the filed rates of the railroads were only relevant to the extent that consumers were constrained to pay them for lack of any other options.
>
> In stark contrast, the **competitors allegedly excluded** in this case are telephone companies, just like Ameritech, that **are governed by the same rate-filing requirements** in that industry. Unlike the steel companies in *Lower Lake Erie*, consumers in the local telephone market are captive to rates approved by the state PUCS. **Any measure of damages in this case would necessarily involve the Court's determination of a hypothetical lower rate that would have been**

47

> **approved by the various state PUCs—exactly the messy task which the filed rate doctrine seeks to avert.** Thus, since filed rates are necessarily implicated by Plaintiffs' claims, the distinction drawn by Lower Lake Erie is not relevant to the case at bar. See *County of Stanislaus v. Pacific Gas & Elec. Co.*, 114 F.3d 858, 865 (9th Cir.1997) (similarly finding *Lower Lake Erie* 's distinction irrelevant where filed rates are unavoidable).

Id. at *5-6 (emphasis added).

The distinction between the measure of damages asserted in Goldwasser and the claims asserted in Lower Lake Erie may be applicable to this case if damages are asserted based upon the difference between Highmark's approved rates and the rates Highmark's rate-regulated competitors could have charged plaintiffs but for the UPMC-Highmark conspiracy. Pursuant to Keogh, a plaintiff cannot sustain a claim based upon hypothetical rates that require the approval of an administrative agency because the administrative agency determines the legality of the rates and will not assess the legality of a hypothetical rate. If plaintiffs seek to amend the second amended complaint to assert claims for damages based upon the rates Highmark's lower-cost, rate-regulated competitors would have charged plaintiffs absent the UPMC-Highmark conspiracy, the court could not entertain those claims; this court under Keogh may not engage in the ratemaking process to determine the rates those lower-cost competitors' would have charged. If Highmark's lower-cost competitors, e.g., Aetna, United, CIGNA, and Coventry, are regulated entities required to obtain the PID's approval for rates charged for individual and group policies, the court cannot consider plaintiffs' claims without offending the nonjusticiability principles set forth in Keogh. On the other hand, if Highmark's competitors were exempt from the rate-approval requirements, the filed rate doctrine arguably may not be applicable. See 40 PA. CONS. STAT. § 3803(d).

To the extent plaintiffs seek to amend the second amended complaint to include a

measure of damages based upon the difference between the approved rates they paid to Highmark and approved rates of Highmark's competitors, those claims may not be barred by the filed rate doctrine. In <u>Stein v. Pacific Bell</u>, 173 F.Supp.2d 975, 984-85 (N.D. Cal. 2001), the plaintiffs alleged that due to the defendants' anticompetitive conduct, they were forced to pay the defendants' supracompetitive rates as opposed to the lower rates charged by the defendants' competitors. The court distinguished the measure of damages set forth by the plaintiffs in that case from the measure of damages set forth by the plaintiffs in <u>Goldwasser</u>. <u>Id.</u> at 985. While in <u>Goldwasser</u> the plaintiffs sought relief based upon the difference between the approved rates charged by the defendants and hypothetical approved rates the defendants' competitors would have charged but for the defendants' anticompetitive conduct, the plaintiffs in <u>Stein</u> sought damages based upon the difference between approved rates charged by the defendants and approved rates they could have paid to the defendants' competitors but for the defendants' exclusionary conduct. <u>Id.</u> Thus, the damages sought by the plaintiffs in <u>Stein</u> were not speculative or based upon hypothetical rates, and the court did not have to engage in the ratemaking process to award damages; instead, the court could compare the legally approved rates of the defendants and the legally approved rates of their competitors to determine the damage caused to the plaintiffs by the defendants' anticompetitive conduct. <u>Id.</u> at 985-86. The court in <u>Stein</u> determined that under those circumstances the measure of damages set forth by the plaintiffs was similar to the measure of damages sought in <u>Lower Lake Erie</u> and was not barred by the filed rate doctrine. <u>Id.</u> at 985. The court noted, however, that the measure of damages based upon the difference between the approved rates of the defendants and the defendants' low-cost competitors was not adequately plead. <u>Id.</u> at 986. The court on that basis dismissed the plaintiffs' claims for damages and granted the plaintiffs leave to amend the complaint. <u>Id.</u>

The measure of damages in the second amended complaint is not based upon the difference between approved rates plaintiffs paid to Highmark and the approved rates they could have paid to Highmark's competitors if they were not excluded from the market. Plaintiffs in the second amended complaint allege that as a result of the UPMC-Highmark conspiracy, they were forced to pay inflated rates for Highmark insurance, and they would have paid less for Highmark insurance but for the UPMC-Highmark conspiracy. That measure of damages as discussed supra is barred under Keogh. The second amended complaint must, therefore, be dismissed because plaintiffs' claims are barred by the filed rate doctrine. Plaintiffs are granted leave to amend to the extent they can establish a claim that does not require the court to engage in the ratemaking process or to second guess the determination of the PID with respect to approved legal rates.

**B.  Highmark's market and monopoly power[23] (counts IV and VI)**

---

[23] At the hearing with respect to the pending motions to dismiss, plaintiffs suggested to the court that a LECG report with "extensive findings about the barriers of entry to the health insurance market and about its findings that Highmark had substantial market power" could be incorporated by reference into the second amended complaint. (H.T. 7/1/2013 (ECF No. 235) at 44-45.) Plaintiffs argued the document, which is 193 pages, is publicly available and they quoted extensively from it in the complaint. (Id. at 45.) Highmark following the hearing filed a "Response to Plaintiffs' Request to Take Judicial Notice of the LECG Report." (ECF No. 214.) Plaintiffs replied to Highmark's response and asserted, among other things, that "[p]laintiffs' claims are in no way *dependent* upon the Court considering the LECG Report, which only substantiates the SAC's adequately pled claims." (ECF No. 217 at 5) (emphasis in original.) The Third Circuit Court of Appeals has commented:

> As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. Angelastro, 764 F.2d at 944. However, an exception to the general rule is that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment." Shaw, 82 F.3d at 1220 (emphasis added); see also Trump, 7 F.3d at 368 n. 9 ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (quoting

Plaintiffs in count IV of the second amended complaint assert Highmark willfully acquired and maintained a monopoly in the market of private health insurance in violation of § 2 of the Sherman Act. (ECF No. 90 ¶¶ 244-49.) Plaintiffs in count VI of the second amended complaint assert Highmark willfully attempted to monopolize "the market for health care

> Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3rd Cir.1993)).
>
> The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint-lack of notice to the plaintiff-is dissipated "[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint." Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir.1993) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2nd Cir.1991)); see also San Leandro, 75 F.3d at 808-09. What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent. See Shaw, 82 F.3d at 1220.
>
> …
>
> [T]he language in both Trump and Shaw makes clear that what is critical is whether the claims in the complaint are "based" on an extrinsic document and not merely whether the extrinsic document was explicitly cited. See Trump, 7 F.3d at 368 n. 9; Shaw, 82 F.3d at 1220.

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

Plaintiffs' concession in their response that their "claims are in no way dependent upon the Court considering the LECG Report" indicates the LECG Report is not integral to their claims, i.e., their claims are not *based* upon that document. Although plaintiffs cite to the document and quote from it the second amended complaint, the court declines to consider the *entirety* of the 193-page document in deciding the pending motions to dismiss. See In re Schering Plough Corp, Intron/Temodar Consumer Class Action, 678 F.3d 235, 250-51 (3d Cir. 2012) ("Under Fed.R.Civ.P. 8(a)(2), a complaint should set forth a "short and plain statement" of the claim to relief. Plaintiffs cannot be permitted to incorporate an endless series of external documents into a complaint simply "by reference" to them, as this would lead to an impossible task for defendants in filing their answers, and for courts in reviewing the sufficiency of complaints.).

financing and administration for private employers and individuals in and around Allegheny

County" in violation of § 2 of the Sherman Act. (ECF No. 90 ¶¶ 257-263.) Highmark argues

counts IV and VI should be dismissed because plaintiffs did not set forth factual allegations

sufficient to support the conclusion that Highmark had market power in the relevant markets.[24]

(ECF No. 189 at 11-12.)

> Section 2 of the Sherman Act provides that "[e]very person who shall
> monopolize, or attempt to monopolize ... any part of the trade or commerce
> among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2.
>
> To state a claim for monopolization, a plaintiff must allege "(1) the possession of
> monopoly power in the relevant market and (2) the willful acquisition or
> maintenance of that power as distinguished from growth or development as a
> consequence of a superior product, business acumen, or historical accident."
> Schuylkill Energy Resources v. Pennsylvania Power & Light Co., 113 F.3d 405,
> 412-13 (3d Cir.) (quotations omitted), cert. denied, 522 U.S. 977, 118 S.Ct. 435,
> 139 L.Ed.2d 335 (1997).
>
> To state a claim for attempted monopolization, a plaintiff must allege "(1) that the
> defendant has engaged in predatory or anticompetitive conduct with (2) a specific
> intent to monopolize and (3) a dangerous probability of achieving monopoly
> power." Schuylkill, 113 F.3d at 413.

Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc., 159 F.3d 129, 141 (3d Cir.

1998). To sustain a monopolization claim, a plaintiff must prove the defendant possessed

monopoly power.[25] Id. To sustain an attempted monopolization claim, a plaintiff must prove the

defendant "possessed sufficient market power to come dangerously close to [monopolizing the

---

[24] The court's discussion infra is limited to addressing Highmark's argument that plaintiffs did
not sufficiently allege it had market power with respect to counts IV and V of the second
amended complaint. The parties did not brief and the court does not address whether plaintiffs
set forth factual allegations sufficient to satisfy the other elements of a claim for monopolization
or attempted monopolization under § 2.

[25] "Monopoly power under § 2 requires 'something greater' than market power under § 1."
Queen City Pizza, Inc. v. Domino Pizza, Inc., 124F.3d 430, 442 (3d Cir. 1997) (quoting Eastman
Kodak, 504 U.S. at 481).

relevant market]." <u>Barr Laboratories, Inc. v. Abbott Laboratories</u>, 978 F.2d 98, 112 (3d Cir. 1992).

"Market power is the ability to raise prices above those that would be charged in a competitive market." <u>Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.</u>, 468 U.S. 85, 109 n.38 (1984). One author has noted that "[m]onopoly power is merely a substantial degree of market power and economists use the terms interchangeably. There is no bright line between market power and monopoly power." 1 JOHN J. MILES, HEALTH CARE & ANTITRUST LAW 5-22 (Thomson Reuters 2013). The Supreme Court of the United States has defined monopoly power as "the power to control prices or exclude competition." <u>United States v. E.I du Pont de Nemours & Co.</u>, 351 U.S. 377, 391 (1956). Stated another way, monopoly power is the ability to "(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion." PHILLIP E. AREEDA & HERBERT HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW 5-6 (Wolters Kluwer Law & Business, 4th ed. 2013). "If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." <u>Broadcom Corp. v. Qualcomm Inc.</u>, 501 F.3d 297, 307 (3d Cir. 2007). "[A] market may be unusually susceptible to monopolization—and therefore an allegation of monopoly power may be particularly compelling—where significant barriers to new-firm entry such as stringent industry regulation and high start-up cost are present." <u>Babyage.com, Inc. v. Toys "R" Us, Inc.</u>, 558 F.Supp.2d 575, 585 (E.D. Pa. 2008) (citing <u>Broadcom</u>, 501 F.3d at 307).

The burden is on the plaintiff to prove a defendant possesses monopoly power. <u>In re Remeron Direct Purchaser Antitrust Litig.</u>, 367 F.Supp.2d 675, 679-80 (D.N.J. 2005). A plaintiff may prove a defendant possessed monopoly power by "direct evidence of supracompetitive

pricing and high barriers to entry," <u>Harrison Aire, Inc. v. Aerostar Int'l</u>, 423 F.3d 374, 381 (3d

Cir. 2005), or circumstantial evidence of "the structure and composition of the relevant market,"

<u>Broadcom</u>, 501 F.3d at 307. "[C]ourts more typically examine market structure in search of

circumstantial evidence of monopoly power." <u>Harrison Aire</u>, 423 F.3d at 381. To prove a

defendant has monopoly power by circumstantial evidence, "a plaintiff typically must plead and

prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers'

protect that market." <u>Id.</u> (quoting <u>Harrison Aire</u>, 423 F.3d at 381. "Barriers to entry are factors,

such as regulatory requirements, high capital costs, or technological obstacles, that prevent new

competition from entering a market in response to a monopolist's supracompetitive prices."

<u>Broadcom</u>, 501 F.3d at 307. The Supreme Court of the United States has noted that "without

barriers to entry it would presumably be impossible to maintain supracompetitive prices for an

extended time." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 591 n.15

(1986).

   Courts within the Third Circuit have held a defendant has significant market share

supporting an inference of monopoly power if the defendant possesses sixty percent or more

market share in the relevant market. <u>See e.g.</u>, <u>Houser v. Fox Theatres Mgmt. Corp.</u>, 845 F.2d

1225, 1230 (3d Cir. 1988) (inferring at the motion to dismiss stage that defendant had monopoly

power because the plaintiff alleged the defendant controlled between 66% and 71% of the

relevant market); <u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056, 1065 (3d Cir. 1978)

(finding control of "100% to 89.8%" of the relevant market "is generally considered

monopolistic"); <u>In re Mushroom Direct Purchaser Antitrust Litig.</u>, 514 F.Supp.2d 683, 700 (E.D.

Pa. 2007) ("Plaintiffs have pled sufficiently monopoly power for defendant EMMC by alleging

that defendant EMMC controlled sixty to ninety percent of the Agaricus mushroom market and

annually removed over fifty million pounds of Agaricus mushrooms from production.").

Courts within the Third Circuit are not likely to infer the existence of monopoly power from a defendant's market share if the defendant possesses fifty-five percent or less market share in a relevant market. See e.g., Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 201 (3d Cir. 1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power."); Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 749 (3d Cir. 1996) (holding proof that the defendant controlled forty-seven percent of the relevant market "without concrete evidence of anticompetitive behavior" was not sufficient to prove the defendant had monopoly power); Only v. Ascent Media Grp., LLC, Civ. No. 06-2123, 2006 WL 2865492, at *5 (D.N.J. Oct. 5, 2006) ("Courts generally do not find that a defendant company has monopoly power if it controls less than 50 percent of the given market.").

Highmark argues "Royal Mile admits that it is entirely within UPMC's control, not Highmark's control, who enters or expands in the insurance market in Western Pennsylvania….For this reason, Royal Mile has not plausibly alleged that Highmark has market power." (ECF No. 189.) As discussed supra, a defendant has market power if it has the ability "to price substantially above the competitive level" and "to persist in doing so for a significant period without erosion by new entry or expansion." AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW, supra at 5-6. Highmark's argument that it did not have market power because UPMC controlled the entry of Highmark's competitors in the relevant market "blend[s] the market power inquiry with the question of whether the defendant[] obtained market power through improper exclusionary conduct." AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW, supra at 5-7. A court may consider the existence of barriers to entry in the relevant market to determine whether a defendant possessed market power or monopoly power;

indeed, barriers to entry enable a defendant to charge supracompetitive prices for a prolonged period of time without the threat of competition. Id. Contrary to Highmark's argument, a defendant to be liable for monopolization under § 2 does not have to be responsible for the barrier to entry to have market power. Id. The Court of Appeals for the Third Circuit has identified barriers to entry that are not within the control of the defendant including "regulatory requirements, high capital costs, or technological obstacles." Broadcom, 501 F.3d at 307. These barriers to entry may have little to do with the culpable conduct of any defendant.[26] Areeda and Hovenkamp have commented that "focusing on a defendant's ability to exclude rivals seemingly ignores the more general protection of monopoly profits—namely, entry barriers not resting on conduct by the defendant.…While impediments to rivals' entry or expansion can protect any ability the defendant otherwise has to profit from a supracompetitive price, they do not necessarily create or indicate any such power." AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW, supra at 5-7.

Plaintiffs in the second amended complaint allege Highmark had market power because it had the power to control prices in the relevant market.[27] Plaintiffs allege Highmark's market share in the relevant market "exceeded 60% continuously from January 1, 2000 to the present."

---

[26] The Court of Appeals for the Ninth Circuit has identified the following five "main sources of entry barriers:" "(1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1439 (8th Cir. 1995).

[27] Plaintiffs allege the relevant market with respect to Highmark is the market of "health care financing and administration for private employers and individuals, including indemnity insurance, managed care products such as HMO, PPO, or POS plans, and third-party administration of employer self-funded health plans." (ECF No. 90 ¶ 210.) The court will refer to this market as the "relevant market" in this section of the opinion.

(ECF No. 90 ¶ 210.) Plaintiffs allege there are barriers to entry in the relevant market, i.e., UPMC's refusal to contract competitively with Highmark's competitors. Plaintiffs allege Highmark controlled the prices consumers were charged for health insurance in the relevant market and charged plaintiffs inflated premiums while experiencing "rapid growth in profits, as its net income increased from less than $50 million in 2001 to approximately $398 million in 2006." (ECF No. 90 ¶¶ 105, 210.) These allegations, i.e., Highmark possessed a sixty percent market share, there was a barrier to entry in the relevant market, and Highmark charged supracompetitive prices while experiencing growth, support an inference that Highmark had market power substantial enough to constitute monopoly power under § 2 of the Sherman Act. Based upon the foregoing, plaintiffs in the second amended complaint sufficiently alleged Highmark possessed monopoly power in the relevant market to state a claim for monopolization and attempted monopolization[28] under § 2 of the Sherman Act.

---

[28] As discussed <u>supra</u>, monopoly power is a substantial degree of market power. Having concluded plaintiffs alleged facts to support the conclusion that Highmark possessed monopoly power in the relevant market, the court will not address whether plaintiffs sufficiently alleged Highmark had market power for the purpose of their attempted monopolization claim. The court notes, however, that

> [t]o say that one who has monopolized has also attempted to monopolize is redundant and adds nothing to the scope of available remedies. The attempt is merged into the completed offense. Of course, the plaintiff may plead both offenses and allow the court to base its disposition on either or neither offense as the evidence emerges.

AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW, <u>supra</u> at 8-35. At least two courts of appeals to consider the issue have held that a defendant that *actually* monopolizes a market cannot be held liable for *attempting* to monopolize the market. <u>Re/Max Int'l, Inc. v. Realty One, Inc.</u>, 173 F.3d 995, 1021 (6th Cir. 1999) ("Of course, the evidence supporting Re/Max's claim that the defendants have monopoly power cuts against its theories of attempted monopolization and conspiracy to monopolize."); <u>Olympia Equip. Leasing Co. v. W. Union Tel. Co.</u>, 797 F.2d 370, 373 (7th Cir. 1986) ("Olympia's complaint also charges attempted monopolization, but in a case such as this where the plaintiff presents (as we shall see) adequate evidence of monopoly power, he can get no mileage out of charging attempted as well as completed monopolization.").

Highmark cites <u>St. Clair v. Citizens Financial Group</u>, 340 F. App'x 62, 66 (3d Cir. 2009), in support of its argument that Highmark, based upon the allegations contained in the second amended complaint, did not have market power because it did not have power to exclude competitors from the relevant market. In <u>St. Clair</u>, the court of appeals determined the plaintiff "failed to allege the percentage of the relevant market controlled by Defendants or plead any facts regarding the strength of competition, probable development of the industry, the nature of the anticompetitive conduct, or the elasticity of consumer demand." <u>Id.</u> The court held that under those circumstances plaintiff's allegation that the defendants "effectively barricaded entry into the market" was conclusory. <u>Id.</u> The <u>St. Clair</u> decision does not stand for the proposition that a defendant must be responsible for the barriers to entry in the relevant market to support a finding that the defendant has market power or monopoly power in the relevant market.

Highmark also cites to <u>Dicar, Inc. v. Stafford Corrugated Prods., Inc.</u>, Civ. No. 05-5426, 2010 WL 988548, at *13 (D.N.J. 2010), in support of its argument that a plaintiff must allege the defendant caused barriers to entry in the relevant market to prove the defendant possessed monopoly power or a dangerous probability of obtaining monopoly power in the relevant market. (ECF No. 189 at 12-13.) In <u>Dicar</u>, the court commented that to determine whether there is a dangerous probability the defendant will achieve monopoly power, the court must consider: "(1) the size of the defendants' market share (2) the strength of competition, (3) probable

---

In <u>LePage's Inc. v. 3M</u>, 324 F.3d 141, 169 (3d Cir. 2003), the Court of Appeals for the Third Circuit did not address the particular issue, but declined to "consider the correctness of the District Court's ruling on the attempted monopolization claim because [it upheld] its decision on the monopolization claim." The court noted: "The jury returned the same amount of damages on both claims and LePage's concedes that under those circumstances discussion of the attempted monopolization is unnecessary." <u>Id.</u>

development of the industry, (4) the barriers to entry, (5) the nature of the anticompetitive conduct, and (6) the elasticity of consumer demand." <u>Dicar</u>, 2010 WL 9888548, at *13 (citing <u>Barr Laboratories</u>, 978 F.2d at 112). The plaintiff in that case set forth factual allegations with respect to the first factor, i.e., the size of the defendants' market share. The court held that with respect to the second and third factors, i.e., the strength of competition and probable development of the industry, the plaintiff failed to allege factual allegations sufficient to show there was a lack of competition in the relevant market. <u>Dicar</u>, 2010 WL 9888548, at *13. The court commented:

> Although market share is significant, as the Third Circuit explained, **a plaintiff must show "that there was [some] significant reduction in the number of manufacturers in the market during the relevant time period because of [plaintiffs'] allegedly anti-competitive conduct," for instance, by showing that a competitor was forced out of the market or that prices fluctuated.** <u>See</u> <u>Barr Labs.</u>, 978 F.2d at 114; <u>U.S. v. Empire Gas Corp.</u>, 537 F.2d 296, 305 (8th Cir.1976) (finding no dangerous probability of success in absence of evidence that competitors decided not to enter or leave market because of defendant's actions).

<u>Dicar</u>, 2010 WL 9888548, at *13 (emphasis added).

The court is not persuaded by Highmark's citation to <u>Dicar</u>. The court in <u>Dicar</u> cited to <u>Barr Laboratories</u> for the proposition that a plaintiff must allege the defendant caused barriers to entry to show the defendant had a dangerous probability of achieving monopoly power. The bolded and underlined excerpt from <u>Dicar</u> quoted above, however, is not the entirety of the Third Circuit Court of Appeals' sentence in <u>Barr Laboratories</u>. In <u>Barr Laboratories</u>, the court held that in considering the "stability of the market structure, the entry of new manufacturers and products, and the stability of prices in the erythromycin market[,]" evidence with respect to market concentration and the defendants' market share was insufficient for the plaintiff to meet its burden to prove the defendant had a dangerous probability of monopolizing the relevant

market. Barr Laboratories, 978 F.2d at 112, 113. The court commented:

> **Barr also suffers from a lack of evidence showing that there was any significant reduction in the number of manufacturers in the market during the relevant time period because of Abbott's allegedly anti-competitive contracts *or otherwise.*** Evidence of a significant net reduction in the number of producers in the market **could be** evidence of some reasonable hope of success. Moreover, there is no evidence that any competitor was forced out because of Abbott's conduct. See Empire Gas, 537 F.2d at 305 (finding no dangerous probability of success in absence of evidence that defendant's competitors decided not to enter or to leave market because of defendant's actions). The only evidence on this point is Barr's observation that of thirty-two pharmaceutical companies that sold ethylsuccinate products in 1990, ten had no sales, apparently indicating their exit from the market. Reply Brief for Appellant at 18 n. 6. We do not think that this evidence is sufficient in the face of the other evidence showing a continuing entry of competitors during the time that is at issue.

Barr Laboratories, 978 F.2d at 114 (emphasis added). The entirety of the sentence in Barr Laboratories that is quoted by the court in Dicar indicates there was a lack of evidence with respect to the reduction of the defendants' competitors **because of** the defendants' conduct ***or otherwise***. Id. The court in Barr Laboratories did not hold that to prove monopoly power or a dangerous probability of achieving monopoly power a plaintiff must prove the defendant caused barriers to entry in the relevant market.

A plaintiff must allege the defendant has sufficient market power to sustain a claim for attempted monopolization, which requires consideration, among other things, of defendant's market share, ability to control price, and the existence of barriers to entry in the relevant market. The court in Barr Laboratories considering the totality of the evidence determined there was insufficient evidence to prove there was a dangerous probability of the defendant achieving monopoly power because, among other things, competitors entered the market during the relevant timeframe, there were no barriers to entry in the relevant market, and no evidence the defendant's conduct eliminated or barred competition in the relevant market. Id. The court held

the relevant market was a competitive market, and, therefore, there was not a reasonable probability that competitors in the market would fall victim to the defendant's allegedly anticompetitive conduct. Id. The "lack of evidence showing that there was any significant reduction in the number of manufacturers in the market during the relevant time period because of [the defendant's] allegedly anti-competitive contracts" was one of many factors considered by the court and was not a case dispositive factor. Id. The court in Barr Laboratories did not hold that to establish a defendant has market power sufficient to state a claim for monopolization or attempted monopolization, the defendant must cause barriers to entry in the relevant market; indeed, as discussed supra, the existence and cause of barriers to entry are two of many factors a court may consider to determine whether a defendant has market power sufficient to state a claim under § 2 of the Sherman Act, and the barriers to entry may be caused by outside forces not within the control of the defendant. Plaintiffs in the second amended complaint alleged facts sufficient to support the conclusion that Highmark had market power substantial enough to constitute monopoly power in the relevant market. As discussed supra, however, plaintiffs' antitrust claims in the second amended complaint must be dismissed based upon the application of the filed rate doctrine.

### C.  Indirect Purchaser Rule (counts I-III and V)

UPMC argues counts I, II, III, and V should be dismissed because plaintiffs lack standing to pursue those claims under the indirect purchaser rule set forth by the Supreme Court of the United States in Illinois Brick Co. v. Illinois, 431 U.S. 720, 729 (1977). The indirect purchaser rule provides that "only direct purchasers from antitrust violators may recover damages in antitrust suits." Howard Hess Dental Lab v. Dentsply Int'l, 424 F.3d 363, 369 (3d Cir. 2005) ("Hess I"). There are three policy considerations underlying the indirect purchaser rule:

(1) a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge;

(2) the evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and

(3) permitting direct and indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue.

Hess I, 424 F.3d at 369-70.

Plaintiffs in the second amended complaint allege they purchased health insurance from Highmark. (ECF No. 90 ¶ 5.) Highmark contracted with UPMC to provide its customers, e.g., plaintiffs, health care. Plaintiffs under those circumstances are indirect purchasers of UPMC's services. The central theory of plaintiffs' second amended complaint is that "[t]he supracompetitive reimbursement rates imposed by UPMC on all payors, including Highmark, are passed on to patient-subscribers (including Plaintiff class), resulting in both market injury and injury the class." (ECF No. 90 ¶ 26, 166) ("Highmark has in turn passed on the costs of UPMC's charges to employers, consumers, and patients by charging higher premiums.") Absent an applicable exception, plaintiffs' claims against UPMC would, therefore, be barred by the indirect purchaser rule.

Plaintiffs argue their claims are not barred by the indirect purchaser rule because the co-conspirator exception is applicable to their claims against UPMC. (ECF No. 119 at 15.) Although the Third Circuit Court of Appeals has not been presented with a case warranting the application of the co-conspirator exception, the court of appeals in Hess I, 424 F.3d at 376, acknowledged a limited co-conspirator exception and outlined the circumstances under which

the exception would apply. The court commented:

> [S]uch an exception would only exist in circumstances where the middlemen would be barred from bringing a claim against their former co-conspirator-the manufacturer-because their involvement in the conspiracy was "truly complete" ( i.e., if the middlemen would be barred from suing by the "complete involvement defense" of a manufacturer).

Id. The court determined the co-conspirator exception was not applicable to the case before it because the middleman's involvement in the conspiracy was not "truly complete." Id. at 383 ("If there is a general co-conspirator exception, it would only apply if the middlemen were barred from bringing a claim against their former co-conspirator—the manufacturer—because their involvement in the conspiracy was "truly complete." However, in our case, Plaintiffs could not qualify for such an exception because the District Court concluded, and Plaintiffs have conceded, that the dealers' involvement in the alleged conspiracy with Dentsply was not 'truly complete.'"). The court, having determined the dealers' involvement was not truly complete, did not address whether a co-conspirator may assert a complete involvement defense under federal antitrust laws. Id. at 381. Based upon Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134 (1968), and Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299 (1985), however, a complete involvement defense exists under federal antitrust laws and will bar a co-conspirator's claims against another conspirator in appropriate circumstances. See Wallach v. Eaton Corp., 814 F.Supp.2d 428, 435-37 (D. Del. 2011).

In Perma Life, the district court held, among other things, that the plaintiff's claims asserted under the Sherman Act were barred by the doctrine of in pari delicto, which means "of equal fault." Perma Life, 392 U.S. at 136, 137. The defendant in Perma Life manufactured automobile mufflers and other exhaust system parts. Id. at 136. The defendant "initiated a detailed plan for promoting the sale of mufflers by extensively advertising the 'Midas' trade

name and establishing a nationwide chain of dealers who would specialize in selling exhaust system equipment." Id. Prospective dealers as part of the defendant's plan were required to enter into sales agreements prepared by a wholly-owned subsidiary of the defendant. Id. The Court explained the provisions of the sales agreement as follows:

> The agreement obligated the dealer to purchase all his mufflers from Midas, to honor the Midas guarantee on mufflers sold by any dealer, and to sell the mufflers at resale prices fixed by Midas and at locations specified in the agreement. The dealers were also obligated to purchase all their exhaust system parts from Midas, to carry the complete line of Midas products, and in general to refrain from dealing with any of Midas' competitors. In return Midas promised to underwrite the cost of the muffler guarantee and gave the dealer permissing [sic] to use the registered trademark 'Midas' and the service mark 'Midas Muffler Shops.' The dealer was also granted the exclusive right to sell 'Midas' products within his defined territory. He was not required to pay a franchise fee or to purchase or lease substantial capital equipment from Midas, and the agreement was cancelable by either party on 30 days' notice.

Id. at 137. The plaintiffs sued the defendant for illegal restraint of trade based upon the sales agreement and its various provisions restricting the plaintiffs' ability to purchase from other manufacturers. Id. The plaintiffs in the complaint alleged that on various occasions they objected to the restrictive provisions, but the defendant's subsidiary refused to eliminate the restrictions and threatened to terminate the sales agreement if they failed to comply with those provisions. Id.

The court of appeals affirmed the district court's application of the in pari delicto defense. Id. at 137-38. The court of appeals reasoned the plaintiffs knew about the restrictive covenants when they entered into the sales agreement, profited from the sales agreement, and sought and obtained additional franchise agreements under the same terms. Id. at 38. The court held the plaintiffs under those circumstances were barred from seeking recovery from the defendant. Id.

The Supreme Court was in "complete disagreement with the Court of Appeals." Id. at 138. The Court held an in pari delicto defense did not exist under the antitrust laws and even if it did, the facts of the case did not warrant its application. Id. The Court reasoned Congress had not indicated the defense existed under antitrust laws, which "are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." Id. The Court explained:

> [W]e cannot accept the Court of Appeals' idea that courts have power to undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal arranements [sic] formulated and carried out by others. Although petitioners may be subject to some criticism for having taken any part in respondents' allegedly illegal scheme and for eagerly seeking more franchises and more profits, their participation was not voluntary in any meaningful sense. They sought the franchises enthusiastically but they did not actively seek each and every clause of the agreement. Rather, many of the clauses were quite clearly detrimental to their interests, and they alleged that they had continually objected to them. Petitioners apparently accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity. The argument that such conduct by petitioners defeats their right to sue is completely refuted by the following statement from Simpson: 'The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws.' 377 U.S., at 16, 84 S.Ct., at 1054.

Perma Life, 392 U.S. at 139.

The defendant in Perma Life argued the plaintiffs actively supported the entirety of its plan, and the plaintiffs under those circumstances should be barred from recovery. Id. at 140. The Court declined to hold the plaintiffs' claims were barred based upon their "complete involvement" in the defendant's plan. Id. The Court reasoned that although the plaintiffs enthusiastically sought the franchise agreements, they did not "actively seek" each restrictive covenant in the sales agreement, most of which were detrimental to the plaintiffs' self-interest. Id. The Court noted the plaintiffs objected on numerous occasions to the restrictive covenants

and were met with allegations of "heresy" and threats of punishment for doing so. Id. at 141. The Court determined under those circumstances the plaintiffs "did not aggressively support and further the monopolistic scheme," and, therefore, were not barred from seeking recovery from the defendant. Id. at 140. The Court in Perma Life did not, however, preclude the possibility of a complete involvement defense. Id. The Court commented:

> We need not decide…whether such truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of in pari delicto, for barring a plaintiff's cause of action, for in the present case the factual picture respondents attempt to paint is utterly refuted by the record.

Id.

"The Supreme Court had occasion to re-examine the complete involvement defense in Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 298, 308 (1985)." Wallach, 814 F.Supp.2d at 435. The Court in Bateman recognized that in Perma Life it did not address

> whether a plaintiff who engaged in "truly complete involvement and participation in a monopolistic scheme"-one who "aggressively support[ed] and further[ed] the monopolistic scheme as a necessary part and parcel of it"-could be barred from pursuing a damages action, finding that the muffler dealers had relatively little bargaining power and that they had been coerced by the franchisor into agreeing to many of the contract's provisions.

Bateman, 472 U.S. at 308. With respect to the level of fault applicable to warrant the complete involvement defense, the Court in Bateman acknowledged:

> In separate opinions [in Perma Life], five Justices agreed that the concept of "equal fault" should be narrowly defined in litigation arising under federal regulatory statutes. "[B]ecause of the strong public interest in eliminating restraints on competition, ... many of the refinements of moral worth demanded of plaintiffs by ... many of the variations of in pari delicto should not be applicable in the antitrust field." Id., at 151, 88 S.Ct., at 1991 (MARSHALL, J., concurring in result). The five Justices concluded, however, that **where a plaintiff truly bore at least substantially equal responsibility for the violation, a defense based on such fault-whether or not denominated in pari delicto -should be recognized in antitrust litigation.**

Bateman, 472 U.S. at 308-09 (footnote omitted and emphasis added). The issue before the court in Bateman was whether the Court's "emphasis [in Perma Life] on the importance of analyzing the effects that fault-based defenses would have on the enforcement of congressional goals" was applicable to claims brought under the federal securities laws. Id. at 308. The Court determined its pronouncements in Perma Life with respect to the federal antitrust laws were equally applicable to federal securities laws. Id. at 310-11. The Court held:

> [T]he views expressed in Perma Life apply with full force to implied causes of action under the federal securities laws. Accordingly, a private action for damages in these circumstances may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.

Bateman, 472 U.S. at 310-11. Courts recognize the foregoing two-part test as the applicable test to determine whether a plaintiff's federal antitrust claims against its co-conspirator are barred by the complete involvement defense. See Wallach, 814 F.Supp.2d at 437; see also Sullivan v. Nat'l Football League, 34 F.3d 1091, 1107 (1st Cir. 1994); Fla. Software Sys., Inc. v. Columbia/HCA Healthcare Corp., Civ No. 97-2866, 1999 WL 781812, at *2 (M.D. Fla. Sept. 16, 1999); Bieter Co. v. Blomquist, 848 F.Supp. 1446, 1449 (D. Minn. 1994).

In Wallach, the court commented:

> While the Hess I Court left some question as to the actual existence of the exception-based upon its failure to apply the exception to the facts of the case and its acknowledgment that the Third Circuit had yet to address whether a complete involvement defense existed in an antitrust action, *see generally*, Hess I, 424 F.3d at 376–84–the Court appears to have subsequently affirmed the potential applicability of the general coconspirator exception. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 259 (3rd Cir.2010) (" Hess II ") ("As we explained in Hess I, the Plaintiffs could come within Illinois Brick's coconspirator exception only if the Dealers were precluded from asserting claims against Dentsply because their participation in the conspiracy was 'truly complete.' ").

67

Wallach, 814 F.Supp.2d at 435. The plaintiff trucking companies in Wallach, sued the defendants under §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act, 15 U.S.C § 14. Wallach, F.Supp.2d at 432. The defendants included Eaton, a manufacturer of transmissions for Class 8 trucks, and truck manufacturers that sold Class 8 trucks to trucking companies. Id. at 433. The plaintiffs sued all defendants for conspiracy under §§ 1 and 2 of the Sherman Act and asserted a claim against Eaton for attempted monopolization under § 2 of the Sherman Act. Id. at 432. According to the plaintiffs, Eaton sold transmissions to the truck manufacturers. Id. The truck manufacturers sold trucks to the plaintiffs. Id. The plaintiffs alleged Eaton and the truck manufacturers conspired to put Eaton's competitor in manufacturing transmissions out of business, "thereby expanding Eaton's monopoly and permitting all defendants to share in the profits resulting from this monopoly." Id. The plaintiffs alleged they were injured by, among other things, having to pay higher prices for trucks due to the higher prices Eaton charged to the truck manufacturers for transmissions. Id. at 434.

All the defendants in Wallach argued that because the plaintiffs purchased trucks from the truck manufacturers, as opposed to purchasing directly from Eaton, the plaintiffs' claims were barred by the indirect purchaser rule set forth in Illinois Brick. Wallach, 814 F.Supp.2d at 434. The plaintiffs, like the plaintiffs in this case, argued the co-conspirator exception applied and, therefore, they had standing to assert their claims against Eaton. Id. at 435. The court in Wallach after determining the co-conspirator exception was "viable" in the Third Circuit based upon a reading of Hess I and Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 259 (3d Cir. 2010) ("Hess II"), "examine[d] the circumstances in which a complete involvement defense would apply." Wallach, 814 F.Supp.2d at 435. The court considered the Supreme Court's decisions in Perma Life and Bateman and determined a complete involvement

defense is applicable where "complete, voluntary and substantially equal participation in an illegal practice" is shown. <u>Wallach</u>, 814 F.Supp.2d at 437.

The court determined that if the truck manufacturers asserted claims against Eaton, those claims would be barred by the complete involvement defense because the truck manufacturers "actively participated in the formulation and encouraged the continuation of an illegal scheme in substantially equal part with Eaton." <u>Id.</u> at 438. The court noted that unlike the plaintiffs in <u>Perma Life</u>, the truck manufacturers in <u>Wallach</u> were "far from being coerced" and "there [were] no allegations that suggest that either Eaton or [the truck manufacturers] did substantially more than the other to maintain or further the conspiracy; instead, the allegations suggest[ed] that each party needed to fully participate in order for the conspiracy to succeed." <u>Id.</u> Specifically, the truck manufacturers approached the seller, Eaton, in order to develop mutually beneficial partnership agreements. <u>Wallach</u>, 814 F.Supp.2d at 438. The parties engaged in arms-length negotiations that resulted in long-term agreements, "whereby [the other defendants] would receive sizeable rebates for meeting penetration goals and Eaton would see [its competitor's] market share significantly diminished." <u>Id.</u> The truck manufacturers, unlike the plaintiffs in <u>Perma Life</u>, "actively supported and furthered the conspiracy by meeting their percentage targets…and amending and extending their [long-term agreements]." <u>Id.</u> The court concluded that under those circumstances the truck manufacturers' involvement in the conspiracy was truly complete, and the co-conspirator exception applied to the case, meaning the indirect purchaser rule did not bar the claims asserted by the plaintiffs. <u>Id.</u>

The court agrees with the statement of the law articulated in <u>Wallach</u> and the analysis with respect to the co-conspirator exception. In summary, the Third Circuit Court of Appeals in <u>Hess I</u> and <u>Hess II</u> recognized a limited co-conspirator exception to the indirect purchaser rule—

although it has not addressed a case warranting application of the exception. The co-conspirator exception applies to suits brought by indirect purchasers when there are allegations of conspiracy, the co-conspirators are joined as co-defendants, and the middleman's involvement is truly complete, i.e., the middleman is "at least substantially equal[ly] responsib[le]for the violation" as the seller.[29] Bateman, 472 U.S. at 309-10. Under the Supreme Court's pronouncements in Perma Life and Bateman, a complete involvement defense exists under federal antitrust law and will in appropriate circumstances bar a co-conspirator's federal antitrust claims.

Here, plaintiffs' conspiracy claims asserted against UPMC may not be barred by the indirect purchaser rule because under the facts alleged in the second amended complaint the co-conspirator exception could apply to those claims. Plaintiffs properly joined both Highmark and UPMC as defendants in this case. Highmark based upon the factual allegations in the second amended complaint was completely involved in the UPMC-Highmark conspiracy, i.e., Highmark was at least substantially equally responsible for the alleged antitrust violation. In other words, if Highmark sued UPMC based upon the supracompetitive prices UPMC charged Highmark, UPMC could assert the complete involvement defense and the preclusion of that suit would not interfere with the enforcement of the antitrust laws.[30]

---

[29] UPMC first argued that for Highmark's involvement in the conspiracy to be truly complete, Highmark had to be "more culpable" than UPMC. (ECF No. 96 at 15.) UPMC abandoned that argument in its supplemental brief filed after the hearing with respect to the pending motions to dismiss. UPMC in its supplemental brief noted: "A co-conspirator's involvement is 'truly complete' only where the co-conspirator is at least a 'substantially equal participant' in the alleged wrongdoing." (Id. (quoting Hess I, 424 F.3d at 383)); (ECF No. 219 at 7 n.2).)

[30] As the court noted in Wallach, following Bateman courts applied the second prong of the two-part test, which specifically refers to securities law, to antitrust suits, i.e., "preclusion of suit

UPMC argues plaintiffs did not allege Highmark's involvement in the conspiracy was truly complete, and, therefore, the complaint is insufficient to show that the co-conspirator exception does not apply in this case. (ECF No. 213 at 6.) UPMC argues plaintiffs' allegations that UPMC coerced Highmark and imposed anticompetitive terms and conditions upon insurers such as Highmark "specifically contradict any argument that Highmark's involvement is truly complete." (Id.) The facts as alleged in the second amended complaint, however, are more like the facts in Wallach (complete involvement based upon the truck manufacturers acts in furtherance of the conspiracy), than the facts in Perma Life (the illegal conduct was "thrust upon" the direct purchaser). Perma Life, 392 U.S. at 141.

Here, as detailed supra, plaintiffs in the second amended complaint allege Highmark and UPMC conspired to protect each other in order to reduce competition in their respective markets and raise prices Highmark charged to plaintiffs. (ECF No. 90 ¶ 25.) To accomplish these goals, UPMC agreed to not competitively contract with Highmark's health insurance competitors and to stunt the growth of the UPMC Health Plan. (Id. ¶¶ 84, 88.) Highmark, like the truck manufacturers defendants in Wallach, allegedly fully participated in and furthered the conspiracy by "withdraw[ing] its commitment to and refus[ing] any significant financial support or assistance for West Penn Allegheny," withdrawing its low-price Community Blue product, and paying excessive reimbursement rates to UPMC. (Id. ¶¶ 25-26.) UPMC's agreement to blockade Highmark's competitors from entering the market permitted Highmark to "raise without

---

cannot significantly interfere with the enforcement of antitrust laws." Wallach, 814 F.Supp.2d at 437 n.4. UPMC does not argue and the court sees no reason why the preclusion of a lawsuit filed by Highmark against UPMC based upon the facts alleged in the second amended complaint would interfere with the enforcement of antitrust laws. The court will, therefore, focus its inquiry on whether Highmark's involvement in the UPMC-Highmark conspiracy was truly complete.

constraint" the rates charged to plaintiffs. (Id. ¶ 28.) UPMC and Highmark as a result of their quid pro quo conspiracy enjoyed "record profits." (Id. ¶ 26.) UPMC's argument that based upon the allegations contained in the second amended complaint the UPMC-Highmark conspiracy was "thrust upon" Highmark lacks merit. As alleged, Highmark was a full and willing participant in the conspiracy and was at least substantially equally responsible for the harm alleged by the plaintiffs, i.e., the supracompetitive rates. Highmark's involvement in the UPMC-Highmark conspiracy based upon the foregoing was truly complete. If the allegations in the second amended complaint are proven, the co-conspirator exception to the indirect purchaser rule would apply to plaintiffs' claims for conspiracy asserted against UPMC in counts I and II of the second amended complaint.

UPMC argues, however, that with respect to the § 2 claims asserted against UPMC based upon its unilateral conduct unrelated to the conspiracy, i.e., counts III and V, the co-conspirator exception does not apply and those claims are, therefore, barred by the indirect purchaser rule. Plaintiffs argue the co-conspirator exception applies to all their claims asserted against UPMC under the Sherman Act based upon the court's decision in Wallach, in which the court applied the co-conspirator exception to all claims asserted by the plaintiffs, including the claim against Eaton for monopolization under § 2. As UPMC argues, however, there is no indication in the Wallach opinion that the defendants argued the co-conspirator exception did not apply to the individual claim asserted against Eaton. The court agrees that Wallach did not address the individual claim. While plaintiffs argue the rationale in Wallach does not apply to nonconspiracy claims, Wallach does not rule out that the co-conspirator exception would apply to nonconspiracy claims.

Plaintiffs argue independently of their reliance on Wallach that their claims against

UPMC in counts III and V satisfy the three factors necessary to warrant the application of the co-conspirator exception to those counts. (ECF No. 219 at 3-4.) As set forth by the court of appeals in <u>Hess I</u>, for an indirect purchaser to have standing to assert claims against the seller, it must (1) allege a price-fixing conspiracy between the seller and direct purchaser; (2) join the seller and direct purchaser co-conspirators as co-defendants in the case; and (3) establish the middleman's involvement was truly complete. <u>Hess I</u>, 424 F.3d at 376, 378-79. Plaintiffs' analysis with respect to these factors indicates counts III and V of the second amended complaint are redundant to count II of the second amended complaint, which is asserted against UPMC and Highmark for conspiracy to monopolize in violation of § 2.

UPMC argues counts III and V are based upon UPMC's unilateral conduct and not upon its conspiracy with Highmark. Plaintiffs argue with respect to the first factor that although counts III and V are based upon allegations that UPMC acting alone violated § 2 of the Sherman Act, those counts are not "without conspiracy allegations." (ECF No. 219 at 4.) Plaintiffs argue:

> The conspiracy between UPMC and Highmark is integral to the entire SAC, including the Section 2 violations, because it demonstrates and depends upon the market power wielded by both UPMC and Highmark, and the *quid pro quo* agreement they made to illegally enhance each other's monopolies and market power. UPMC's *quid pro quo* conspiracy with Highmark enhanced its ability to exercise monopoly power in the market for health care services.

(<u>Id.</u>) With respect to the second factor, plaintiffs argue they joined Highmark and UPMC as co-defendants in this case. Plaintiffs assert with respect to the third factor that Highmark's involvement in the conspiracy was truly complete. The court cannot discern based upon plaintiffs' analysis of the foregoing factors how the substance of counts III and V differ from count II. Plaintiffs assert one measure of damages in the second amended complaint, i.e., the difference between the rates Highmark charged to plaintiffs and the rates Highmark would have

charged in the absence of the UPMC-Highmark conspiracy. Plaintiffs, if successful at trial, cannot receive a duplicative recovery. Although plaintiffs may plead claims against UPMC in the alternative to their conspiracy claims against Highmark and UPMC, if counts III and V are based upon UPMC conspiring with Highmark to monopolize and raise prices, those claims are not in the alternative to count II; indeed, they are conspiracy claims seeking the same measure of damages for all three claims. The three claims are based upon the same set of factual allegations, i.e., Highmark and UPMC conspired to restrict competition and raise rates charged to plaintiffs. To the extent UPMC charged Highmark supracompetitive prices separate and apart from any conspiracy with Highmark, claims based upon that conduct would be barred by the indirect purchaser rule.[31] To the extent counts III and V are based upon UPMC charging Highmark supracompetitive prices pursuant to the conspiracy, those claims are indistinguishable from count II of the second amended complaint, and are, therefore, redundant.[32] As discussed supra, however, all antitrust claims asserted by plaintiffs must be dismissed under Rule 12(b)(6) because plaintiffs did not set forth a legally cognizable measure of damages in the second amended complaint, i.e., plaintiffs' measure of damages is precluded by the filed rate doctrine.

---

[31] UPMC argues plaintiffs lack antitrust standing because plaintiffs' alleged injuries are too remote. (ECF No. 96 at 18.) UPMC's argument is based upon Highmark being a "more direct victim of UPMC's alleged actions." (Id.) As discussed supra, plaintiffs' claims are based upon UPMC and Highmark conspiring to, among other things, increase their profits by raising the rates Highmark charged to plaintiffs. Plaintiffs allege they suffered the exact injury UPMC and Highmark conspired to achieve. Plaintiffs under those circumstances do not lack standing to sue UPMC and Highmark for the difference between the rates Highmark charged to plaintiffs and the rates they would have charged plaintiffs in the absence of the conspiracy. Plaintiffs' claims as plead, however, are barred under the filed rate doctrine.

[32] To the extent the claims asserted against Highmark in counts IV and VI are also based upon the UPMC-Highmark conspiracy to restrict competition and raise prices and not unilateral action taken by Highmark, those claims are redundant to count II.

**D. Statute of limitations with respect to the claim for tortious interference with existing and prospective business relations (count VII)**

UPMC argues plaintiffs' claim for tortious interference with existing and prospective business relations should be dismissed because it is barred by the statute of limitations. (ECF No. 96 at 19.) UPMC argues that to the extent the claim is not time barred, this court should decline to exercise supplemental jurisdiction over the claim because plaintiffs' federal claims, i.e., the primary reason for the court to exercise supplemental jurisdiction over the state law claim, should be dismissed under the filed rate doctrine. (Id.) Plaintiffs assert their claim is not time barred because they adequately alleged that "UPMC engaged in continuing unlawful conduct after December 2, 2008," and UPMC fraudulently concealed the existence of the conspiracy, which tolled the statute of limitations. (ECF No. 119 at 19.)

The statute of limitations for interference with existing and prospective contractual relations under Pennsylvania law is two years. 24 PA. CONS. STAT. § 5524(3); Riggs v. AHP Settlement Trust, 421 F. App'x 136, 138 n.2 (3d Cir. 2011) ("Claims for tortious interference are also subject to a two-year limitations period."). Plaintiffs filed this lawsuit against UPMC and Highmark on December 2, 2010. (ECF No. 1.) As UPMC argues, "the tortious interference claim [asserted against it by plaintiffs] must be based on conduct that occurred on or after December 2, 2008." (ECF No. 96 at 19.) Plaintiffs in the second amended complaint allege that "[t]he illegal conspiracy continued until at least Summer 2008." (ECF No. 90 ¶ 233.) Plaintiffs, however, do not allege specific conduct by UPMC that constituted tortious interference with existing and prospective contractual relations that occurred after Summer 2008. Plaintiff's claim for tortious interference with existing or prospective contractual relations is based upon the following allegation:

75

> UPMC has tortiously interfered with Plaintiffs' existing and prospective
> contractual relations with Highmark, including but not limited to the campaign to
> discontinue the Community Blue program.

(ECF No. 90 ¶ 265.) Contrary to this allegation and plaintiffs' assertion that they have alleged

UPMC tortuously interfered with their existing and prospective contractual relations on or after

December 2, 2008, plaintiffs in the second amended complaint allege that "Community Blue was

in fact shut down by January 2004, and is now out of business." (ECF No. 90 ¶ 96.) According to

plaintiffs, Highmark in 2001 sued UPMC for false and misleading advertising about Community

Blue. (Id. ¶ 66.) Based upon these allegations, UPMC did not engage in conduct on or after

December 2, 2008 that constitutes tortious interference with existing or prospective contractual

relations with respect to Community Blue.

To the extent plaintiffs intend to rely upon other action taken by UPMC on or after

December 2, 2008, to form the basis of their tortious interference with existing or prospective

contractual relations claim, plaintiffs did not plead sufficient factual allegations to support the

claim. Plaintiffs argue they alleged that "UPMC engaged in continuing unlawful conduct after

December 2, 2008." (ECF No. 119 at 19) (citing ECF No. 90 ¶¶ 1, 175, 241, 242.) Plaintiffs do

not identify unlawful action taken by UPMC on or after December 2, 2008; instead, plaintiffs

make conclusory allegations that "unlawful and anticompetitive conduct continued after 2008

and continues to this day." (ECF No. 90 ¶ 1.) Plaintiffs point to the following allegations in the

second amended complaint in support of their argument that they have alleged unlawful conduct

on the part of UPMC that occurred on or after December 2, 2008:

> UPMC has engaged in a relentless campaign of anticompetitive, predatory
> conduct since at least 1999, **and continuing through the present day**, in an
> attempt to monopolize the Allegheny County market for acute inpatient hospital
> services and/or for tertiary and quaternary care services.

UPMC's conduct constitutes unlawful monopolization and unlawful anticompetitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and **such violation and the effects thereof are continuing and will continue** unless injunctive relief is granted.

As a direct and proximate result of **UPMC's continuing violations of Section 2 of the Sherman Act**, Plaintiffs and other members of the class have suffered injury in damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums, than they would have paid but for the Sherman Act violations.

(ECF No. 1 ¶¶ 175, 241, 242) (emphasis added.) These allegations are conclusory and not sufficient to support a claim that UPMC tortuously interfered with plaintiffs' existing or prospective contractual relations on or after December 2, 2008. Plaintiffs' claim for tortious interference with existing or prospective contractual relations is time barred unless, as plaintiffs argue, the statute of limitations was tolled because of UPMC's alleged fraudulent concealment of its tortious conduct.

Plaintiffs allege that UPMC fraudulently concealed its conduct that constituted tortious interference with existing or prospective contractual relations. (ECF No. 119 at 19.) "'In order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff justifiably relied.'" Pulli v. Ustin, 24 A.3d 421, 426 (Pa. Super. Ct. 2011) (quoting Baselice v. Franciscan Friars Assumption BVM Province, Inc., 879 A.2d 270, 278 (Pa. Super. Ct. 2005)). "A 'defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient.'" Krapf v. St. Luke's Hosp., 4 A.3d 642, 650 (Pa. Super. Ct. 2010) (quoting Molineux v. Reed, 532 A.2d 792, 794 (Pa. 1987)). The "'statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause.'" Krapf, 4 A.3d at

650 (quoting Fine v. Checcio, 870 A.2d 850, 861 (Pa. 2005). Plaintiffs in the second amended

complaint point to the following allegations in support of its position that UPMC "had numerous

opportunities to disclose to the Plaintiff Class and the public in general the conspiracy, but have

failed to do so:"

> In a November 13, 2007 Pittsburgh Post Gazette article, UPMC justified its first
> quarter profit jump of 43% and its $93 Million net income on accounting changes,
> though it noted that it had a "solid" quarter;

> The Pittsburgh Post Gazette reported in August 2004, 2005, 2006 and 2007 record
> profits at UPMC.

(ECF No. 90 ¶ 218(g) and (h).) Plaintiffs assert these allegations from UPMC "acknowledg[ing]

its significant profits" along with allegations that Highmark "repeatedly advanced explanations

for the annual, significant rate increases" are evidence that Highmark and UPMC "fraudulently

concealed their conspiracy to attempt to and/or actually monopolize the health insurance and

health care delivery markets in Western Pennsylvania." (ECF No. 90 ¶ 217, 219.) *Failing to

disclose* the UPMC-Highmark conspiracy, however, is not sufficient to establish an "affirmative

independent act of concealment" necessary to toll the statute of limitations for the tortious

interference claim, which is based, at least in part, upon UPMC's "campaign to discontinue the

Community Blue program." (ECF No. 90 ¶ 265.) Highmark's conduct with respect to its alleged

fraudulent concealment, furthermore, cannot be imputed to UPMC because the tortious

interference claim is not a conspiracy claim.

Plaintiffs in the second amended complaint also allege various governmental agencies

investigated the UPMC-Highmark conspiracy prior to December 2, 2008. (ECF No. 90 ¶ 181-

89.) At least one of those investigations, i.e., the investigation performed by the Pennsylvania

Attorney General, became public knowledge by the filing of a lawsuit against UPMC prior to

December 2, 2008.[33] (Id. ¶ 185.) Plaintiffs allege that "[i]n May 2007, the Pennsylvania Attorney General sued to enjoin UPMC's acquisition of Mercy Hospital as a violation of federal antitrust law." (Id.) According to plaintiffs, the Pennsylvania Attorney General in the complaint filed in that case alleged that "UPMC had denied access to tertiary care facilities to all health insurers except Highmark," and "in 2005 and 2006 UPMC possessed a 45% market share in all acute care inpatient services and a 60% market share Tertiary Care services." (Id. ¶¶ 186-87.) Plaintiffs allege that "UPMC settled the Attorney General's lawsuit through the entry of a Consent Decree." (Id. ¶ 188.) Based upon the foregoing allegations contained in the second amended complaint, if UPMC fraudulently concealed its conspiracy with Highmark, plaintiffs—in light of the Attorney General's investigation and lawsuit, which implicated UPMC's market share, antitrust violations, and relationship with Highmark—arguably may not be justified in relying on the concealment.

Under those circumstances, the factual allegations in the second amended complaint are insufficient to support the conclusion that UPMC fraudulently concealed its conduct that constituted tortious interference with plaintiffs' existing and prospective contractual relationship with Highmark and plaintiffs justifiably relied upon the concealment. The factual allegations relating to plaintiffs' claim for tortious interference with existing or prospective contractual relations show that the claim is time barred, and that claim must be dismissed. The dismissal is without prejudice in the event plaintiffs can assert factual allegations sufficient to show there was fraudulent concealment by UPMC that could toll the statute of limitations.

---

[33] The court is not aware whether the other investigations, i.e., investigations performed by the Department of Justice or the PID, were public knowledge prior to December 2, 2008.

## VI.    Conclusion

Based upon the foregoing discussion, plaintiffs' antitrust claims asserted against Highmark and UPMC (counts I-VI) will be dismissed under the filed rate doctrine. Plaintiffs' claim for tortious interference with existing and prospective contractual relations asserted against UPMC under Pennsylvania common law (count VII) will be dismissed because on the face of the second amended complaint it is time barred. The motions to dismiss filed by UPMC (ECF No. 95) and Highmark (ECF No. 188) will be granted. Plaintiffs are granted leave to seek to amend the second amended complaint within thirty days of the entry of the order granting the motions to dismiss to the extent they are able to plead, with respect to the antitrust claims, a measure of damages that does not require the court to interfere with the ratemaking authority of the PID and, with respect to the tortious interference claim against UPMC, a basis for fraudulent concealment. An appropriate order will be entered.

By the court,

Dated: September 27, 2013            /s/ JOY FLOWERS CONTI
                                     Joy Flowers Conti
                                     Chief United States District Judge