# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROYAL MILE COMPANY, INC.,** **PAMELA LANG** and **COLE'S WEXFORD HOTEL, INC.,** on their own behalf and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>**UPMC and HIGHMARK, INC.,**<br><br>    Defendants. | **Case No. 10-1609** |

## OPINION

**CONTI, Chief District Judge**

### I.    Introduction

Pending before the court in this antitrust action is a motion for leave to file a third amended complaint (ECF No. 249) filed by plaintiffs Royal Mile Company, Inc. ("Royal Mile"), Pamela Lang ("Lang") and Cole's Wexford Hotel, Inc. ("Cole's Wexford" and collectively with Lang and Royal Mile, "plaintiffs"). Defendants UPMC and Highmark, Inc. ("Highmark") oppose plaintiffs' motion for leave arguing that permitting amendment based upon the allegations set forth in the proposed third amended complaint, which was attached to plaintiffs' motion for leave, would be futile, and the class action allegations contained within the proposed third amended complaint are insufficient as a matter of law. (ECF Nos. 253, 254, 256, 266, 269, 271, 273, 277, 278, 283.)

Based upon the court's review of the parties' voluminous submissions and the hearing held with respect to those submissions on April 7, 2014, plaintiffs' motion for leave will be granted in part and denied in part for the reasons set forth herein.

## II.     Procedural History

On December 2, 2010, plaintiffs initiated this case by filing a complaint alleging (1) UPMC and Highmark engaged in anticompetitive conduct in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, and (2) UPMC tortuously interfered with plaintiffs' existing and prospective business relations in violation of Pennsylvania common law. (ECF No. 1.) On August 16, 2012, plaintiffs filed an amended complaint against UPMC and Highmark. (ECF No. 77.) On September 17, 2012, UPMC and Highmark each filed a motion to dismiss the amended complaint and a brief in support of their motions alleging plaintiffs failed to state a claim for relief. (ECF Nos. 77, 78, 80, 81.)

On October 4, 2012, plaintiffs filed a motion seeking preliminary approval of a settlement with Highmark, certification of class, and appointment of class counsel (the "motion for preliminary approval of class settlement"). (ECF No. 88.)

On October 9, 2012, plaintiffs filed the second amended complaint against UPMC and Highmark asserting the following counts:

- **Count I**: conspiracy in restraint of trade or commerce in violation of § 1 of the Sherman Act against Highmark and UPMC;

- **Count II**: conspiracy to monopolize in violation of § 2 of the Sherman Act against Highmark and UPMC;

- **Count III**: willful acquisition and maintenance of a monopoly in the relevant market for healthcare services in violation of § 2 of the Sherman Act against UPMC;

- **Count IV**: willful acquisition and maintenance of a monopoly in the relevant market for private health insurance in violation of § 2 of the Sherman Act against Highmark;

- **Count V**: willful attempted monopolization in violation of § 2 of the Sherman Act against UPMC;

- **Count VI**: willful attempted monopolization in violation of § 2 of the Sherman Act against Highmark; and

- **Count VII**: tortious interference under Pennsylvania law with existing and prospective business relations against UPMC.

(ECF No. 90 at 55-62.) On October 23, 2012, UPMC filed a motion to dismiss the second amended complaint. (ECF No. 95.) On October 26, 2012, Highmark filed a motion to dismiss the second amended complaint. (ECF No. 98.) On November 15, 2012, Highmark filed a motion to withdraw its motion to dismiss in light of the pending motion for preliminary approval of class settlement. (ECF No. 104.) On November 16, 2012, the court granted Highmark's motion to withdraw its motion to dismiss. (ECF No. 105.)

On May 17, 2013, after a failed settlement attempt between plaintiffs and Highmark, and plaintiffs' withdrawal of their motion for preliminary approval of class settlement and certification of the class, Highmark filed a renewed motion to dismiss the second amended complaint for failure to state a claim. (ECF No. 188.) On June 7, 2013, plaintiffs filed a response in opposition to Highmark's motion to dismiss for failure to state a claim. (ECF No. 195.) On June 26, 2013, Highmark with leave of court filed a reply in support of its motion to dismiss. (ECF No. 207.)

On September 27, 2013, after consideration of the parties' submissions, which included supplemental briefing, and the oral argument presented to the court at a hearing held on July 1, 2013, the court issued an opinion and order granting UPMC's and Highmark's motions to dismiss the second amended complaint. (ECF Nos. 240, 241.) The court held the second amended complaint must be dismissed because the measure of damages set forth in the second amended complaint implicated the filed rate doctrine, and plaintiffs' claim for tortious interference with existing and prospective contractual relations was time barred. (ECF No. 240 at

1.) The second amended complaint was dismissed without prejudice to plaintiffs seeking leave to file a third amended complaint "to the extent they [were] able to plead, with respect to the antitrust claims, a measure of damages that does not require the court to interfere with the ratemaking authority of the…[Pennsylvania Insurance Department (the "PID")] and, with respect to the tortious interference claim against UPMC, a basis for fraudulent concealment." (Id. at 80.)

On October 28, 2013, plaintiffs filed a motion for leave to file a third amended complaint, a brief in support of the motion, and the proposed third amended complaint attached to the motion. (ECF No. 249.) On October 29, 2013, plaintiffs filed an erratum with respect to the motion for leave to file a third amended complaint and a brief in support of the motion. (ECF Nos. 250, 251.) On November 4, 2013, Highmark filed a brief in opposition to the motion for leave to file a third amended complaint. (ECF No 253.) On November 21, 2013, UPMC filed a brief in opposition to the motion for leave to file a third amended complaint. (ECF No. 254.) On November 27, 2013, Highmark with leave of court filed a supplemental opposition to the motion for leave to file a third amended complaint. (ECF No. 256.) On January 14, 2014, plaintiffs filed a reply brief. (ECF No. 262.) On January 27, 2014, Highmark with leave of court filed a sur-reply brief in opposition to the motion for leave to file a third amended complaint. (ECF No. 266.) On February 10, 2014, UPMC with leave of court filed a sur-reply brief in opposition to the motion for leave to file a third amended complaint. (ECF No. 269.)

On April 7, 2014, the court heard oral argument on the pending motion for leave to file a third amended complaint. (H.T. 4/7/14 (ECF No. 270).) The court ordered supplemental briefing with respect to whether: (1) co-pays made to UPMC were part of the PID's ratemaking process; and (2) members of the putative plaintiff class that would have stayed with Highmark but for the alleged UPMC-Highmark conspiracy are entitled to damages. (H.T. 4/7/14 (ECF No. 270) at 9-

10, 55-56.)

On April 21, 2014, plaintiffs, Highmark, and UPMC each filed supplemental briefs. (ECF Nos. 271, 272, 273.) On May 5, 2014, Highmark and UPMC each filed a response to plaintiffs' supplemental brief. (ECF Nos. 277, 278.) On May 13, 2014, plaintiffs filed a reply brief to Highmark's and UPMC's supplemental briefs. (ECF No. 280.) On May 27, 2014, UPMC with leave of court filed a sur-reply brief in support of its opposition to plaintiffs' motion for leave to file a third amended complaint. (ECF No. 283.)

Plaintiffs' motion for leave to file a third amended complaint having been fully briefed is now ripe to be decided by the court.

### III.     Factual Allegations in the Proposed Third Amended Complaint[1]

The parties are familiar with the factual allegations contained in the second amended complaint, which were reviewed by the court in its opinion granting UPMC's and Highmark's motions to dismiss the second amended complaint. (ECF No. 240.) Plaintiffs repeat many of the allegations from the second amended complaint in the proposed third amended complaint. For that reason, the court in this opinion will not provide a detailed recitation of the repeated allegations set forth in the proposed third amended complaint. To the extent factual allegations contained in the proposed third amended complaint were not addressed in the second amended complaint or focused on by the court in its opinion with respect to the motions to dismiss, they will be addressed in this section.

---

[1] The factual background is derived from the factual allegations in the proposed third amended complaint, which are accepted as true for purposes of deciding the motion for leave to file a third amended complaint. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) ("When considering a Rule 12(b)(6) motion, courts accept as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiffs.").

### A. Summary of the Allegations in the Proposed Third Amended Complaint

Plaintiffs[2] are purchasers of health insurance coverage from Highmark,[3] Highmark Health Insurance Company[4] ("Highmark Health Insurance"), and "potentially other Highmark entities"[5] (collectively, the "Highmark defendants"). (ECF No. 250-1 ¶ 1.) Plaintiffs allege they suffered damages as a result of a conspiracy entered into by UPMC[6] and the Highmark

---

[2] Plaintiffs seek to add an additional plaintiff to the complaint, i.e., William Jay Snyder, CPA, ("Snyder") which "is a sole proprietor operating an accounting business." (ECF No. 250-1 ¶ 6.)

[3] According to plaintiffs:

> Highmark…possesses market power. The relevant product market in which Highmark possesses market power is (among other potential markets) the market for health insurance and/or health care financing and administration for small group private employers and individuals.
> …
> The relevant geographic market is Allegheny County and surrounding counties. As noted above, health insurance companies are legally required to make services available within 20 miles or 30 minutes travel from an enrollee's residence or work, which necessitates the formation of localized networks of providers.

(ECF No. 250-1 ¶¶ 219-20.) Plaintiffs in support of their allegation that Highmark has market power cite to a 2013 market analysis by Compass Lexecon, an economic consulting firm, which reported that "Highmark's market share in Western Pennsylvania increased from 60 to 65 percent for the period from 2005 to 2011." (Id. ¶ 223.)

[4] According to plaintiffs, HHIC "is a for-profit subsidiary of Defendant Highmark, Inc.," which "was not subject to rate filing requirements until 2012." (ECF No. 250-1 ¶ 10.) Plaintiffs seek to add HHIC as a defendant in this case.

[5] Plaintiffs seek to add "Other Unnamed Highmark Entities" as defendants in this case. (ECF No. 250-1 ¶ 11.) According to plaintiffs: "The Other Unnamed Highmark Entities identified as Defendants are any Highmark entities that have charged premiums to the Plaintiff class since 2002." (Id.)

[6] Plaintiffs allege: "UPMC has market power in at least two different product markets: the market for inpatient services, and the market for tertiary and quaternary acute care inpatient services." (ECF No. 250-1 ¶ 206.)

defendants. (Id.) From 2002 until at least mid-2008, "with effects lasting to the present day,"[7] UPMC and the Highmark defendants conspired "to control, divide and/or monopolize both the market for medical care and the market for health insurance in the Greater Pittsburgh area and to their exclusive benefit." (Id. ¶ 1.) Plaintiffs allege the conspiracy "continued until at least Summer 2008, and likely through to the renegotiation of the UPMC-Highmark contract at the end of 2011." (Id. at 78 ¶ 3.)

Pursuant to the conspiracy, "UPMC agreed to protect the dominant market position of the Highmark Defendants by curtailing the extent to which UPMC offered its own insurance coverage that would have competed with those Highmark defendants, and by refusing to make its complete network available to competing health insurers." (Id.) UPMC agreed not to sell the UPMC Health Plan to Highmark's actual or potential competitors, and refused to contract at competitive rates with non-Highmark health insurance plans.[8] (ECF No. 250-1 ¶¶ 94, 95.) In exchange for UPMC's promises, "the Highmark Defendants agreed to stop supporting the West Penn Allegheny hospital system, UPMC's principal competitor for the provision of health care services in Allegheny County and surrounding counties, and to drop its 'Community Blue'

---

According to plaintiffs: "The relevant geographic market [with respect to its claims against UPMC] is Allegheny County and surrounding counties. Approximately 95% of county residents stay within the county for acute inpatient care. There is accordingly a clear and unequivocal demand by county residents to access care locally." (Id. ¶ 207.)

[7] Plaintiffs allege that "[w]hile UPMC began offering in-network provider contracts to some of Highmark's competitors after the conspiracy ended, Highmark has continued to reap profits from its illegally obtained monopoly status." (ECF No. 250-1 ¶ 227.)

[8] In support of this allegation, plaintiffs allege that UPMC's "share of the health insurance market dropped 4 percent in two years as a result of its *quid pro quo* conspiracy with Highmark." (ECF No. 250-1 ¶ 232.)

insurance coverage, which offered lower cost insurance options that used West Penn Allegheny's network." (Id.)

Plaintiffs allege that as a result of the conspiracy:

- They "have been deprived of competitive alternatives in the form of other health insurers that would have entered the market but for Highmark and UPMC's anti-competitive behavior." (ECF No. 250-1 ¶ 126);

- They paid "inflated, above-market premiums to Highmark." (Id.);

- They paid higher direct health care costs to UPMC than they would have paid but for the conspiracy. (ECF No. 250-1 ¶ 1);

- "[P]otential competitors in the health insurance market were foreclosed from entering the market in any meaningful sense, and were prevented from offering competitive products to the Plaintiff class." (Id. ¶¶ 1, 40);[9] and

- Third-party administrators ("TPAs"), "who provide alternative self-insured health insurance products to employers," were blocked from entry into the health insurance market. (Id. ¶ 98);

In other words, according to plaintiffs, but for the UPMC-Highmark conspiracy:

- There would have been "more choices for healthcare insurance providers,"[10] and, therefore, plaintiffs would have "paid lower premiums to purchase equivalent levels of insurance." (Id.);[11] and

---

[9] A 2013 market analysis by Compass Lexecon, an economic consulting firm, reports that "Aetna and United Healthcare had market shares 'in the 1-4% range[,]'" and "'marketplace realities, especially taken in the context of market conditions in [Western Pennsylvania], do not support a proven ability of competitors to expand readily and effectively to attract substantial volumes of members away from Highmark." (ECF No. 250-1 ¶¶ 226, 234.)

[10] Plaintiffs allege:

> But for the conspiracy, commercial insurers such as United, Aetna, Coventry, and others (that were not subject to rate-filing requirements with the PID) would have entered the Allegheny County area market and would have been able to offer viable alternatives to Highmark's coverage at lower prices than were charged by Highmark. Because the premiums charged by these commercial insurers would have been lower than the premiums charged by Highmark, Plaintiffs would have purchased this lower cost insurance.

(ECF No. 250-1 ¶ 128.)

- There would have been "more viable alternatives to UPMC who would have offered equivalent care at lowers prices," and, therefore, plaintiffs would have "paid lower amounts to health care providers." (Id.);

**B. Class Action Allegations**

Plaintiffs assert this class action on behalf of: (1) "all persons, whether natural or fictitious, who purchased health insurance coverage from, or otherwise paid any premiums or portion thereof to, the Highmark Defendants, and whose policies were in effect at any time on or after January 1, 2002;" and (2) "all persons, whether natural or fictitious, who received health care services from Defendant UPMC and paid for those services in whole or in part by remitting payment directly to UPMC at any time on or after January 1, 2002." (ECF No. 250-1 ¶¶ 17, 18.)

With respect to each individual plaintiff, plaintiffs allege:

Plaintiff Royal Mile Company, Inc. is a member of the Plaintiff class. Royal Mile Company purchased health insurance coverage from Highmark, Inc., providing coverage for its employees, during the Class Period. Royal Mile purchased PPO and PPO Blue Standard policies during the Class Period. Members of Royal Mile's health plan paid UPMC-affiliated providers for at least a portion of the health care services they received from these providers.

…

Plaintiff Pamela Lang is a member of the Plaintiff class. Lang purchased PPO health insurance coverage from Highmark, Inc., providing coverage for herself and her family, during the Class Period. Ms. Lang paid UPMC-affiliated providers for at least a portion of the health care services received from these providers.

…

Plaintiff Cole's is a member of the Plaintiff class. Plaintiff Cole's, during the relevant period, purchased group health insurance coverage from Highmark Inc. and Highmark Health Insurance Co. for its employees. Defendant Highmark Inc. assigned both a group number and client number to Plaintiff Cole's and said numbers are 08316412 and 036351, respectively. During the class period, Highmark Inc. shifted Cole's to its for-profit subsidiary, Highmark Health Insurance Co. Plaintiff Cole's purchased PPO Blue $1250 High Deductible Value

---

[11] Plaintiffs allege: "but for the conspiracy, Highmark would have continued to offer health insurance through Community Blue, and Plaintiffs would have been able to obtain healthcare insurance from Community Blue at a lower cost." (ECF No. 250-1 ¶ 237.)

group health insurance policy directly from Highmark, Inc., and later PPOBlue $1250 (or Smart PPOBlue $1250 09/70 Copays Plan) from Highmark Health Insurance Co., paying directly by check on a monthly basis for the health insurance premiums. Members of Cole's health plan paid UPMC-affiliated providers for at least a portion of the health care they received from these providers.

…

Plaintiff William Jay Snyder, CPA is a member of the Plaintiff class. Plaintiff William Jay Snyder, CPA, during the relevant period, purchased group health insurance coverage from Highmark Inc. for its employees. William Jay Snyder, CPA purchased group health insurance policy directly from Highmark, Inc., and later Highmark Health Insurance Co., and paid for health insurance premiums by check on a monthly basis. William Jay Snyder, CPA was assigned Customer number 08000-3407 and Group number 08359816. William Jay Snyder, CPA paid UPMC-affiliated providers for at least a portion of the health care services received from these providers.

(ECF No. 250-1 at 20-23.) According to plaintiffs, "[t]here are questions of law and fact common to all members of the Plaintiff class."[12] (Id. ¶ 25.)

---

[12] Plaintiffs identify the common questions of law and fact as:

(a) whether Defendants violated the federal antitrust laws by the acts alleged herein;

(b) whether Defendants' conduct resulted in antitrust harm to the members of the Plaintiff class, including but not limited to (i) harm in the form of being deprived of meaningful choice and competition in the health care insurance they were able to purchase, and in being deprived of lower cost alternatives that would have been offered by competing insurers, and that would have provided equivalent or superior coverage for lower premiums, had it not been for the Defendants' illegal conspiracy; (ii) harm in the form of being deprived of meaningful choice and competition in the health care services and providers they were able to obtain, and in being deprived of lower cost alternatives that would have been offered by competing health care providers and/or UPMC, and that would have provided equivalent or superior services for lower costs, had it not been for the Defendants' illegal conspiracy; (iii) harm in the form of excess, above-market or supracompetitive premium rates charged by Defendants Highmark, Inc. and Highmark Health Insurance Co., and/or premiums that were inflated by the pass-through of monopoly rents imposed by UPMC to the extent that these claims are not foreclosed by the filed rate doctrine; and (iv) harm in the form of excess,

### C. Rate Filing Requirements

Plaintiffs allege that at all relevant times, Highmark, which is registered with the PID as a hospital plan corporation and a professional health services plan corporation, was required "to file its 'base rate' for small groups with the PID under the previous version of the law." (ECF No. 250-1 ¶ 239.) According to plaintiffs, "[u]nder Pennsylvania law in effect until March 21, 2012, entities other than hospital plan corporations, professional health services plan corporations, or HMOs were not required to file premiums for small group policies with the PID." (Id. ¶ 238 (citing 40 PA. CONS. STAT. § 3803(e) (1996), *amended by* 40 PA. CONS. STAT. § 3801.303(e) (2012).) With respect to the rate-filing requirements and Highmark's potential competitors, i.e., other health insurers and TPAs, plaintiffs allege:

> Many of Highmark, Inc.'s potential competitors (i.e., competitors that were excluded from the market due to the UPMC-Highmark conspiracy) were for-profit insurers, such as United Healthcare. TPAs were also excluded by the conspiracy. Had these excluded health care insurers not been excluded by the conspiracy, they would have conducted business in the Allegheny County area as commercial entities, and not as HMOs, professional health services plan corporations, or hospital plan corporations: they could not have been professional health services plan corporations or hospital plan corporations if they were for-profit commercial insurers, and they would have had a substantial incentive not to do business as an HMO because HMOs were subject to far more regulatory oversight, including the requirement of filing base rates for small groups. Thus, at least until March 21, 2012, the excluded alternative insurers would have had a strong incentive to conduct most if not all of their business in Western Pennsylvania in a way that did not subject them to rate filing. Indeed, some of these alternative insurers were already offering products not subject to rate filing, such as PPO plans, in the Philadelphia market. Had they not been excluded from

above-market or supracompetitive rates charged by UPMC for medical services provided by UPMC;

(c) whether Defendants acted willfully or recklessly in conspiring as alleged herein; and

(d) whether the members of the class have sustained economic damages and, if so, what is the proper measure of such damages.

(ECF No. 250-1 ¶ 25.)

the market in Allegheny County and surrounding counties, they would have offered Plaintiffs similar products, which would not have been subject to the rate filing requirement.

…

Because these for-profit insurers and TPAs would not have entered the market as hospital plan corporations, professional health services plan corporations, or HMOs, these entities would have been beyond the PID's rate approval jurisdiction until March 21, 2012. But for the conspiracy, these competitors would have participated in the Allegheny County area health insurance market and would have been able to access UPMC's facilities and complete provider network. As a natural economic consequence of increased competition, they would have charged Plaintiffs lower premiums than have been charged by Highmark since 2002.

(ECF No. 250-1 ¶¶ 241-42.)

### D. Highmark Health Insurance Company ("HHIC")

Highmark charged "some members of the Plaintiff class[, including Cole's Wexford] even higher premiums by shifting their plans to [HHIC]." (ECF No. 250-1 ¶ 113.) HHIC was not required to file its premiums with the PID until 2012. (Id.) Plaintiffs allege:

This discontinue-and-migrate strategy for small group plans harmed the plaintiff class. Cole's and other purchasers of small group insurance coverage in the Plaintiff class paid artificially inflated, supracompetitive premiums to Highmark Health Insurance Co. (and possibly to other for-profit Highmark insurers), and these premiums were not filed with the PID and also were not located within a band around any base rate that was filed with the PID. But for the conspiracy, these purchasers of small group plans would have paid lower premiums either to (a) Highmark Health Insurance Co. or other Highmark entities whose small group premium amounts were not subject to any rate filing requirement; or (b) one of the excluded or marginalized commercial insurers (whose small group plans would not have been subject to filing requirements).

(Id. ¶ 253.)

### E. TPAs

Plaintiffs allege: "In Western Pennsylvania, access to UPMC facilities is essential for any TPA to launch a competitive product." (ECF No. 250-1 ¶ 98.) According to plaintiffs, Managed Care of America, a TPA based in Pittsburgh, Pennsylvania, "has been repeatedly shut out of the

market in Western Pennsylvania over the last fifteen years, although it competes effectively throughout the United States in other markets." (ECF No. 250-1 ¶ 105.) UPMC, pursuant to the conspiracy and against its own self-interest, refused to contract with TPAs like Managed Care of America and health insurance providers other than Highmark. (Id. ¶ 105-06.) Managed Care of America, "[w]ithout UPMC facilities in its network,…cannot assemble an attractive product to offer prospective employer customers." (Id. ¶ 105.)

## IV.    Standard of Review

The court may grant a plaintiff leave to amend a complaint under Federal Rule of Civil Procedure 15, which provides: "The court should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15. Rule 15, however, "does not permit amendment when it would be futile. Futility 'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'" Kenny v. United States, 489 F. App'x 628, 633 (3d Cir. 2012) (citing Burtch v. Millberg Factors, Inc., 662 F.3d 212, 231 (3d Cir. 2011)). "The standard for deciding whether claims are futile for the purpose of granting leave to amend a complaint is the same as a motion to dismiss." Markert v. PNC Fin. Servs. Group, Inc., 828 F. Supp. 2d 765, 771 (E.D. Pa. 2011). "[I]f the court determines that plaintiff has had multiple opportunities to state a claim but has failed to do so, leave to amend may be denied." See 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 2010).

A motion to dismiss tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383,

388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 667 (citing Twombly, 550 U.S. at 556).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.…Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 667 (quoting Twombly, 550 U.S. at 556. Two working principles underlie Twombly. Iqbal, 556 U.S. at 667. First, with respect to mere conclusory statements, a court need not accept as true all the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id.

(quoting Fed. R. Civ. P. 8(a)(2)). A court considering a motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 664.

## V.    Discussion[13]

---

[13] In the proposed third amended complaint, plaintiffs define the relevant geographic market as "Allegheny County and surrounding counties." (ECF No. 249-2 ¶ 207.) UPMC in its response in opposition to plaintiff's motion for leave to file the proposed third amended complaint argues: "Plaintiffs' reference to an unspecified 'geographic area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market.'" (ECF No. 254 at 14 (quoting Tnus Bros. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991).) Plaintiffs in the second amended complaint defined the relevant geographic market as "Allegheny County." (ECF No. 90 ¶ 207.) At the hearing on April 7, 2014, the following exchange took place between the court and counsel for plaintiffs:

> THE COURT: I think the point that they were making is that you had a more specific pleading before, and now you have one that's vaguer, and they don't know what the import of that is. Is there any reason you couldn't have made the same allegations you made previously?

> MR. HUME: Not that I'm aware of, Your Honor, if I could just confer with counsel. I'm not aware of any reason why in the amendment process -- I was not aware of any intent or effort to –

> THE COURT: To diminish it.

> MR. HUME: -- to be less specific about –

> THE COURT: Well, there's no reason for change. If you get leave to amend, then just use the original geographic market that you had -- the relevant market that you stated –

## A. Individual Plaintiff, i.e., Pamela Lang

### 1. Damages measured by the difference between the rates Lang paid Highmark and the rates Lang would have paid Highmark absent the UPMC-Highmark conspiracy

The court in its opinion dated September 27, 2013, dismissed the second amended complaint because the measure of damages alleged by the plaintiffs, i.e., the difference between rates charged by Highmark that were approved by the PID and rates Highmark would have charged and which require the approval of the PID absent the UPMC-Highmark conspiracy, were barred by the filed rate doctrine. (ECF No. 240 at 31-32.) Plaintiffs in the proposed third amended complaint include the exact measure of damages that this court previously held was barred by the filed rate doctrine. The court at the hearing on April 7, 2014, denied plaintiffs' motion for leave to file a third amended complaint to the extent plaintiffs allege in the proposed third amended complaint a measure of damages based upon rates charged by Highmark that were approved by the PID and rates Highmark would have charged and which require the approval of the PID absent the UPMC-Highmark conspiracy. (H.T. (ECF No. 270) at 10.) The court held that if plaintiffs are granted leave to file the proposed third amended complaint, claims based upon that measure of damages, as well as allegations made in support thereof, could not be included in the third amended complaint.[14] (Id.) The court noted, however, that its holding does not bar

---

MR. HUME: If we are given leave to amend, we will be as specific as we were the first time.

THE COURT: Whatever that specificity was, that would clear up any ambiguity.
(H.T. 4/7/14 (ECF No. 270) at 12.) Accordingly, to the extent plaintiffs are granted leave to file a third amended complaint, they should specific the relevant geographic markets with the specificity used in their prior pleadings filed in this case.

[14] Plaintiffs improperly in their submissions in support of their motion for leave to file a third amended complaint request reconsideration of the court's opinion dated September 27, 2013.

plaintiffs from appealing the court's September 27, 2013 opinion at the appropriate time, and UPMC and Highmark on the record recognized that they cannot argue plaintiffs waived their right to appeal the court's decision. (Id.)

2. **Damages measured by the difference between the payments Lang directly paid to UPMC and the payments Lang would have directly paid to UPMC absent the UPMC-Highmark conspiracy**

Lang in the proposed third amended complaint, on behalf of the putative individual plaintiff class, asserts a measure of damages based upon the difference between the payments she made directly to UPMC and payments she would have made directly to UPMC absent the UPMC-Highmark conspiracy. (ECF No. 249-2 at 78 ¶ 6.) Highmark argued in its submissions that pursuant to the court's opinion dated September 27, 2013, the filed rate doctrine bars Lang's measure of damages based upon her direct payments to UPMC because at all times relevant to this case, all insurance companies, i.e., nonprofit *and* for-profit entities, were required to "file all of the terms of their individual insurance plans with the PID, including amounts of co-pays, deductibles and coinsurance, and the PID approved all of those amounts." (ECF No. 256 at 13 (citing 40 PA. CONS. STAT. §§ 3801.303(c), 3803(c).) Plaintiffs in their supplemental brief addressing Highmark's argument with respect to the measure of damages based upon Lang's direct payments to UPMC being barred by the filed rate doctrine, assert:

> [B]ased upon Plaintiffs' review of the publicly available information, it appears that counsel for Highmark accurately represented that copays and deductibles are filed with the PID. Given this, Plaintiffs recognize that, under the Court's September 27, 2013 Opinion [D.E. 240], any argument that Highmark's copays or deductibles would have been different but for the anticompetitive conspiracy

---

The court at the April 7, 2014 hearing denied plaintiffs' request because plaintiffs did not present a basis for the court to reconsider its decision. (H.T. 4/7/14 (ECF No. 270) at 5 ("There's not a basis that's been presented for reconsideration that would be such that the Court would entertain those claims again.").)

> alleged in this case would likely be barred by this Court's interpretation of the filed rate doctrine. Similarly, any argument that the individual plaintiffs in this case would have received more favorable copays or deductibles from excluded competitors but for the conspiracy would also presumably be barred by this Court's interpretation of the filed rate doctrine as articulated in its September 27 Opinion.

(ECF No. 273 at 1-2.) Highmark and plaintiffs are correct; because at all relevant times to this case all insurance companies were required to file their individual insurance plans with the PID, including amounts of co-pays, deductibles and coinsurance, a measure of damages based upon the difference between the direct payments Lang made to UPMC prior to the UPMC-Highmark conspiracy and the direct payments Lang made to UPMC following the UPMC-Highmark conspiracy is barred by this court's interpretation of the filed rate doctrine set forth in the court's opinion dated September 27, 2013. Under those circumstances, plaintiffs' motion for leave to file a third amended complaint is denied to the extent Lang asserts a measure of damages based upon the difference between the direct payments Lang made to UPMC prior to the UPMC-Highmark conspiracy and the direct payments Lang would have made to UPMC absent the UPMC-Highmark conspiracy.[15]

Based upon the foregoing, plaintiffs failed to assert a measure of damages with respect to Lang and the individual subscribers she seeks to represent that is not barred by the filed rate doctrine. Plaintiffs' motion for leave to file a third amended complaint with respect to Lang and the individual plaintiffs she seeks to represent will, therefore, be denied.

---

[15] In any event, plaintiffs argument that the court's interpretation of the filed rate doctrine set forth in the opinion dated September 27, 2013, is erroneous, and, therefore, Lang's measure of damages based upon the difference between the direct payments Lang made to UPMC and the direct payments Lang would have made to UPMC absent the UPMC-Highmark conspiracy is not barred by the filed rate doctrine, is preserved for appeal.

### B. Small Group Plaintiffs, i.e., Royal Mile and Cole's Wexford[16]

#### 1. Damages measured by the difference between the rates the small group plaintiffs paid Highmark and the rates the small group plaintiffs would have paid Highmark absent the UPMC-Highmark conspiracy

For the reasons set forth in the court's opinion dated September 27, 2013, a measure of damages based upon between the rates the small group plaintiffs paid Highmark and the rates the small group plaintiffs would have paid Highmark absent the UPMC-Highmark conspiracy is barred by the filed rate doctrine. As discussed <u>infra</u>: (1) plaintiffs' request for reconsideration of the court's September 27, 2013 opinion is denied because plaintiffs did not present the court a basis for reconsideration; and (2) plaintiffs' argument that the court's analysis of the filed rate doctrine in the opinion dated September 27, 2013 is erroneous is preserved for appeal. Plaintiffs' motion for leave to file a third amended complaint is denied to the extent the proposed third amended complaint sets forth a measure of damages based upon the difference between the rates the small group plaintiffs paid Highmark and the rates the small group plaintiffs would have paid Highmark absent the UPMC-Highmark conspiracy.

---

[16] With respect to the TPAs, the court at the April 7, 2014 hearing held that there are insufficient allegations in proposed third amended complaint with respect to the TPAs for plaintiffs to rely upon the TPAs to set forth a viable measure of damages. (H.T. (ECF No. 270) at 36.) The court at the hearing noted: "Unless there's some type of allegation that these particular small [group] employers would have been able to meet these requisite standards for self-insurance,…[plaintiffs] can't bring in the TPAs." (<u>Id.</u>)

Plaintiffs in response to the court's holding stated: "one of if not the main reason [allegations with respect to the TPAs are] in the complaint is that it would have impacted the overall market." (<u>Id.</u> at 37.) As the court explained, plaintiffs' experts at the appropriate time may opine on the effect TPAs would have had on the market absent the UPMC-Highmark conspiracy, but there are insufficient allegations in the proposed third amended complaint to support a measure of damages based upon the rates the small group employer-plaintiffs paid to Highmark and the rates the small group employer-plaintiffs would have paid to the TPAs absent the UPMC-Highmark conspiracy.

2. **Damages measured by the difference between the rates the small group plaintiffs paid Highmark during the alleged UPMC-Highmark conspiracy and the rates the small group plaintiffs would have paid Highmark's insurance competitors not subject to the rate-filing requirements absent the conspiracy**

   a. **Payments made to Highmark's competitors *after* March 21, 2012**

Plaintiffs in their submissions to the court concede that beginning on March 21, 2012, all insurers—nonprofits and for-profits alike—were required to file their group rates with the PID. Under those circumstances, and as the court noted on the record at the hearing on April 7, 2014, plaintiffs' claims are barred by the filed rate doctrine to the extent the measure of damages is based upon the difference between rates the small group plaintiffs paid to Highmark during the alleged UPMC-Highmark conspiracy and the rates the small group plaintiffs would have paid beginning on March 21, 2012 to Highmark's competitors but for the UPMC-Highmark conspiracy. (H.T. 4/7/14 (ECF No. 270) at 20.)

   b. **Payments made to Highmark's unregulated competitors *prior* to March 21, 2012**

The court in its opinion dated September 27, 2013, determined UPMC's and Highmark's motions to dismiss the second amended complaint would be granted because the factual allegations contained in the second amended complaint implicated the filed rate doctrine, and plaintiffs' claim for tortious interference with existing and prospective contractual relations was time barred. (ECF No. 240 at 1.) With respect to the filed rate doctrine, the court explained:

> Pursuant to [Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156 (1922)], a plaintiff cannot sustain a claim based upon hypothetical rates that require the approval of an administrative agency because the administrative agency determines the legality of the rates and will not assess the legality of a hypothetical rate. If plaintiffs seek to amend the second amended complaint to assert claims for damages based upon the rates Highmark's lower-cost, rate-regulated competitors would have charged plaintiffs absent the UPMC-Highmark conspiracy, the court could not entertain those claims; this court under Keogh

may not engage in the ratemaking process to determine the rates those lower-cost competitors' would have charged. If Highmark's lower-cost competitors, e.g., Aetna, United, CIGNA, and Coventry, are regulated entities required to obtain the PID's approval for rates charged for individual and group policies, the court cannot consider plaintiffs' claims without offending the nonjusticiability principles set forth in Keogh. On the other hand, if Highmark's competitors were exempt from the rate-approval requirements, the filed rate doctrine arguably may not be applicable. See 40 PA. CONS. STAT. § 3803(d).

To the extent plaintiffs seek to amend the second amended complaint to include a measure of damages based upon the difference between the approved rates they paid to Highmark and approved rates of Highmark's competitors, those claims may not be barred by the filed rate doctrine.

(ECF No. 240 at 48-49.) As discussed above, plaintiffs' motion for leave to file a third amended complaint will be denied to the extent plaintiffs assert a measure of damages based upon the difference between the rates Highmark charged plaintiffs during the alleged UPMC-Highmark conspiracy and the rates Highmark would have charged plaintiffs but for the UPMC-Highmark conspiracy.

Plaintiffs in the proposed third amended complaint assert another measure of damages based upon the difference between the rates Highmark charged the small group plaintiffs during the alleged UPMC-Highmark conspiracy and the rates Highmark's "excluded and marginalized competitors" who were not subject to the PID's rate-filing requirements prior to March 21, 2012, would have charged the small group plaintiffs but for the UPMC-Highmark conspiracy. (ECF No. 250-1 ¶ 237.) This measure of damages would not require the court to interfere with the ratemaking authority of the PID by second-guessing the legally approved rates Highmark filed with the PID and charged to the small group plaintiffs during the alleged UPMC-Highmark conspiracy. Under those circumstances, the named small group plaintiffs' motion for leave to file a third amended complaint will be granted because they asserted a measure of damages in the proposed third amended complaint that is not barred by Keogh.

### i. Highmark's argument in opposition to the measure of damages set forth in the proposed third amended complaint

Highmark argues, however, that "[t]he small group plaintiffs have not plausibly alleged they would have paid lower rates to commercial insurers than they paid to Highmark. In fact, the complaint's own allegations make such a claim *implausible*." (ECF No. 256 at 7 (emphasis in original).) Highmark's implausibility argument is based upon Highmark being a nonprofit insurer and Highmark's competitors referred to in the complaint, i.e., Aetna, United, Heath America/Coventry, and CIGNA,[17] being for-profit insurers. (Id.) According to Highmark, "plaintiffs do not allege any facts to make it plausible that, even absent the supposed conspiracy, for-profit entities would have charged less than non-profit Highmark." (Id. at 7-8.) At the hearing on April 7, 2014, the court rejected Highmark's implausibility argument with respect to the nonprofit and for-profit status of the insurers, explaining:

> I don't give [Highmark's] argument as much credence as they would want me to give. You know, because if you are in an excluded market situation, the fact that a nonprofit is charging one thing is of no moment because there was no competition to have brought in something lower.
>
> Now, I still would require you to prove what the lower rates would have been charged by a for-profit entity, but it doesn't necessarily equate to that a for-profit, even when there's antitrust activity occurring, would have charged still more than this rate that was being charged. So I don't give that a lot of weight.

(H.T. 4/7/14 (ECF No. 270) at 14.) For the same reasons articulated by the court on the record at the hearing on April 7, 2014, Highmark's argument that it is always *implausible* that in a market unencumbered by the alleged UPMC-Highmark conspiracy Highmark's for-profit insurer-

---

[17] Plaintiffs in the proposed third amended complaint refer to Highmark's competitors as "Aetna," "United," "Heath America/Coventry," and "CIGNA." The court in this opinion will, therefore, refer to Highmark's competitors by those names.

competitors would charge less than nonprofit Highmark, is not a basis for this court to deny the small group plaintiffs' leave to file a third amended complaint.

> ### ii.   UPMC's argument in opposition to the measure of damages set forth in the proposed third amended complaint

UPMC argues that plaintiffs in the third amended complaint set forth a "new theory" of recovery, i.e., "the alleged Highmark-UPMC conspiracy increased prices consumers paid to Highmark's non-conspiring competitors, and absent these increased prices, Plaintiffs would have switched their insurance." (ECF No. 254 at 6.) According to UPMC, "Plaintiffs…lack antitrust standing to challenge this alleged conspiracy's effect on market prices charged by a non-defendant." (Id. (citing Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 581 (3d Cir. 1979).) UPMC argues that the Third Circuit Court of Appeals in Mid-West Paper "held that purchasers, such as Plaintiffs, lack antitrust standing to allege that a conspiracy caused the defendants' competitors to inflate their prices." (ECF No. 254 at 6 (citing Mid-West Paper, 596 F.2d at 583-87).)

The small group plaintiffs do not dispute UPMC's interpretation of Mid-West Paper; rather, the small group plaintiffs dispute UPMC's reading of the proposed third amended complaint. (ECF No. 262 at 9.) The small group plaintiffs assert that—contrary to UPMC's arguments—they are not suing UPMC and Highmark based upon the alleged UPMC-Highmark conspiracy's effect on market prices or Highmark's excluded and marginalized insurance competitors implementing price increases in the relevant insurance market. (Id.) The small group plaintiffs argue that in the third amended complaint they seek damages based upon UPMC and Highmark conspiring to monopolize the relevant markets by, among other ways, marginalizing Highmark's insurer competitors *in* and excluding Highmark's competitors *from* the relevant

insurance market. (Id.) According to the small group plaintiffs, "it is well established that consumers like Plaintiffs have standing when challenging exclusion of a defendant's competitors from the relevant market." (Id. (citing Blue Shield of Va. V. McCready, 457 U.S. 465, 478-79 (1982); In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1178 (3d Cir. 1993)).)

UPMC's interpretation of the proposed third amended complaint is not supported by the allegations within the proposed third amended complaint. The small group plaintiffs in the proposed third amended complaint do not allege that they were injured by the alleged UPMC-Highmark conspiracy's effect on insurance market prices; rather, the small group plaintiffs allege they were injured because the alleged UPMC-Highmark conspiracy marginalized and excluded from the relevant insurance market Highmark's competitors that were not subject to the PID's rate-filing requirements prior to March 21, 2012. (ECF No. 250-1 ¶¶ 128, 233, 234, 236, 237, 241, 242, 243, 244.) In other words, the small group plaintiffs in the proposed third amended complaint allege that—but for the UPMC-Highmark conspiracy—Highmark's insurance competitors that were not subject to the PID's rate-filing requirements would have offered health insurance equivalent to the health insurance offered by Highmark at a lower rate than Highmark's filed rate, and, under those circumstances, the small group plaintiffs would have purchased the lower-cost health insurance from Highmark's competitors. (Id.) Accordingly, the small group plaintiffs seek damages from UPMC and Highmark measured by the difference between Highmark's filed rate actually paid by the small group plaintiffs and the lower, unregulated rates the small group plaintiffs would have paid to Highmark's marginalized and excluded competitors but for the allege UPMC-Highmark conspiracy. Based upon the allegations in the proposed third amended complaint, UPMC's argument that the small group plaintiffs do

not have antitrust standing to assert their claims lacks merit and is not a basis for the court to deny the small group plaintiffs leave to file a third amended complaint.

UPMC also argues that the small group plaintiffs failed to "plead facts to demonstrate that, but for the alleged conspiracy, they would have purchased comparable or superior health insurance from a Highmark competitor at a lower price than they paid to Highmark." (ECF No. 254 at 10.) As detailed above, however, the small group plaintiffs in the proposed third amended complaint allege that but for the UPMC-Highmark conspiracy:

> (1) UPMC would have entered into contracts with Highmark's insurance competitors that were marginalized in or excluded from the relevant insurance market and not subject to the PID's rate-filing requirements, i.e., Aetna, United, Heath America/Coventry, and CIGNA;
>
> (2) Highmark's insurance competitors that were marginalized in or excluded from the relevant insurance market and not subject to the PID's rate-filing requirements would have charged the small group plaintiffs a rate lower than the filed rate the small group plaintiffs actually paid to Highmark during the alleged UPMC-Highmark conspiracy;
>
> (3) The health insurance offered by Highmark's insurance competitors that were marginalized in or excluded from the relevant insurance market and not subject to the PID's rate-filing requirements would have been equivalent to the health insurance the small group plaintiffs purchased from Highmark during the alleged UPMC-Highmark conspiracy; and
>
> (4) The small group plaintiffs would have purchased the equivalent and lower-cost insurance from Highmark's insurance competitors that were marginalized in or excluded from the relevant insurance market and not subject to the PID's rate-filing requirements.

(ECF No. 250-1 ¶¶ 128, 233, 234, 236, 237, 241, 242, 243, 244.) Based upon the foregoing allegations asserted in the proposed third amended complaint, the small group plaintiffs plausibly alleged that "but for the alleged conspiracy, they would have purchased comparable or superior health insurance from a Highmark competitor at a lower price than they paid to Highmark." (ECF No. 254 at 10.) UPMC's argument that the small group plaintiffs "have failed to plead

facts to support their new theory" is, therefore, unfounded and not a basis for the court to deny the named-small group plaintiffs leave to file a proposed third amended complaint.

### 3. Damages measured by the difference between the rates Cole's Wexford paid HHIC and the rates Cole's Wexford would have paid HHIC but for the allege UPMC-Highmark conspiracy.

#### a. Measure of damages

Cole's Wexford in the proposed third amended complaint sets forth a measure of damages based upon the difference between the rates it paid to HHIC during the alleged UPMC-Highmark conspiracy—an entity not subject to the PID's rate-filing requirements prior to March 21, 2012—and the rates it would have paid HHIC but for the UPMC-Highmark conspiracy. (ECF No. 250-1 ¶ 253.) To the extent Highmark switched Cole's Wexford to HHIC prior to March 21, 2012, the measure of damages asserted by Cole's Wexford in the proposed third amended complaint would not be barred by <u>Keogh</u>. Cole's Wexford in the proposed third amended complaint, however, does not specify when, i.e., the date on which, Highmark shifted its business to HHIC. In other words Cole's Wexford does not plausibly allege whether Highmark shifted Cole's Wexford to HHIC before or after HHIC was required to file its rates with the PID. Cole's Wexford's motion for leave to file a third amended complaint will be granted to the extent Cole's Wexford can plausibly allege that Highmark shifted Cole's Wexford to HHIC prior to March 21, 2012, and Cole's Wexford paid rates to HHIC that were not subject to approval by the PID. Cole's Wexford will only be entitled to damages based upon a hypothetical rate that HHIC would have charged Cole's Wexford until March 21, 2012, the date on which HHIC was required to file its rates with the PID. Cole's Wexford motion for leave to file a third amended complaint will be denied if Highmark did not shift Cole's Wexford to HHIC until after March 21, 2012.

26

### b. HHIC as a defendant

The small group plaintiffs in the proposed third amended complaint seek to add HHIC as a defendant in this case. As the court explained at the hearing on April 7, 2014, however, there are no allegations in the complaint that HHIC was a member of the alleged UPMC-Highmark conspiracy. (H.T. 4/7/14 (ECF No. 270) at 48-49.) If plaintiffs are successful on the claims asserted against Highmark, Highmark—and not HHIC—would be liable to pay damages to plaintiffs. Calculating damages based upon the difference between the rates the small group plaintiffs paid HHIC and the rates the small group plaintiffs would have paid to HHIC absent the UPMC-Highmark conspiracy does not change that result. Plaintiffs' motion for leave to file a third amended complaint will be, therefore, denied to the extent plaintiffs seek to add HHIC as an additional defendant in this case.

## C. Statute of Limitations

### 1. Relation Back

UPMC and Highmark argue that plaintiffs' theory of recovery based upon UPMC and Highmark conspiring to exclude Highmark's competitors from the relevant markets is barred by the statute of limitations. Highmark argues: "That exclusion theory of liability is completely different from the liability theory that appeared in all of plaintiffs' prior complaints, i.e., that Highmark's filed rates were unlawfully inflated. It therefore does not relate back to the filing of the original complaint." (ECF No. 277 at 4 (citing <u>Glover v. FDIC</u>, 698 F.3d 139, 146 (3d Cir. 2012).)

Federal Rule of Civil Procedure 15(c)(1)(B) provides that an amendment relates back to the date of the original pleading when, among other things, "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set

out—in the original pleading." Fᴇᴅ. R. Cɪᴠ. P. 15(c)(1)(B). Relation back is applicable in situations where the amended claim shares a "'common core of operative facts'" with the original pleading. USX Corp. v. Barnhart, 395 F.3d 161, 167 (3d Cir.2004) (quoting Bensel v. Allied Pilots Ass'n, 387 F.3d 310 (3d Cir.2004)). In addition to an identity of transaction, courts also inquire into "whether the opposing party has been put on notice regarding the claim or defense raised by the amended pleading." 6A Cʜᴀʀʟᴇs Aʟᴀɴ Wʀɪɢʜᴛ, Aʀᴛʜᴜʀ R. Mɪʟʟᴇʀ, ᴀɴᴅ Mᴀʀʏ Kᴀʏ Kᴀɴᴇ, Fᴇᴅᴇʀᴀʟ Pʀᴀᴄᴛɪᴄᴇ & Pʀᴏᴄᴇᴅᴜʀᴇ § 1497 (3d ed.).

> The insistence on notice does not mean that the courts will bar relation back simply because the amended pleading deviates markedly from the original.... The fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading.... Indeed, an amendment that states an entirely new claim for relief will relate back as long as it satisfies the test embodied in Rule 15(c)(1)(B).

Id.

Here, UPMC's and Highmark's arguments that relation back does not apply to plaintiffs' new exclusionary theory of liability lack merit. The proposed third amended complaint is based upon the same set of operative facts as the original complaint, concerns the same "transaction" at issue in the original complaint, i.e., the alleged conspiracy of UPMC and Highmark, and UPMC and Highmark had notice of the factual allegations in the proposed third amended complaint when the original complaint was filed.

In the original complaint filed in this case on December 2, 2010, plaintiffs alleged UPMC and Highmark

> conspired, agreed and acted in an organized, orchestrated and deliberate fashion to control, divide and/or monopolize the markets for medical care and health insurance in the Greater Pittsburgh area to their exclusive benefit, all in violation of the federal antitrust laws and other laws and all to the great and direct economic harm of Plaintiffs.

(ECF No. 1 ¶ 1.) The proposed third amended complaint is based upon the common core of operative facts set forth in the original complaint, i.e., UPMC and Highmark conspired to monopolize the health insurance and health care markets in the relevant geographic markets. Although in the original, first amended, and second amended complaints plaintiffs' measure of damages was based upon UPMC and Highmark forcing plaintiffs "to pay excessive, above-market premiums" for health insurance, plaintiffs in the original, first amended, and second amended complaint alleged UPMC and Highmark pursuant to their conspiracy agreed to "exclude rival insurers from the Pittsburgh market." (ECF No. 1 ¶ 100; ECF no. 74 ¶ 101; ECF No. 90 ¶ 101.) In the original, first amended, complaint, plaintiffs alleged:

> UPMC and Highmark have entered into an illegal agreement to restrain trade by protecting and reinforcing one another's market power. Under this agreement, UPMC has agreed to block the entry or expansion of rival health insurers for the benefit of Highmark, enabling Highmark to raise premiums charged to the members of the Plaintiff class, in exchange for Highmark's agreement to favor UPMC with discriminatory reimbursement rates and grants – and no diminution in patient volume. UPMC agreed to protect Highmark from competition and to act to exclude potential competitors from the market. In turn, Highmark agreed to protect UPMC from competition and to raise the costs for operation of UPMC's primary competitor, West Penn Allegheny.
>
> …
>
> [T]his agreement is unlawful under the rule of reason. It has raised prices and excluded competition in both of the relevant markets alleged above, including specifically the market for health insurance. There are no procompetitive justifications or benefits for Highmark and UPMC's collusion.

(ECF No. 1 ¶¶ 188, 191; ECF No. 74 ¶¶ 193, 196; ECF No. 90 ¶¶ 226, 229.) Based upon the foregoing allegations, UPMC and Highmark have been on notice since the original complaint was filed on December 12, 2012, that plaintiffs alleged UPMC and Highmark sought to exclude Highmark's competitors from the relevant markets as part of their conspiracy. Relation back is appropriate under those circumstances. Plaintiffs, furthermore, seek to file the proposed third

amended complaint in an attempt to cure the deficiencies in the second amended complaint with respect to the measure of damages. "Rule 15(c) also permits plaintiff to reassert a claim that was deficiently stated initially." 6A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice & Procedure § 1497 (3d ed. 2010). Under the foregoing circumstances, relation back is appropriate in this case, and plaintiffs are not barred by the statute of limitations from filing the proposed third amended complaint subject to the restrictions set forth in this opinion.

### 2. Fraudulent Concealment

#### a. Tortious Interference with Existing and Prospective Contractual Relations against UPMC

The court in its opinion dated September 27, 2013, dismissed plaintiffs' claim for tortious interference with existing and prospective contractual relations against UPMC because it was time barred under the applicable two-year statute of limitations for tort claims in Pennsylvania. (ECF No. 240 at 79.) The court reasoned: (1) plaintiffs did not sufficiently allege that UPMC engaged in any conduct after the summer of 2008 that could form the basis for a claim of tortious interference with contractual relations within the applicable statute of limitations; and (2) plaintiffs did not set forth sufficient factual allegations to permit the tolling of the statute of limitations for conduct that occurred prior to the summer of 2008 based upon UPMC fraudulently concealing its conduct with respect to the UPMC-Highmark conspiracy, i.e., plaintiffs did not sufficiently allege UPMC *affirmatively* concealed its allegedly tortious conduct. (Id. at 75-79.)

Plaintiffs in the proposed third amended complaint set forth the same factual allegations that were set forth in the second amended complaint with respect to (1) plaintiffs' tortious

interference with existing and prospective contractual relations claim against UPMC, and (2) UPMC allegedly fraudulently concealing its tortious conduct, and do not set forth additional allegations in the proposed third amended complaint that would change the court's analysis with respect to plaintiffs' claim for tortious interference with existing and prospective contractual relations against UPMC. (ECF No. 90 ¶¶ 217-24; ECF No. 250-1 ¶¶ 254-61.) For the same reasons the court granted UPMC's motion to dismiss the second amended complaint with respect to the tortious interference with existing and prospective contractual relations claim, i.e., it is barred by the applicable two-year statute of limitations, plaintiffs' motion for leave to file a third amended complaint will be denied with respect to the tortious interference with existing and prospective contractual relations claim asserted against UPMC. Plaintiffs' argument that UPMC fraudulently concealed the conduct forming the basis for their tortious interference with existing and prospective business relations claim is preserved for purposes of appeal, but plaintiffs' motion for leave to file a third amended complaint is denied with respect to any allegation related to that claim, including the entirety of Count VII in the proposed third amended complaint.

### b. Conspiracy Claims against UPMC and Highmark

"Antitrust actions are subject to a four-year statute of limitations, meaning of course, that suit must be brought within four years after the cause of action accrued." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 536 (6th Cir. 2008) (citing 15 U.S.C. § 15b ("Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued.")). The complaint in this case was filed on December 2, 2010. (ECF No. 1.) Accordingly, if plaintiffs are successful on their claims, they may only recover for damages they suffered as a result of the UPMC-Highmark conspiracy beginning on December 2, 2006. Plaintiffs in the proposed third amended

complaint, however, seek damages based upon UPMC's and Highmark's conduct that occurred prior to December 2, 2006, which is outside the applicable four-year statute of limitations. Plaintiffs argue they are entitled to damages based upon UPMC's and Highmark's anticompetitive conduct that occurred prior to December 2, 2006, because UPMC and Highmark fraudulently concealed the UPMC-Highmark conspiracy.

The requirements for tolling the statute of limitations based upon a defendant's fraudulent concealment are similar under federal and Pennsylvania law. Lower Lake Erie, 998 F.2d at 1178. In Lower Lake Erie, the court explained:

> We have not specifically elucidated the standards for pleading fraudulent concealment in the antitrust context. However, in a case decided under Pennsylvania law, Bohus v. Beloff, 950 F.2d 919 (3d Cir.1991), we identified the three factors necessary to forestall the running of the limitations statute by way of a fraudulent concealment allegation: (1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action. Id. at 925–26.

Lower Lake Erie, 998 F.2d at 1178. The court held that with respect to federal antitrust claims, a plaintiff seeking to toll the statute of limitations based upon the defendant's fraudulent concealment must also show the plaintiff exercised due diligence until the discovery of the facts forming the basis for the antitrust claim. Id. at 1179 (citing Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389 (6th Cir. 1975)).

Plaintiffs in the proposed third amended complaint set forth the following allegations with respect to UPMC's and Highmark's alleged fraudulent concealment of the conspiracy:

> 255. Defendants have had numerous opportunities to disclose to the Plaintiff class and the public in general the conspiracy, but have failed to do so. By way of example:
>
> > a) In July 2010, a Senior Vice President of Defendant Highmark, testifying before Pennsylvania's General Assembly, stated that health

insurance rates have increased ("sometimes at unacceptable levels") due to ever-rising medical costs and a fragile economy;

b) In an August 31, 2009 article, Defendant Highmark explained that health insurance rates increased because of increases in utilization; rising doctor, hospital and prescription costs; higher reimbursement demands from doctors and hospitals; and reduced federal payments to providers;

c) In a November 2011 article, Defendant Highmark blamed increased costs on an unusually high number of medical scans, outpatient surgical procedures and lab services;

d) In a September 24, 2002 Pittsburgh Post Gazette article, Defendant Highmark cited inadequate federal reimbursements as the basis for increased rates;

e) In a March 24, 2005 Pittsburgh Post Gazette article, Defendant Highmark blamed rate increases on its 2003 claim experiences;

f) In an October 2, 2003 article in The Valley News Dispatch, Defendant Highmark again blamed its then-recent rate hikes on rising medical costs and flat reimbursement rates from the federal government;

g) In a November 13, 2007 Pittsburgh Post Gazette article, UPMC justified its first quarter profit jump of 43% and its $93 Million net income on accounting changes, though it noted that it had a "solid" quarter;

h) In 2005 and 2006, Defendant Highmark submitted requests to the Pennsylvania Insurance Department for rate increases but, while setting forth its rate structure in its filing, made no mention of the illegal conspiracy between the two Defendants here;

i) The Pittsburgh Post Gazette reported in August 2004, 2005, 2006 and 2007 record profits at UPMC.

256. In the articles, publications and statements above, Defendant Highmark repeatedly advanced explanations for the annual, significant rate increases, and UPMC acknowledged its significant profits, but at no time did either Defendant state that it had entered into an agreement with the other Defendant to monopolize the health insurance and delivery markets in Western Pennsylvania, or to reduce or eliminate competition in each other's relevant markets.

(ECF No. 250-1 ¶¶ 255-56.) With respect to UPMC's alleged fraudulent concealment set forth in paragraphs 255(g) and (i) of the complaint, this court already held that those allegations are not sufficient to constitute "an affirmative act of concealment." (ECF No. 240 at 78.) Plaintiffs did not provide the court a basis to reconsider its decision.

With respect to plaintiffs' allegations with respect to Highmark, allegations that Highmark communicated reasons for the rate increases other than the alleged conspiracy with UPMC are not sufficient to establish an affirmative independent act of concealment necessary to toll the statute of limitations for the conspiracy claims. Plaintiffs do not allege that the reasons for the rate increases allegedly communicated by Highmark were *false* or did not contribute to the rate increases; rather, at the hearing on April 7, 2014, counsel for plaintiffs stated:

> [T]he point is we do allege quite specifically in Paragraph 255 there were repeated statements from the Defendants that those were the reasons. You know, higher costs, you know, inflation, overexcessive demand, whatever, all these other reasons, without disclosing a central reason that contributed materially to that, which is we've agreed not to have any competition.

(H.T. 4/7/14 (ECF No. 270) at 45.) Plaintiffs' argument is that because Highmark did not disclose its conspiracy with UPMC as a reason for the rate increase, Highmark affirmatively concealed the existence of the conspiracy. As this court held in the opinion dated September 27, 2013, however, *failing to disclose* the UPMC-Highmark conspiracy is not sufficient to establish an affirmative independent act of concealment necessary to toll the statute of limitations for plaintiffs' claims. Plaintiffs may not, therefore, recover for damages sustained prior to December 2, 2006, and the motion for leave to file a third amended complaint is denied with respect to the fraudulent concealment allegations asserted against UPMC and Highmark and any allegation that plaintiffs are entitled to damages predating December 2, 2006.

### 3. Class Action Allegations

### 1. Sufficiency of the Class Action Allegations

#### a. Applicable Legal Standard

UPMC argues "plaintiffs have failed to plead valid class allegations." (ECF No. 254 at 11.) Highmark argues plaintiffs "have not plausibly alleged that their claim is suitable for class treatment." (ECF No. 256 at 4.) Plaintiffs argue in response that "defendants improperly challenge class certification at the pleading stage" because "'the Rule 23 requirements differ in kind from legal rulings under Rule 12(b)(6).'" (ECF No. 262 at 16 (quoting In re Cmty. Bank of N. Va., 622 F.3d 275, 303 (3d Cir. 2010)).)

The Supreme Court of the United States has recognized that with respect to class certification under Federal Rule of Civil Procedure 23, "[s]ometimes the issues are plain enough from the pleadings to determine whether" class certification is appropriate in a given case. Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982). The Third Circuit Court of Appeals has explained that in "rare" cases, "where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met," a court may strike class allegations contained in a complaint. Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 93 n.30 (3d Cir. 2011) (citing Rios v. State Farm Fire & Cas. Co., 469 F.Supp.2d 727, 740 (S.D. Iowa 2007)). The court of appeals in Landsman noted, however, that in all other cases, i.e., the majority of cases, "[t]o determine if the requirements of Rule 23 have been satisfied, a district court must conduct a 'rigorous analysis.'" Landsman, 640 F.3d at 93 (quoting In re Hydrogen Peroxide Antiturst Litig., 552 F.3d 305, 309 (3d Cir. 2008)). The court of appeals explained:

> In [conducting a rigorous analysis], a "court may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'" Id. at 316 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir.2001)). Particularly when a court considers predominance, it

may have to venture into the territory of a claim's merits and evaluate the nature of the evidence. <u>Id.</u> at 310–11. In most cases, some level of discovery is essential to such an evaluation. In <u>Weiss v. Regal Collections</u>, 385 F.3d 337 (3d Cir.2004), we emphasized the importance of discovery as part of the class certification process. "It seems appropriate," we said, "that the class action process should be able to 'play out' according to the directives of Rule 23 and should permit due deliberation by the parties and the court on the class certification issues." <u>Weiss</u>, 385 F.3d at 347–48 (footnote omitted). Accordingly, "[a]llowing time for limited discovery supporting certification motions may ... be necessary for sound judicial administration." <u>Id.</u> at 347 n. 17. These concerns were the basis for setting down a "rigorous analysis" requirement in <u>Hydrogen Peroxide</u>, where we recognized that changes in Rule 23 reflected the need "for a thorough evaluation of the Rule 23 factors." <u>Hydrogen Peroxide</u>, 552 F.3d at 318.

<u>Landsman</u>, 640 F.3d at 93.

The court must be cognizant when evaluating a defendant's motion to strike class allegations from a complaint that "'[a]n order granting a motion to strike class allegations is tantamount to a denial of class certification after a motion to certify.'" <u>Smith v. Merial Ltd.</u>, Civ. Action No. 10–439, 2012 WL 2020361, at *6 (D.N.J. June 5, 2012) (quoting 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 3:4 (10th ed. 2013)). "[T]he burden remains with the party seeking class certification regardless who moves the court to make the determination." <u>Blihovde v. St. Croix Cnty. Wis.</u>, 219 F.R.D. 607, 614 (W.D. Wis. 2003). This means that regardless whether the defendant files a motion to strike class allegations pursuant to Federal Rule of Civil Procedure 12(f) based upon insufficient class allegations in a complaint, or a plaintiff files a motion to certify a class pursuant to Rule 23 based upon a more fully developed record, the plaintiff has the burden to prove that the requirements set forth in Rule 23 are met, and the court must accordingly apply Rule 23. <u>In re Cmty. Bank of N. Va.</u>, 622 F.3d at 302 n.19; 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 3:4 (10th ed. 2013). It would be error for a court to apply the Rule 12(b)(6) plausibility standard set forth in <u>Twombly</u> and <u>Iqbal</u> to "dismiss" class action allegations in a complaint. <u>In re Cmty. Bank of N. Va.</u>, 622 F.3d at 302

n.19. The Court of Appeals for the Third Circuit recognized in <u>In re Hydrogen Peroxide</u>, that

"the requirements set out in Rule 23 are not mere pleading rules." <u>In re Hydrogen Peroxide</u>, 552

F.3d at 316. The court of appeals, quoting a decision from the Court of Appeals for the Seventh

Circuit, explained:

> "The reason why judges accept a complaint's factual allegations when ruling on motions to dismiss under Rule 12(b)(6) is that a motion to dismiss tests the legal sufficiency of a pleading. Its factual sufficiency will be tested later-by a motion for summary judgment under Rule 56, and if necessary by trial. By contrast, an order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises (and, if the case is settled, there could not be such an examination even if the district judge viewed the certification as provisional)."

<u>Id.</u> at 316 n. 15 (quoting <u>Szabo v. Bridgeport Machines, Inc.</u>, 249 F.3d 672, 675-76 (7th Cir.

2001).

Based upon the foregoing, UPMC and Highmark may challenge plaintiffs' class action

allegations at this stage of the proceedings, i.e., the pleading stage. If it is "plain enough from the

pleadings" in the proposed third amended complaint that plaintiffs cannot sustain their burden to

show class treatment is appropriate in this case under Rule 23, plaintiffs will not be granted leave

to file a third amended complaint containing the class allegations set forth in the proposed third

amended complaint. The court under Rule 15 should "freely" grant plaintiffs leave to amend the

complaint, but will not grant leave to amend if the amendment would be futile.[18] Plaintiffs are

---

[18] For the reasons set forth in this opinion, it is apparent on the face of the proposed third amended complaint that with respect to certain claims plaintiffs cannot satisfy the class action requirements set forth in Rule 23. If the court granted plaintiffs leave to file a third amended complaint containing those class allegations, UPMC and Highmark could file motions to strike those allegations from the complaint, and the court would grant those motions. The parties, however, already briefed and argued those class certification issues before the court, and the court reviewed the parties' submissions, considered their arguments, and researched the applicable law with respect to those issues. It would, therefore, be a waste of judicial resources

correct, however, that the Rule 12(b)(6) pleading standards set forth in Iqbal and Twombly do not apply with respect to plaintiffs' class allegations; rather, the court must apply Rule 23 to determine whether class treatment is *actually* appropriate in this case. The court must determine whether this is one of the "rare" cases in which it is "plain enough from the pleadings" that plaintiffs cannot meet their burden under Rule 23 to show class treatment is appropriate in this case.

### b. Rule 23

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1232 (2013). To be certified, a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. FED. R. CIV. P. 23(a). With respect to commonality, a court must assess the susceptibility of plaintiffs' entire claim to class treatment, which includes providing a sound methodology for determining damages across the class. Comcast, 133 S.Ct. at 1433. In Wal–Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541 (2011), the Court held commonality includes proof that a classwide proceeding will generate "common answers apt to drive the resolution of the litigation." Wal–Mart, 131 S.Ct. at 2551. The Court explained that common contentions central to the classwide issues should be resolved "in one stroke." Id. The lack of a single stroke

---

and contrary to Rule 15 to permit plaintiffs to file the proposed third amended complaint containing those class allegations.

resolution underscores the predominance of individual issues in a case that warrants the denial of class certification. <u>Yarger v. ING Bank, fsb</u>, 285 F.R.D. 308, 327 (D.Del. 2012).[19]

The class—in addition to satisfying the four requirements set forth in Rule 23(a)—must fit within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b). <u>In re Cmty. Bank of N. Va.</u>, 418 F.3d at 302. Rule 23(b) provides:

> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > **(1)** prosecuting separate actions by or against individual class members would create a risk of:
> >
> > > **(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > **(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> >
> > **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> >
> > **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> >
> > > **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

---

[19] Prior to the Supreme Court's decisions in <u>Wal–Mart</u> and <u>Comcast</u> "the case law was far more accommodating to class certification." <u>In re Rail Freight Fuel Surcharge Antitrust Litig.</u>, 725 F.3d 244, 255 (D.C.Cir.2013). After <u>Wal–Mart</u> and <u>Comcast</u>, Rule 23 requires a harder look at issues such as commonality and predominance.

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b). To determine whether to certify a class, the court must be satisfied "after a rigorous analysis" that all the requirements for class certification are met. Gen. Tel. Co., 457 U.S. at 160. The rigorous analysis requires the court to make explicit findings; "'the requirements of Rule 23 must be met, not just supported by some evidence.'" Id. at 320 (quoting In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 33 (2d Cir. 2006)).

The proponent of class certification has the burden of proving each of the prerequisites of a class action under Rule 23(a) and that the class fits within one of the three categories of class actions set forth in Rule 23(b); indeed, "[a] party's assurance to the court that it intends or plans to meet the [Rule 23] requirements is insufficient." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 316 n. 14, 317 (citing Unger v. Amedisys, 401 F.3d 316, 320 (5th Cir. 2005)); Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 354 (3d Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit."). It may not be necessary for a plaintiff to establish the merits of its case at the certification stage, but, if establishing the merits is necessary to determine whether class certification requirements are met, the court may have to conduct a "'preliminary inquiry into the merits.'" In re Hydrogen Peroxide, 552 F.3d at 317 (quoting Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 168 (1974)). The court of appeals in In re Hydrogen Peroxide explained how a court should handle "[a]n overlap between a class certification requirement and the merits of a claim" as follows:

Because the decision whether to certify a class "requires a thorough examination of the factual and legal allegations," id. at 166, the court's rigorous analysis may include a "preliminary inquiry into the merits," id. at 168, and the court may "consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take," id. at 166 (quoting 5 Moore's Federal Practice § 23.46[4] ) (quotation marks omitted). See id. at 168 ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action."). A contested requirement is not forfeited in favor of the party seeking certification merely because it is similar or even identical to one normally decided by a trier of fact. Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.

In re Hydrogen Peroxide, 552 F.3d at 317-318.

"'A critical need' of the trial court at certification 'is to determine how the case will be tried,…including how the class is to be ascertained.'" Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013) (quoting In re Hydrogen Peroxide, 552 F.3d at 319). A plaintiff "[a]s 'an essential prerequisite' to class certification…must show by a preponderance of the evidence that the class is ascertainable." Hayes, 725 F.3d at 354 (citing Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592 (3d Cir. 2012); In re Hydrogen Peroxide, 552 F.3d at 320). "[A]scertainability is important because it 'eliminates serious administrative burdens ... by insisting on the easy identification of class members'; allows for the best notice practicable, and thereby protects absent class members; and protects defendants by clearly identifying the individuals to be bound by the final judgment." Hayes, 725 F.3d at 354-54 (citing Marcus, 687 F.3d at 593). "If a class cannot be ascertained in an economical and 'administratively feasible' manner…significant benefits of a class action are lost." Carrera, 727 F.3d at 307 (quoting Marcus, 687 F.3d at 593-94).

The court of appeals in Hayes explained the "two important elements" of ascertainability as follows:

First, the class must be defined with reference to objective criteria. Id. Second, there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Id. at 593–94. We explained that "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Id. at 593; see also William B. Rubenstein, Newberg on Class Actions § 3:3 (5th ed. 2011) ("Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry."). We noted that other courts have gone so far as to hold "that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." Marcus, 687 F.3d at 593.

Hayes, 725 F.3d at 355. "[T]o satisfy ascertainability as it relates to proof of class membership, the plaintiff must demonstrate his purported method for ascertaining class members is reliable and administratively feasible, and permits a defendant to challenge the evidence used to prove class membership." Carrera, 727 F.3d at 307. A plaintiff cannot meet its burden to show the class is administratively ascertainable "if individualized fact-finding or mini-trials will be required to prove class membership." Carrera, 727 F.3d at 307.

The requirement of ascertainability protects the due process rights of defendants in class action lawsuits. Carrera, 727 F.3d at 307. The court of appeals in Carrera explained this concept as follows:

A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues. See McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 231–32 (2d Cir.2008) (rejecting a "fluid recovery" method of determining individual damages, in which aggregate damages would be based on estimates of the number of defrauded class members and their average loss), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008); see also Dukes, 131 S.Ct. at 2561 (rejecting a method of class certification in which a sample set of class members would be used to extrapolate average damages). A defendant has a similar, if not the same, due process right to challenge the proof used to demonstrate class membership as it does to challenge the elements of a plaintiff's claim. See Marcus, 687 F.3d at 594 ("Forcing BMW and Bridgestone to accept as true absent persons' declarations that they are members of the class, without further indicia of

reliability, would have serious due process implications."). Ascertainability provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership.

Id.

In Hayes, the district court granted the plaintiff's motion for class certification, and the defendant on appeal to the Third Circuit Court of Appeals contested class certification. Id. at 351. The court of appeals remanded the case based upon Marcus v. BMW of N. Am., LLC, 687 F.3d 583 (3d Cir. 2012), which was decided after the district court in Hayes granted the plaintiff's motion for class certification, and "thoroughly explored Rule 23's class definition, ascertainability, and numerosity requirements," which were in issue in that case. Id. at 351-52. The court of appeals in Hayes explained its decision in Marcus with respect to ascertainability as follows:

> The plaintiffs in Marcus sued BMW and Bridgestone for selling allegedly defective run-flat tires (RFTs). Id. at 588. The class definition sought to capture owners and lessees who purchased or leased new BMWs with original-equipment Bridgestone RFTs from BMW dealerships in New Jersey and whose tires had gone flat and been replaced. Id. at 592. We found the proposed class raised "serious ascertainability issues." Id. at 593. In particular, lease and purchase records from BMW dealerships were over-inclusive because they did not document the brand of tire on each car leased or sold. Id. And not all owners and lessees took their vehicles back to a BMW dealer to have their tires replaced— hence repair records were under-inclusive. Id. at 594. Remanding the case to the district court, we said:
>
>> If Marcus attempts to certify a class on remand, the District Court—adjusting the class definition as needed—must resolve the critical issue of whether the defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative. We caution, however, against approving a method that would amount to no more than ascertaining by potential class members' say so. For example, simply having potential class members submit affidavits that their Bridgestone RFTs have gone flat and been replaced may not be "proper or just." ... Forcing BMW and Bridgestone to accept as true absent persons' declarations that they are members of the class, without

> further indicia of reliability, would have serious due process implications.

> Id. (citation omitted) (quoting Xavier v. Philip Morris USA Inc., 787 F.Supp.2d 1075, 1090 (N.D.Cal.2011)).

Hayes, 725 F.3d at 356.

The court of appeals in Hayes remanded the case because the district court, which granted class certification, "did not have the benefit of Marcus's guidance," and "did not consider whether it would be administratively feasible to ascertain class members." Id. at 355. In granting the plaintiff's motion for class certification, the district court held that the defendant not having administrative records from which the plaintiff's proposed class could be ascertained was not a barrier to class certification. Id. The court of appeals explained, however, that "Rule 23's requirements that the class be administratively feasible to ascertain and sufficiently numerous to warrant class action treatment cannot be relaxed or adjusted on the basis of [the plaintiff's] assertion that [the defendant's] records are of no help to him." Id. at 356. The court of appeals held that in light of the district court's finding that the defendant did not have administrative records from which the putative class could be ascertained, "to be successful on remand, plaintiff must offer some reliable and administratively feasible alternative that would permit the court to" ascertain the class. Id. The court of appeals cautioned, however, that plaintiff's "petition for class certification will founder if the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding." Id.

### c. Analysis

Here, plaintiffs define the class in the proposed third amended complaint as:

> all persons, whether natural or fictitious, who purchased health insurance coverage from, or otherwise paid any premiums or portion thereof to, the

Highmark Defendants, and whose policies were in effect at any time on or after January 1, 2002.[20]

(ECF No. 250-1 ¶¶ 17-18.) As discussed above, plaintiffs in the proposed third amended complaint attempt to set forth at least two measures of damages for the putative class of small group plaintiffs. The first measure of damages is the difference between the rates the small group plaintiffs paid Highmark during the alleged UPMC-Highmark conspiracy and the rates the small groups plaintiffs would have paid Highmark's excluded and marginalized competitors not subject to the PID's rate-filing requirements prior to March 21, 2012, but for the alleged UPMC-Highmark conspiracy. The second measure of damages is the difference between the rates the small group plaintiffs that Highmark switched to HHIC paid to HHIC during the alleged UPMC-Highmark conspiracy and the rates the small group plaintiffs that Highmark switched to HHIC would have paid to HHIC but for the alleged UPMC-Highmark conspiracy.

UPMC argues that plaintiffs failed to plead valid class allegations because they failed "to show that common questions predominate over individualized issues," i.e., plaintiffs' alleged

---

[20] Plaintiffs in the proposed third amended complaint also define the class as:

> all persons, whether natural or fictitious, who received health care services from Defendant UPMC and paid for those services in whole or in part by remitting payment directly to UPMC at any time on or after January 1, 2002.

(ECF No. 250-1 ¶ 17.) As discussed herein, however, plaintiffs do not have a legally cognizable antitrust claim based upon damages measured by the direct payments the individual plaintiffs or the small group plaintiffs' employees paid to UPMC during the alleged UPMC-Highmark conspiracy and the direct payments the individual plaintiffs or the small group plaintiffs' employees *would have* paid to UPMC but for the alleged UPMC-Highmark conspiracy. The individual plaintiffs' claims are barred in this respect based upon the application of the filed rate doctrine, and the small group plaintiffs' do not have standing to sue UPMC and Highmark based upon the payments made by their employees.

injuries "are highly individualized and cannot be established by common proof." (ECF No. 254 at 11-12.) UPMC explains:

> Plaintiffs seek to combine in a single class disparate groups of consumers with unique injuries and underwriting characteristics, including Highmark subscribers who (1) were transferred to Highmark Health Insurance Co. (HHIC) and allegedly paid inflated premiums to it; (2) would have purchased cheaper comparable insurance from Aetna; (3) would have purchased cheaper comparable insurance from Cigna; (4) would have purchased cheaper comparable insurance from United; (5) would have purchased cheaper comparable insurance from Health America; (6) would have purchased Community Blue; (7) would have purchased the UPMC Health Plan; (8) would have used a TPA; or (9) directly paid UPMC. See Third Am. Compl. ¶ 25.

> But the inquiry into which of these routes, if any, a particular consumer would have taken—as well as whether a particular consumer would have elected to remain with Highmark—would require the fact finder "to make individualized inquiries regarding the nature of each member's claim." *Thompson*, 2004 WL 62710, *5. Furthermore, "individualized market conditions" reflecting such factors as the size and composition of the risk pool, the availability of prior claims history, the scope of coverage, the provisions and limits for copayments and deductibles, and price drive the market for health insurance. *See Blades*, 400 F.3d at 572. Thus, "particularized evidence" is required to show both the "competitive price" and the terms that would have been offered to any consumer and whether any consumer was actually harmed by the alleged anticompetitive conduct. *Id.*

(Id. at 12-13.) Highmark adds that the class as defined is not plausible because it includes Highmark customers that would have stayed with Highmark but for the alleged UPMC-Highmark conspiracy. Highmark argues those class members' damages would be barred by the filed rate doctrine because they would be calculated based upon the legally-approved rates those customers paid to Highmark and the legally-approved rates those customers would have paid to Highmark but for the alleged UPMC-Highmark conspiracy. According to Highmark, calculating that measure of damages requires rate-making, i.e., determining what the hypothetical rate that Highmark would have charged the small group plaintiffs and would have been approved by the

PID but for the alleged UPMC-Highmark conspiracy, which is forbidden by the filed rate doctrine.

UPMC and Highmark are correct; the putative small-group plaintiff class as defined in the proposed third amended complaint does not satisfy the requirements of Rule 23 because damages cannot be proven on a class wide basis; indeed, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." Comcast, 133 S.Ct. at 1433; In re Relafen Antitrust Litig., 221 F.R.D. 260, 272 n.10 (D. Mass. 2004).[21] Individualized inquiry would be necessary to determine whether the members of the small group plaintiffs' class would have (1) stayed with Highmark but for the alleged UPMC-Highmark conspiracy; or (2) switched to one of Highmark's alleged excluded and marginalized competitors but for the UPMC-Highmark conspiracy. As Highmark points out, to the extent members of the small group plaintiffs' putative class would have stayed with Highmark but for the alleged UPMC-Highmark

---

[21] In In re Relafen, the court commented:

> The Court assumes that consumers who continued to choose Relafen in the actual world would have done so in the but-for world—that is, even if generic nabumetone had become available in August 1998 rather than August 2001. This assumption is admittedly imperfect: Consider, for example, consumers who continued purchasing Relafen after generic entry, but only because they were reluctant to switch after starting treatment with the branded drug. Had generic alternatives been available earlier, such consumers might have started with and continued purchasing generic nabumetone rather than Relafen. The Court nevertheless excludes such consumers because identifying them would require the sort of individualized inquiries that would render class certification inappropriate. See Cardizem, 200 F.R.D. at 343 (distinguishing between switchers, for whom "[t]here is no need for individual analysis of switching behavior," and non-switchers, for whom there is such a need); cf. Basic, Inc. v. Levinson, 485 U.S. 224, 242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (recognizing that requiring proof of an individualized issue such as reliance "effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones").

In re Relafen, 221 F.R.D. at 272 n.10.

conspiracy, their measure of damages would be barred by the filed rate doctrine. As discussed above, certifying a class for which damages cannot be proven on a class wide basis is inefficient and improper. Certification of a class action under those circumstances especially would be improper because the measure of damages for one segment of the putative class, i.e., Highmark's customers that would have stayed with Highmark but for the alleged UPMC-Highmark conspiracy, would be barred under the filed rate doctrine. Based upon the foregoing, it is "plain enough from the pleadings" that plaintiffs cannot meet the requirements of Rule 23 to prove class certification based upon the definition of the putative class set forth the proposed third amended complaint is warranted in this case. Gen. Tel. Co., 457 U.S. at 160.

The court at the hearing on April 7, 2014, and as part of its review of the parties' submissions, considered other possible class definitions that the small group plaintiffs may rely upon for class certification in this case. The viability of those definitions are discussed below.

     i.     **Putative class defined as "Highmark customers that would have switched their insurance coverage from Highmark to one of Highmark's excluded or marginalized competitors but for the alleged UPMC-Highmark conspiracy"**

The court at the hearing on April 7, 2014, questioned the parties about whether a class could be defined as Highmark customers that would have switched their insurance coverage from Highmark to one of Highmark's excluded or marginalized competitors but for the alleged UPMC-Highmark conspiracy. As Highmark points out in their supplemental brief, however, a class defined based upon that criterion is not administratively ascertainable. As the Third Circuit Court of Appeals has repeatedly cautioned, a "petition for class certification will founder if the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding." Hayes, 725 F.3d at 356; Carrera, 727 F.3d at 305; Marcus, 687 F.3d at 593. A class defined as Highmark customers that would have

switched their insurance coverage from Highmark to one of Highmark's excluded or marginalized competitors but for the alleged UPMC-Highmark conspiracy cannot be administratively or reliably ascertained based upon Highmark's records or some other objective criteria; rather, the class could only be ascertained by questioning each of Highmark's small group insurance customers about what they would have done but-for the alleged UPMC-Highmark conspiracy. Under those circumstances, the class would be ascertained based upon an individualized inquiry of potential class members and based only upon their say so without discovery or the ability to cross-examine those potential class members, which "would have serious due process implications" for UPMC and Highmark because they would be forced "to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability." Marcus, 687 F.3d at 594.[22] Certification of such a class would run afoul of Rule 23 and relieve plaintiffs of their burden to "show by a preponderance of the evidence that there is a reliable and administratively feasible method for ascertaining the class." Hayes, 725 F.3d at 356.

Plaintiffs in response to Highmark's and UPMC's arguments with respect to the insufficiency of plaintiffs' class allegations assert, however, that under applicable antitrust laws, plaintiffs are not required to prove that any of the members of the putative small group plaintiffs class would have switched from Highmark to one of Highmark's excluded or marginalized competitors but for the alleged UPMC-Highmark conspiracy because "[a]ll consumers who participate in a market victimized by illegal exclusionary activity suffer antitrust injury because they are *denied the benefits of a competitive marketplace*." (ECF No. 280 at 3 (emphasis in

_____

[22] As the court of appeals commented in Marcus: "The class definition and ascertainability problems spill into the predominance inquiry as well." Marcus, 687 F.3d at 594 n.3.

original).) According to plaintiffs, even the small group plaintiffs that would have stayed with Highmark but-for the alleged UPMC-Highmark conspiracy whose measure of damages is barred by the filed rate doctrine is entitled to damages in this case. Plaintiffs argue that under <u>Lower Lake Erie</u> they propose a legally cognizable measure of damages that is not based upon whether members of the putative small group plaintiff class would have switched insurers. Plaintiffs describe that measure of damages as follows: "'look[ing] at the rate that Highmark filed, and you can look at the but-for price that would have been charged in a competitive market by competitors who would not have had to file rates.'" (ECF No. 280 at 4 (quoting H.T. 4/7/14 (ECF No. 270) at 17).) UPMC argues plaintiffs cannot prove each member of the small group class is entitled to damages in this case based upon mere proof that the alleged UPMC-Highmark conspiracy excluded Highmark's competitors from the relevant market. According to UPMC, plaintiffs must also prove that the alleged antitrust violation, i.e., excluding competitors from the market, **caused** each member of the putative small-group plaintiff class *actual* harm.

Plaintiffs' reliance on <u>Lower Lake Erie</u> for the proposition that all members of the putative small-group plaintiff class are entitled to damages based upon proof that the alleged UPMC-Highmark conspiracy excluded and marginalized Highmark's competitors is misplaced. In <u>Lower Lake Erie</u>, the Third Circuit Court of Appeals held the filed rate doctrine does not preclude claims for damages based upon non-rate anticompetitive conduct. <u>Lower Lake Erie</u>, 998 F.2d at 1159. In that case, several groups of plaintiffs sued railroad companies alleging the railroad companies conspired "to eliminate competition and monopolize the transportation and handling of iron ore." <u>Id.</u> at 1152. The plaintiffs alleged:

> Railroad officials orally agreed that leases of railroad docks or facilities should be examined or modified to frustrate the efforts of non-railroad docks to handle ore from self-unloaders. They also agreed to refuse to provide competitively-priced

inland rail service, i.e., to publish commodity line haul rates for moving ore from such docks. Finally, it was agreed that railroad docks should assess the same handling charges for unloading ore from bulkers as from self-unloaders, regardless of the extent of service performed.

…

To effectuate the goal of market preclusion, the railroads used coercion to enforce adherence to the agreement to foreclose competition from private docks. B & LE and its co-conspirators did indeed restrict the lease and sale of railroad-owned dock property and boycotted non-railroad docks. These activities eliminated much of the economic incentives to use self-unloaders. By impeding the progress of the private dock system, the railroads were also effective in foreclosing competition from trucks.

Id. at 1153. The issue before the court of appeals relevant to this case was whether the plaintiffs' claims for treble damages based upon allegations that the railroads "conspired to preclude competition in which ICC-approved rates played a role in thwarting market entry" were barred under Keogh and Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409 (1986). Id. at 1158.

With respect to the steel company-plaintiffs, the district court in Lower Lake Erie dismissed their claims for damages based upon rates filed by the railroads and "any damage claims that would require estimating what rates the ICC would have accepted, an estimation forbidden by Keogh." Lower Lake Erie, 998 F.2d at 1158. The district court permitted two of the steel company-plaintiffs' claims against the railroads to proceed. Id. The district court described those claims as follows:

"(1) [a claim] that [the steel companies] could have paid lower dock-handling rates (sooner) to the private docks than they did to the railroad docks if the railroads had not retarded the development of the self-unloader industry; and

(2) [a claim] that [the steel companies] could have paid lower land transport rates (sooner) to the truckers, had the railroads not restrained competition by that industry and monopolized linehauling from their docks."

Lower Lake Erie, 998 F.2d at 1158 (quoting In re Lower Lake Erie Iron Ore Antitrust Litig., 759

F.Supp. 219, 234 (E.D. Pa. 1991)). The district court reasoned that with respect to those claims, the "plaintiffs' damages [did] not depend on proof of price-fixing by defendants, which <u>Keogh</u> would bar, but on proof that defendants conspired to exclude low cost competitors from the market, which does not implicate the ICC's exclusive jurisdiction and therefore is not barred by *Keogh*." <u>Lower Lake Erie</u>, 998 F.2d at 1158. The district court also determined that one of the plaintiffs' "claims for damages emanating from the delay in the construction and use of [its] own dock facilities" was not barred under <u>Keogh</u>. <u>Id.</u> at 1159. The district court noted that to bar such a claim "would overextend *Keogh's* reach and could produce a rule that one who pays for services governed by ICC tariffs is foreclosed from asserting that antitrust violations prevented use of a less expensive, equivalent service." <u>Id.</u>

The Court of Appeals for the Third Circuit affirmed the decision of the district court with respect to the steel company-plaintiffs holding "the district court correctly characterized [the railroads'] anti-competitive activity as market preclusion, and <u>Keogh's</u> protective rule cannot apply to forbid recovery for the resulting economic detriment." <u>Lower Lake Erie</u>, 998 F.2d at 1159. The court of appeals held:

> As the Supreme Court has succinctly stated, *Keogh* merely prevents private shippers from sustaining an award of treble damages by claiming that ICC-approved rates were the product of an antitrust violation. *Square D*, 476 U.S. at 422, 106 S.Ct. at 1929. That statement of *Keogh's* protection does not preclude liability based on non-rate anticompetitive activity. Indeed, the steel companies' case involves damage claims based on non-rate activity that targeted potential low-cost competitors.

<u>Lower Lake Erie</u>, 998 F.2d at 1159. The court acknowledged "that the success of anticompetitive non-rate activity would coincidentally implicate rates," but noted the rates charged by the railroad in that case were "ancillary" to the steel company-plaintiffs' claims. <u>Id.</u> The court instructed:

It is fully consistent with *Keogh*…to accept these rates as lawful and nonetheless to conclude that through non-rate activities, particularly the restriction on the sale or lease of dock space and the refusal to deal with potential competitors, the railroads effectively retarded entry of lower cost competitors to the market. The instrument of damage to the steel companies was the absence of the lower-cost combination. In contrast, the Supreme Court in *Keogh* made it clear that "the instrument by which *Keogh* is alleged to have been damaged is rates approved by the Commission." 260 U.S. at 161, 43 S.Ct. at 49.

Lower Lake Erie, 998 F.2d at 1159. The court stressed that the plaintiffs in Lower Lake Erie met their burden by showing "the railroads conspired to protect their stronghold in the ore transport market by blocking entry by low-cost competitors, not that the railroads charged an unlawful rate." Id. This was in contrast to the shipper's burden in Keogh—which the Court found the shipper could not meet—to prove that but for the conspiracy a carrier would have charged him a lower rate **and** the lower rate would have been approved by the ICC. Id.

Notably, Lower Lake Erie was not a class action lawsuit, and, therefore, the plaintiffs in that case did not face the same obstacles with respect to proving causation and injury in fact that the small group plaintiffs seeking class treatment face in this case. To establish a right to treble damages in a private antitrust lawsuit, a plaintiff must prove, among other elements, injury in fact **and** antitrust injury. "Injury in fact is not the same as antitrust injury, nor can the requirement be satisfied by 'broad allegations of harm to the 'market' as an abstract entity.'" Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 1002 (9th Cir. 2000) (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 n.8 (1990)). The Supreme Court has defined "injury in fact" for the purpose of constitutional standing as: "an invasion of a legally protected interest which is (a) concrete and particularized…and (b) 'actual or imminent, not conjectural or hypothetical[.]'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). Antitrust injury, however, is defined

as: "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful[.]'" <u>Ethypharm S.A. France v. Abbott Labs.</u>, 707 F.3d 223, 233 (3d Cir. 2013) (quoting <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977)).

Under plaintiffs' theory in this case, proving antitrust injury to the market, i.e., the decrease in competition in the relevant insurance markets, is sufficient to establish *all* class members' right to monetary damages. As UPMC and Highmark point out, however, plaintiffs' class as defined—small groups that purchased insurance from Highmark during the relevant time period—includes: (1) small groups that would have switched to one of Highmark's marginalized or excluded competitors but for the alleged UPMC-Highmark conspiracy; **and** (2) small groups that would have stayed with Highmark but for the alleged UPMC-Highmark conspiracy. The named small group plaintiffs fit within the first category of class members, and they may prove they suffered injury in fact *and* antitrust injury because they are not precluded by law from showing that but for the decreased competition caused by the alleged UPMC-Highmark conspiracy, they would have purchased insurance at a lower rate from one of Highmark's marginalized or excluded competitors, which were not subject to the PID rate-filing requirements. The *actual* harm suffered by the named small group plaintiffs is the difference between the rates they paid to Highmark during the alleged UPMC-Highmark conspiracy and the rates they would have paid unregulated insurance carriers but for the alleged UPMC-Highmark conspiracy prior to March 21, 2012.

The named small-group plaintiffs' measure of damages in this regard is similar to the steel company-plaintiffs' measure of damages in <u>Lower Lake Erie</u>. The steel company-plaintiffs in <u>Lower Lake Erie</u> provided evidence to the jury that but for the defendant-railroads' conspiracy

to exclude their competitors, the steel company-plaintiffs would have "invest[ed] in the more cost-effective self-unloaders." Lower Lake Erie, 998 F.2d at 1175.[23] The court of appeals explained that evidence was presented to the jury that:

> [b]ecause the railroads also controlled access to their docks and provided inland transportation of ore from the docks only by rail, the self-unloader/non-railroad dock system also compromised the railroads' monopoly on the inland transportation of iron ore. With self-unloaders discharging cargo at private docks, less costly trucks could haul the ore from the non-railroad docks and provide land transportation savings to the steel companies.

Id. at 1153. In other words, the steel company-plaintiffs in Lower Lake Erie introduced evidence to show they would have switched from utilizing the docks and the rail-transportation provided by the defendant-railroads that were subject to ICC-approval to using the new and cheaper technologies, i.e., self-unloaders, private docks, and "less costly trucks," which were not subject to rate-filing requirements. Id. at 1153. Proving the railroad-defendants' antitrust violation

---

[23] With respect to the steel company-plaintiffs' evidence that they would have used the self-unloader technology but for the railroad-defendants' illegal conspiracy, the district court in Lower Lake Erie commented:

> [W]hether the steel companies' claims for "self-unloader" damages—by far the largest portion of their awards—can be sustained depends upon whether the evidence shows that they had both the ability and the intention to enter the lake-transport market at the relevant times.
>
> There is ample evidence that the steel companies would have sought the lowest-cost method of transporting iron ore from its source to their mills, and would have utilized self-unloaders had they been available. And, if the jury accepted the testimony of plaintiffs' witnesses, the jury could well have found that the plaintiff steel companies would have purchased or leased their own self-unloader vessels. See, e.g., testimony concerning National's acquisition of the vessel Stinson, and the testimony of Mr. Dragoneer (liability N.T. 772) and Mr. Stuthers (liability N.T. 838–44).

Lower Lake Erie, 759 F.Supp. at 226.

caused the steel company-plaintiffs injury in fact, therefore, was not in issue in <u>Lower Lake Erie</u> because the steel company-plaintiffs produced evidence to show that but-for the railroad-defendants' exclusionary conduct, they would have paid lower, unregulated rates. Similarly, in this case, proving injury in fact is not an issue with respect to the named small group plaintiffs that allege they would have switched to one of Highmark's low-cost competitors but for the alleged UPMC-Highmark conspiracy. The court applying the motion to dismiss standard, i.e., <u>Iqbal</u> and <u>Twombly</u>, must accept as true that the named small group plaintiffs can show that but for the alleged UPMC-Highmark conspiracy, they would have purchased insurance from Highmark's low-cost competitors. A measure of damages based upon that evidence would not be barred by the filed rate doctrine.

With respect to the second group of small group plaintiffs in the putative class in this case, i.e., the small group-plaintiffs that would have stayed with and continued to pay Highmark rates approved by the PID but for the alleged UPMC-Highmark conspiracy, those putative class members cannot show that the alleged antitrust violation caused them injury in fact. *Consumers are not injured by paying a legally filed rate*, and the rates paid by the small group-plaintiffs that would have stayed with Highmark but for the alleged UPMC-Highmark conspiracy would at all relevant times be legally-approved filed rates. <u>In re N.J. Title Ins. Litig.</u>, 683 F.3d 451, 461 (3d Cir. 2012) (citing <u>Keogh</u>, 260 U.S. at 163; <u>Wegoland Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 18 (2d Cir. 1994)). Despite the steel company-plaintiffs' allegations of illegal exclusionary conduct on the part of the railroad-defendants in <u>Lower Lake Erie</u>, the steel company-plaintiffs were prohibited from asserting a measure of damages "based upon rates charged by the defendant railroads." <u>Lower Lake Erie</u>, 998 F.2d at 1158. In other words, the steel company-plaintiffs in that case were not permitted to proceed on a theory of recovery based upon allegations that they

would have patronized the railroad-defendants and paid them a lower price but-for the railroad defendants' anticompetitive exclusionary conduct. Similarly, in this case, members of the putative small-group plaintiff class that would have stayed with Highmark cannot proceed on a theory that they would have paid lower rates to Highmark absent the alleged UPMC-Highmark conspiracy because that theory of recovery is barred by the filed rate doctrine, and, therefore, those small group-plaintiffs cannot show they suffered injury in fact based upon the payment of those rates.

Based upon the foregoing, plaintiffs' reliance on <u>Lower Lake Erie</u> for the proposition that proving antitrust injury is sufficient to establish all members of the small group plaintiff class are entitled to damages in this case is misplaced. Plaintiffs cannot—as a matter of law—prove on a class wide basis that all members of the class as defined in the proposed third amended complaint suffered injury in fact as a result of the alleged UPMC-Highmark conspiracy. Plaintiffs cannot, therefore, prove the prima facie elements of an antitrust claim on a class wide basis. Under those circumstances, the small group plaintiffs' claims are not suitable for class treatment.

### ii. Putative class defined as "Highmark customers that were switched to HHIC"

The small group plaintiffs also attempt to assert a measure of damages based upon difference between the rates the small group plaintiffs that Highmark switched to HHIC paid to HHIC during the alleged UPMC-Highmark conspiracy and the rates the small group plaintiffs that Highmark switched to HHIC would have paid to HHIC but for the alleged UPMC-Highmark conspiracy. Class certification may be appropriate based upon this group of Highmark customers because individualized inquiry is not necessary to determine class membership; indeed, the class would be administratively ascertainable if Highmark has records of customers that were switched

from Highmark to HHIC. Damages could be calculated on a class wide basis based upon the difference between the unregulated rates the customers that were switched to HHIC paid to HHIC during the alleged UPMC-Highmark conspiracy and the unregulated rates those customers would have paid to HHIC but for the UPMC-Highmark conspiracy. As discussed above, however, the small group plaintiffs did not set forth sufficient factual allegations with respect to when the named small group plaintiffs were switched from Highmark to HHIC. If the small group plaintiffs were switched from Highmark to HHIC after March 21, 2012, their claims would be barred by the filed rate doctrine because HHIC was required to file its rates with the PID beginning on that date. The small group plaintiffs will be granted leave to file a third amended complaint containing class allegations with respect to a class defined as Highmark customers that were switched to HHIC prior to March 21, 2012. The class' damages, however, would be limited to recovery based upon the length of time the class paid unregulated rates to HHIC.[24]

### 2. Adequacy of Plaintiffs' Counsel to Represent the Putative Class

UPMC argues "Plaintiffs' class allegations should be stricken for the additional reason that Plaintiffs' counsel faces irreconcilable conflicts of interest that preclude adequate class representation." (ECF No. 254 at 14.) The court at the April 7, 2014 hearing held that whether

---

[24] As discussed above, plaintiffs seek to add Snyder as an additional named plaintiff in this case because according to plaintiffs, Snyder was a Highmark customer who Highmark switched to HHIC. Plaintiffs are granted leave to add Snyder as an additional named small-group plaintiff in this case if they are able to plausibly allege that Highmark switched Snyder to HHIC prior to March 21, 2012, Snyder paid unregulated rates to HHIC, and Snyder would have paid lower rates to HHIC but for the alleged UPMC-Highmark conspiracy. In re Cmty. Bank of N. Va., 622 F.3d 275, 298 (3d Cir. 2010) ("[A]n amended complaint adding a class member as a new named plaintiff need only satisfy Rule 15(c)(1)(B) to relate back to an earlier complaint.").

plaintiffs' counsel can adequately represent the putative class is not ripe for consideration by the court. (H.T. 4/7/14 (ECF No. 270) at 39.) In light of the foregoing analysis, there are currently no valid class allegations pending before the court. The issue of adequacy of plaintiffs' counsel to represent the putative class is, therefore, moot and will not be decided by the court at this stage in the proceedings. UPMC—to the extent it determines it is appropriate to do so—should raise the issue whether plaintiffs' counsel can adequately represent the putative class when valid class allegations are pending before the court.

## VI.   Conclusion

For the reasons set forth herein, plaintiffs' motion for leave to file a third amended complaint (ECF No. 249) will be GRANTED IN PART and DENIED IN PART. On or before October 1, 2014, plaintiffs may file a third amended complaint—subject to the restrictions set forth in this opinion. An appropriate order will be entered.

By the court:

Dated: August 21, 2014

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge