# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COLE'S WEXFORD HOTEL, INC.,
on its own behalf and on behalf of all
others similarly situated,

     Plaintiffs,

     v.

UPMC and HIGHMARK, INC.,

     Defendants.

Case No. 10-1609

## OPINION

**CONTI, Chief District Judge**

### I.    Introduction

Pending before the court in this antitrust action is a motion to dismiss the third amended complaint filed by defendant Highmark, Inc. ("Highmark") (ECF No. 288) and a motion to dismiss the third amended complaint filed by defendant UPMC (ECF No. 290). UPMC and Highmark argue, among other things, that the third amended complaint filed by plaintiff Cole's Wexford Hotel, Inc. ("Cole's Wexford")[1] fails to state any claim for relief and the class action allegations contained in the third amended complaint are insufficient as a matter of law under Federal Rule of Civil Procedure 23. Based upon the court's review of the parties' submissions and for the reasons set forth in this opinion, the motion to dismiss filed by Highmark (ECF No. 288) will be denied, and the motion to dismiss filed by UPMC (ECF No. 290) will be granted in part and denied in part.

---

[1] Cole's Wexford is the sole remaining plaintiff in this case and will be referred to in this opinion as "Cole's Wexford." The court will collectively refer to Cole's Wexford and the parties previously dismissed from this case, i.e., Royal Mile Company, Inc., and Pamela Lang, as "plaintiffs."

## II.    Procedural History

On December 2, 2010, Royal Mile Company, Inc., Royal Mile Asset Management, LLC, and Pamela Lang initiated this case by filing a complaint alleging (1) UPMC and Highmark engaged in anticompetitive conduct in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, and (2) UPMC tortuously interfered with plaintiffs' existing and prospective business relations in violation of Pennsylvania common law. (ECF No. 1.) On August 16, 2012, plaintiffs filed an amended complaint against UPMC and Highmark. (ECF No. 77.) On September 17, 2012, UPMC and Highmark each filed a motion to dismiss the amended complaint and briefs in support of their motions alleging plaintiffs failed to state a claim for relief. (ECF Nos. 77, 78, 80, 81.)

On October 4, 2012, plaintiffs filed a motion seeking preliminary approval of a settlement with Highmark, certification of class, and appointment of class counsel (the "motion for preliminary approval of class settlement"). (ECF No. 88.)

On October 9, 2012, plaintiffs filed the second amended complaint against UPMC and Highmark alleging UPMC and Highmark violated §§ 1 and 2 of the Sherman Act and UPMC committed tortious interference with existing and prospective business relations under Pennsylvania law. (ECF No. 90 at 55-62.) On October 23, 2012, UPMC filed a motion to dismiss the second amended complaint. (ECF No. 95.) On October 26, 2012, Highmark filed a motion to dismiss the second amended complaint. (ECF No. 98.) On November 15, 2012, Highmark filed a motion to withdraw its motion to dismiss in light of the pending motion for preliminary approval of class settlement. (ECF No. 104.) On November 16, 2012, the court granted Highmark's motion to withdraw its motion to dismiss.  (ECF No. 105.)

On May 17, 2013, after a failed settlement attempt between plaintiffs and Highmark,

and plaintiffs' withdrawal of their motion for preliminary approval of class settlement and certification of the class, Highmark filed a renewed motion to dismiss the second amended complaint for failure to state a claim. (ECF No. 188.) On June 7, 2013, plaintiffs filed a response in opposition to Highmark's motion to dismiss for failure to state a claim. (ECF No. 195.) On June 26, 2013, Highmark with leave of court filed a reply in support of its motion to dismiss. (ECF No. 207.)

On September 27, 2013, after consideration of the parties' submissions, which included supplemental briefing, and the oral argument presented to the court at a hearing held on July 1, 2013, the court issued an opinion and order granting UPMC's and Highmark's motions to dismiss the second amended complaint. (ECF Nos. 240, 241.) The court held the second amended complaint must be dismissed because the measure of damages set forth in the second amended complaint implicated the filed rate doctrine, and plaintiffs' claim for tortious interference with existing and prospective contractual relations was time barred. (ECF No. 240 at 1.) The second amended complaint was dismissed without prejudice to plaintiffs seeking leave to file a third amended complaint "to the extent they [were] able to plead, with respect to the antitrust claims, a measure of damages that does not require the court to interfere with the ratemaking authority of the…[Pennsylvania Insurance Department (the "PID")] and, with respect to the tortious interference claim against UPMC, a basis for fraudulent concealment." (Id. at 80.)

On October 28, 2013, plaintiffs filed a motion for leave to file a third amended complaint, a brief in support of the motion, and the proposed third amended complaint attached to the motion. (ECF No. 249.) On October 29, 2013, plaintiffs filed an erratum with respect to the motion for leave to file a third amended complaint and a brief in support of the motion. (ECF Nos. 250, 251.) On November 4, 2013, Highmark filed a brief in opposition to the motion for

leave to file a third amended complaint. (ECF No 253.) On November 21, 2013, UPMC filed a brief in opposition to the motion for leave to file a third amended complaint. (ECF No. 254.) On November 27, 2013, Highmark with leave of court filed a supplemental opposition to the motion for leave to file a third amended complaint. (ECF No. 256.) On January 14, 2014, plaintiffs filed a reply brief. (ECF No. 262.) On January 27, 2014, Highmark with leave of court filed a sur-reply brief in opposition to the motion for leave to file a third amended complaint. (ECF No. 266.) On February 10, 2014, UPMC with leave of court filed a sur-reply brief in opposition to the motion for leave to file a third amended complaint. (ECF No. 269.)

On April 7, 2014, the court heard oral argument on the motion for leave to file a third amended complaint. (H.T. 4/7/14 (ECF No. 270).) The court ordered supplemental briefing. (H.T. 4/7/14 (ECF No. 270) at 9-10, 55-56.) On April 21, 2014, plaintiffs, Highmark, and UPMC each filed supplemental briefs. (ECF Nos. 271, 272, 273.) On May 5, 2014, Highmark and UPMC each filed a response to plaintiffs' supplemental brief. (ECF Nos. 277, 278.) On May 13, 2014, plaintiffs filed a reply brief to Highmark's and UPMC's supplemental briefs. (ECF No. 280.) On May 27, 2014, UPMC with leave of court filed a sur-reply brief in support of its opposition to plaintiffs' motion for leave to file a third amended complaint. (ECF No. 283.)

On August 21, 2014, the court granted in part and denied in part the motion for leave to file a third amended complaint. The court:

– denied the motion for leave with respect to the claims asserted by the individual plaintiffs because the measure of damages asserted by those plaintiffs in the proposed third amended complaint was barred by the filed rate doctrine;

– denied the motion for leave with respect to the claims asserted by the small group plaintiffs based upon damages measured by the difference between rates the small group plaintiffs paid to Highmark during the alleged UPMC-Highmark conspiracy and the rates the small group plaintiffs would have paid beginning on March 21, 2012, to Highmark's competitors but for the UPMC-Highmark conspiracy because that measure of damages

was barred by the filed rate doctrine;

− granted plaintiffs leave to amend with respect to the small group plaintiffs' claims based upon damages measured by the difference between the rates Highmark charged the small group plaintiffs during the alleged UPMC-Highmark conspiracy and the rates Highmark's excluded and marginalized competitors who were not subject to the PID's rate-filing requirements prior to March 21, 2012, would have charged the small group plaintiffs prior to March 21, 2012, but for the UPMC-Highmark conspiracy;

− granted plaintiffs leave to amend with respect to the small group plaintiffs' claims based upon damages measured by the difference between the rates the small group plaintiffs paid to Highmark's subsidiary Highmark Health Insurance Company during the alleged UPMC-Highmark conspiracy and prior to March 21, 2012, and the rates it would have paid Highmark Health Insurance Company but for the UPMC-Highmark conspiracy;

− held that under the relation back doctrine, plaintiffs were not prohibited by the statute of limitations from filing the proposed third amended complaint;

− denied leave to amend with respect to plaintiffs' tortious interference with contractual relations claim against UPMC because the claim was barred by the two-year statute of limitations under Pennsylvania law, and plaintiffs did not set forth factual allegations sufficient to toll the statute of limitations with respect to fraudulent concealment;

− held plaintiffs could not recover for damages based upon their antitrust claims that were sustained prior to December 2, 2006, because recovery was barred by the four-year statute of limitations, and plaintiffs did not set forth factual allegations sufficient to toll the statute of limitations based upon fraudulent concealment; and

− struck the class action allegations with respect to the small group plaintiffs because individual questions predominated over questions of law and fact common to the class.

(ECF No. 284); Royal Mile Co., Inc. v. UPMC and Highmark, 40 F.Supp.3d 552 (W.D. Pa. 2014).

On October 1, 2014, Cole's Wexford filed the third amended complaint. (ECF No. 286.) Cole's Wexford is the only named plaintiff in the third amended complaint. Cole's Wexford asserts the following claims against defendants:

- Count I: conspiracy in restraint of trade or commerce in violation of § 1 of the Sherman Act against Highmark and UPMC;

- Count II: conspiracy to monopolize in violation of § 2 of the Sherman Act

against Highmark and UPMC;

- Count III: willful acquisition and maintenance of a monopoly in the relevant market for healthcare services in violation of § 2 of the Sherman Act against UPMC;

- Count IV: willful acquisition and maintenance of a monopoly in the relevant market for private health insurance in violation of § 2 of the Sherman Act against Highmark;

- Count V: willful attempted monopolization in violation of § 2 of the Sherman Act against UPMC; and

- Count VI: willful attempted monopolization in violation of § 2 of the Sherman Act against Highmark.

(ECF No. 286.) On October 31, 2014, Highmark filed a motion to dismiss the third amended complaint and brief in support of the motion. (ECF Nos. 288, 289.) On the same day, UPMC filed a motion to dismiss the third amended complaint and a brief in support of the motion. (ECF Nos. 290, 291.) On December 4, 2014, Cole's Wexford filed a response in opposition to each of the motions to dismiss. (ECF Nos. 294, 295.) On December 18, 2014, Highmark filed a reply in support of its motion to dismiss. (ECF No. 298.) On January 6, 2015, UPMC filed a reply in support of its motion to dismiss. (ECF No. 300.)

The motions to dismiss having been fully briefed by the parties are now ripe to be decided by the court.

### III.     Factual Allegations in the Third Amended Complaint[2]

### A.  Summary of the Allegations with respect to the UPMC-Highmark Conspiracy

---

[2] The factual background is derived from the factual allegations in the proposed third amended complaint, which are accepted as true for purposes of deciding the motion for leave to file a third amended complaint. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) ("When considering a Rule 12(b)(6) motion, courts accept as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiffs.").

Cole's Wexford is a purchaser of small group health insurance coverage from Highmark and its subsidiaries, including Highmark Health Insurance Company ("HHIC"), a for-profit entity. (ECF No. 286 ¶ 1.) Cole's Wexford alleges it suffered damages as a result of a "sustained and orchestrated anticompetitive conspiracy" entered into by UPMC, "the area's largest healthcare provider," and the Highmark, "the area's largest health insurance provider." (Id.) According to Cole's Wexford, UPMC possessed market power "in at least two different product markets: the market for inpatient services, and the market for tertiary and quaternary acute care inpatient services[,]" and Highmark possessed market power in "(among other potential markets) the market for health insurance and/or health care financing and administration for small group private employers." (Id. ¶¶ 194, 208.) Cole's Wexford alleges that UPMC and Highmark "conspired, agreed, and acted in an organized, orchestrated, and deliberate fashion to control, divide, and/or monopolize both the market for medical care and the market for health insurance in the Western Pennsylvania area," and the conspiracy's effects are "lasting to the present day." (Id.)[3]

---

[3]   In the proposed third amended complaint, plaintiffs alleged the conspiracy "continued until at least Summer 2008, and likely through to the renegotiation of the UPMC-Highmark contract at the end of 2011." (ECF No. 250-1 at 73 ¶ 3.) In the third amended complaint, Cole's Wexford does not allege that the conspiracy ended in summer 2008; rather, Cole's Wexford alleges:

> The effects of the conspiracy lasted until at least March 2012, and likely to the present day. The conspiracy—and the bilateral monopolies the conspiracy conferred on Highmark and UPMC—created steep barriers to entry that prevented other insurers from entering the market. The effects of the conspiracy included a long-lasting barrier to other insurers forming a competitive provider network that included UPMC's flagship hospitals, UPMC Presbyterian and UPMC Shadyside. The effects of the conspiracy also included a longstanding unwillingness on the part of UPMC to offer competitive provider contracts and reimbursement rates to insurers who would compete with Highmark. Because of these long-lasting effects of the conspiracy, potential competitors such as United and Aetna have

Pursuant to the conspiracy:

> UPMC agreed to protect Highmark's dominant market position by, among other things, curtailing the extent to which UPMC offered its own insurance coverage that would have competed with Highmark, refusing to make its complete network available to competing health insurers, and refusing to sell its insurance subsidiary to actual or potential competitors of Highmark.

(ECF No. 286 ¶ 1.) In exchange for UPMC's promises:

> Highmark, among other things, agreed to stop supporting the West Penn Allegheny hospital system, UPMC's principal competitor for the provision of health care services in Western Pennsylvania, and agreed to drop its "Community Blue" insurance coverage, which offered lower cost insurance options that used West Penn Allegheny's network

(Id.)

Cole's Wexford alleges the result of the conspiracy was the exclusion[4] of competing insurers from the relevant health insurance marketplace. (Id.) According to Cole's Wexford, the exclusion of competing insurers caused it economic harm. Cole's Wexford explains:

---

> struggled, and continue to struggle, to become viable competitors in Western Pennsylvania.

(ECF No. 286 ¶ 229.)

[4]    Cole's Wexford alleges in support of these allegations:

> Data from the Compass Lexecon Report indicates the higher statewide market share of Highmark's competitors is a reflection of competitor strength outside of the Western Pennsylvania region. The Compass Lexecon Report compared insurer market share data at the statewide level to the Western Pennsylvania market. The report concludes that "shares are significantly skewed in the state level data and even more skewed at the local WPA level, suggesting that rivals represent a smaller competitive fringe to Highmark and UPMC." It further states: "Rivals' shares for the narrower WPA geography … differ considerably from those estimated from state-wide data for each of the insurers, and generally are higher for Highmark and lower for rivals [in Western Pennsylvania]." In particular, Aetna's 14 percent statewide market share drops to 3 percent for Western Pennsylvania. The Report also emphasizes that "state-level data tend to overstate competitors' shares and understate Highmark and UPMC's because [Highmark and UPMC] operate primarily in WPA."

Highmark unilaterally transferred small group plan subscribers from the nonprofit Highmark, Inc. to a for-profit subsidiary, Highmark Health Insurance Co. ("HHIC") beginning on July 1, 2010 in order to avoid being constrained by the Pennsylvania Insurance Department's ("PID") oversight authority. This migration enabled Highmark, through HHIC, to charge supracompetitive prices for small group plans until March 21, 2012, when these rates became subject to the PID's regulatory jurisdiction. In the absence of the conspiracy, Highmark would not have been able to impose inflated, supracompetitive premiums on its small group plan subscribers during this period.

…

Highmark's migration of customers began with plans that were due for renewal on July 1, 2010. Plaintiff Cole's [Wexford] was among these customers. Cole's [Wexford] renewed its Highmark plan with Highmark Health Insurance Co. on July 1, 2010.

(Id. ¶¶ 2, 241.)[5] In other words, "[o]nce Highmark was free of both meaningful competition (as a result of its conspiracy with UPMC) and regulatory scrutiny (as a result of its migration strategy), it was able to charge supracompetitive premiums to its small group customers." (Id. ¶ 242.) Cole's Wexford was harmed by the conspiracy because "[b]ut for the conspiracy, these purchasers of small group plans would have paid lower premiums to Highmark Health Insurance

---

…

Highmark's dominance in Western Pennsylvania was not reflected in other markets. The Compass Lexecon Report states that Highmark's market share in 2011 was "substantially lower than 65% in central Pennsylvania and West Virginia where the same market survey reports market shares of 28% and 27%, respectively."

(ECF No. 286 ¶¶ 217, 219.)

[5]    Cole's Wexford alleges in support of these allegations:

On July 20, 2010, the Pennsylvania House Insurance Committee held a public hearing on the subject of health insurance rate increases. As discussed more fully below, then-Insurance Commissioner Joel Ario testified that an increasing number of Highmark's customers were complaining about being charged excessive premium renewal rates after being transferred to Highmark's for-profit subsidiary, Highmark Health Insurance Co.

(ECF No. 286 ¶ 189.)

Co. or other Highmark entities whose small group premium amounts were not subject to any rate filing requirement." (Id.)

### B.  The Relevant Geographic Market

Cole's Wexford defines the relevant geographic market as:

> the 29-county area of Western Pennsylvania, specifically Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland counties….

(ECF No. 286 ¶ 195.) According to Cole's Wexford, Allegheny County is "the most populous county within the Relevant Geographic Market" and "[a]pproximately 95% of Allegheny County residents stay within the county for acute inpatient care. There is accordingly a clear and unequivocal demand by residents to access care locally." (Id. ¶¶ 197, 204.)

### IV.  Standard of Review

A motion to dismiss tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face."

Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 667 (citing Twombly, 550 U.S. at 556).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.…Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 667 (quoting Twombly, 550 U.S. at 556. Two working principles underlie Twombly. Iqbal, 556 U.S. at 667. First, with respect to mere conclusory statements, a court need not accept as true all the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. (quoting FED. R. CIV. P. 8(a)(2)). A court considering a motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 664.

## V.    Discussion

The arguments raised by Highmark and UPMC in support of their motions to dismiss will be addressed below.

### A.  Highmark's Arguments

#### 1.  Highmark argues Cole's Wexford Failed to Plead Injury in Fact

Highmark argues Cole's Wexford's claims should be dismissed in their entirety because Cole's Wexford in the third amended complaint did not plead it suffered injury in fact[6] caused by the alleged UPMC-Highmark conspiracy. In other words, Highmark asserts Cole's Wexford failed to plead factual allegations showing how it was injured by the alleged UPMC-Highmark conspiracy. Specifically, Highmark notes Cole's Wexford did not allege whether but for the conspiracy it would have stayed with HHIC or switched to one of Highmark's excluded or marginalized insurance competitors. Cole's Wexford argues that it plausibly alleged that it overpaid HHIC for health insurance because of the alleged UPMC-Highmark conspiracy. According to Cole's Wexford, with respect to pleading injury in fact, it is of no consequence whether but for the alleged UPMC-Highmark conspiracy it would have paid a lower rate for health insurance by continuing to pay HHIC or switching to one of Highmark's allegedly

---

[6]    Injury in fact is one of three requirements for constitutional standing under Article III of the United States Constitution. Township of Lyndhurdst, N.J. v. Priceline.com Inc., 657 F.3d 148, 154 (3d Cir. 2011) (citing Lujan, 504 U.S. at 560) (noting the three requirements of Article III standing are injury in fact, causation and redressability). Highmark's motion to dismiss is based only upon the injury in fact requirement. The court's discussion herein is, therefore, limited to whether Cole's Wexford set forth factual allegations sufficient to plausibly show it suffered injury in fact.

excluded competitors; rather, it is HHIC's overcharge to Cole's Wexford in the first instance that constitutes injury in fact in this case.

The Supreme Court has defined "injury in fact" for the purpose of constitutional standing as: "an invasion of a legally protected interest which is (a) concrete and particularized...and (b) 'actual or imminent, not conjectural or hypothetical[.]'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). The Third Circuit Court of Appeals has recognized that with respect to a plaintiff's pleading burden, "[i]njury-in-fact is not Mount Everest." Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 293 (3d Cir. 2005). "The contours of the injury-in-fact requirement, while not precisely defined, are very generous. Once a plaintiff has alleged some specific, 'identifiable trifle' of injury…the requirement of a constitutionally adequate stake in the controversy is satisfied." Bowman v. Wilson, 672 F.2d 1145, 1151 (3d Cir. 1982) (quoting United States v. SCRAP, 412 U.S. 669, 686-89 n.14 (1973)).

"Monetary harm is a classic form of injury-in-fact[, and] is often assumed without discussion." Danvers, 432 F.3d at 293 (citing Adams v. Watson, 10 F.3d 915, 920-25 n.13 (1st Cir. 1993)). "The obvious fact that [a plaintiff is] forced to pay money it otherwise would have kept for itself [is] sufficient to confer Article III standing." Danvers, 432 F.3d at 293. A plaintiff may satisfy its pleading burden in this regard by alleging it was overcharged for a product because of the defendant's anticompetitive conduct. See In re Processed Egg Prods. Antitrust Litig., 851 F.Supp.2d 867, 887 (E.D. Pa. 2012) (holding plaintiffs sufficiently alleged they suffered injury in fact by alleging they personally "paid artificially inflated prices for eggs because of the Defendants' conspiracy"); D.R. Ward Constr. Co. v. Rohm and Haas Co., 470 F.Supp.2d 485, 492-93 (E.D. Pa. 2006) (holding plaintiffs sufficiently alleged they suffered

injury in fact by alleging they "paid inflated prices for products with plastics additives due to an overcharge on plastics additives"); see also Perez v. State Farm Mut. Auto. Ins. Co., 319 F. A'ppx 615, 617 (9th Cir. 2009) ("The injury alleged—anticompetitive prices charged to all policyholders regardless of whether any particular insured ever has a repair need—is sufficient to confer constitutional standing: the alleged overcharges are a concrete, particularized, and actual injury-in-fact that is fairly traceable to the conduct complained of, and is likely to be redressed by a favorable decision."); In re Foreign Exch. Benchmark Rates Antitrust Litig., 74 F.Supp.3d 581, 595 (S.D.N.Y. 2015) ("The U.S. Complaint's plausible allegations about an overarching conspiracy among horizontal competitors to fix prices that resulted in Plaintiffs paying overcharges satisfy the injury-in-fact requirement at the pleading stage.").

Here, Cole's Wexford sufficiently alleges it suffered monetary harm, i.e., injury in fact, in the form of overcharges it paid for health insurance caused by the allegedly anticompetitive conspiracy entered into between UPMC and Highmark. (ECF No. 286 ¶ 1.) Cole's Wexford, in summary, alleges:

- UPMC and Highmark had market power in the relevant markets (ECF No. 286 ¶¶ 190-227);

- UPMC and Highmark entered into an anticompetitive conspiracy to protect each other's market power, i.e., UPMC "refus[ed] to contract on reasonable terms with any competing health insurer or to sell its health insurance affiliate to any competing health insurer," and Highmark "withdr[ew] its commitment to and refuse[d] any significant financial support or assistance for West Penn Allegheny" (Id. ¶¶ 21, 22);

- the alleged UPMC-Highmark conspiracy "created steep barriers to entry that prevented other insurers from entering the market;" indeed, "[b]ecause of [the] long-lasting effects of the conspiracy, potential competitors such as United and Aetna have struggled, and continue to struggle, to become viable competitors in Western Pennsylvania" (Id. ¶ 229);

- HHIC—without threat of competition—was able to charge Cole's Wexford "supracompetitive premiums" for health insurance (Id. ¶ 242); and

- Cole's Wexford actually "paid artificially inflated, supracompetitive premiums" to HHIC because it was a "captive customer" of Highmark and its subsidiaries and did not have any other "viable alternatives to Highmark's coverage" because of the UPMC-Highmark conspiracy (Id. ¶¶ 116, 230, 242).

Based upon the allegations contained in the third amended complaint, Cole's Wexford has alleged it suffered an actual, concrete, and particularized invasion of a legally protected interest, i.e., it was forced to pay and actually did pay the supracompetitive premiums charged by HHIC for health insurance as a result of the UPMC-Highmark conspiracy.

Highmark argues, however, that Cole's Wexford failed to adequately plead injury in fact because it did not allege whether but for the alleged UPMC-Highmark conspiracy it would have stayed with HHIC or switched to one of Highmark's insurance competitors, and Cole's Wexford asserts that its only measure of damages is the difference between the rates it paid to HHIC and the rates it would have paid HHIC but for the alleged UPMC-Highmark conspiracy. Highmark's argument—*at this stage of the litigation*—is not persuasive. Cole's Wexford sufficiently alleged it suffered injury, i.e., it suffered monetary harm because it paid HHIC supracompetitive rates for health insurance. The allegations in the third amended complaint—which the court must accept as true—are sufficient to establish that regardless whether Cole's Wexford would have stayed with HHIC or switched to one of Highmark's insurance competitors not subject to PID oversight, it would have paid lower rates in a freely competitive market. Duraco Prods., Inc. v. Joy Plastic Enters. Ltd., 822 F.Supp. 1202, 1211 (W.D. Pa. 1993) ("[T]he public has an interest in a healthy, competitive market which results in lower prices for popular goods."); Geneva Pharmaceuticals Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 488 (2d Cir. 2004) ("Competition, which fosters innovation and tends to lower prices for consumers, directly pits one producer against another.").

15

In other words, based upon the allegations in the third amended complaint, prices charged by *either* HHIC or Highmark's competitors not subject to PID oversight would be lower but for the alleged UPMC-Highmark conspiracy. Cole's Wexford, therefore, set forth factual allegations sufficient to plausibly allege it suffered injury in fact in the form of monetary harm, i.e., overcharges for health insurance, in this case.

Highmark cited three decisions in support of its argument that Cole's Wexford failed to plead injury in fact—National ATM Council, Inc. v. Visa Inc., 922 F.Supp.2d 73 (D.D.C. 2013); Dominguez v. UAL Corp., 666 F.3d 1359 (D.C. Cir. 2012); and In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litigation, Civ. Action No. 12-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013). (ECF No. 289 at 4, 7.) None of those decisions, however, supports the argument that Cole's Wexford was required to allege which health insurance option it would have chosen absent the alleged UPMC-Highmark conspiracy.

In National ATM, the plaintiffs in three separate antitrust actions claimed "that the [automatic teller machine ("ATM")] access fee pricing requirements that [the defendants]…imposed on banks and ATM operators violate[d]" the antitrust laws. National ATM, 922 F.Supp.2d at 75. The access fee pricing requirements imposed by the defendants provided that an ATM operator could not charge a consumer whose ATM card only operated on a network of one of the defendants a higher access fee than a consumer whose ATM card operated on another network. Id. at 75. The plaintiffs, ATM operators and consumers, argued the access fee pricing requirements harmed competition and resulted in the plaintiffs paying supracompetitive access fees. Id. The court addressed whether the plaintiffs sufficiently alleged antitrust standing, i.e., that they suffered an injury in fact and that the injury is the kind of injury the antitrust laws was intended to prevent. Id. at 80-81.

The plaintiffs in <u>National ATM</u> argued that because they set forth factual allegations in the complaint about the defendants' anticompetitive conduct, they "more than satisfied the requirements for pleading antitrust injury in fact." <u>National ATM</u>, 922 F.Supp.2d at 82-83. The court rejected the plaintiffs' argument, explaining: "a 'naked assertion' of antitrust injury … is not enough; an antitrust claimant must put forth factual 'allegations plausibly suggesting (not merely consistent with)' antitrust injury.'" <u>Id.</u> (quoting <u>NicSand Inc. v. 3M Co.</u>, 507 F.3d 442, 451 (6th Cir. 2007)). The court concluded that in each of the three complaints there existed insufficient allegations with respect to how each plaintiff was injured by the defendants' access fee pricing requirements. The court commented that the complaints contained conclusory allegations and did not provide a "link between the alleged harm to competition and the plaintiff's pocketbook." <u>Id.</u> at 86. The court explained:

> [N]one of the complaints does anything more than make the ''but for'' claim. The complaints do not specify what market is being restrained, how it is supposed to work, how it was adversely affected, and how that circumstance injured the plaintiffs. A critical problem is that plaintiffs do not make clear who pays whom in these transactions. They do not explain what the ATM operators' costs might be or how they are tied to the pricing of the fees, and there are no facts in the complaints that support a conclusion that prices would be lower if the restrictions at issue were lifted.

<u>Id.</u> at 89. Based upon the foregoing—along with the conclusion that the plaintiffs failed to plausibly allege the existence of a conspiracy—the court dismissed the complaints without prejudice. <u>Id.</u> at 96.

In this case, the third amended complaint contains specific details about the alleged UPMC-Highmark conspiracy and how the conspiracy enabled Highmark and its subsidiary, HHIC, to charge supracompetitive rates to Cole's Wexford. Cole's Wexford plausibly alleged that—pursuant to the UPMC-Highmark conspiracy—UPMC refused to contract with

Highmark's insurance competitors in exchange for Highmark working to "hobble" UPMC's "sole viable competitor, West Penn Allegheny." (ECF No. 286 ¶ 24.) Highmark's competitors as a result were marginalized in or excluded from the health insurance market. (Id.) The third amended complaint contains allegations that Highmark and its subsidiaries were able to charge Cole's Wexford supracompetitive prices for health insurance without the threat of competition. Cole's Wexford alleges UPMC's and Highmark's revenues "soared" after they entered into the conspiracy and the premium increases "were well above national averages." (Id. ¶ 109.) These allegations—unlike the allegations in National ATM—are sufficient to plausibly allege *how* the alleged UPMC-Highmark conspiracy caused Cole's Wexford injury in fact, i.e., monetary harm in the form of overcharges for health insurance. National ATM does not support Highmark's argument that Cole's Wexford did not plausibly allege injury in fact.

In In re Ductile, some—but not all—products purchased by the plaintiffs were subject to an allegedly anticompetitive scheme by the defendants. Ductile, 2013 WL 5503308, at *18-19. The court dismissed some of the claims against the defendants asserted by certain plaintiffs because those plaintiffs did not specify in the complaint whether the price of the products they purchased was affected by the allegedly anticompetitive scheme. Id. at *19. The court also dismissed claims against other plaintiffs who alleged they purchased products from the defendants but did not allege that they purchased them during the existence of the price-fixing conspiracy alleged in the complaint. Id. at *20. As discussed above, Cole's Wexford in the third amended complaint provided detail with respect to how the alleged UPMC-Highmark conspiracy worked and caused it to pay supracompetitive prices for health insurance. The issues articulated in In re Ductile about whether the plaintiffs set forth factual allegations sufficient for the court to plausibly infer that they were actually injured by the anticompetitive conduct alleged in the

complaint do not exist in this case. Based upon the allegations in the complaint—which this court must accept as true—all rates for health insurance would have been lower but for the alleged UPMC-Highmark conspiracy. Cole's Wexford is not required at this stage to indicate whether in the but-for world it would have paid a lower rate to HHIC or one of Highmark's excluded insurance competitors not subject to PID oversight. Cole's Wexford's well-plead allegation that it was injured by overpaying for health insurance as a result of UPMC's and Highmark's allegedly anticompetitive conduct is sufficient to withstand Highmark's motion to dismiss.

In <u>Dominguez</u>, the plaintiff brought a class action antitrust lawsuit against an airline challenging the airline's policy prohibiting ticket resale. <u>Dominguez</u>, 666 F.3d at 1360. The district court determined the airline's policy was lawful and granted summary judgment in favor of the airline. <u>Id.</u> at 1361. The plaintiff appealed, and the Court of Appeals for the Federal Circuit determined the plaintiff's lawsuit should have been dismissed because he lacked standing under Article III, noting his claimed injury was "too speculative." <u>Id.</u> The court of appeals commented that the case was at the summary judgment stage so the plaintiff could not rest on "mere allegations" to prove he had standing; rather, he had to "establish each element of standing by putting forth 'specific facts.'" <u>Id.</u> (quoting <u>Lujan</u>, 504 U.S. at 561). The plaintiff's theory of recovery was that the airline's prohibition on ticket resale prevented him from purchasing a less expensive airline ticket because it foreclosed the emergence of a second market of ticket resellers. <u>Id.</u> at 1362. The court concluded that based upon the evidence presented by the plaintiff, a reasonable jury could not find that he suffered injury in fact.

The plaintiff in <u>Dominguez</u> relied upon an expert who determined that, based upon a consumer survey, "a high percentage of respondents would consider using a feature allowing

them to legally sell or give away airline tickets they are unable to use." Id. at 1363. The consumer survey did not, however, consider the costs associated with running a secondary market, the itinerary change fees the airline currently imposed upon its customers, or the other costs the airline would have to absorb to change its reservation system. The court determined that the plaintiff could not rely upon the expert and consumer survey to establish injury in fact in that case because the consumer survey "failed to present an accurate picture of the prices that would be negotiated in [the relevant] market." Id. at 1364. The court commented that the consumer survey did not "speak to the relevant question of whether secondary market prices would have been lower than what [the plaintiff] paid[.]" Id. The consumer survey compared flights similar to the plaintiff's flight without the imposition of the policy prohibiting transfers. The plaintiff had received a discount on his airline ticket because he purchased tickets for three flights at one time. The court explained:

> The survey claims secondary market prices would be lower than prices without a package discount, but [the plaintiff] did not pay that price. Even if [the expert's] survey shows that some [airline] customers were injured by the No Transfer Policy—and for the reasons already discussed that seems uncertain at best—it would still be speculative to think the survey shows [the plaintiff] was one of them.

Id. The court also noted that the data offered by the plaintiff did not account for the airline's pricing strategy based upon the policy prohibiting transfers and how the pricing strategy would change without the policy. The court vacated the decision of the district court and remanded the case for dismissal based upon lack of jurisdiction. The court concluded no reasonable juror could find the plaintiff suffered injury in fact based upon the evidence presented, which "pile[d] speculation atop speculation[.]" Id.

Here, unlike Dominguez, this case is only in the pleadings stage, and, as discussed above, Cole's Wexford's allegations with respect to the alleged UPMC-Highmark conspiracy causing it to pay overcharges for health insurance are sufficient to satisfy the injury in fact requirement of Article III standing. The issue in Dominguez concerned whether the plaintiff adduced evidence sufficient for a reasonable jury to find that he would have paid a lower price for his airline ticket absent the defendant's alleged antitrust violation, i.e., whether the plaintiff showed he was injured by the defendant's allegedly anticompetitive conduct. Here, Highmark does not argue that the third amended complaint contains insufficient factual allegations with respect to whether Cole's Wexford would have paid a lower rate for health insurance in a competitive market. Highmark's argument concerns to whom Cole's Wexford would have paid those lower rates. Highmark does not set forth any authority indicating that because Cole's Wexford did not allege to whom it would have paid those rates it failed to allege it suffered injury in fact. Highmark may raise this issue in a motion for summary judgment if Cole's Wexford's is not able to adduce evidence sufficient for a reasonable jury to conclude the alleged UPMC-Highmark conspiracy caused it to pay supracompetitive prices for health insurance. At this stage, however, Highmark's motion to dismiss must be denied with respect to its argument that Cole's Wexford failed to set forth factual allegations sufficient to plausibly allege it suffered injury in fact.

2. **Highmark Argues the Class Allegations Should be Stricken from the Third Amended Complaint**

Highmark argues that the court should strike Cole's Wexford class action allegations because "it is clear on the face of the complaint that individualized inquiry regarding issues of injury in fact and damages would predominate over any common issues in this case." (ECF No. 289 at 12.) Cole's Wexford in response argues that Highmark misreads the complaint because

Cole's Wexford in the third amended complaint sets forth a single measure of damages based upon Cole's Wexford and class members overpaying HHIC for health insurance premiums as a result of the alleged UPMC-Highmark conspiracy. (ECF No. 294 at 9.) Cole's Wexford asserts that the single measure of damages set forth in the third amended complaint is the difference between the prices actually paid to HHIC during the relevant timeframe and the prices Cole's Wexford and class members would have paid to HHIC but for the alleged UPMC-Highmark conspiracy. (Id. at 10.) Cole's Wexford also asserts that "it is ordinarily procedurally inappropriate to address class certification issues at the pleading stage because 'the Rule 23 requirements differ in kind from legal rulings under Rule 12(b)(6).'" (ECF No. 294 at 11 (quoting In re Cmty. Bank of N. Va., 622 F.3d 275, 303 (3d Cir. 2010).)

The legal principles and arguments raised by Highmark and Cole's Wexford will be addressed below.

### a. Applicable Legal Standard

The Supreme Court of the United States has recognized that with respect to class certification under Federal Rule of Civil Procedure 23, "[s]ometimes the issues are plain enough from the pleadings to determine whether" class certification is appropriate in a given case. Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982). The Third Circuit Court of Appeals has explained that in "rare" cases, "where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met," a court may strike class allegations contained in a complaint. Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 93 n.30 (3d Cir. 2011) (citing Rios v. State Farm Fire & Cas. Co., 469 F.Supp.2d 727, 740 (S.D. Iowa 2007)). The court of appeals in Landsman noted, however, that in all other cases—the majority of cases—"[t]o determine if the requirements of Rule 23 have been satisfied, a district court must

conduct a 'rigorous analysis.'" <u>Landsman</u>, 640 F.3d at 93 (quoting <u>In re Hydrogen Peroxide</u>

<u>Antiturst Litig.</u>, 552 F.3d 305, 309 (3d Cir. 2008)). The court of appeals explained:

> In [conducting a rigorous analysis], a "court may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.' " <u>Id.</u> at 316 (quoting <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 167 (3d Cir.2001)). Particularly when a court considers predominance, it may have to venture into the territory of a claim's merits and evaluate the nature of the evidence. <u>Id.</u> at 310–11. In most cases, some level of discovery is essential to such an evaluation. In <u>Weiss v. Regal Collections</u>, 385 F.3d 337 (3d Cir.2004), we emphasized the importance of discovery as part of the class certification process. "It seems appropriate," we said, "that the class action process should be able to 'play out' according to the directives of Rule 23 and should permit due deliberation by the parties and the court on the class certification issues." <u>Weiss</u>, 385 F.3d at 347–48 (footnote omitted). Accordingly, "[a]llowing time for limited discovery supporting certification motions may ... be necessary for sound judicial administration." <u>Id.</u> at 347 n. 17. These concerns were the basis for setting down a "rigorous analysis" requirement in <u>Hydrogen Peroxide</u>, where we recognized that changes in Rule 23 reflected the need "for a thorough evaluation of the Rule 23 factors." <u>Hydrogen Peroxide</u>, 552 F.3d at 318.

<u>Landsman</u>, 640 F.3d at 93.

The court must be cognizant when evaluating a defendant's motion to strike class

allegations from a complaint that "'[a]n order granting a motion to strike class allegations is

tantamount to a denial of class certification after a motion to certify.'" <u>Smith v. Merial Ltd.</u>, Civ.

Action No. 10–439, 2012 WL 2020361, at *6 (D.N.J. June 5, 2012) (quoting 1 Joseph M.

McLaughlin, McLaughlin on Class Actions § 3:4 (10th ed. 2013)). "[T]he burden remains

with the party seeking class certification regardless who moves the court to make the

determination." <u>Blihovde v. St. Croix Cnty. Wis.</u>, 219 F.R.D. 607, 614 (W.D. Wis. 2003).

Regardless whether the defendant files a motion to strike class allegations pursuant to Federal

Rule of Civil Procedure 12(f) based upon insufficient class allegations in a complaint, or a

plaintiff files a motion to certify a class pursuant to Rule 23 based upon a more fully developed

record, the plaintiff has the burden to prove that the requirements set forth in Rule 23 are met,

and the court must accordingly apply Rule 23. <u>In re Cmty. Bank of N. Va.</u>, 622 F.3d at 302 n.19; 1 Joseph M. McLaughlin, MᴄLᴀᴜɢʜʟɪɴ ᴏɴ Cʟᴀss Aᴄᴛɪᴏɴs § 3:4 (10th ed. 2013). It would be error for a court to apply the Rule 12(b)(6) plausibility standard set forth in <u>Twombly</u> and <u>Iqbal</u> to "dismiss" class action allegations in a complaint. <u>In re Cmty. Bank of N. Va.</u>, 622 F.3d at 302 n.19. The Court of Appeals for the Third Circuit recognized in <u>In re Hydrogen Peroxide</u>, that "the requirements set out in Rule 23 are not mere pleading rules." <u>In re Hydrogen Peroxide</u>, 552 F.3d at 316. The court of appeals, quoting a decision from the Court of Appeals for the Seventh Circuit, explained:

> "The reason why judges accept a complaint's factual allegations when ruling on motions to dismiss under Rule 12(b)(6) is that a motion to dismiss tests the legal sufficiency of a pleading. Its factual sufficiency will be tested later-by a motion for summary judgment under Rule 56, and if necessary by trial. By contrast, an order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises (and, if the case is settled, there could not be such an examination even if the district judge viewed the certification as provisional)."

<u>Id.</u> at 316 n.15 (quoting <u>Szabo v. Bridgeport Machines, Inc.</u>, 249 F.3d 672, 675-76 (7th Cir. 2001).

Based upon the foregoing discussion, Highmark may challenge Cole's Wexfrod's class action allegations at this stage of the proceedings, i.e., the pleading stage. If this is one of the "rare" cases in which it is "plain enough from the pleadings" that Cole's Wexford cannot sustain its burden to show class treatment is appropriate in this case under Rule 23, Cole's Wexford will not be permitted to proceed with its class action allegations and they will be stricken from the third amended complaint. <u>Gen. Tel. Co.</u>, 457 U.S. at 160; <u>Landsman</u>, 640 F.3d at 93 n.30.

    **b. Rule 23**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1232 (2013). To be certified, a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. FED. R. CIV. P. 23(a). With respect to commonality, a court must assess the susceptibility of plaintiffs' entire claim to class treatment. In Wal–Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541 (2011), the Court held commonality includes proof that a classwide proceeding will generate "common answers apt to drive the resolution of the litigation." Wal–Mart, 131 S.Ct. at 2551. The Court explained that common contentions central to the classwide issues should be resolved "in one stroke." Id. The lack of a single stroke resolution underscores the predominance of individual issues in a case that warrants the denial of class certification. Yarger v. ING Bank, fsb, 285 F.R.D. 308, 327 (D.Del. 2012).

The class—in addition to satisfying the four requirements set forth in Rule 23(a)—must fit within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b). In re Cmty. Bank of N. Va., 418 F.3d at 302. Rule 23(b) provides:

> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > **(1)** prosecuting separate actions by or against individual class members would create a risk of:
> >
> > > **(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > **(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)** the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b). To determine whether to certify a class, the court must be satisfied "after a rigorous analysis" that all the requirements for class certification are met. Gen. Tel. Co., 457 U.S. at 160. The rigorous analysis requires the court to make explicit findings; "'the requirements of Rule 23 must be met, not just supported by some evidence.'" Id. at 320 (quoting In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 33 (2d Cir. 2006)).

The proponent of class certification has the burden of proving each of the prerequisites of a class action under Rule 23(a) and that the class fits within one of the three categories of class actions set forth in Rule 23(b); indeed, "[a] party's assurance to the court that it intends or plans to meet the [Rule 23] requirements is insufficient." In re Hydrogen Peroxide, 552 F.3d at 316 n. 14, 317 (citing Unger v. Amedisys, 401 F.3d 316, 320 (5th Cir. 2005)); Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 354 (3d Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit."). It may not be necessary for a plaintiff to establish the

merits of its case at the certification stage, but, if establishing the merits is necessary to determine whether class certification requirements are met, the court may have to conduct a "'preliminary inquiry into the merits.'" In re Hydrogen Peroxide, 552 F.3d at 317 (quoting Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 168 (1974)). The court of appeals in In re Hydrogen Peroxide explained how a court should handle "[a]n overlap between a class certification requirement and the merits of a claim" as follows:

> Because the decision whether to certify a class "requires a thorough examination of the factual and legal allegations," id. at 166, the court's rigorous analysis may include a "preliminary inquiry into the merits," id. at 168, and the court may "consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take," id. at 166 (quoting 5 Moore's Federal Practice § 23.46[4] ) (quotation marks omitted). See id. at 168 ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action."). A contested requirement is not forfeited in favor of the party seeking certification merely because it is similar or even identical to one normally decided by a trier of fact. Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.

In re Hydrogen Peroxide, 552 F.3d at 317-18.

"'A critical need' of the trial court at certification 'is to determine how the case will be tried,…including how the class is to be ascertained.'" Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013) (quoting In re Hydrogen Peroxide, 552 F.3d at 319). A plaintiff "[a]s 'an essential prerequisite' to class certification…must show by a preponderance of the evidence that the class is ascertainable." Hayes, 725 F.3d at 354 (citing Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592 (3d Cir. 2012); In re Hydrogen Peroxide, 552 F.3d at 320). "[A]scertainability is important because it 'eliminates serious administrative burdens ... by insisting on the easy identification of class members'; allows for the best notice practicable, and thereby protects absent class members; and protects defendants by clearly identifying the individuals to be bound by the final

judgment." Hayes, 725 F.3d at 354-54 (citing Marcus, 687 F.3d at 593). "If a class cannot be ascertained in an economical and 'administratively feasible' manner…significant benefits of a class action are lost." Carrera, 727 F.3d at 307 (quoting Marcus, 687 F.3d at 593-94).

The court of appeals in Hayes explained the "two important elements" of ascertainability as follows:

> First, the class must be defined with reference to objective criteria. Id. Second, there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Id. at 593–94. We explained that "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Id. at 593; see also William B. Rubenstein, Newberg on Class Actions § 3:3 (5th ed. 2011) ("Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry."). We noted that other courts have gone so far as to hold "that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." Marcus, 687 F.3d at 593.

Hayes, 725 F.3d at 355. "[T]o satisfy ascertainability as it relates to proof of class membership, the plaintiff must demonstrate his purported method for ascertaining class members is reliable and administratively feasible, and permits a defendant to challenge the evidence used to prove class membership." Carrera, 727 F.3d at 307. A plaintiff cannot meet its burden to show the class is administratively ascertainable "if individualized fact-finding or mini-trials will be required to prove class membership." Carrera, 727 F.3d at 307.

The requirement of ascertainability protects the due process rights of defendants in class action lawsuits. Carrera, 727 F.3d at 307. The court of appeals in Carrera explained this concept as follows:

> A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues. See McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 231–32 (2d Cir.2008) (rejecting a "fluid recovery" method of

determining individual damages, in which aggregate damages would be based on estimates of the number of defrauded class members and their average loss), abrogated on other grounds by <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008); <u>see also</u> <u>Dukes</u>, 131 S.Ct. at 2561 (rejecting a method of class certification in which a sample set of class members would be used to extrapolate average damages). A defendant has a similar, if not the same, due process right to challenge the proof used to demonstrate class membership as it does to challenge the elements of a plaintiff's claim. <u>See</u> <u>Marcus</u>, 687 F.3d at 594 ("Forcing BMW and Bridgestone to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications."). Ascertainability provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership.

<u>Id.</u>

In <u>Hayes</u>, the district court granted the plaintiff's motion for class certification, and the defendant on appeal to the Third Circuit Court of Appeals contested class certification. <u>Id.</u> at 351. The court of appeals remanded the case based upon <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583 (3d Cir. 2012), which was decided after the district court in <u>Hayes</u> granted the plaintiff's motion for class certification, and "thoroughly explored Rule 23's class definition, ascertainability, and numerosity requirements," which were in issue in that case. <u>Id.</u> at 351-52. The court of appeals in <u>Hayes</u> explained its decision in <u>Marcus</u> with respect to ascertainability as follows:

The plaintiffs in <u>Marcus</u> sued BMW and Bridgestone for selling allegedly defective run-flat tires (RFTs). <u>Id.</u> at 588. The class definition sought to capture owners and lessees who purchased or leased new BMWs with original-equipment Bridgestone RFTs from BMW dealerships in New Jersey and whose tires had gone flat and been replaced. <u>Id.</u> at 592. We found the proposed class raised "serious ascertainability issues." <u>Id.</u> at 593. In particular, lease and purchase records from BMW dealerships were over-inclusive because they did not document the brand of tire on each car leased or sold. <u>Id.</u> And not all owners and lessees took their vehicles back to a BMW dealer to have their tires replaced—hence repair records were under-inclusive. <u>Id.</u> at 594. Remanding the case to the district court, we said:

If Marcus attempts to certify a class on remand, the District Court—adjusting the class definition as needed—must resolve the critical issue of whether the defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative. We caution, however, against approving a method that would amount to no more than ascertaining by potential class members' say so. For example, simply having potential class members submit affidavits that their Bridgestone RFTs have gone flat and been replaced may not be "proper or just." ... Forcing BMW and Bridgestone to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications.

Id. (citation omitted) (quoting Xavier v. Philip Morris USA Inc., 787 F.Supp.2d 1075, 1090 (N.D.Cal.2011)).

Hayes, 725 F.3d at 356.

The court of appeals in Hayes remanded the case because the district court, which granted class certification, "did not have the benefit of Marcus's guidance," and "did not consider whether it would be administratively feasible to ascertain class members." Id. at 355. In granting the plaintiff's motion for class certification, the district court held that the lack of administrative records from which the plaintiff's proposed class could be ascertained was not a barrier to class certification. Id. The court of appeals explained, however, that "Rule 23's requirements that the class be administratively feasible to ascertain and sufficiently numerous to warrant class action treatment cannot be relaxed or adjusted on the basis of [the plaintiff's] assertion that [the defendant's] records are of no help to him." Id. at 356. The court of appeals held that in light of the district court's finding that the defendant did not have administrative records from which the putative class could be ascertained, "to be successful on remand, plaintiff must offer some reliable and administratively feasible alternative that would permit the court to" ascertain the class. Id. The court of appeals cautioned, however, that plaintiff's "petition for class certification

will flounder if the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding." Id.

### c. Analysis

### i. The court's opinion dated August 21, 2014

Highmark argues that based upon this court's ruling in the opinion dated August 21, 2014, the class action allegations should be stricken from the third amended complaint. To analyze whether Highmark's argument is meritorious, the court must first consider its decision dated August 21, 2014. In the proposed third amended complaint at issue in the court's opinion dated August 21, 2014, plaintiffs set forth two measures of damages for the putative class of small group plaintiffs:[7] (1) the difference between the rates the small group plaintiffs paid Highmark during the alleged UPMC-Highmark conspiracy and the rates the small groups plaintiffs would have paid Highmark's excluded and marginalized competitors not subject to the PID's rate-filing requirements prior to March 21, 2012, but for the alleged UPMC-Highmark conspiracy; and (2) the difference between the rates the small group plaintiffs that Highmark switched to HHIC paid to HHIC during the alleged UPMC-Highmark conspiracy and the rates the small group plaintiffs that Highmark switched to HHIC would have paid to HHIC but for the alleged UPMC-Highmark conspiracy.

---

[7] Plaintiffs in the proposed third amended complaint defined the small group plaintiff class as:

> all persons, whether natural or fictitious, who purchased health insurance coverage from, or otherwise paid any premiums or portion thereof to, the Highmark Defendants, and whose policies were in effect at any time on or after January 1, 2002.

(ECF No. 250-1 ¶¶ 17-18.)

UPMC in its opposition to plaintiffs' motion for leave to file the third amended complaint argued that common issues among the class did not predominate over individualized issues because the small group plaintiffs' injuries were highly individualized and could not be established by common proof. UPMC argued the class as defined included Highmark subscribers that but for the alleged UPMC-Highmark conspiracy would have had nine different options for health insurance, and to determine which option each member of the class would have selected but for the alleged UPMC-Highmark conspiracy would require a fact finder to make individualized inquiries regarding the nature of each member's claim.

Highmark in its opposition to plaintiffs' motion for leave to file the proposed third amended complaint argued the class as defined was not plausible because it included Highmark customers that would have stayed with Highmark but for the alleged UPMC-Highmark conspiracy. Highmark explained that those class members' damages would be barred by the filed rate doctrine because the damages would be calculated based upon the legally-approved rates those customers paid to Highmark and the legally-approved rates those customers would have paid to Highmark but for the alleged UPMC-Highmark conspiracy.

The court in its opinion dated August 21, 2014, held that UPMC and Highmark were correct, explaining:

> [T]he putative small-group plaintiff class as defined in the proposed third amended complaint does not satisfy the requirements of Rule 23 because damages cannot be proven on a class wide [sic] basis; indeed, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." Comcast, 133 S.Ct. at 1433; In re Relafen Antitrust Litig., 221 F.R.D. 260, 272 n.10 (D. Mass. 2004).

Royal Mile, 40 F.Supp.3d at 585. The court further explained that individualized questions with respect to the damages calculation based upon the class allegations in the proposed third

amended complaint would overwhelm questions common to the class because determining damages necessarily included resolving whether the class members would have stayed with Highmark or switched to another health insurance provider. If members of the small group plaintiffs' putative class would have stayed with Highmark but for the alleged UPMC-Highmark conspiracy, their measure of damages would be barred by the filed rate doctrine, i.e., those members of the putative plaintiff class could not prove they were injured by the alleged UPMC-Highmark conspiracy because a consumer is not injured when it pays a legally filed rate. Royal Mile, 40 F.Supp.3d at 594-95 (citing In re N.J. Title Ins. Litig., 683 F.3d 451, 461 (3d Cir. 2012) (citing Keogh, 260 U.S. at 163; Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994)). The court commented that based upon Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), certifying a class for which damages cannot be proven on a classwide basis is inefficient and improper, especially because a segment of the putative class could not prove it was injured by the alleged UPMC-Highmark conspiracy. Royal Mile, 40 F.Supp.3d at 586-87. The court concluded that based upon the foregoing analysis, it was "plain enough from the pleadings" that the small group plaintiffs could not meet the requirements of Rule 23 to prove class certification based upon the definition of the putative class set forth the proposed third amended complaint. Id. at 586.

A recent decision from the Court of Appeals for the Third Circuit, Neale v. Volvo Cars of North America, LLC, --- F.3d ----, 2015 WL 4466919 (3d Cir. July 22, 2015), implicates that this court's reading of Comcast was too broad. This court cited Comcast for the proposition that class certification is improper if damages cannot be proven on a classwide basis. The Court of Appeals for the Third Circuit in Neale explained that the Court in Comcast "held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate

33

the theory of antitrust impact that the district court accepted for class-action treatment." Neale, 2015 WL 4446919, at *16 (citing Comcast, 133 S.Ct. at 1433). The defendant in Neale cited to Comcast for the proposition that a plaintiff attempting to achieve class certification must show that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." Neale, 2015 WL 4446919, at *16. The court of appeals rejected the defendant's reading of Comcast, noting the decision did not create a "broad-based rule applicable to Rule 23(b)(3)." Neale, 2015 WL 4466919, at *16. The court explained:

> [T]he Supreme Court specifically noted that it was not breaking any new ground by stating at the beginning of its opinion: "This case thus turns on the straightforward application of class-certification principles." Comcast, 133 S.Ct. at 1433. A close reading of the text above makes it clear that the predominance analysis was specific to the antitrust claim at issue. That is eminently sensible. Every question of class certification will depend on the nature of the claims and evidence presented by the plaintiffs. What we know for sure is that whatever " Comcast's ramifications for antitrust damages models or proving antitrust impact," a trial court must " 'consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class.' " In re Blood Reagents Antitrust Litig., 783 F.3d 183, 186–87 (3d Cir.2015) (quoting Hydrogen Peroxide, 552 F.3d at 320).

> Our reading of Comcast is consistent with decisions by several of our sister courts. That is because "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." Comcast, 133 S.Ct. at 1437 (Ginsburg, J. & Breyer, J., dissenting) (citing 2 William B. Rubenstein, Newberg on Class Actions § 4:54 (5th ed.2012)). Had the District Court ruled as Volvo requested, denying certification on that basis alone would have amounted to an abuse of discretion. See Roach, 778 F.3d at 409. In sum, and as explained by the Fifth Circuit, it is "a misreading of Comcast " to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." In re Deepwater Horizon, 739 F.3d at 815 & n. 104.

Id. at *16-17. Based upon the rationale by the court of appeals in Neale, this court erroneously relied on Comcast for the broad-based rule that a class should not be certified if damages cannot be proven on a classwide basis. The decision in Neale, however, does not warrant a different

outcome in the court's opinion dated August 21, 2014, with respect to the class action allegations in the proposed third amended complaint.

As the court of appeals explained, the proper consideration under the predominance requirement of Rule 23 is whether "'questions of law or fact common to class members predominate over any questions affecting only individual members.'" Neale, 2015 WL 4466919, at *13 (quoting FED. R. CIV. P. 23(b)(3)). Despite its citation to Comcast, this court in its opinion dated August 21, 2014, applied the correct standard of law when it determined that based upon the factual allegations contained in the proposed third amended complaint the questions of law or fact common to class members *did not* predominate over questions affecting individual members of the class. Royal Mile, 40 F.Supp.3d at 585 (noting "questions of individual damage calculations will inevitably overwhelm questions common to the class"). As the court explained, there were members of the putative class as defined in the proposed third amended complaint that could not prove individual injury, also known as antitrust impact, caused by the alleged UPMC-Highmark conspiracy because a plaintiff is not injured when it pays a legally filed rate. In other words, there were members of the putative class—those who would have continued to purchased health insurance from Highmark but for the alleged UPMC-Highmark conspiracy— that could not prove an essential element of an antitrust claim under the Sherman Act.

The Third Circuit Court of Appeals has recognized: "'If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.'" In re Hydrogen Peroxide, 552 F.3d at 311 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001)). Under the Sherman Act, "to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." In re Hydrogen Peroxide, 552 F.3d at 311 (citing Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d

Cir. 1977)). Based upon the class definition for small group plaintiffs in the proposed third amended complaint, all class members could not prove antitrust impact resulting from the alleged UPMC-Highmark conspiracy.[8] To determine if class members would have continued to purchase health insurance from Highmark but for the alleged UPMC-Highmark conspiracy, and, thus, could not prove a prima facie case under the Sherman Act, would require individualized questioning about whether the class members would have switched their health insurance coverage but for the alleged UPMC-Highmark conspiracy.[9] That individualized inquiry of antitrust impact for each class member would inevitably overwhelm the common questions of law and fact in this case. Under those circumstances—even without the court's citation to Comcast—it was plain enough from the proposed pleadings that it was one of the "rare" cases in which certification of the class defined in the proposed complaint, i.e., the proposed third amended complaint, was not proper.

## ii. The Class Defined in the Third Amended Complaint

The court in its opinion dated August 21, 2014, explained that class certification may be appropriate in this case based upon a class defined as Highmark customers that Highmark

---

[8]    The court of appeals for the Eighth Circuit has recognized that "proof of conspiracy is not proof of common injury." Blades v. Monsanto Co., 400 F.3d 562, 572 (8th Cir. 2005).

[9]    The court in the opinion dated August 21, 2014, considered whether a class could be defined as "Highmark customers that would have switched their insurance coverage from Highmark to one of Highmark's excluded or marginalized competitors but for the alleged UPMC–Highmark conspiracy." Royal Mile, 40 F.Supp.3d at 586-87. The court determined that class membership in that class as defined would be based upon the class members' say-so, i.e., not administratively ascertainable, and, it, therefore, would violate UPMC's and Highmark's due process rights. Id. at 586.

switched to HHIC prior to March 21, 2012.[10] Royal Mile, 40 F.Supp.3d at 592-93. The court noted that the class would be administratively ascertainable if Highmark has records of customers that were switched from Highmark to HHIC, and damages could be calculated on a classwide basis based upon the difference between the unregulated rates the customers that were switched to HHIC paid to HHIC during the alleged UPMC-Highmark conspiracy and the unregulated rates those customers would have paid to HHIC but for the UPMC-Highmark conspiracy.

Cole's Wexford in the third amended complaint defines the putative class as: "all persons, whether natural or fictitious, who purchased small group health insurance coverage from, or otherwise paid any small group plan premiums or portion thereof to, Highmark Health Insurance Co., or a similar for-profit subsidiary of Highmark Inc., between approximately July 1, 2010 and approximately March 21, 2012." (ECF No. 286.) Highmark argues in its motion to dismiss and accompanying briefs that based upon the court's opinion dated August 21, 2014, Cole's Wexford's class allegations should be stricken from the third amended complaint because it is clear on the face of the complaint that Cole's Wexford cannot prove injury in fact on a classwide basis, and, therefore, individual questions overwhelm the common issues in this case. (ECF No. 289 at 12.) Highmark explains that Cole's Wexford cannot prove that *all* members of the putative plaintiff class suffered injury in fact and damages caused by the alleged UPMC-Highmark conspiracy because the putative class contains members that would have switched

---

[10]      Plaintiffs in their submissions with respect to their motion for leave to file the proposed third amended complaint conceded that that beginning on March 21, 2012, all insurers—nonprofits and for-profits alike—were required to file their group rates with the PID. Under those circumstances, any measure of damages based upon health insurance rates charged on March 21, 2012, and thereafter, would be barred by the filed rate doctrine.

from HHIC to Highmark's insurance competitors and Cole's Wexford conceded that it is not seeking damages based upon the difference between rates class members paid to HHIC and rates class members would have paid to Highmark's insurance competitors but for the alleged UPMC-Highmark conspiracy. (ECF No. 298 at 4.) Highmark explains: "That means that the complaint alleges no legally cognizable theory of injury for any of the switchers, so the complaint states no claim as to them and they cannot be members of the proposed class." (Id. at 3.)

Cole's Wexford argues in response that in the third amended complaint it asserts a measure of damages based upon "the price that Highmark charged the HHIC Class during the conspiracy period…[and] the price Highmark would have charged the HHIC Class in the absence of the conspiracy." (ECF No. 294 at 10.) As Highmark points out, Cole's Wexford in the third amended complaint "is not claiming damages resulting from premiums the Class would have paid to competing insurers that would have entered the market but for the conspiracy." (Id. at 10, n.3.) Cole's Wexford argues its theories of injury-in-fact and impact do not require an analysis of whether any class member would have switched its insurance coverage from HHIC to one of Highmark's competitors. (Id. at 10.)

The court cannot agree with Highmark's argument, which is based upon this court's misreading of Comcast, i.e., that class certification is proper only if damages can be proven on a classwide basis. As discussed above, the proper consideration with respect to predominance is whether "questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). At this stage, the allegations in the third amended complaint with respect to the anticompetitive actions of UPMC and Highmark are common to all members of the putative class. Cole's Wexford alleges that, among other things, UPMC and Highmark engaged in an anticompetitive conspiracy to exclude Highmark's

38

competitors so that UPMC could charge Highmark exorbitant rates which Highmark could pass on to its consumers, i.e., Cole's Wexford and other members of the putative class.

As previously discussed, damages need not be proven on a classwide basis for class certification to be appropriate. Cole's Wexford contends, furthermore, that it is seeking damages for itself and other members of the class limited to the difference between the rates HHIC charged and the rates HHIC would have charged but for the alleged UPMC-Highmark conspiracy. Unlike the *proposed* third amended complaint, the third amended complaint does not set forth a measure of damages barred by the filed rate doctrine. It is not plain enough from the pleadings that an individualized inquiry about whether each member of the putative class can prove its prima facie case and damages would overwhelm the common questions of law and fact in this case. Under those circumstances, the court is not convinced that this is one of the "rare" cases "where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." Landsman & Funk, 640 F.3d at 93 n.30.

Highmark may raise its arguments in opposition to class certification at that stage of the proceedings. At that time, Cole's Wexford's damages model "'must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'"[11]

---

[11]    Cole's Wexford may be able to prove that members of the class would have stayed with HHIC in the but for world with evidence that in the *actual* world, once UPMC began contracting with Highmark's insurance competitors, prices for health insurance were lower than the rates Cole's Wexford paid HHIC, and the members of the class continued to purchase health insurance from HHIC. In re Relafen Antitrust Litig., 221 F.R.D. 260, 272 n.10 (D. Mass. 2004) ("The Court assumes that consumers who continued to choose Relafen in the actual world would have done so in the but-for world—that is, even if generic nabumetone had become available in August 1998 rather than August 2001."); In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 320 (E.D. Mich. 2001) ("Evidence that all or virtually all class members substituted a lower-priced generic for some of their Cardizem CD purchases after generics became available gives rise to the inference that they would have similarly done so in the but-for world….Likewise,

Comcast, 133 S.Ct. at 1433 (quoting ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 57, 62 (2d Ed. 2010)). Highmark's request for the court to strike the class action allegations in the third amended complaint will be denied.

**B. UPMC's Arguments**

**1. UPMC argues that Cole's Wexford Failed to Allege an Antitrust Claim Against UPMC**

In the third amended complaint, Cole's Wexford alleges that on July 1, 2010, Highmark transferred it and other members of the putative plaintiff class to HHIC to charge them supracompetitive prices for health insurance without PID oversight, and continued to overcharge them for health insurance until March 21, 2012. UPMC argues that Cole's Wexford failed to state an antitrust claim against it because Cole's Wexford does not allege any action taken by UPMC after 2008. (Id.) In other words, according to UPMC, Cole's Wexford does not plausibly allege that the conspiracy between UPMC and Highmark existed when Highmark "unilaterally" transferred Cole's Wexford and other members of the putative class to HHIC to charge them supracompetitive rates without PID oversight. (ECF No. 300 at 2.)

Cole's Wexford argues in response that: (1) the third amended complaint contains allegations sufficient to plausibly show that Highmark charged Cole's Wexford and the putative plaintiff class supracompetitive rates *pursuant* to the alleged UPMC-Highmark conspiracy; (2) UPMC is jointly and severally liable for Highmark's actions taken pursuant to the alleged UPMC-Highmark conspiracy, even if UPMC was not fully aware of those actions; (3) whether

---

evidence that other class members obtained increased discounts on their Cardizem CD purchases after generic entry likewise gives rise to the inference that increased discounts would have been obtained in the but-for world."). A class comprised of those individuals may be administratively ascertainable based upon HHIC's records of its customers and would not necessarily be based upon the putative class members' say-so.

UPMC engaged in misconduct during the class period is not dispositive with respect to Cole's Wexford's claims against UPMC; (4) the third amended complaint contains allegations that the alleged UPMC-Highmark conspiracy lasted beyond 2008; and (5) UPMC is liable for damages accrued after the alleged UPMC-Highmark conspiracy ended.

The arguments presented by UPMC and Cole's Wexford raise a number of issues, which will be addressed below to determine whether Cole's Wexford plausibly stated a claim for relief against UPMC.

### a.  The Concerted Action Requirement of §§ 1 and 2 of the Sherman Act

Cole's Wexford asserts claims against UPMC and Highmark for antitrust damages under § 1 and § 2 of the Sherman Act based upon UPMC and Highmark *conspiring* to restrain trade in the relevant health insurance market (§ 1) and to monopolize in the relevant health insurance and health provider markets (§ 2). Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States…is declared to be illegal." 15 U.S.C. § 1. Section 2 imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To impose liability upon defendants under § 1, a plaintiff always must prove concerted action taken by the defendants, such as an *agreement* between two defendants to restrain trade. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 n.13 (1984). When a plaintiff's claim under § 2 is based upon a *conspiracy* to monopolize, the plaintiff also must prove the defendants entered into an agreement to monopolize the relevant market. Id. The Third Circuit Court of Appeals has explained that "to the extent it bans conspiracies to monopolize, section 2 is largely superfluous, as conspiracies to monopolize will usually—if not

always—run afoul of section 1's prohibition of conspiracies that unreasonably restrain trade." W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 99 n.7 (3d Cir. 2010).

### b. Conspirator Liability

"Antitrust liability is joint and several." 1 JOHN J. MILES, HEALTH CARE AND ANTITRUST L. § 9:13 (2015). "Thus, each defendant participating in the unlawful conduct is liable for the entire amount of damages caused by the violation regardless of the degree of its culpability in causing the damages." Id. A conspirator may withdraw from the conspiracy. Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 837 (11th Cir. 1999) (citing Hyde v. United States, 225 U.S. 347, 369 (1912)). "A conspirator who withdraws from the conspiracy is no longer a member of the conspiracy and the subsequent acts of the conspirators usually do not bind him." Morton's Market, 198 F.3d at 837. "The exception is where a continuing conspiracy[12] is alleged.

---

[12] "When a conspiracy 'contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation,' the conspiracy is a continuing offense." United States v. Lowery, 409 F.Supp.2d 732, 736-37 (W.D. Va. 2006) (quoting Untied States v. Kissel, 218 U.S. 601, 607 (1910)). The Supreme Court of the United States has explained:

> [T]he mere continuance of the result of a crime does not continue the crime. United States v. Irvine, 98 U. S. 450, 25 L. ed. 193, 3 Am. Crim. Rep. 334. But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one. Take the present case[.] A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business, and will continue their combined efforts to drive the competitor out until they succeed. If they do continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success. A conspiracy in restraint of trade is different from and more than a contract in restraint of trade. A conspiracy is constituted by an agreement, it is true, but it is the result of the agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract, but is a result of it. The contract is instantaneous, the partnership may endure as one and the same partnership for

42

Since a continuing conspiracy is alleged as one crime, a conspirator is still liable for the crimes of his co-conspirators even after his withdrawal, so long as he is sued during the limitations period." Id. at 937 n.22. "In the context of a continuing conspiracy to violate the antitrust laws…each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).

### c. Discussion

Here, Cole's Wexford set forth factual allegations to plausibly show that UPMC and Highmark agreed to protect each other's market powers in the relevant markets, and that agreement lasted until at least 2012. Cole's Wexford alleges that:

- in 2002, UPMC and Highmark—as part of the conspiracy—entered into a ten-year provider agreement set to expire in June 2012, pursuant to which Highmark would pay UPMC reimbursement rates "that were much higher than those previously negotiated for [WPAHS]" (ECF No. 286 ¶ 73);

- UPMC, pursuant to the conspiracy, refused to contract competitively with Highmark's insurance competitors, and, thus, Highmark's insurance competitors were prevented from entering the relevant market or achieving more than a ten percent market share in the relevant market (Id. ¶ 92, 216);

---

years. A conspiracy is a partnership in criminal purposes. That as such it may have continuation in time is shown by the rule that an overt act of one partner may be the act of all without any new agreement specifically directed to that act.

Kissel, 218 U.S. at 607-08. The alleged UPMC-Highmark conspiracy set forth in the third amended complaint is a continuing conspiracy. In 2002, UPMC and Highmark allegedly agreed to protect each other's market power, and made promises and assurances to each other to obtain those results. Their agreement required both defendants to "remain in business" and "continue their combined efforts," i.e., UPMC refusing to competitively contract with Highmark's insurance competitors and Highmark financially hobbling WPAHS, to achieve the aim of their agreement. Id.

- Highmark—without any meaningful competition in the health insurance market—was able to pass on the costs of paying UPMC higher reimbursement rates pursuant to the provider agreement to Cole's Wexford and other members of the putative class; it transferred them to HHIC and charged them supracompetitive rates without PID oversight (Id. ¶ 22, 102);

- Cole's Wexford and other members of the putative plaintiff class became captive customers of Highmark because of the alleged UPMC-Highmark conspiracy, which included participation in the ten-year provider agreement (Id. ¶ 230);

- at some point before or during 2013, "UPMC began offering in-network provider contracts to some of Highmark's competitors," but Highmark's contract with UPMC was more favorable "relative to its rivals' contracts with UPMC," and Highmark "continued to reap profits from its illegally obtained monopoly status" (Id. ¶ 218); and

- as of April 8, 2013, the insurance market was in a "state of transition" because of the end of the ten-year provider contract between UPMC and Highmark (Id. ¶ 225).

UPMC argues that Highmark unilaterally acted, i.e., did not act pursuant to the conspiracy, when it transferred Cole's Wexford and other members of the putative class to HHIC to charge them supracompetitive rates for health insurance. The allegations in the third amended complaint, however, are sufficient to plausibly show that at the time Highmark transferred Cole's Wexford and other members of the putative class to HHIC to charge them supracompetitive rates, UPMC received high reimbursement rates from Highmark under the ten-year provider agreement, which the parties entered into as part of the conspiracy. Highmark passed the cost of UPMC's high reimbursement rates onto Cole's Wexford and other members of the putative plaintiff class without threat of competition due to UPMC's refusal to offer competitive contracts to Highmark's insurance competitors. The foregoing allegations and the reasonable inferences drawn therefrom are sufficient to plausibly show that (1) Highmark transferred Cole's Wexford and other members of the putative plaintiff class to HHIC to charge them supracompetitive rates for health insurance *pursuant* to its conspiracy with UPMC; and (2) during that time, i.e., July 1,

2010, through March 21, 2012, Highmark and UPMC were actively engaged in the alleged UPMC-Highmark conspiracy. In other words, Cole's Wexford set forth factual allegations sufficient to plausibly show that UPMC and Highmark took concerted action prior to, during, and after the summer of 2008.

Notably, Cole's Wexford alleges that:

– on September 22, 2011, UPMC communicated to the Pennsylvania Senate Banking and Insurance Committee that "going forward" UPMC wanted to "invite every insurer to come in at market rates not determined by [UPMC] but determined by a third party" (ECF No. 286 ¶ 85);

– at some point prior to or during 2013, "UPMC began offering in-network provider contracts to some of Highmark's competitors" (Id. ¶ 218); and

– as of April 8, 2013, the insurance market was in a "state of transition" after the end of the ten-year provider contract between UPMC and Highmark (Id. ¶ 225).

These allegations—viewed in the light most favorable to Cole's Wexford—are sufficient to plausibly show that UPMC did not withdraw[13] from the alleged UPMC-Highmark conspiracy prior to July 1, 2010; indeed, based upon the foregoing allegations, on September 22, 2011— fourteen months after Highmark began charging Cole's Wexford supracompetitive rates for health insurance—UPMC indicated that "going forward" it wanted to engage with Highmark's insurance competitors. (ECF No. 286 ¶ 85.) In other words, the reasonable inference is that as of September 22, 2011—nine months before the expiration of the ten-year provider agreement—

---

[13]     The Court of Appeals for the Third Circuit has explained:

Mere cessation of activity in furtherance of an illegal conspiracy does not necessarily constitute withdrawal. The defendant must present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals.

United States v. Steele, 685 F.2d 793, 803-04 (3d Cir. 1982).

UPMC was not actively engaged with Highmark's insurance competitors. Under those circumstances, the factual allegations in the third amended complaint[14] are sufficient to plausibly show that at the time Highmark transferred Cole's Wexford and other members of the putative plaintiff class to HHIC to charge them supracompetitive rates, UPMC was acting upon the

---

[14] UPMC argues that based upon a newspaper article published on December 19, 2010, and a newspaper article published on April 1, 2011, Cole's Wexford's allegations with respect to a conspiracy existing in and around 2011 are "entirely implausible." (ECF No. 291 at 9 n.1.) UPMC requests the court to consider the newspaper articles as "matters of public record" in deciding its motion to dismiss. (Id. (quoting Beverly Enters. v. Trump, 182 F.3d 183, 190 n.3 (3d Cir. 1999).) Cole's Wexford argues consideration of the newspaper articles is "inappropriate for consideration on a motion to dismiss, which requires the Court to accept as true the factual allegations in the Complaint." (ECF No. 295 at 12 n. 3.)

"[F]ederal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." 5C CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1366 (3d ed. 2004) (citing inter alia Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 559 (3d Cir. 2002); Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 905 (3d Cir. 1997)). The Third Circuit Court of Appeals has acknowledged that "[t]he general rule, of course, is that 'a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings[,]'" W. Penn Allegheny, 627 F.3d at 97 n.6, but "[i]t is well-settled that in deciding a motion to dismiss, courts generally may consider…matters of public record," Beverly Enters., 182 F.3d at 190 n.3.

The court—at this stage of the litigation—will not consider the newspaper articles to decide UPMC's motion to dismiss the third amended complaint. As the court held in Mill Bridge V, Inc. v. Benton, Civ. Action No. 08-2806, 2009 WL 4639641, at *14 (E.D. Pa. Dec. 3, 2009), "[n]ewspaper articles are publicly available, but they are not 'matters of public record' for purposes of consideration on a motion to dismiss." The court in In re Astea Int'l Inc. Sec. Litig., Civ. Action No. 06-1467, 2007 WL 2306586, at *8 (E.D. Pa. Aug. 9, 2007), explained:

> [D]efendants confuse "publicly available" with "public record." Articles published in accounting journals and law reviews, conference call transcripts, see J/H Real Estate Inc. v. Abramson, 901 F.Supp. 952, 955 (E.D.Pa.1995), and company web sites, see Moore U.S.A. Inc. v. The Standard Register Co., 139 F.Supp.2d 348, 363 (W.D.N.Y.2001), are not "matters of public record." See also Pension Benefit Guar. Corp., 998 F.2d at 1197 (noting that a public record includes criminal case dispositions, letter decisions of government agencies, and published reports of administrative bodies).

Id. at *8.

alleged UPMC-Highmark conspiracy by refusing to contract competitively with Highmark's health insurance competitors.[15]

UPMC argues that this court held that based upon previous versions of the complaint, UPMC did not commit any unlawful acts post-2008, and, therefore, the allegations in the third amended complaint—which are similar to the allegations in the previous versions of the complaint—do not plausibly show that a conspiracy existed post-2008. In the court's opinion dated September 27, 2013, it dismissed from the second amended complaint plaintiffs' claim for tortious interference with contractual relations against UPMC. The court explained: (1) plaintiffs' claim—first filed on December 10, 2010—was barred by the two-year statute of limitations, i.e., plaintiffs did not set forth factual allegations sufficient to identify any unlawful action taken by UPMC on or after December 2, 2008, that could form the basis for a claim of tortious interference with contractual relations; and (2) the factual allegations in the second amended complaint were insufficient to toll the statute of limitations based upon UPMC fraudulently concealing its conduct that allegedly constituted tortious interference with contractual relations. (ECF No. 240 at 75-80.) In the court's opinion dated August 21, 2014, the court denied plaintiffs' motion for leave to file a third amended complaint for the same reasons set forth in the opinion dated September 27, 2014, because the proposed third amended complaint contained the same factual allegations as the second amended complaint with respect

---

[15]     UPMC argues that Cole's Wexford does not have "standing to sue for a conspiracy's effect on market prices, as that effect is 'highly effectual.'" (ECF No 300 at 5 (quoting Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 584 (3d Cir. 1979).) Cole's Wexford, however, is not suing because it was injured by the conspiracy's effect on market prices; rather, it is suing because Highmark—pursuant to the alleged UPMC-Highmark conspiracy—charged or caused HHIC to charge Cole's Wexford and other members of the putative class supracompetitive rates for health insurance.

to the claim for tortious interference against UPMC and allegations of fraudulent concealment. (ECF No. 284 at 30-31.)

Plaintiffs in the second amended and proposed third amended complaints set forth conclusory allegations that the conspiracy existed after 2008; indeed, plaintiffs did not allege that UPMC took any unlawful action post-2008 in those versions of the complaint. The court held that under those circumstances, the allegations in the second amended and proposed third amended complaint did not plausibly show a conspiracy existed post-2008. Cole's Wexford in the third amended complaint, however, set forth additional factual allegations to plausibly show that the alleged UPMC-Highmark conspiracy existed through March 21, 2012. Cole's Wexford specifically alleges that from July 1, 2010, through March 21, 2012, Highmark—lacking any competition in the relevant market—transferred Cole's Wexford and other members of the putative class to HHIC to charge them supracompetitive rates without PID oversight in order to recoup UPMC's high reimbursement costs that Highmark paid pursuant to the ten-year provider agreement. Cole's Wexford also alleges that on September 22, 2011, UPMC indicated that "going forward" it wanted to engage with Highmark's insurance competitors. (ECF No. 286 ¶ 85.) The reasonable inference drawn from those allegations is that as of at least September 22, 2011, UPMC pursuant to the alleged UPMC-Highmark conspiracy had not contracted with Highmark's insurance competitors, and, therefore, Cole's Wexford was charged supracompetitive rates as a captive customer of HHIC. In other words, Cole's Wexford sufficiently alleges that it was a captive customer of HHIC from July 1, 2010, through March 21, 2012, as a result of the alleged UPMC-Highmark conspiracy that was in effect during that time. UPMC's reliance on the court's holdings with respect to the second amended and proposed third amended complaints is misplaced because as detailed above, Cole's Wexford set forth additional

allegations in the third amended complaint that plausibly show the alleged UPMC-Highmark conspiracy existed post-2008 and until at least March 21, 2012.  UPMC's motion to dismiss the third amended complaint will, therefore, be denied with respect to this issue.

### 2.   UPMC argues Cole's Wexford Lacks Standing to Sue UPMC

#### a.   Indirect Purchaser Rule and Co-conspirator Exception

UPMC argues the indirect purchaser rule[16] set forth by the Supreme Court of the United States in Illinois Brick Co. v. Illinois, 431 U.S. 720, 729 (1977), bars all claims asserted against it by Cole's Wexford. (ECF No. 291 at 11; ECF No. 285 at 13.) The indirect purchaser rule provides that "only direct purchasers from antitrust violators may recover damages in antitrust suits." Howard Hess Dental Lab v. Dentsply Int'l, 424 F.3d 363, 369 (3d Cir. 2005) ("Hess I"). The Third Circuit Court of Appeals has recognized a limited co-conspirator exception to the indirect purchaser rule—although it has not addressed a case warranting application of the exception. Id.; Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 259 (3d Cir. 2010) ("Hess II"). The co-conspirator exception applies to suits brought by indirect purchasers when there are allegations of conspiracy, the co-conspirators are joined as co-defendants, and the middleman's involvement is truly complete, i.e., the middleman is "at least substantially equal[ly] responsib[le]for the violation" as the seller. Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 309-10 (1985). Under the Supreme Court's pronouncements in Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134 (1968), and Bateman, a complete involvement defense exists under federal antitrust law and will in appropriate circumstances bar a co-conspirator's federal antitrust claims.

---

[16]    See the court's opinion dated September 27, 2013, for a full discussion of the genesis of the indirect purchaser rule and the co-conspirator exception. (ECF No. 40 at 61-74.)

### b. Cole's Wexford's Claims (counts III and V) Against UPMC Based Upon UPMC's Unilateral Conduct

This court previously held that plaintiffs' claims asserted against UPMC based upon UPMC's unilateral conduct—and not the alleged UPMC-Highmark conspiracy—are barred by the indirect purchaser rule because plaintiffs were indirect purchasers of healthcare from UPMC, i.e., plaintiffs purchased health insurance from Highmark, which purchased healthcare for plaintiffs from UPMC. In the third amended complaint, Cole's Wexford again asserts two claims (counts III and V) against UPMC based upon UPMC's unilateral conduct. Based upon the allegations in the third amended complaint, Cole's Wexford purchased health insurance from HHIC, which paid UPMC reimbursement rates for Cole's Wexford healthcare. Cole's Wexford was, therefore, an indirect purchaser of healthcare from UPMC. Counts III and V will, therefore, be dismissed from the third amended complaint because they are barred by the indirect purchaser rule, and the co-conspirator exception does not apply to those claims.

### c. Cole's Wexford Claims (counts I and II) Against UPMC Based Upon the UPMC-Highmark Conspiracy

With respect to the conspiracy counts alleged against UPMC and Highmark (counts I and II), UPMC argues those claims are barred against UPMC under the indirect purchaser rule. UPMC explained that based upon the allegations set forth in the third amended complaint, Cole's Wexford is an indirect purchaser of healthcare from UPMC and the co-conspirator exception to the indirect purchaser rule does not apply to those claims. As discussed supra, the co-conspirator exception applies to suits brought by indirect purchasers when there are allegations of conspiracy, the co-conspirators are joined as co-defendants, and the middleman's involvement is truly complete, i.e., the middleman is "at least substantially equal[ly] responsib[le] for the violation" as the seller. Bateman, 472 U.S. at 309-10.

UPMC argues that the co-conspirator exception does not apply in this case because based upon the allegations in the third amended complaint: (1) a conspiracy did not exist when Highmark transferred Cole's Wexford and other members of the putative class to HHIC to charge them supracompetitive rates; and (2) Cole's Wexford did not join the direct purchasers—HHIC and Highmark's other subsidiaries—as defendants in this case. (ECF No. 291 at 12.) Cole's Wexford argues that the co-conspirator exception applies to the conspiracy counts asserted against UPMC and Highmark (counts I and II) because it sufficiently alleged a conspiracy existed when Highmark transferred Cole's Wexford and other members of the putative class to HHIC to charge it supracompetitive rates. Cole's Wexford argues that UPMC's argument with respect to its failure to join HHIC as a defendant in this case is unavailing because: (1) "a corporate parent and its subsidiaries cannot conspire for purposes of the antitrust laws;" and (2) "a corporate parent can participate in a conspiracy through its subsidiary if, for example, that subsidiary acts as an agent for the parent or at the behest of the parent." (ECF No. 295 at 14-15.)

As discussed supra, Cole's Wexford sufficiently alleged that the UPMC-Highmark conspiracy existed when Highmark transferred Cole's Wexford and other members of the putative class to HHIC. With respect to whether Cole's Wexford is required to join HHIC as a defendant for the co-conspirator exception to the indirect purchaser rule to apply in this case, the court in its opinion dated August 21, 2014, held HHIC could not be joined as a defendant in this case because there were no allegations in the proposed third amended complaint that HHIC was a member of the alleged UPMC-Highmark conspiracy. Cole's Wexford did not set forth additional allegations in the third amended complaint to plausibly show that HHIC was a

member of the UPMC-Highmark conspiracy, and, therefore, based upon the allegations in the third amended complaint Cole's Wexford may not add HHIC as a defendant in this case.

Cole's Wexford in the third amended complaint, however, set forth factual allegations sufficient to plausibly show that Highmark—pursuant to the alleged UPMC-Highmark conspiracy—used HHIC, which was not subject to PID oversight, to overcharge Cole's Wexford and other members of the putative class to recoup the costs associated with paying UPMC high reimbursement rates. Under those circumstances, and at the pleadings stage of the litigation, the court concludes that the co-conspirator exception might apply to this case. The Third Circuit Court of Appeals has explained the problems that arise in an indirect purchaser suit are:

> (1) a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge;
>
> (2) the evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and
>
> (3) permitting direct and indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue.

Hess I, 424 F.3d at 369-70. The Third Circuit Court of Appeals has further explained that to determine whether the indirect purchaser rule bars a plaintiff's recovery, the court should consider whether the foregoing issues are implicated in a given case. Merican, Inc. v. Ceterpillar Tractor Co., 713 F.2d 958, 967 (3d Cir. 1983) ("[T]he availability of the section 4 remedy depends not on the plaintiff's characterization of the illegal activity but on whether the problems identified in Illinois Brick would be avoided if relief were allowed."). The court will consider whether each of the issues identified by the court of appeals with respect to indirect purchaser

suits are implicated in this case to determine whether Cole's Wexford—without joining HHIC as a co-conspirator defendant—can sue UPMC based upon the alleged UPMC-Highmark conspiracy.

### i. Whether a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge

The risk of duplicative liability or inconsistent adjudications is not implicated in this case.

As the Ninth Circuit Court of Appeals commented in <u>Royal Printing Company v. Kimberly-Clark Corporation</u>, 621 F.2d 323, 326 (9th Cir. 1980),[17] "[t]here is little reason for [an antitrust

---

[17]    The Third Circuit Court of appeals approvingly cited <u>Royal Printing</u> in <u>Merican, Inc. v. Caterpillar Tractor Co.</u>, 713 F.2d 958, 967 n. 20 (3d Cir. 1983). The Third Circuit Court of Appeals commented:

> [<u>Royal Printing</u>] involved violations of § 1 of the Sherman Act alleged by several small retail businesses against ten of the nation's largest manufacturers of paper products. On a motion to dismiss under <u>Illinois Brick</u>, the court held that an indirect purchaser could sue for damages when it had made its purchases from a subsidiary or division of a co-conspirator, even if the pricing decision of such a subsidiary or division was determined by market forces. 621 F.2d at 326–27 & n. 4. The court went on to hold that purchases made through independent wholesalers, however, were barred. <u>Id.</u> at 327–28. The <u>Royal Printing</u> decision parallels the exception to Illinois Brick that we recognized in <u>In re Sugar Indus. Antitrust Litig.</u>, 579 F.2d 13 (3d Cir.1979). In that case we held that an antitrust violator cannot evade liability "by the simple expedient of inserting a subsidiary between the violator and the first uncontrolled purchaser." <u>Id.</u> at 19. While our view of the exception is somewhat narrower than that of the Ninth Circuit, see <u>Mid-West Paper Prods.</u>, 596 F.2d at 589 (violator must dominate subsidiary's prices in accordance with the general price fixing conspiracy), the exception in any form is inapplicable to this case. In its complaint Appellees admit that OMCO, the direct purchaser in this case, is not a subsidiary of Caterpillar but rather an independent dealer. Complaint at ¶¶ 8, 13; app. at 9B, 11B. Thus under either <u>Royal Printing</u> or <u>Mid-West Paper Prods.</u>, Appellees would be barred by the rule of <u>Illinois Brick</u>.

conspirator] to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator." The Ninth Circuit Court of Appeals explained that the litigation decisions of a subsidiary are usually subject to parental control, and a parent would forbid its subsidiary from suing the direct seller because the lawsuit would reveal the parent's anticompetitive behavior. Id. Here, HHIC is a subsidiary of Highmark, an alleged co-conspirator of UPMC. The allegations in the third amended complaint are sufficient to permit a reasonable inference that HHIC acted at the direction and control of Highmark when it charged supracompetitive rates to Cole's Wexford. Under those circumstances, if HHIC sued UPMC, any defenses applicable to a suit by Highmark would apply to a suit by HHIC. If Highmark sued UPMC to recover the high reimbursement rates UPMC charged Highmark, UPMC could assert the complete involvement defense, because based upon the allegations in the third amended complaint, Highmark was at least substantially equally responsible for the alleged antitrust violations in this case.[18] Although a lawsuit by HHIC against UPMC is possible, "the correspondingly small risk of multiple recovery" does not warrant the application of the indirect purchaser rule to this case. Royal Printing, 621 F.2d at 326.

---

Merican, 958 F.2d at 967-68 n.20.

[18]     As this court explained in its opinion dated September 27, 2013, the Supreme Court of the United States in Bateman held:

> [A] private action for damages…may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.

Bateman, 472 U.S. at 310-11. Courts recognize the foregoing two-part test as the applicable test to determine whether a plaintiff's federal antitrust claims against its co-conspirator are barred by the complete involvement defense. See Wallach v. Eaton Corp., 814 F.Supp.2d 428, 437 (D. Del. 2011); see also Sullivan v. Nat'l Football League, 34 F.3d 1091, 1107 (1st Cir. 1994); Fla. Software Sys., Inc. v. Columbia/HCA Healthcare Corp., Civ No. 97-2866, 1999 WL 781812, at *2 (M.D. Fla. Sept. 16, 1999); Bieter Co. v. Blomquist, 848 F.Supp. 1446, 1449 (D. Minn. 1994).

     **iii.**    **Whether the evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and**

           **Whether permitting direct and indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue**

The second and third issues that arise in indirect purchaser suits will be addressed together. The Ninth Circuit Court of Appeals in <u>Royal Printing</u> noted that "[d]etermining what portion of the illegal overcharge was 'passed on' to [the plaintiff] would involve all the evidentiary and economic complexities that <u>Illinois Brick</u> clearly forbade." <u>Royal Printing</u>, 621 F.2d at 327. The court of appeals permitted the plaintiff, however, to recover the full amount of the overcharge from the indirect seller. <u>Id.</u> The court of appeals reasoned that "there is nothing wrong with the plaintiff winning a windfall gain, so long as the antitrust laws are vindicated and the defendant does not suffer multiple liability, with its potential for windfall loss." <u>Id.</u> Here, the issues of evidentiary complexities and uncertainties with respect to determining damages may be avoided by permitting Cole's Wexford to recover the full amount of the overcharges; indeed, permitting Cole's Wexford to obtain full recovery would provide incentive for private plaintiffs to sue. <u>Royal Printing</u>, 621 F.2d at 325-326 ("The threat of private treble-damages suits is vital to the enforcement of the antitrust laws."). The second and third issues that arise in indirect purchaser suits are not, therefore, offended by permitting Cole's Wexford to sue UPMC in this case. Based upon the foregoing discussion, the underlying policy considerations of the indirect purchaser rule would not be offended if Cole's Wexford is permitted to sue UPMC based upon the overcharges it paid to HHIC under Highmark's direction and pursuant to the alleged UPMC-

Highmark conspiracy.

For the reasons discussed above, UPMC's motion to dismiss will be granted with respect to the claims that are based upon UPMC's alleged unilateral conduct (counts III and V) and denied without prejudice with respect to the claims that are based upon UPMC's conspiracy with Highmark (counts I and II). UPMC may raise its indirect purchaser argument with respect to counts I and II at a later stage in this litigation; indeed, if Cole's Wexford and other members of the putative class lack sufficient evidence to prove that HHIC acted at the direction of Highmark when it overcharged Cole's Wexford and other members of the putative class for health insurance, the indirect purchaser rule might bar Cole's Wexford's claims against UPMC.

### 3. UPMC argues that Cole's Wexford's Class Allegations Should Be Stricken from the Third Amended Complaint For Failure to Plead Commonality and Typicality

UPMC argues that Cole's Wexford does not sufficiently allege that its claims are common or typical of the claims of the putative plaintiff class. (ECF No. 291 at 14.) UPMC reasons that Cole's Wexford is "an establishment with unique health care and insurance needs" who's insurance plan "was shifted to HHIC effective July 1, 2010." (<u>Id.</u>) UPMC argues that under those circumstances, "[p]laintiffs allege no facts to support why Cole's is typical or common, and none are apparent." (<u>Id.</u>) Cole's Wexford in response argues:

> [T]he TAC on its face demonstrates that Cole's claims are typical of the class because, like other members of the class, it alleges that it was injured by the UPMC-Highmark conspiracy by virtue of paying supracompetitive prices to an HHIC plan from July 2010 onwards—indeed, Highmark unilaterally moved Cole's to the HHIC plan and immediately increased its rates. Just like other class members, Cole's claims will rest on the resolution of a number of common questions of law and fact as set forth in Paragraph 15 of the TAC. To the extent other members of the class were always subscribers of HHIC and were not unilaterally switched (as Cole was) does not defeat typicality.

(ECF No. 295 at 17.)

### a. Commonality

As previously discussed, a court may strike class allegations at the pleading stage if "the issues are plain enough from the pleadings to determine whether" class certification is appropriate in a given case. Gen. Tel. Co., 457 U.S. at 160. The Third Circuit Court of Appeals has explained that "'commonality' demands that the members of a prospective class share at least one question of fact or law common to their claims." Rodriguez v. Nat'l City Bank, 726 F.3d 372, 376 (3d Cir. 2013) (citing Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)). Cole's Wexford in the third amended complaint set forth factual allegations to plausibly show that it and other members of the putative plaintiff class share at least one question of fact or law common to their claims. Cole's Wexford plausibly alleges it and other members of the putative class paid Highmark for health insurance, but—pursuant to the alleged UPMC-Highmark conspiracy— were transferred to HHIC and charged supracompetitive prices for health insurance. UPMC's argument that Cole's Wexford failed to plead commonality is, therefore, not a basis to strike the class allegations in the third amended complaint.

### b. Typicality

With respect to typicality, the Third Circuit Court of Appeals has commented that "[t]he 'typicality' requirement instructs courts 'to assess whether the class representatives themselves present [the] common issues of law and fact that justify class treatment....'" Rodriguez, 726 F.3d at 376 n.4 (quoting Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985)).[19] Cole's Wexford

---

[19]    The Third Circuit Court of Appeals in Johnston v. HBO Film Management, Inc., 265 F.3d 178, (3d Cir. 2001), explained:

> [I]n a properly certified class, the claims of the class representatives must be typical of the class as a whole. See Prudential, 148 F.3d at 310. In considering the typicality issue, the district court must determine whether "the named plaintiff[s'] individual circumstances are markedly different or ... the legal theory upon which

alleges that it and the putative class members paid Highmark for health insurance, and Highmark transferred them to HHIC to charge them supracompetitive prices for health insurance. Those allegations in the third amended complaint present the common issues of law and fact that justify class treatment in this case. UPMC's argument that Cole's Wexford failed to plead typicality is, therefore, not a basis to strike the class allegations in the complaint.[20]

### 4. UPMC argues that Counsel for Cole's Wexford Cannot Adequately Represent the Putative Class

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." This court has not certified a class. UPMC's arguments with respect to the adequacy of class

---

the claims are based differs from that upon which the claims of other class members will perforce be based." Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.1985) (internal quotations omitted). This criteria does not require that all putative class members share identical claims. Indeed, so long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." Newton, 259 F.3d at 183–84 (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir.1998)); Baby Neal, 43 F.3d at 58 ("Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."). Here, because the claims of the plaintiffs and the putative class members all arise from the alleged misrepresentations by the defendants, the claims of the plaintiffs are typical of those of the class.

Johnston, 265 F.3d at 184.

[20] UPMC asserts that Cole's Wexford "fail[s] to assert facts in support of the other required elements of a class action" but does not elaborate on its argument. (ECF No. 291 at 14.) The court will, therefore, defer its consideration of the other required elements of a class action to the class certification stage of this case.

counsel are, therefore, premature.[21] UPMC may raise its arguments with respect to the adequacy of class counsel at the class certification stage of this case.

### 5. Cole's Wexford's Claims Are Barred By the Statute of Limitations

UPMC argues that Cole's Wexford's claims are barred by the four-year statute of limitations governing antitrust actions because Cole's Wexford did not allege "that UPMC engaged in any misconduct in the four years prior to" filing the third amended complaint. (ECF No. 291 at 17.) The Third Circuit Court of Appeals has explained:

> Parties are generally required to assert affirmative defenses early in litigation, so they may be ruled upon, prejudice may be avoided, and judicial resources may be conserved….Federal Rule of Civil Procedure 8(c) requires that a defendant plead an affirmative defense, such as a statute of limitations defense, in his answer. Rule 8(c) states:
>
> > Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively ... statute of limitations ... and any other matter constituting an avoidance or affirmative defense.
>
> Fed.R.Civ.P. 8(c).
> …
> Technically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer. Rule 12(b) states that "[e]very defense ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion...." The defenses listed in Rule 12(b) do not include limitations defenses. Thus, a limitations defense must be raised in the answer, since Rule 12(b) does not permit it to be raised by motion. However, the law of this Circuit (the so-called "Third Circuit Rule") permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir.1975). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir.1978).

---

[21]     Rule 23(g)(3) provides that "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Counsel for Cole's Wexford, however, has not filed a motion for interim appointment of class counsel.

Robinson v. Johnson, 313 F.3d 128, 134-35 (3d Cir. 2002).

Here, it is not apparent on the face of the third amended complaint that the claims asserted against UPMC are barred by the statute of limitations. Cole's Wexford filed the third amended complaint on October 1, 2014. (ECF No. 286.) Pursuant to the four-year statute of limitations applicable to antitrust actions, Cole's Wexford may recover for damages it suffered as a result of the alleged UPMC-Highmark conspiracy beginning on October 1, 2010. As explained above, the allegations in the third amended complaint and the reasonable inferences drawn therefrom are sufficient to plausibly show that at least at the time Highmark transferred Cole's Wexford and other members of the putative plaintiff class to HHIC to charge them supracompetitive rates, i.e., July 1, 2010, UPMC was acting upon the alleged UPMC-Highmark conspiracy by refusing to competitively contract with Highmark's health insurance competitors. There are no allegations to suggest that UPMC stopped acting upon the alleged UPMC-Highmark conspiracy between July 1, 2010, and October 1, 2010. Indeed, as detailed above, Cole's Wexford alleges that on September 22, 2011—fourteen months after Highmark began charging Cole's Wexford supracompetitive rates for health insurance—UPMC indicated that "going forward" it wanted to engage with Highmark's insurance competitors. (ECF No. 286 ¶ 85.) In other words, the reasonable inference is that as of September 22, 2011—nine months before the expiration of the ten-year provider agreement—UPMC was not actively engaged with Highmark's insurance competitors. Based upon the foregoing, it is not apparent from the face of the third amended complaint that Cole's Wexford's claims asserted against UPMC were untimely filed. UPMC's motion to dismiss will, therefore, be denied with respect to this issue.

**VI.     Conclusion**

Cole's Wexford's claims (counts I and II) against UPMC and Highmark based upon the alleged UPMC-Highmark conspiracy will survive the motions to dismiss filed by UPMC and Highmark. Cole's Wexford's claims (counts IV and VI) against Highmark that are not based upon its concerted action with UPMC also survive Highmark's motion to dismiss. Cole's Wexford's claims (counts III and V) against UPMC that are not based upon UPMC's concerted action with Highmark will be dismissed with prejudice. The face of the third amended complaint does not show that as a matter of law class certification is improper in this case. Cole's Wexford's class allegations will not be stricken from the third amended complaint.

Accordingly, the motion to dismiss filed by Highmark (ECF No. 288) will be denied, and the motion to dismiss filed by UPMC (ECF No. 290) will be granted in part and denied in part. An appropriate order will be entered.

BY THE COURT,

Dated: September 1, 2015                    /s/ JOY FLOWERS CONTI
                                            Joy Flowers Conti
                                            Chief United States District Judge