IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROYAL MILE COMPANY, INC., PAMELA LANG and COLE'S WEXFORD HOTEL, INC., on their own behalf and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>UPMC and HIGHMARK INC.,<br><br>    Defendants. | Case No. 2:10-cv-01609-JFC<br><br>Judge Joy Flowers Conti |

**Revised Report and Recommendation No. 4**
**Concerning Threshold Discovery Disputes Between Plaintiffs and Highmark**

Pending before the Special Master is a threshold discovery dispute between Plaintiffs and Defendant Highmark regarding whether Plaintiffs may seek discovery regarding rates charged by Highmark between 1999 and 2001, 2008 and 2010, and after March 2012. For the reasons that follow, the Special Master concludes that Plaintiffs may seek discovery regarding these topics.

I.    **Background**

Plaintiffs' Second Amended Complaint against UPMC and Highmark alleged, broadly, that UPMC and Highmark engaged in anticompetitive conduct resulting in antitrust injury to Plaintiffs and all similarly situated persons in the form of increased health insurance premiums. [*See generally* Plaintiffs' Second Amended Complaint (ECF No. 90) at ¶¶ 55-62, 224]. In September 2013, the Court dismissed this Complaint without prejudice, finding that, as alleged in the Second Amended Complaint, Plaintiffs' claims were barred by the filed rate doctrine[1] to

---

[1] "The filed rate doctrine 'bars antitrust suits based on rates that have been filed and approved by federal agencies' and state agencies." [Sept. 23, 2013 Mem. Op. at 24 (quoting McCray v. Fidelity Nat'l Title Ins. Co., 682 F.3d 229, 236 (3d Cir. 2012); *see Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 256 (1922)].

the extent that the alleged damages were based on the difference between Highmark's Pennsylvania Insurance Department ("PID")-approved rates and rates that would have been charged and which would have required approval of the PID. [Sept. 27, 2013 Mem. Op. (ECF No. 240) at 31-32]. In so finding, the Court noted that "a determination by the PID that the rates charged by Highmark were not 'excessive, inadequate, or unfairly discriminatory' is not subject to review" by the Court or a jury. [*Id*. at 36 (citing 40 Pa. Const. Stat. 3803(e)(1)].

The Court accordingly dismissed the Second Amended Complaint, but granted Plaintiffs leave to amend "to the extent they can assert a claim for damages that is not barred by *Keogh*." (*Id*. at 45). The Court cautioned Plaintiffs that an amended claim may also be barred if (1) it would require the Court to assess a hypothetical rate that potential competitors may have charged and (2) "if that rate would have needed to be approved by the PID." (*Id*. at 45-46). Still, the Court further noted that the filed rate doctrine may not bar future claims if the competitors were exempt from rate-approval requirements, or if the measure of damages was to be based on the difference between approved rates paid to Highmark and approved rates of Highmark's competitors. (*Id.* at 48-49).

Plaintiffs subsequently moved to file a Third Amended Complaint. (ECF No. 249). Highmark and UPMC opposed Plaintiffs' Motion, arguing that "permitting amendment … would be futile" and that "the class action allegations [were] insufficient as a matter of law." (Aug. 21, 2014 Mem. Op. at 1). The Court concluded that various aspects of the proposed amended complaint were barred by the filed rate doctrine. Nevertheless, the Court permitted Plaintiffs to go forward with claims that asserted a measure of damages "based upon the difference between the rates Highmark charged the small group plaintiffs during the alleged UPMC-Highmark conspiracy" and rates that would have been charged by competitors not subject to the PID rate-

2

filing requirements prior to March 21, 2012. (*Id*. at 21). In addition, the Court permitted Cole's Wexford to proceed with claims setting forth a measure of damages based on the difference between rates it paid to Highmark Health Insurance Company (HHIC) and rates it would have paid but for the alleged conspiracy until March 21, 2012, on which date HHIC was required to begin filing its rates with the PID. (*Id*. at 26).

Plaintiffs filed a Third Amended Complaint in October 2014. This Complaint alleges that, beginning in 2002, Highmark and UPMC conspired to "control, divide, and/or monopolize both the market for medical care and the market for health insurance," resulting in the exclusion of competitors from the health insurance market. [Third Amended Complaint (ECF No. 286) at ¶ 1]. Plaintiffs defined the class as all persons who purchased small group health insurance from HHIC "or a similar for-profit subsidiary of Highmark Inc. between approximately July 1, 2010 and approximately March 21, 2012." (*Id*. at ¶ 11).

The Court lifted a stay of discovery in this case in 2015, and the parties entered into settlement discussions. Plaintiffs and Highmark were unable to reach an agreed settlement, however Plaintiffs have reached a tentative settlement agreement with Defendant UPMC which would require UPMC to pay $12.5 million in damages to Plaintiff.

On January 20, 2016, Plaintiffs served on Highmark a draft set of discovery requests seeking, broadly, information regarding the rates Highmark charged to small group customers during three time periods: (1) 1999-2001, before Highmark allegedly began conspiring with UPMC regarding rates; (2) January 1, 2008 – July 1, 2010, the time period immediately before Highmark switched small group customers to its for-profit subsidiary, Highmark Health Insurance Company (HHIC); and (3) March 21, 2012 to the present. (Mot. at 1). Highmark objected to Plaintiffs' requests, and the parties agreed to seek from the Special Master the

resolution of two threshold questions regarding this discovery, namely, whether either the filed rate doctrine or the "proportionality" aspect of Rule 26(b)(1) precludes Plaintiffs from seeking this discovery.

The Special Master has reviewed Plaintiffs' letter brief on this issue, treated as a Motion for purposes of this dispute only, Highmark's responsive letter brief, treated as Highmark's Opposition for purposes of this dispute, and Plaintiffs' Reply letter brief, as well as all exhibits submitted with those briefs. These findings follow.

**Discussion / Analysis**

1. **Does the Filed Rate Doctrine preclude discovery of rates Highmark charged that were filed with a regulator?**

Plaintiffs contend that information concerning rates charged during the three time periods at issue are relevant for three different reasons. First, Plaintiffs claim that the details regarding rates charged between 1999 and 2001 are relevant to serve as a benchmark for what competitive rates would have been during the June 2010 – March 2012 class period, suggesting that an expert may be able to rely on those earlier rates to project what a "normal" rate increase would have been through the class period. (Mot. at 1-2). Second, Plaintiffs argue that rates charged by Highmark between January 1, 2008 and July 1, 2010 will be useful inasmuch as those rates will show "how rates increased after HHIC was able to charge rates with no rate filing obligation whatsoever." (Mot. at 2). Finally, Plaintiffs assert that rate information post-dating March 21, 2012, will show "the extent to which rate-filing may (or may not) have changed the rates being charged by HHIC, and the extent to which the effects of the anticompetitive conduct may (or may not) have slowly become mitigated or lessened in much more recent years." (Mot. at 1-2).

Highmark opposes Plaintiffs' requests, arguing that requests seek information concerning regulated rates that are not related to the July 2010 to March 2012 class period. (Opp. at 1-2).

According to Highmark, "Plaintiffs' damages are limited to any overcharges on unregulated rates, but it requests eight years of information about regulated rates." (*Id*.) More specifically, Highmark contends that the requested rate information "could never serve as a potentially relevant benchmark for damages" because the earlier rates were regulated but the later rates were not, meaning that "there would not be an apples to apples comparison." (*Id*. at 2).

With respect to the 2008 to 2010 rates and 2012 through the present rates, Highmark argues that such an inquiry would only be useful inasmuch as it may enable Plaintiff "to argue that the regulated rates were the competitive rates, and that any increase above those regulated rates was supracompetitive." (*Id*.) Highmark suggests that this is "precisely what the filed rate doctrine prohibits" because it would require the Court to determine whether the filed rates were identical to the rates that would have occurred in a competitive market. (*Id*. at 2-3).

a. **Rates charged between 1999-2001**

The Special Master finds persuasive Plaintiffs' contention that data regarding the rate charged between 1999 and 2001 will prove useful in executing a benchmark comparison of expected rates against actual rates charged during the class period. "[T]he benchmark approach evaluates prices … in the market at issue, comparing prices in the impact period to available prices before and/or after the alleged period of impact (the "control period")." [Justin McCrary and Daniel L. Rubinfield, *Measuring Benchmark Damages in Antitrust Litigation*, J. of Econometrics, Vol. 3(1) at 63 (2014)]. Here, Plaintiffs contend that the earlier rates will provide the basis for the "control period" prior to the alleged period of impact (the class period).

Highmark argues that "the Benchmark method rests on unstable ground," citing *In re Cox Enterprises Inc. Set-Top Cable Television Box Antitrust Litigation*, 2011 WL 6826813 at *16 (W.D. Okla. Dec. 28, 2011). In that case, however, the plaintiffs proposed using the benchmark

5

method to compare rates for a cable television box charged to consumers in the United States against rates charged to Canadian consumers.[2] The court concluded that the benchmark method was on "unstable ground" because of "the differences regarding regulations and costs imposed on Canadian and American cable providers," and not because of issues related to the benchmark method itself. (*Id*.) The *Cox Enterprise* facts are not analogous to the situation at issue here. Indeed, Highmark goes too far when it contends that the earlier rates are of little relevance because the later rates were charged by a "separate, unregulated entity." (Opp. at 2). HHIC is a wholly-owned subsidiary of Highmark and, during the class period, it operated in the same market as Highmark itself did between 1999 and 2001. Moreover, while Highmark was required to file its rates with the PID between 1999 and 2001 but no similar requirements applied to HHIC during the class period, both entities operated under the same regulatory structure, namely, that structure imposed by Pennsylvania statute and applied by the PID. This situation is therefore fundamentally different than that at issue in the *In re Cox Enterprises*.

Numerous cases have recognized the benchmark method as a reliable method for demonstrating damages in numerous cases. [See, e.g., *In re Neurontin Antitrust Litig*., 2011 WL 286118 at *10 (D.N.J. Jan. 25, 2011); *Meijer Inc. v. Warner Chilcott Holdings Company III, Ltd.*, 246 F.R.D. 293, 311 (D.D.C. 2007)]. To be sure, Plaintiffs' suggested use of the 1999 – 2001 rates for this purpose may be somewhat attenuated, as Plaintiffs propose treating those earlier rates as a competitive rate and relying on an expert to adjust those rates forward roughly 9 years to determine what a similarly competitive rate would have been during the class period. Whether such expert testimony would be admissible under *Daubert v. Merrell Dow*

---

[2] Moreover, as Plaintiffs in this case note, *In re Cox Enterprises* resolved a class certification issue, and not a discovery dispute. (*See* Reply at 2; *In re Cox Enters. Inc. Set-Top Cable Television Box Antitrust Litig*., 2011 WL 6826813 at *16).

*Pharmaceuticals Inc.*, 509 U.S. 579 (1993), however, is beyond the scope of this opinion and indeed is more properly left for the Court, and not the Special Master, to resolve.

Rather, at this stage, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. … Information within this scope of discovery need not be admissible in evidence to be discoverable." [Fed. R. Civ. P. 26(b)(1)]. "The Federal Rules' relevancy requirement is to be construed broadly, and material is relevant if it bears on, or reasonably could bear on, an issue that is or may be involved in the litigation." [*Beazer East, Inc. v. The Mead Corp.*, 2010 WL 5071762 at *2 (W.D. Pa. Dec. 6, 2010) (citing *Oppenheimer Fund. Inc. v. Sanders*, 437 U.S. 340, 350, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978))]. "Discovery requests are considered relevant if there is any possibility that the information sought may be relevant to the general subject matter of the action." [*Luther v. Kia Motors America, Inc.*, 2008 WL 5335024 at *1 (W.D. Pa. Dec. 18, 2008) (citing *Oppenheimer*, 437 U.S. at 351)].

Plaintiffs propose obtaining discovery in order to assess the impact of alleged anticompetitive conduct and alleged damages. Such purposes are certainly within the general subject matter of this action, and for this reason, Plaintiff should be permitted to seek discovery regarding this area.

   b. **Rates charged between 2008 and 2010, and after 2012**

Plaintiffs argue that information regarding rates charged by Highmark immediately prior to the class period and immediately after the class period, through the present, is relevant for purposes of assessing the competitiveness of the rates that Highmark charged during the class period. In essence, Plaintiffs contend that comparing the regulated pre-class period rates against the regulated rates of the class period is likely to provide evidence that rates "dramatic[ally]

spiked" once the unregulated period began, and that comparing regulated post-class period rates against class period rates is likely to show that "the effects of the anticompetitive conduct may (or may not) have slowly become mitigated or lessened in much more recent years." (Mot. at 2).

Plaintiffs have met their burden to show that the proposed discovery is relevant to the issues in this case. While Highmark asserts, correctly, that the filed rate doctrine limits inquiry into whether a rate charged under such a regulatory scheme was in fact competitive (*see* Sept. 27, 2013 Mem. Op. (ECF No. 240) at 36), Plaintiffs do not ask the Special Master to recommend such an inquiry here, nor is the discovery at issue likely to lead the Court to conduct such an inquiry. Rather, Plaintiffs' proposed discovery actually relies on an assumption that the pre- and post- class period rates (i.e., the regulated rates) were *not* "excessive, inadequate, or unfairly discriminatory." [40 Pa. Const. Stat. 3803(e)(1)]. Plaintiffs argue that the discovery will tend to show that the rates during the class period were drastically different than the rates charged during the regulated time frame, thereby providing evidence of anticompetitive conduct. This proposed use of the requested discovery will require the Court or a jury only to assess the reasonableness of the *unregulated* rates.

The Court's August 2014 Memorandum Opinion permitting Plaintiffs to file the Third Amended Complaint specifically permitted an assessment of the rates in effect during the unregulated period. (*See* Aug. 21, 2014 Mem. Op. at 21, 26). Plaintiffs' proposed discovery will tend to provide relevant information concerning these rates, and Plaintiffs should be permitted to seek this information.

2. **Does the principle of "proportionality" preclude the discovery Plaintiffs seek?**

The December 2015 revisions to Rule 26 of the Federal Rules of Civil Procedure provide permit that parties to obtain relevant discovery provided that it is "proportional to the needs of

the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." [Fed. R. Civ. P. 26(b)(1)].

The Advisory Committee's note to the amended Rule 26 explains that, while ideally, parties should resolve proportionality issues during the Rule 26(f) conference,

> "if the parties continue to disagree, the discovery dispute could be brought before the court and the parties' responsibilities would remain as they have been since 1983. A party claiming undue burden or expense ordinarily has far better information -- perhaps the only information -- with respect to that part of the determination. A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."

[Fed. R. Civ. P. 26 cmt. to R26(b)(1)].

In the Third Circuit, "the party asserting that the request is irrelevant or unduly burdensome must show specifically how the request is burdensome, oppressive, or irrelevant." [*Alexander v. Roadway Express, Inc.*, 2009 WL 793022 at \*2 (March 24, 2009) (citing J*osephs v. Harris* Corp., 677 F.2d 985, 992 (3d Cir.1982))]. Highmark contends that the proposed discovery would cost $190,000 in data fees, plus additional expenses for data collection from an e-discovery vendor. (Opp. at 4-5). Highmark notes that Plaintiff has reached a pending settlement agreement with co-Defendant UPMC under which UPMC would pay Plaintiffs $12.5 million, implying that Plaintiffs' claims against Highmark should be similarly valued. (*Id*. at 4).

According to Plaintiffs, however, the 10,000 small group subscribers in the proposed class paid significantly more than $12.5 million in premiums to HHIC during the class period. (Reply at 3). Plaintiffs contend that the $12.5 million agreement between Plaintiffs and UPMC is not reflective of the value of the remaining dispute between Plaintiffs and Highmark. Rather,

Plaintiffs argue, "[s]ettlements early in a case made with co-conspirators who are not the primary culprits and who agree to cooperate with plaintiffs are often made at substantial discounts." (Reply at 3).

The Special Master concludes that, at this time, Plaintiffs have the stronger argument on this point. While recognizing that Highmark has reserved a right to raise specific objections regarding burdensomeness when it serves its objections and responses (*see* Opp. at 4 n. 4), the only precise figure presented by Highmark at this time is $190,000. While the potential damage claims as to Highmark may not reach the $100 million figure put forth by Plaintiffs, if Plaintiffs' claims are proved, the damages will almost certainly exceed $12.5 million. Indeed, the Special Master doubts that UPMC would have agreed to the pending settlement agreement if it had reason to believe that $12.5 million was the maximum possible amount of damages. Regardless, the proposed discovery is relevant and important to the question of whether Highmark engaged in anticompetitive conduct, and Highmark almost certainly has the resources to comply with this request. While not ruling on burdensomeness arguments that may be made as to specific requests, the Special Master concludes that proportionality concerns should not serve as a bar to proceeding with the discovery requests at this time.

## II.     Conclusion

For the foregoing reasons, the Special Master concludes that Plaintiffs have shown that the proposed discovery topics are relevant to the claims at issue in this case, and that Highmark has not demonstrated that the topics seek discovery that is disproportionate to the case. It is recommended that Plaintiffs may proceed with discovery on this topic.

March 9, 2016
/s/ Hon. Richard A. Levie (Ret.)
Hon. Richard A. Levie (Ret.)
Special Master