**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COLE'S WEXFORD HOTEL, INC.,** | ) | |
| on its own behalf and on behalf of all | ) | |
| others similarly situated, | ) | Case No. 2:10-cv-01609-JFC |
| | ) | |
| Plaintiffs, | ) | Judge Joy Flowers Conti |
| | ) | |
| v. | ) | Electronically Filed |
| | ) | |
| **UPMC** and | ) | |
| **HIGHMARK INC.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S AND UPMC'S MOTION FOR
FINAL APPROVAL OF SETTLEMENT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ................................................................................................ 1

II. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ......................... 1

    A.  The Proposed Settlement Merits a Presumption of Fairness ................................. 2

    B.  The Proposed Settlement Satisfies the *Girsh* Factors ............................................ 4

        1.  The Complexity, Expense, and Likely Duration of Litigation ................... 5

        2.  The Reaction of the Class ........................................................................ 8

        3.  The Stage of the Proceedings.................................................................... 8

        4.  The Risks of Establishing Liability, Damages, and Class Certification ... 10

        5.  The Ability of the Defendants to Withstand a Greater Judgment............. 11

        6.  The Range of Reasonableness of the Settlement in Light of the Best
            Recovery and All Attendant Risks of Litigation....................................... 12

    C.  The *Prudential* Factors Weigh in Favor of Approval ........................................... 14

III. CONCLUSION.................................................................................................... 15

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alin v. Honda Motor Co.*,
  2012 U.S. Dist. LEXIS 188223 (D.N.J. Apr. 13, 2012) ...........................................................4

*Carson v. Am. Brands*,
  450 U.S. 79 (1981).................................................................................................................2

*Fisher Bros. v. Mueller Brass*,
  630 F. Supp. 493 (E.D. Pa. 1985) .......................................................................................13

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975)........................................................................................ passim

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000)......................................................................................2

*In re Auto. Refinishing Paint Antitrust Litig.*,
  2004 U.S. Dist. LEXIS 29162 (E.D. Pa. Oct. 13, 2004)........................................................5

*In re Cmty. Bank of N. Va.*,
  2008 U.S. Dist. LEXIS 62787 (W.D. Pa. Aug. 14, 2008) ......................................................5

*In re Computron Software*,
  6 F. Supp. 2d 313 (D.N.J. 1998) .................................................................................7, 8, 12

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009)................................................................................................15

*In re Linerboard Antitrust Litig.*,
  292 F. Supp. 2d 631 (E.D. Pa. 2003) ...................................................................................5

*In re Linerboard Antitrust Litig.*,
  321 F. Supp. 2d 619 (E.D. Pa. 2004) ................................................................................13

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................................11

*In re NFL Players Concussion Injury Litig.*,
  2016 U.S. App. LEXIS 6908 (3d Cir. Apr. 18, 2016) ................................................... passim

*In re Packaged Ice Antitrust Litig.*,
  2011 U.S. Dist. LEXIS 17255 (E.D. Mich. Feb. 22, 2011)..................................................14

# TABLE OF AUTHORITIES
## (cont'd)

**Page**

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
584 F. Supp. 2d 697 (M.D. Pa. 2008) .......................................................................13

*In re Processed Egg Prods. Antitrust Litig.*,
284 F.R.D. 278 (E.D. Pa. 2012) ..............................................................................13

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998) .............................................................................. passim

*In re ViroPharma Inc. Sec. Litig.*,
2016 U.S. Dist. LEXIS 8626 (E.D. Pa. Jan. 25, 2016) ...........................................15

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) .............................................................................. passim

*Lazy Oil Co. v. Witco Corp.*,
95 F. Supp. 2d 290 (W.D. Pa. 1997) ......................................................5, 7, 11, 13

*Meijer, Inc. v. 3M*,
2006 U.S. Dist. LEXIS 56744 (E.D. Pa. Aug. 14, 2006)................................4, 8, 13

*Nichols v. Smithkline Beecham Corp.*,
2005 U.S. Dist. LEXIS 7061 (E.D. Pa. Apr. 22, 2005) ...........................................12

*Palamara v. Kings Family Restaurants*,
2008 U.S. Dist. LEXIS 33087 (W.D. Pa. Apr. 22, 2008)...................................8, 13

*Pichler v. UNITE*,
775 F. Supp. 2d 754 (E.D. Pa. 2011) ......................................................................10

*Sowers v. Freightcar Am., Inc.*,
2008 U.S. Dist. LEXIS 94281 (W.D. Pa. Nov. 19, 2008) .......................................10

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011)....................................................................................12

*Texas v. Organon USA Inc.*,
2005 U.S. Dist. LEXIS 27011 (D.N.J. Sept. 13, 2005) ...........................................15

*Yong Soon Oh v. AT&T Corp.*,
225 F.R.D. 142 (D.N.J. 2004)...................................................................................9

# TABLE OF AUTHORITIES
## (cont'd)

**Page**

*Zanghi v. FreightCar Am., Inc.*,
   2016 U.S. Dist. LEXIS 5914 (W.D. Pa. Jan. 19, 2016)....................................................5, 7, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ...........................................................................................................................2, 11

Fed. R. Civ. P. 26 ................................................................................................................................3

Newberg on Class Actions (5th ed. 2015) ...............................................................1, 2, 5, 8, 12

## I.      INTRODUCTION

On April 6, 2016, the Court granted preliminary approval to the Settlement between

UPMC and Plaintiff, finding "that the Settlement falls within the range of reasonableness

meriting possible final approval" and allowing notice to be sent to the Settlement Class.[1]  Dkt.

374 ¶ 1.  For many of the same reasons that it granted preliminary approval, the Court should

now grant final approval.  The Settlement was negotiated at arm's length, before a neutral

mediator, and between Parties with experienced counsel who have investigated and litigated the

merits of this case over the past five years.  Final approval will eliminate substantial risk to both

sides and help defray the significant cost of disputing numerous complex antitrust issues.  In

contrast to a final litigated resolution—which is likely years, experts, and millions of dollars

away—the Settlement ensures Class Members speedy and fair compensation.  In particular, it

requires UPMC to:  (1) pay the Settlement Class $12,500,000; (2) pay all reasonable costs of

notice and administering the Settlement; and (3) provide reasonable cooperation at its own

expense to Plaintiff in pursuing claims against Highmark, all of which are preserved.  *See* Dkt.

346-1 ¶¶ 33, 59, 60.  The Settlement is more than fair and adequate, and it should be approved.

## II.     THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

"[T]here is an overriding public interest in settling class action litigation, and it should

therefore be encouraged."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir.

2004).  Indeed, "'the law favors settlement, particularly in class actions and other complex cases

where substantial judicial resources can be conserved by avoiding formal litigation.'"  *Id*.

(citation omitted); *see also* Newberg on Class Actions § 13:52 (5th ed. 2015) ("Thus, while the

---

[1] Unless otherwise indicated, capitalized terms have the same meanings as set forth in the Agreement and its amendments (Dkt. 346-1, 367-4 & 378-1).

judicial system always favors settlement, it especially welcomes settlement in complex cases such as class suits, and even more so, the more complex the class action.").

Courts approve settlements that are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Third Circuit mandates a three-step process for determining whether a settlement meets that standard.  ***First***, while the burden under Rule 23(e) rests with the settling parties, courts apply a presumption of fairness where certain procedural criteria are met.  *See In re NFL Players Concussion Injury Litig.*, 2016 U.S. App. LEXIS 6908, at *48-49 (3d Cir. Apr. 18, 2016).  ***Second***, whether or not the presumption applies, courts grant final approval after balancing the nine *Girsh* factors for fairness, reasonableness, and adequacy.  *Id.* at *49-60 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).  ***Finally***, pursuant to *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998), courts may also consider whether other discretionary factors support settlement.  In each respect, the Settlement in this case warrants final approval.

## A.    <u>The Proposed Settlement Merits a Presumption of Fairness</u>

The Settlement is presumptively reasonable.  In determining whether to approve a settlement, "the court need not decide the merits of the case nor substitute its judgment of what the case might be worth for that of class counsel."  Newberg § 13:49; *see also Carson v. Am. Brands*, 450 U.S. 79, 88 n.14 (1981).  Rather, the presence of four procedural safeguards means that Class Counsel made an informed, non-collusive choice, and the Court should defer to the judgment of Class Counsel:  "'(1) [T]he negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'"  *NFL Players*, 2016 U.S. App. LEXIS 6908, at *48; *see Warfarin*, 391 F.3d at 535 (applying the presumption); *In re Austrian & German*

2

*Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000) ("If the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation … it is not for the Court to substitute its judgment as to a proper settlement for that of such competent counsel.").

The first three factors are easily met in this case.  As discussed at length in Plaintiff's and UPMC's motion for preliminary approval of their Settlement, *see* Dkt. 346 at 3-7, Plaintiff and UPMC reached their Settlement only after an arm's-length full-day mediation.  The mediation was conducted pursuant to the Court's rules and orders.  *See* Dkt. 312 at 8 (Rule 26(f) report discussing mediation); Dkt. 313 (ordering mediation).  As ordered, the Parties retained a neutral and highly experienced third-party mediator—David Geronemus of JAMS.  *See* Dkt. 317.  The Parties also exchanged extensive mediation statements totaling almost 90 pages and attaching over 75 exhibits.  Moreover, the Parties engaged in significant discovery prior to the mediation, including substantial productions of documents and sworn testimony.  Dkt. 346 at 10-11; *see also infra* at 9-11.  Finally, experienced counsel represented the Parties.  Counsel and their firms have substantial class action and antitrust practices and experience.

The final factor, the reaction of the Class, also to date favors the presumption.  Notice issued to the Class on April 20, 2016, via direct mailing and publication in thirty newspapers.  Thus far, only five of more than ten thousand mailed notices have been returned as undeliverable, the website established for this Settlement has received 883 unique visitors, and there have been 119 calls to the toll-free number designated to provide Class Members with information.  Yet there have been no objections reported to date.[2]

---

[2] After the objection period closes on June 20, 2016, the Parties will submit a supplemental brief apprising the Court of the final reaction of the Class and updating this analysis.

The circumstances thus warrant the presumption of fairness.  This litigation has been hard-fought, with zealous counsel on both sides, and the Class now stands to see millions in direct payments.  The Parties are not seeking approval right after the lawsuit was filed, and the Settlement does not award large sum-certain attorney's fees based on vague relief to the Class. There is no reason to doubt Class Counsel's judgment in agreeing to the Settlement, and the Court should find the Settlement presumptively fair.  *See Meijer, Inc. v. 3M*, 2006 U.S. Dist. LEXIS 56744, at *38-39 (E.D. Pa. Aug. 14, 2006) (applying "presumption of fairness" where "Class Counsel has extensive experience litigating antitrust class actions," parties "exchanged detailed mediation statements," and settlement occurred "after a year of litigation and discovery" and "resulted from arm's-length negotiations that occurred both during the Court-suggested mediation and in the months following").

B.      **The Proposed Settlement Satisfies the *Girsh* Factors**

Regardless of any presumption, the Court should grant final approval for the independent reason that the Third Circuit's nine-factor *Girsh* test overwhelmingly favors approval.  *See Alin v. Honda Motor Co.*, 2012 U.S. Dist. LEXIS 188223, at *31 (D.N.J. Apr. 13, 2012) (final approval warranted under *Girsh* "[e]ven absent the presumption of fairness").  These factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*NFL Players*, 2016 U.S. App. LEXIS 6908, at *49-50 (quoting *Girsh*, 521 F.2d at 157).  The overwhelming balance of the *Girsh* factors supports final approval in this case.

1.      <u>The Complexity, Expense, and Likely Duration of Litigation</u>

An "antitrust class action is arguably the most complex action to prosecute."  *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003) (quoting *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29162, at *23 (E.D. Pa. Oct. 13, 2004) (noting "the general rule that antitrust cases are exceedingly complex, expensive, and lengthy"); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 297 (W.D. Pa. 1997) (first factor supported settlement because the "case involved numerous complex factual and legal issues relating to whether the alleged conspiracy took place and, if so, the damages suffered by the Class"). Moreover, regardless of the cause of action, "[c]omplexity may be demonstrated if the parties have spent significant time and money litigating to the point of settlement."  Newberg § 13:52; *see Zanghi v. FreightCar Am., Inc.*, 2016 U.S. Dist. LEXIS 5914, at *48-49 (W.D. Pa. Jan. 19, 2016) (factor supported settlement where case had already been ongoing for many years); *In re Cmty. Bank of N. Va.*, 2008 U.S. Dist. LEXIS 62787, at *26-27 (W.D. Pa. Aug. 14, 2008) (factor supported settlement where there had been many prior motions and hearings).

This case is no exception to these rules.  It has already had a long and complex history. Plaintiff and UPMC have engaged in three rounds of dispositive motions over the past five years addressing the legal sufficiency of Plaintiff's claims and their likelihood of success at class certification and on the merits.  These motions resulted in six arguments and three opinions by the Court totaling 200 pages.  *See* Dkts. 240, 284, 301.  And the issues raised in these dispositive motions will continue to surface if the claims against UPMC continue—in its last opinion, the Court expressly reserved ruling on several key issues relating to both class certification and the

merits of UPMC's defenses.  *See* Dkt. 301 at 56, 59 (allowing UPMC to raise argument "at a later stage in this litigation" and reminding Plaintiff to produce "sufficient evidence" then).[3]

    If this case goes to trial, UPMC would raise numerous factual and legal defenses to Plaintiff's claims.  Among other things, UPMC would likely argue that no conspiracy was possible because it had an acrimonious relationship with Highmark at all relevant times:  since well before 2011, UPMC and Highmark have been embroiled in litigation and disputes against one another; Pennsylvania's Governor has twice intervened to try to improve their relationship; there are four separate Consent Decrees governing different aspects of their relationship; and there have been many legislative hearings, marketing campaigns, and lobbying efforts pitting one company against the other.  *See* Dkt. 315 (UPMC Answer) at ¶¶ 1, 24.  UPMC could further contend that it had insufficient market power to infringe the antitrust laws; that it suffered from below-market rates due to Highmark's monopoly; and that any overcharges were unilateral acts by Highmark and not done in furtherance of the alleged conspiracy.  *See* Dkt. 301 at 36-40 & n.11, 43-49 (opinion discussing conspiracy).

    On the other hand, Plaintiff would contend that UPMC and Highmark have been engaged in a conspiracy going back to at least 2002, which continued to affect Western Pennsylvania health insurance premiums in 2010-12.  *See* Dkt. 286 (Third Amended Compl.) ¶ 1.  To meet its legal burden, Plaintiff would likely argue that:  UPMC had market power; UPMC received higher reimbursement rates from Highmark in exchange for UPMC's participation in the conspiracy; the filed rate doctrine does not bar its claims; the co-conspirator exception to the indirect purchaser rule applies; and the overcharges were caused by and done in furtherance of the conspiracy.  *See id.* ¶ 22; Dkt. 301 at 36-40 & n.11, 43-49.

_____

    [3] Plaintiff's Motion for Fees and Expenses, filed today as well, describes the time, effort, and cost expended by Plaintiff's counsel to date.

Resolving these complex issues will require extensive litigation.  Under the present case management orders, briefing on class issues does not close until September 26, 2016, a hearing on class certification is set for October, and fact discovery does not close until November 30, 2016.  *See* Nov. 18, 2015 Order ¶¶ 3(B)-(C) (Dkt. 316).[4]  Expert discovery on the merits and summary judgment briefing will likely extend well into 2017, with any trial over a year away. *See id*.  And ultimate resolution may require further post-trial proceedings; Plaintiff has already indicated its intent to appeal the Court's rulings on the filed rate doctrine.  *See* Dkt. 295 at 15 n.8. Final approval will avoid all of that burden, time, and expense.  *See Zanghi*, 2016 U.S. Dist. LEXIS 5914, at *48-49 ("inevitable post-trial motions and appeals" supported settlement).

The need for expert discovery, as well as the motion practice over admissibility that expert evidence often engenders, separately speak to the complexity of the issues and the fairness of the Settlement.  Both Plaintiff and UPMC are likely to present one or more experts on issues going to class certification, liability, and damages, and the Court will be required to assess the reliability and methodology of some or all of these experts prior to trial.  Courts routinely grant final approval where settlement avoids the need to develop and resolve objections to that kind of testimony.  *See Lazy Oil*, 95 F. Supp. 2d at 297 (factor supported settlement where "[t]he complex issues relating to damages were the subject of conflicting testimony by numerous experts on both sides"); *In re Computron Software*, 6 F. Supp. 2d 313, 317 (D.N.J. 1998) (factor supported settlement where the "issues required extensive expert testimony").

---

[4] Plaintiff and Highmark have separately moved to extend the deadlines for class discovery and certification briefing because, in light of threshold discovery disputes that are pending before the Court, Highmark to date "has not produced any documents requested by Plaintiffs."  Motion to Extend Discovery ¶ 10 (Dkt. 384); Response (Dkt. 385).  The motions do not seek to continue the close of merits-based fact discovery on November 30, 2016.

2.      The Reaction of the Class

While the deadline for objection has yet to close, the reaction of the Class to date also favors approval.  *See supra* § II.A & n2.  Despite widespread notice, the Settlement Administrators have not reported any objections or opt-outs.  As noted, Plaintiff and UPMC will supplement this brief to more fully assess this factor.  *See id.*

3.      The Stage of the Proceedings

The third *Girsh* factor also weighs in favor of approval.  Settlements "reached at earlier stages of proceedings, as in the instant case, are favored" because they result in greater cost savings.  *Computron*, 6 F. Supp. 2d at 318; *see also Palamara v. Kings Family Restaurants*, 2008 U.S. Dist. LEXIS 33087, at *7 (W.D. Pa. Apr. 22, 2008) (factor supported settlement "reached at a relatively early stage of the proceedings").

The key is whether "counsel had an adequate appreciation of the merits of the case before negotiating."  *Warfarin*, 391 F.3d at 537.  When applying this factor, "courts will look beyond formal discovery to see if the parties had other avenues to gather information concerning the merits of the case."  Newberg § 13:50; *see NFL Players*, 2016 U.S. App. LEXIS 6908, at *54-55 ("formal discovery is not a requirement for the third *Girsh* factor"); *see also Prudential*, 148 F.3d at 320.  These "other avenues" include "past litigation presenting similar legal issues or factual similarities"; "the results of publicly available government investigations"; and "documents exchanged and witnesses produced informally, perhaps through the mediation process."  Newberg § 13:50; *see NFL Players*, 2016 U.S. App. LEXIS 6908, at *54-55; *see also Prudential*, 148 F.3d at 320 (factor supported settlement where plaintiffs reviewed defendant's documents and had access to materials collected by multi-state investigative task force); *Meijer*, 2006 U.S. Dist. LEXIS 56744, at *38 (approving settlement where parties "had access to the … trial record and the Court's ruling on collateral estoppel" in a related case).

Here, the Settlement negotiations followed factual investigation through months of discovery in both this case and a designated related case, *West Penn Allegheny Health System, Inc. v. UPMC et al.*, No. 2:09-cv-00480-JFC (W.D. Pa.).  Highmark and UPMC produced to Plaintiff files from the Department of Justice's investigation into the alleged conspiracy.  *See* Dkt. 346-4 (Cavanaugh Decl.) ¶¶ 8, 9.  These files include hundreds of thousands of pages of documents, data, and other information, as well as deposition transcripts for sixteen UPMC and Highmark executives—including the then-CEOs of both companies, Kenneth Melani and Jeffrey Romoff—and 349 exhibits thereto.  *See id.*

The Parties also formally engaged in new discovery.  In November 2012, for example, UPMC, West Penn Allegheny Health System ("WPAHS"), and Highmark served responses to interrogatories and related documents.  *See* Dkt. 346-4 ¶ 10.  UPMC also obtained information about Plaintiff through discovery served on Plaintiff and its health insurance broker.  *See id.* ¶ 12.  And the Parties had access to many relevant public documents, including:

> (1) testimony from legislative hearings regarding [Highmark Health Insurance Co. ("HHIC")]; (2) media coverage of the UPMC-Highmark relationship and the market for health insurance and healthcare services in Western Pennsylvania; (3) exhibits and transcripts for the [WPAHS] litigation; (4) information about regulatory proceedings involving Highmark in relation to its attempted merger with Independence Blue Cross and its successful acquisition of the WPAHS.

*Id.* ¶ 6.  This public record directly informed the claims in the case.  *See, e.g., id.* ¶¶ 3, 7 (explaining that Plaintiff's claims were "factually similar" to and "expressly relies on" claims raised in DOJ investigation and WPAHS lawsuit); Dkt. 286 ¶¶ 85, 152 (Plaintiff's complaint citing public materials).  All of this formal and informal discovery weighs in favor of final approval.  *See Yong Soon Oh v. AT&T Corp.*, 225 F.R.D. 142, 149 (D.N.J. 2004) (factor supported approval where "the parties engaged in discovery" as part of earlier administrative proceedings and "confirmatory discovery in connection with the mediation process").

Counsel on both sides also have a strong "grasp of the legal hurdles" needed to prevail. *NFL Players*, 2016 U.S. App. LEXIS 6908, at *48-49; *see Pichler v. UNITE*, 775 F. Supp. 2d 754, 759-60 (E.D. Pa. 2011).  Here, UPMC and Plaintiff have been able to assess the legal merits of the case through multiple rounds of dispositive motions over five years.  *See* Dkts. 240, 284, 301.  These proceedings addressed both the legal sufficiency of Plaintiff's claims, and their likelihood of success at class certification and on the merits.  These years of litigation and discovery have crystallized the legal issues and given both sides appreciation for the legal standards on which their claims and defenses will depend.  *See Sowers v. Freightcar Am., Inc.*, 2008 U.S. Dist. LEXIS 94281, at *8-9 (W.D. Pa. Nov. 19, 2008) (factor supported approval "even before the formal commencement of discovery" because preliminary injunction proceedings made parties "aware of the nature of their respective claims and defenses").

4.    The Risks of Establishing Liability, Damages, and Class Certification

The fourth, fifth, and sixth *Girsh* factors test the "uncertainty on both sides with respect to both liability and damages," as well as obtaining or defeating class certification.  *Zanghi*, 2016 U.S. Dist. LEXIS 5914, at *56.  These factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."  *Prudential*, 148 F.3d at 319.

Here, the complexity of the issues speaks to the risks that both sides would face going forward.  *See supra* § II.B.1.  Although each side is confident it will prevail, Plaintiff and UPMC acknowledge the possibility of a loss at the class certification, summary judgment, or trial stages. The risks to both sides are especially large in this case given what is at stake.  If Plaintiff were to prevail completely, UPMC—a nonprofit corporation—could be liable for hundreds of millions of dollars.  On the other hand, if UPMC were to prevail, Plaintiff would have invested over five

years of attorney time and millions of dollars in litigation expenses with nothing to show for itself or the Class from UPMC.[5]

Moreover, "[t]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998).  Were litigation to proceed here, UPMC will likely present expert analyses of health insurance premiums in Western Pennsylvania and the extent to which hospital costs influenced such premiums during the Class Period to contend that, irrespective of class treatment or liability, no Class Member actually suffered harm caused by UPMC.  Plaintiff would obviously present countervailing analyses, and where "divergent testimony would render the litigation an expensive and complicated 'battle of experts'" on such key issues as damages, "courts have recognized the need for compromise." *Lazy Oil*, 95 F. Supp. 2d at 337 (factor supported settlement where "battle between Plaintiffs' and Defendants' experts would involve sophisticated analyses that might simply be rejected by a jury as speculative or unreliable").  The Settlement eliminates all of these risks and buys valuable peace for both sides.

5.     The Ability of the Defendants to Withstand a Greater Judgment

Whether or not UPMC could satisfy a greater judgment is immaterial under the circumstances of this case.  This *Girsh* factor is relevant "when the defendant's professed inability to pay is used to justify the amount of the settlement," which is not the case here.  *NFL Players*, 2016 U.S. App. LEXIS 6908, at *58 (factor was neutral even though the settlement

---

[5] The risk for Plaintiff is compounded because even if it did prevail at the class certification stage, any order granting litigation class certification "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C).  Thus, while this may be less significant than the other *Girsh* factors, there is always the "possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321.

value may have represented only "a 'fraction of one year's revenues'" for the defendant); *see Warfarin*, 391 F.3d at 538; *see also Computron*, 6 F. Supp. 2d at 320 (skipping factor altogether). The Court already found that "the Settlement falls within the range of reasonableness." Dkt. 374 ¶ 1. Whether or not UPMC—a regional non-profit—could withstand a greater judgment does not undermine the Court's finding or otherwise weigh against final approval.

> 6.      The Range of Reasonableness of the Settlement in Light of the Best Recovery and All Attendant Risks of Litigation

The final two *Girsh* factors are "two sides of the same coin," and courts often analyze them together. *Warfarin*, 391 F.3d at 538; *see NFL Players*, 2016 U.S. App. LEXIS 6908, at *58-59. In determining whether a settlement is reasonable, it is "commonly accepted" for courts to compare the amount of the settlement to the non-trebled damages claimed before any fees and expenses are deducted. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 324-25, 330 (3d Cir. 2011); *see also Warfarin*, 391 F.3d at 538. The Court need not calculate an exact value, but needs to find merely that the settlement is "within the 'ballpark' of reasonableness." Newberg § 13:49 (citation omitted).

The Settlement is well within the ballpark. It offers the Class a favorable percentage of maximum damages, in addition to significant non-monetary benefits. Plaintiff has to date estimated a claim for damages between $100 and $200 million. *See* 4/6/16 Hrg. Tr. at 41:19-42:2, 49:3-25. In that event, the $12.5 million settlement is equal to, at a minimum, 6.25%-12.5% of maximum possible damages, with potential increases due to the *pro rata* allocation procedures. *See* Long-Form Notice at 4-5 (Dkt. 378-3) (explaining how payments to individual Class Members will be calculated). The most conservative estimate is thus well within the range of what courts approve in antitrust cases. *See, e.g.*, *Sullivan*, 667 F.3d at 324 (approving settlement equal to 10.93% of overcharge); *Warfarin*, 391 F.3d at 538-39 (11%); *Nichols v.*

*Smithkline Beecham Corp.*, 2005 U.S. Dist. LEXIS 7061, at *52 (E.D. Pa. Apr. 22, 2005) (9.3%-13.9%); *Lazy Oil*, 95 F. Supp. 2d at 318-19 (5.35%); *see also Palamara*, 2008 U.S. Dist. LEXIS 33087, at *9-10 (approving $4.38 per transaction coupon when statutory penalty was $100).

The Settlement also offers a favorable monetary recovery when compared to the total relevant sales.  Courts in antitrust cases routinely approve settlements of approximately 1-2% of a defendant's relevant sales.  *See, e.g.*, *Fisher Bros. v. Mueller Brass*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving 0.2%, and noting that other defendants settled for between 0.1% and 2.4% of their sales); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) (approving settlement of 1.5% of settling defendant's sales); *Meijer*, 2006 U.S. Dist. LEXIS 56744, at *9-10 (2%); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (1.62%).  In this case, the Settlement represents about 1.1% of the total premiums paid to HHIC during the Class Period, *see* Dkt. 346 at 10, and the Small Group Class is free to pursue additional recovery of the alleged overcharge from Highmark.[6]

In addition to the $12.5 million Settlement Amount, the Settlement also covers all reasonable administration expenses and offers UPMC's reasonable cooperation to the Class in prosecuting its claims against Highmark.  "The provision of such assistance is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement." *Linerboard*, 292 F. Supp. 2d at 643; *see In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 304-05 (E.D. Pa. 2012) (approving settlement where settling defendant's "cooperation pursuant to the settlement aids the Plaintiffs in prosecuting and resolving their claims against the other Defendants").  Additionally, the Settlement acts as an "icebreaker," and courts have long

---

[6] Because it includes a Most-Favored-Nation provision that sets a floor on settlement with Highmark, the Settlement actually helps guarantee that the Class's total recovery—whether assessed as a percent of damages or a percent of relevant sales—will at least double absent a qualifying change in circumstances.

recognized the beneficial role that icebreaker settlements play in encouraging later settlements with other defendants.  *E.g.*, *id.*; *In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 17255, at *50-51 (E.D. Mich. Feb. 22, 2011) (approving "'ice-breaker' settlement" because icebreaker status was "of significant value" to the class).

### C.  The *Prudential* Factors Weigh in Favor of Approval

While the *Girsh* factors favor approving the Settlement, the Court also has the discretion to consider other circumstances consistent with the ultimate goal of "'account[ing] appropriately for the nuances of'" a given settlement and deciding whether it meets Rule 23's "fair, reasonable, and adequate" standard.  *Prudential*, 148 F.3d at 323 (citation omitted).  The Third Circuit has outlined a non-exhaustive list of these *Prudential* factors, including counsel's ability to assess the potential outcome of the case, how the proposed settlement compares to what other claimants might see, and the reasonableness of provisions regarding, *inter alia*, class rights, claims procedures, and attorneys' fees.  *See id.*; *see also NFL Players*, 2016 U.S. App. LEXIS 6908, at *60 (affirming approval in part because "counsel was able to assess the probable outcome of this case, class members had the opportunity to opt out, and the claims process is reasonable").

Here, counsel was well able to assess the complexities, risks, and potential outcome of litigating the claims against UPMC.  *See supra* §§ II.B.1-3.  Other prudential considerations further warrant granting final approval.  **First**, the procedures for implementing the Settlement are themselves fair and reasonable.  UPMC has retained a reputable claims administrator with substantial class action experience, and the *pro rata* allocation plan ensures that individual recoveries are appropriately tailored to the extent of the specific claimant's alleged harm.  The Parties will employ an Escrow Account to hold the Settlement Amount while the claims process

runs its course.[7]  The award of attorneys' fees is not a fixed amount, but remains subject to both objection from Class Members and approval by the Court.  And the Settlement preserves the right of any given Class Member to opt-out.  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 259 n.17 (3d Cir. 2009) (right to opt out supported approval).

**Second**, the Settlement provides all sides complete relief.  There are no other cases, claims, or classes pursuing these kinds of antitrust claims against UPMC.  The Court need not be concerned about disparities in the relief provided because, subject only to opt-out rights, the Settlement secures total peace for UPMC on the claims alleged and entitles all possible claimants to a uniform and fair mechanism for redressing the alleged injury.  Long-running claims can be fully resolved on reasonable grounds that secure the benefits of settlement for all concerned. *See, e.g.*, *In re ViroPharma Inc. Sec. Litig.*, 2016 U.S. Dist. LEXIS 8626, at *42 (E.D. Pa. Jan. 25, 2016) (granting final approval where "there are no known other claimants beyond those represented by the Settlement Class"); *Texas v. Organon USA Inc.*, 2005 U.S. Dist. LEXIS 27011, at *60 (D.N.J. Sept. 13, 2005) (overruling objections and granting final approval in part because "[a]n important part of a settlement like this one is that Defendants achieve 'total peace'").

## III.   **CONCLUSION**

For all of the foregoing reasons, Plaintiff and UPMC respectfully request that the Court grant final approval of the Settlement.

---

[7] The Escrow Account will be administered by a third-party escrow agent and governed by the Escrow Agreement, which establishes the agent's rights and duties.  Pursuant to Paragraph 58 of the Settlement Agreement, a copy of the Escrow Agreement is attached hereto as Exhibit 1.

Respectfully submitted,

 /s/ Rebekah B. Kcehowski
Leon F. DeJulius, Jr. (Pa. No. 90383)
Rebekah B. Kcehowski (Pa. No. 90219)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Tel: (412) 391-3939
Fax: (412) 394-7959
lfdejulius@jonesday.com
rbkcehowski@jonesday.com

Kathy Fenton (*pro hac vice*)
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001-2113
Tel: (202) 879-3939
Fax: (202) 626-1700
kmfenton@jonesday.com

Paul H. Titus (Pa. No. 01399)
Keith E. Whitson (Pa. No. 69656)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place, Suite 2700
Pittsburgh, PA  15222-3001
Tel: (412) 577-5200
Fax: (412) 765-3858
ptitus@schnader.com
kwhitson@schnader.com

*Attorneys for UPMC*

 /s/ Hamish Hume
Hamish Hume (*pro hac vice*)
Melissa Felder Zappala (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
mzappala@bsfllp.com

Arthur H. Stroyd, Jr. (Pa. No. 15910)
Steven J. Del Sole (Pa. No. 73460)
Patrick K. Cavanaugh (Pa. No. 72960)
DEL SOLE CAVANAUGH STROYD LLC
200 1st Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
astroyd@dscslaw.com
sdelsole@dscslaw.com

Andrew M. Stone (Pa. No. 35176)
STONE LAW FIRM, LLC
The Frick Building, Suite 1806
437 Grant Street
Pittsburgh, PA 15219
Tel: (412) 391-2005
Fax: (412) 391-0853
astone@stone-law-firm.com

Scott M. Hare (Pa. No. 63818)
The Frick Building, Suite 1806
437 Grant Street
Pittsburgh, PA 15219
Tel: (412) 338-8632
Fax: (412) 338-6611
scott@scottlawpgh.com

David Stone (*pro hac vice*)
STONE & MAGNANINI LLP
150 JFK Parkway
Short Hills, NJ 07078
Tel: (973) 218-1111
Fax: (973) 218-1106
dstone@stonemagnalaw.com

Dated:  May 6, 2016

*Attorneys for Plaintiff*

16