**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

COLE'S WEXFORD HOTEL, INC., on its
own behalf and on behalf of all others
similarly situated,

        Plaintiffs,

        v.

HIGHMARK INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 10-1609

## OPINION

CONTI, Chief District Judge

### I.    Introduction

Pending before the court in this antitrust lawsuit are objections (ECF Nos. 407, 408) filed

by plaintiff Cole's Wexford Hotel, Inc. ("Cole's Wexford") and defendant Highmark Inc.

("Highmark") to the special master's amended report and recommendation no. 4 (ECF No. 403.).

Cole's Wexford submitted a discovery dispute to the special master appointed in this case to

oversee discovery with respect to whether it may seek from defendant discovery concerning base

rates approved by the Pennsylvania Insurance Department ("PID") and rates actually charged by

Highmark between 1999 and 2001, between 2008 and 2010, and after March 2012. The special

master—citing the filed rate doctrine—recommended that the court deny Cole's Wexford's

discovery requests because Cole's Wexford did not satisfy its burden to show that the

information it seeks is relevant under Federal Rule of Civil Procedure 26. The court agrees with

the special master that Cole's Wexford did not satisfy its burden to show that the information it

requests is relevant. The court will, therefore, adopt the amended report and recommendation no.

4 with respect to that portion of his recommendation, as supplemented by the court's analysis set forth in this opinion.

The court, however, will reject the portion of the amended report and recommendation no. 4 which discussed the construction of the term "relevant" under the 2015 amendments to Federal Rule of Civil Procedure 26. As discussed below, under Rule 26, the court and parties have obligations to analyze the scope of discovery by considering whether the discovery sought is relevant to a party's claims or defenses and proportional to the needs of the case. FED. R. CIV. P. 26(b)(1). Contrary to the analysis in the amended report and recommendation no. 4, discovery requests are not relevant simply because there is a possibility that the information may be relevant to the general subject matter of the action. (ECF No. 403 at 5.) As discussed in more detail below, the special master reached the correct conclusion that Cole's Wexford failed to satisfy its burden under Rule 26 to show that its discovery request is relevant, but did not properly construe the term "relevant" as contemplated by Rule 26. The special master considered relevancy to be as broad as the subject matter, which is broader than the scope of discovery contemplated by Rule 26.

## II.     Procedural History and Background

On October 9, 2012, Cole's Wexford, among other plaintiffs who were later dismissed from this case, filed a second amended complaint against Highmark and then defendant UPMC.[1] (ECF No. 90.) On September 27, 2013, after consideration of motions to dismiss filed by Highmark and UPMC, the parties' submissions related to those motions, and the oral argument presented to the court at a hearing held on July 1, 2013, the court issued an opinion and order

---

[1]     On July 29, 2016, this court approved a settlement agreement between UPMC and Cole's Wexford. (ECF Nos. 414, 415.) UPMC is no longer a defendant in this case.

granting UPMC's and Highmark's motions to dismiss the second amended complaint. (ECF Nos. 240, 241.) The court held the second amended complaint must be dismissed because the measure of damages set forth in the second amended complaint, i.e., the difference between the rates Highmark charged the members of the putative class and the rates it would have charged members of the class but for the alleged UPMC-Highmark conspiracy, implicated the filed rate doctrine, and plaintiffs' claim for tortious interference with existing and prospective contractual relations was time barred. (ECF No. 240 at 1.) The second amended complaint was dismissed without prejudice to plaintiffs seeking leave to file a third amended complaint "to the extent they [were] able to plead, with respect to the antitrust claims, a measure of damages that does not require the court to interfere with the ratemaking authority of the…[PID] and, with respect to the tortious interference claim against UPMC, a basis for fraudulent concealment." (Id. at 80.)

On October 28, 2013, plaintiffs filed a motion for leave to file a third amended complaint, a brief in support of the motion, and the proposed third amended complaint attached to the motion. (ECF No. 249.) On August 21, 2014, the court granted in part and denied in part the motion for leave to file a third amended complaint. The court, among other things:

- denied the motion for leave with respect to the claims asserted by the individual plaintiffs because the measure of damages asserted by those plaintiffs in the proposed third amended complaint was barred by the filed rate doctrine;

- denied the motion for leave with respect to the claims asserted by the small group plaintiffs based upon damages measured by the difference between rates the small group plaintiffs paid to Highmark during the alleged UPMC-Highmark conspiracy and the rates the small group plaintiffs would have paid beginning on March 21, 2012, to Highmark's competitors but for the UPMC-Highmark conspiracy because that measure of damages was barred by the filed rate doctrine;

- granted plaintiffs leave to amend with respect to the small group plaintiffs' claims based upon damages measured by the difference between the rates Highmark charged the small group plaintiffs during the alleged UPMC-Highmark conspiracy and the rates Highmark's excluded and marginalized competitors who were not subject to the PID's

3

rate-filing requirements prior to March 21, 2012, would have charged the small group plaintiffs prior to March 21, 2012, but for the UPMC-Highmark conspiracy;

– granted plaintiffs leave to amend with respect to the small group plaintiffs' claims based upon damages measured by the difference between the rates the small group plaintiffs paid to Highmark's subsidiary Highmark Health Insurance Company during the alleged UPMC-Highmark conspiracy and prior to March 21, 2012, and the rates it would have paid Highmark Health Insurance Company but for the UPMC-Highmark conspiracy;

(ECF No. 284); <u>Royal Mile Co., Inc. v. UPMC and Highmark</u>, 40 F.Supp.3d 552 (W.D. Pa. 2014).

On October 1, 2014, Cole's Wexford filed a third amended complaint. (ECF No. 286.) Cole's Wexford in the third amended complaint alleges that Highmark and UPMC "conspired, agreed, and acted in an organized, orchestrated, and deliberate fashion to control, divide, and/or monopolize both the market for medical care and the market for health insurance," which "resulted in the exclusion of competing insurers from the market." (<u>Id.</u> ¶ 1.) Cole's Wexford defined the class it seeks to represent in this case as "all persons, whether natural or fictitious, who purchased small group health insurance coverage from, or otherwise paid any small group plan premiums or portion thereof to, Highmark Health Insurance Co. ["HHIC"], or a similar for-profit subsidiary of Highmark Inc., between approximately July 1, 2010 and approximately March 21, 2012." (<u>Id.</u> ¶ 11.)

UPMC and Highmark filed motions to dismiss the third amended complaint. (ECF Nos. 288, 290.) On September 1, 2015, the court denied Highmark's motion to dismiss the third amended complaint and granted in part and denied in part UPMC's motion to dismiss the third amended complaint. (ECF Nos. 301, 302.) The court explained, among other things, that "[u]nlike the proposed third amended complaint, the third amended complaint does not set forth a measure of damages barred by the filed rate doctrine." (ECF No. 302 at 39.)

In early 2016, Cole's Wexford submitted to the special master its discovery dispute with respect to base rates approved by the PID and rates actually charged by Highmark between 1999 and 2001, between 2008 and 2010, and after March 2012. On March 9, 2016, the special master filed revised[2] report and recommendation no. 4 with respect to that discovery dispute. (ECF No. 353.) On March 17, 2016, Highmark filed objections to revised report and recommendation no. 4. (ECF No. 359.) On March 31, 2016, Cole's Wexford filed a response in opposition to Highmark's objections. (ECF No. 366.) On April 7, 2016, Highmark filed a reply brief. (ECF No. 372.) The court after review of revised report and recommendation no. 4 and the submissions by Cole's Wexford and Highmark remanded the matter for the parties and special master to conduct an analysis with respect to whether Cole's Wexford's discovery request complied with Federal Rule of Civil Procedure 26, i.e., whether the information sought was relevant and proportional to the case. The court set a briefing schedule for Cole's Wexford to renew its motion with respect to its discovery request with the special master and for the special master to conduct a hearing about the dispute. (H.T. 5/23/16 (ECF No. 397).)

On June 24, 2016, the special master filed the amended report and recommendation no. 4. (ECF No. 403.) In the amended report and recommendation no. 4, the special master, among other things: (1) determined that the only discovery request properly before him was a request for Highmark's base rates and rates Highmark actually charged its customers for specific time periods; (2) determined that under Rule 26 and pursuant to the filed rate doctrine, Cole's Wexford did not satisfy its burden to show that information was relevant to the subject matter of

---

[2] The special master filed a revised report and recommendation no. 4 because the initial report and recommendation no. 4 contained information the parties deemed confidential. The special master filed revised report and recommendation no. 4 to omit the allegedly confidential information.

the litigation; and (3) certain data sought but not specifically identified by Cole's Wexford may be relevant and proportional to this case. (ECF No. 403.)

On July 17, 2016, Cole's Wexford and Highmark each filed objections to the amended report and recommendation no. 4. (ECF Nos. 407, 408.) Cole's Wexford attached to its objections, among other things, the following: (1) a declaration of economist Jeffrey J. Leitzinger ("Leitzinger") (ECF No. 408-2 at 30-37); (2) a declaration of economist Einer R. Elhauge ("Elhauge") (id. at 50-57); and (3) a supplemental declaration of Leitzinger (ECF No. 408-4 at 2.) On July 29, 2016, Cole's Wexford and Highmark filed responses in opposition to each other's objections to the amended report and recommendation no. 4. (ECF Nos. 416, 417.) On August 12, 2016, Cole's Wexford filed a supplement to its objections. (ECF No. 420.) On August 15, 2016, Highmark filed a response to the supplement. (ECF No. 421.)

On August 16, 2016, the court held a hearing with respect to the objections made to the amended report and recommendation no. 4. (H.T. 8/16/16 (ECF No. 423).) The court held on the record that the only issue properly before the special master was "whether or not the Plaintiffs would be able to obtain information concerning rates charged in certain periods by Highmark," which included the rates actually charged and the base rates approved by the PID from 1999 through 2001 and in 2014. (Id. at 3, 44.) In other words, the court held that Cole's Wexford did not properly, i.e., with the requisite specificity, place in issue its discovery requests for various data underlying the rates Highmark charged to its customers during those years. (Id.)

With respect to Cole's Wexford's requests for the base rates approved by the PID and the actual rates charged by Highmark from 1999 through 2001 and in 2014, the court acknowledged that Highmark agreed to provide to Cole's Wexford that information with respect to 2009 and 2013, the year before and year after the class period in this case. (Id.) The court expressed

serious reservations about whether the base rates and rates actually charged by Highmark from 1999 to 2001 and in 2014 were relevant in light of the filed rate doctrine and the evidence submitted by Cole's Wexford. (Id. at 35, 38, 43.) The court also explained that even if it found that information to be relevant, it would need more information from Cole's Wexford and Highmark to assess whether Cole's Wexford's request was proportional to the case. (Id. at 46-50.)

In response to the court's concerns, counsel for Cole's Wexford stated on the record:

Judge, I could go back to the experts and find out if we had some more limited like average rates or something or whatever was filed, if that's even sufficient. I can't speak to that because I haven't asked them that question. But I am certainly willing to go back.

We don't want anything more than what we absolutely need. We are not trying to overburden them. I tried to limit the periods and even reduce them even further just so we have what we absolutely need. So I could go back and ask that question.

And also perhaps -- I know that there are annual reports that sometimes these companies do that have the average rates for a particular group or something, and that might be sufficient too so they wouldn't have to give us every change or every –

(H.T. 8/16/16 (ECF No. 423) at 50-51.) The court responded:

Why don't you find out that information. This goes to the relevancy -- this goes to the proportionality and the burden because there is something to what Highmark is saying, even assuming it's relevant, when you have to go back 17 years and you have to pull up all of this data and you have all of these people that have to work on it. I do understand the need to control certain information, although that warrants putting more of the burden on the party that doesn't want to be open and let some other third party come in. But be that as it may, it is still a significant factor for the Court to consider in terms of what the undertaking would have to be here.

If there's something a lot more discrete that can be more readily determined, it might make the issue easier to resolve. But if -- again, I am still struggling with how you turn a regulated rate as the benchmark for a competitive rate ten years, twelve years later, although I do understand we are looking at what

would be an unregulated rate in – an unregulated competitive rate in the time frame that we're dealing with. So I do appreciate that.

…

What is the minimum really necessary that they would need without having to go back and reconstruct old systems. Because even if I gave you everything you wanted, you wouldn't see this for a long time. That doesn't serve this case well since it's from 2010 and we need to get focused here –

…

-- on getting this case moving. I have got to weigh that too, the timing and that type of thing. So I think that would be very helpful to know that answer at this stage because I could go off on both issues here.

(Id. at 51-52.) The court permitted Cole's Wexford to file a supplemental submission setting forth a more discrete category of base rates and rates actually charged by Highmark and permitted Highmark to respond to that supplemental submission with respect to the proportionality of that request. (Id. at 52-53.)

On August 19, 2016, Cole's Wexford filed a supplement to its objections. (ECF No. 422.) Cole's Wexford, however, did not identify in its supplement a more discrete category of either base rates or rates actually charged by Highmark; rather, Cole's Wexford set forth another discovery request for information including and in addition to the base rates approved by the PID. (Id.) In other words, Cole's Wexford ignored the court's holding that a request for data underlying Highmark's rates was not properly before the special master or the court and that Cole's Wexford should identify a more discrete category of rates that it wanted Highmark to produce. On August 23, 2016, Highmark filed a response to Cole's Wexford's supplement arguing, among other things, that Cole's Wexford did not comply with the court's directive set forth on the record to identify a more discrete category of rates. (ECF No. 425.) Highmark argued Cole's Wexford's supplement requested additional information, which Cole's Wexford did not show was relevant, and Highmark would "face substantial burdens to provide all of the requested data." (Id. at 5.) On August 29, 2016, Cole's Wexford filed a reply to Highmark's

response. (ECF No. 427.) Cole's Wexford in the reply argued that its supplement answered the court's question about whether Cole's Wexford's "experts could base an economic model simply upon publicly filed base rates." (Id. at 2.) Cole's Wexford asserted in its reply that the answer to that question is "yes, but only if (1) Plaintiff's experts have certain additional information for both the pre-conspiracy period and the class period, and (2) Highmark calculated and used base rates during the class period." (Id.) Cole's Wexford in its reply identified five categories of information it is requesting from Highmark. (Id.)

### III.    Standard of Review

The court reviews the special master's findings of fact and conclusions of law de novo. FED. R. CIV. P. 53(f); (ECF No. 92 ¶ 18.) The court may adopt, modify, or reject wholly or in part the report and recommendation. FED. R. CIV. P. 53(f).

### IV.    Discussion

#### A.    Scope of Discovery under the 2015 Amendment to the Federal Rule of Civil Procedure 26

The Federal Rules of Civil Procedure were initially adopted in December 1937. Prudential Ins. Co. of Am. v. U.S. Gympsum Co., 91 F.2d 1080, 1083 (3d Cir. 1993). Rule 26 at that time addressed the taking of depositions. FED. R. CIV. P. 26 advisory committee's note to 1937 adoption. The advisory committee notes to the 1937 adoption of Rule 26 recognized that the "old chancery practice" of limiting discovery "to facts supporting the case of the party seeking it," was "largely abandoned by modern legislation." Id.

Following the 1946 amendments to the rules, Rule 26 still concerned only the taking of depositions. Rule 26 following the 1946 amendments made "clear the broad scope of examination [at a deposition] and that it may cover not only evidence for use at the trial but also

inquiry into matters in themselves inadmissible as evidence but which will lead to the discovery of such evidence." Fed. R. Civ. P. 26 advisory committee's note to 1946 amendment. The advisory committee notes to the 1946 amendment to Rule 26 explain: "The purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of a case." Id.

The 1970 amendment to Rule 26 broadened the scope of Rule 26 to include "all of the discovery devices provided in the discovery rules." Fed. R. Civ. P. 26 advisory committee's note to 1970 amendment. Rule 26(b) was "recast to cover the scope of discovery generally" and "regulate…any of the discovery devices" listed in the rule. Id. The Supreme Court in Oppenheimer Fund Inc. v. Sanders, 437 U.S. 340, 351 (1978), discussed the scope of discovery under the 1970 amendments to Rule 26(b)(1). That 1970 version of Rule 26(b)(1) provided:

> "**Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action**, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

Oppenheimer, 437 U.S. at 351-52 (quoting Fed. R. Civ. P. 26(b)(1) (1970)) (emphasis added). The Supreme Court in Oppenheimer explained: "The key phrase in this definition—'relevant to the subject matter involved in the pending action'—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer, 437 U.S. at 351-52 (quoting Fed. R. Civ. P. 26(b)(1) (1970) (current version at Fed. R. Civ. P. 26(b)(1) (2015)).

The advisory committee in its notes to the 1980 amendment to Rule 26 acknowledged for the first time that there was "widespread criticism of abuse of discovery" under that rule. FED. R. CIV. P. 26 advisory committee's note to 1980 amendment. The advisory committee considered a change to the text of Rule 26 to combat the abuse of discovery, but determined that a textual change was not necessary. Id. The advisory committee concluded that "abuse can best be prevented by intervention by the court as soon as abuse is threatened." Id. The 1980 amendment to Rule 26 authorized and encouraged court intervention in discovery disputes when necessary. Id.[3]

---

[3]    Rule 26(f) following the 1980 amendment provided:

(f) DISCOVERY CONFERENCE. At any time after commencement of an action the court may direct the attorneys for the parties to appear before it for a conference on the subject of discovery. The court shall do so upon motion by the attorney for any party if the motion includes:

(1) A statement of the issues as they then appear;

(2) A proposed plan and schedule of discovery;

(3) Any limitations proposed to be placed on discovery;

(4) Any other proposed orders with respect to discovery; and

(5) A statement showing that the attorney making the motion has made a reasonable effort to reach agreement with opposing attorneys on the matters set forth in the motion. Each party and his attorney are under a duty to participate in good faith in the framing of a discovery plan if a plan is proposed by the attorney for any party. Notice of the motion shall be served on all parties.  Objections or additions to matters set forth in the motion shall be served not later than 10 days after service of the motion.

Following the discovery conference, the court shall enter an order tentatively identifying the issues for discovery purposes, establishing a plan and schedule for discovery, setting limitations on discovery, if any; and determining such other matters, including the allocation of expenses, as are necessary for the

The advisory committee notes to the 1983 amendment to Rule 26 further discussed the abuse of discovery by litigants, which remained a concern of the advisory committee continuing up to the 2015 amendment to Rule 26. FED. R. CIV. P. 26 advisory committee's note to 1983 amendment. The advisory committee notes to the 1983 amendment provide:

> Excessive discovery and evasion or resistance to reasonable discovery requests pose significant problems. Recent studies have made some attempt to determine the sources and extent of the difficulties.
> …
>
> The purpose of discovery is to provide a mechanism for making relevant information available to the litigants. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). Thus the spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues by overuse of discovery or unnecessary use of defensive weapons or evasive responses. All of this results in excessively costly and time-consuming activities that are disproportionate to the nature of the case, the amount involved, or the issues or values at stake.
>
> Given our adversary tradition and the current discovery rules, it is not surprising that there are many opportunities, if not incentives, for attorneys to engage in discovery that, although authorized by the broad, permissive terms of the rules, nevertheless results in delay.…As a result, it has been said that the rules have "not infrequently [been] exploited to the disadvantage of justice." Herbert v. Lando, 441 U.S. 153, 179 (1979) (Powell, J., concurring). These practices impose costs on an already overburdened system and impede the fundamental goal of the "just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1.

---

proper management of discovery in the action. An order may be altered or amended whenever justice so requires.

Subject to the right of a party who properly moves for a discovery conference to prompt convening of the conference, the court may combine the discovery conference with a pretrial conference authorized by Rule 16.

FED. R. CIV. P. 26(f) (1980) (current version at FED. R. CIV. P. 26(b)(1) (2015)).

FED. R. CIV. P. 26 advisory committee's note to 1983 amendment. The 1983 amendment[4] to Rule 26(b)(1) added a paragraph to the rule. Id. The first sentence of the new paragraph was added to "deal with the problem of over-discovery." Id. The new paragraph, in its entirety, provided:

> The frequency or extent of use of the discovery methods set forth in subdivision (a) shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to

---

[4] Rule 26(b)(1) following the 1983 amendment provided:

> (b) **Discovery Methods**. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
>
> (1) *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.
>
> The frequency or extent of use of the discovery methods set forth in subdivision (a) shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation. The court may act upon its own initiative after reasonable notice or pursuant to a motion under subdivision (c).

FED. R. CIV. P. 26(b)(1) (1983) (current version at FED. R. CIV. P. 26(b)(1) (2015)).

obtain the information sought; or (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation. The court may act upon its own initiative after reasonable notice or pursuant to a motion under subdivision (c).

FED. R. CIV. P. 26(b)(1) (1983) (current version at FED. R. CIV. P. 26(b)(1) (2015)). The advisory committee notes explain:

> The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry. The new sentence is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse. The grounds mentioned in the amended rule for limiting discovery reflect the existing practice of many courts in issuing protective orders under Rule 26(c).

FED. R. CIV. P. 26 advisory committee's note to 1983 amendment.

The 1983 amendment to Rule 26(b) encouraged attorneys and the court to prevent abuse in discovery. Id. For example, the advisory committee notes instruct attorneys to "be sensitive to the comparative costs of different methods of securing information," and "to think through their discovery activities in advance so that full utilization is made of each deposition, document request, or set of interrogatories." Id. The 1983 amendment to Rule 26(b) also "contemplate[d] greater judicial involvement in the discovery process." Id. The 1983 amendment to Rule 26(b) addressed the proportionality of discovery in consideration of the following factors: a case's nature and complexity, the importance of the issues at stake, the limitations of a financially weak litigant, and the significance of the substantive issues. Id.

The 1993 amendments to the rules did not change the text of Rule 26(b)(1). The advisory committee in its notes to the 1993 amendment, however, acknowledged "[t]he information explosion of recent decades," which "greatly increased both the potential cost of wide-ranging

discovery and the potential for discovery to be used as an instrument for delay or oppression."

Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment.

In 2000, the text of Rule 26(b)(1) was amended and provided:

**(b) Discovery Scope and Limits.**

**(1)** *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: **Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense**-- including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. **For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.** Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

Fed. R. Civ. P. 26(b)(1) (2000) (current version at Fed. R. Civ. P. 26(b)(1) (2015) (emphasis added). The advisory committee notes to the 2000 amendment to Rule 26(b)(1) once again reflect the advisory committee's concerns about parties engaging in and courts permitting overbroad discovery. Those notes provide, in relevant part:

**Subdivision (b)(1).** In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language. This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery. Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language. Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. Discovery and Disclosure Practice, supra, at 44-45 (1997). The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on

the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that **the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.** The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

…

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.

FED. R. CIV. P. 26(b)(1) advisory committee's note to 2000 amendment.

The 2015 amendments to the Federal Rules of Civil Procedure became effective on December 1, 2015. The current and amended version of Rule 26(b)(1), does not contain any reference to the subject matter of the action. Amended Rule 26(b)(1) provides:

**(b) Discovery Scope and Limits.**

**(1)** *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: **Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case**, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to

relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1) ("amended Rule 26") (emphasis added).

Despite the textual changes made to Rule 26(b)(1), the advisory committee notes explain that the meaning and import of Rule 26(b)(1) remains the same, i.e., the court and parties have obligations to analyze whether the discovery sought is relevant to a party's claims or defenses and proportional to the needs of the case.

The text of the amended rule following the 2015 amendment no longer provides that a court, based upon good cause, may order discovery "of any matter relevant to the subject matter involved in the action." FED. R. CIV. P. 26(b)(1) (2000). The amended rule omits that sentence in its entirety. The advisory committee notes accompanying the 2015 amendments explain, in relevant part:

> The amendment deletes the former provision authorizing the court, for good cause, to order discovery of any matter relevant to the subject matter involved in the action. The Committee has been informed that this language is rarely invoked. Proportional discovery relevant to any party's claim or defense suffices, given a proper understanding of what is relevant to a claim or defense. The distinction between matter relevant to a claim or defense and matter relevant to the subject matter was introduced in 2000. The 2000 Note offered three examples of information that, suitably focused, would be relevant to the parties' claims or defenses. The examples were "other incidents of the same type, or involving the same product"; "information about organizational arrangements or filing systems"; and "information that could be used to impeach a likely witness." Such discovery is not foreclosed by the amendments. Discovery that is relevant to the parties' claims or defenses may also support amendment of the pleadings to add a new claim or defense that affects the scope of discovery.

FED. R. CIV. P. 26(b)(1) advisory committee's note to 2015 amendment.

The standing committee recognized that previous versions of Rule 26(b)(1) contained a distinction between "party-controlled discovery" and "court-controlled discovery." Committee

on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Bankruptcy and Civil Procedure – Request for Comment (2013), available at http://www.regulations.gov/#!documentDetail;D=USC-RULES-CV-2013-0002-0001. The standing committee defined party-controlled discovery under the 2000 amendments to Rule 26(b)(1) to include "matter that is relevant to any party's claim or defense," while court-controlled discovery was limited to "any matter relevant to the subject matter involved in the action." Id. The standing committee acknowledged that its proposed 2015 amendments deleted the sentence authorizing court-controlled discovery of any matter relevant to the subject matter involved in the action, and, that under the proposed rule, "[d]iscovery should be limited to the parties' claims or defenses." Id. at 265.

Following the 2015 amendments becoming effective, however, courts—as noted by the special master in this case—continue to hold that discovery is relevant under 26(b)(1) if there is "'any possibility that the information may be relevant to the general subject matter of the action.'" (ECF No. 403 (quoting Kegerise v. Susquehanna Twp. Sch. Dist., Civ. Action No. 14-0747, 2016 WL 2736048, at *1 (M.D. Pa. May 11, 2016).) This statement of the law prior to the 2015 amendment was—at best—incomplete, and, now, following the 2015 amendments is erroneous. That interpretation of Rule 26(b)(1), furthermore, is contrary to the advisory committee's pervasive and continuing concerns about the abuse of discovery, which stem back to the 1980 amendment to Rule 26.

Any holding—following the 2000 amendment to Rule 26(b)(1)—that the scope of discovery was controlled by any matter relevant to the subject matter involved in the action was erroneous because those holdings omitted the important distinction found in the text of the rule

between party-controlled discovery and court-controlled discovery. Following the 2000 amendments, party-controlled discovery was limited in scope by the claims or defenses in a case, and court-controlled discovery was limited in scope by the subject matter of the litigation. The 2015 amendment to Rule 26(b)(1) "deleted the 'subject matter involved in the action' from the scope of discovery," i.e., deleted a court's authority to order discovery of matter relevant to the subject matter of a case. Now, under amended Rule 26, the scope of all discovery is limited to matter that is relevant to the claims or defenses in the case *and* proportional to what is at stake in a given case. In other words, the scope of discovery is limited to party-controlled discovery.

The special master in this case cited decisions in which the courts relied upon Oppenheimer in support of a broad construction of the term "relevant," i.e., referencing the subject matter, with respect to amended Rule 26(b)(1). (ECF No. 403 (citing Green v. Cosby, 314 F.R.D. 164, 171 (E.D. Pa. 2016); Henry v. Morgan's Hotel Grp., Inc., Civ. Action No. 15-1789, 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016); State Farm Mut. Auto. Ins. Co. v. Fayda, Civ. Action No. 14-9792, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015).) The reliance on Oppenheimer, however, is misplaced. The Supreme Court in Oppenheimer, did not construe just the term "relevant;" rather, the Supreme Court construed the phrase "relevant to the subject matter involved in the pending action," which is a phrase that no longer appears in amended Rule 26(b)(1). The Court's definition of "relevant to the subject matter involved in the pending action," therefore, has no application to the text of amended Rule 26(b)(1), and it would be inappropriate to continue to cite to Oppenheimer for the purpose of construing the scope of discovery under amended Rule 26(b)(1). As set forth in the advisory committee notes to the 2015 amendments to Rule 26(b)(1) and the standing committee's commentary with respect to its proposed 2015 changes to Rule 26(b)(1), the scope of discovery is limited to matter that is

relevant to claims or defenses and is proportional to the needs of a case. For the foregoing reasons, the court rejects the amended report and recommendation no. 4 with respect to the special master's statement that "'[d]iscovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action.'" (ECF No. 403 (quoting <u>Kegerise</u>, 2016 WL 2736048, at *1.)[5]

**B. Relevant to claims or defenses**

**1. The amended report and recommendation no. 4**

The issue properly before the special master in the amended report and recommendation no. 4 was whether Cole's Wexford's requests for Highmark to produce the base rates and actual rates charged by Highmark from 1999 to 2001 and in 2014 were relevant and proportional to the needs of this case. Cole's Wexford attempted to show that the information was relevant through the declarations of Leitzinger and Elhauge. Leitzinger in his declarations sets forth an explanation of how he would use the rates from 1999 to 2001 to arrive at an overcharge calculation in this case, i.e., a dollar amount that represents the difference between what HHIC actually charged to Cole's Wexford and what HHIC would have charged Cole's Wexford but for the alleged UPMC-Highmark conspiracy. Leitzinger explained:

> Because the amount of overcharge depends on these situationally specific circumstances, **the primary focus in constructing the but for world, if possible, is to find a period during which the same market participants were competing in this same market environment free of the effects of the specific anticompetitive behavior at issue.** Once such a period is established the corresponding prices provide an extremely useful benchmark for prices that would have prevailed during the period associated with the antitrust violation but for the anticompetitive behavior after appropriate adjustments are made.

---

[5] The court notes, however, that the special master entitled the section of the amended report and recommendation no. 4 in which he discusses the relevancy of the information requested by Cole's Wexford as "Bearing on Claims and Defenses / Limitations imposed by the Filed Rate Doctrine." (ECF No. 403 at 9.)

This is the role contemplated for the pricing information that has been requested from January 1, 1999 to December 31, 2011, what I refer to as the "earlier benchmark period." Based on the allegations in the Third Amended Complaint, the conspiracy alleged in this case began in 2002. Accordingly, the three years from January 1, 1999 to December 31, 2001 provide a useful window into the kind of market results that would have occurred but for the conspiracy alleged in this case. With insurance premiums from that period in hand, there would then be various ways using data both from that geographic market and other competitors geographic markets)—including, simple extrapolations of the premium levels, extrapolations including adjustments for increased costs or changing demand, and/or econometric modeling—to predict premiums that would have prevailed during the Class period but for the conspiracy (i.e., during the prior from July 1, 2919 to March 21, 2012). Premium data from the earlier benchmark period is uniquely valuable for this purpose because, based on the allegations in the Complaint, there is no other period since then in which the alleged conspiracy and anticompetitive conduct was not occurring or, as is explained in more detail below, may not have acted in some fashion to influence the economic environment.

(ECF No. 408-2 at 32 ¶¶ 8-9 (emphasis added).) Leitzinger explained he would use the base rates and actual rates charged by Highmark in 2014 in relationship to the base rates and actual rates charged by Highmark from 1999 to 2001, i.e., he would use the rates from 2014 to determine how long it took for the effects of the alleged UPMC-Highmark conspiracy to dissipate, which would enable him "to identify a trend over time towards lower premiums which (through extrapolation) could then be used to identify premiums that would have prevailed had the conspiracy never occurred in the first place." (Id. ¶ 15.) Leitzinger further explained that he would use the 2014 base rates and actual rates charged by Highmark to analyze "the extent to which factors independent of the conspiracy or anticompetitive conduct may have caused prices to change from 1999 to the present." (Id. ¶ 16.)[6]

---

[6]  Leitzinger's supplemental declaration provides, in pertinent part:

According to Elhauge's declaration, Cole's Wexford retained him to show that the "issues of antitrust economics raised by the proposed class's claims against Highmark can be resolved on a classwide basis using methodologies and evidence that are common [to] the class." (ECF No. 408-2 at 52 ¶ 4.) Elauge's declaration provides that the base rates and actual rates charged by Highmark from 1999 through 2001 and in 2014 "can assist in understanding the relevant markets before, during, and after the alleged conspiracy period without questioning the appropriateness of the rates filed by Highmark with the Pennsylvania Insurance Department during these times." (ECF No. 408-2 at 53 ¶ 7.) Elhauge explained that the information can be used to:

- show the degree of market power held by relevant market participants before, during, and after the alleged conspiracy conduct (Id. ¶ 9);

- define the relevant antitrust market (Id. ¶ 10);

- determine "whether the actions undertaken by Highmark…would have been in its rational self-interest if those actions had been undertaken standing alone, separate from other components of the alleged conspiracy" ((Id. ¶ 11); and

- "determine the ways in which rivals' abilities or incentives to compete were altered by the alleged conspiracy conduct" (Id. ¶ 13.)

The special master reviewed the declarations of Leitzinger and Elhauge and considered the proposed uses of the base rates and rates actually charged by Highmark from 1999 through 2001 and in 2014 to determine whether Cole's Wexford met its burden to show that the

---

**3. If you construct a model that identifies overcharges during the class period of 2010-2012, does this necessarily mean that the model will identify overcharges between 2002 and July 2010, and after March 2012?**
4. No it does not. In order to determine whether or not there were overcharges during those other periods one would have to apply the overcharge model to those periods, accounting for other factors relevant to rates during those periods. That is not an analysis I plan to undertake. Nor have I been asked by counsel to do so.
(ECF No. 408-4 ¶¶ 3-4.)

information requested is relevant. (ECF No. 403 at 10-12.) The special master determined that each of the proposed uses proffered by Cole's Wexford via the declarations of Leitzinger and Elhauge required the court to "insert itself into the rate setting process," which is forbidden by the filed rate doctrine. (ECF No. 403 at 12.) The special master explained that the "proposed use of the actual rates themselves is not likely to produce admissible evidence that will assist in resolving the question of damages…[because] [i]f the Court were to admit damages evidence which itself was constructed using a baseline established through the use of the filed rate doctrine data, it would necessarily insert itself into the rate setting process." (ECF No. 403 at 12.)

The special master concluded that under those circumstances the information requested by Cole's Wexford was not relevant because "such information is not likely to assist in resolving the question of damages," i.e., there is "no potential use for this data because any damage calculation derived from it would itself be inadmissible." (Id. at 14.) The special master noted that with respect to Elhauge's proposed uses of the base rates and rates actually charged by Highmark, "[p]laintiff does not explain how these concepts are relevant to the damages claim that is at issue in this matter." (ECF No. 403 at 10 n.5.)

### 2. The filed rate doctrine

This court discussed in detail the filed rate doctrine in three of its previous opinions. (ECF Nos., 240, 284, 301.) Because of the important implications the filed rate doctrine has on the discovery dispute presently before the court, a further discussion of the doctrine is warranted here.

The filed rate doctrine "'bars antitrust suits based on rates that have been filed and approved by federal agencies'" and state agencies. McCray v. Fidelity Nat'l Title Ins. Co., 682 F.3d 229, 236 (3d Cir. 2012) (quoting Utilimax.com, Inc. v. PPL Engery Plus, LLC, 378 F.3d

303, 306 (3d Cir. 2004)).

> When the filed rate doctrine applies, it is rigid and unforgiving. Indeed, some have argued that it is unjust. *See, e.g.,* <u>Fax Telecommunicaciones Inc. v. AT & T</u>, 138 F.3d 479, 491 (2d Cir.1998); <u>Ting v. AT&T</u>, 319 F.3d 1126, 1131 (9th Cir.2003). It does not depend on "the culpability of the defendant's conduct or the possibility of inequitable results," nor is it affected by "the nature of the cause of action the plaintiff seeks to bring." <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 58 (2d Cir.1998). It applies whenever a claim would implicate its underlying twin principles of "preventing carriers from engaging in price discrimination as between ratepayers" and "preserving the exclusive role of federal agencies in approving rates." <u>Id.</u>

<u>Simon v. KeySpan Corp.</u>, 694 F.3d 196, 205 (2d Cir. 2012).[7] The filed rate doctrine's genesis is

---

[7] The filed rate doctrine applies when a plaintiff's claim implicates *either* of the doctrine's underlying principles of

> (1) "preventing carriers from engaging in price discrimination as between ratepayers," and (2) "preserving the exclusive role of ... agencies in approving rates ... by keeping courts out of the rate-making process," a function that "regulatory agencies are more competent to perform."

<u>McCray</u>, 682 F.3d at 241 (quoting <u>Marcus</u>, 138 F.3d at 58-59). The first principle, known as the "non-discrimination strand," "recognizes that 'victorious plaintiffs would wind up paying less than non-suing ratepayers.'" <u>McCray</u>, 682 F.3d at 242 (quoting <u>Wegoland Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 21 (2d Cir. 1994)). The nondiscrimination strand is not implicated in this case because Cole's Wexford is suing Highmark on behalf of a putative class. <u>McCray</u>, 682 F.3d at 242. It is, therefore, "unlikely that a victory would allow [plaintiffs] to pay less than other ratepayers." <u>McCray</u>, 682 F.3d at 242.

The second principle is known as the "nonjusticiability strand" and recognizes:

> "(1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set ... rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." <u>Sun City Taxpayers' Assoc. v. Citizens Utils. Co.</u>, 45 F.3d 58, 62 (2d Cir.1995).

<u>McCray</u>, 682 F.3d at 242. A primary concern of the nonjusticiability strand is "preventing courts from engaging in the ratemaking process." <u>McCray</u>, 682 F.3d at 242. The court having to calculate the legal rate but for the defendant's antitrust violations "alone is enough to implicate the nonjusticiability principle." <u>Id.</u>; <u>In re N.J. Title Ins. Litig.</u>, 683 F.3d at 457 ("[T]he nonjusticiability strand recognizes that federal courts are ill-equipped to engage in the rate making process, which does not depend on whether agencies actually use their superior expertise.").

found in <u>Keogh v. Chicago & Northwestern Ry. Co.</u>, 260 U.S. 156 (1922), and its progeny.

In <u>Keogh</u>, the Court held a shipper could not maintain an antitrust lawsuit based upon rates charged by railroad carriers who allegedly conspired together to fix freight transportation rates because "every rate complained of had been duly filed by the several carriers with the Interstate Commerce Commission." <u>Keogh</u>, 260 U.S. at 160. The shipper argued that competition was eliminated pursuant to the conspiracy, which caused the increase in his rates. <u>Id.</u> at 161. The shipper sought damages measured by the difference between the rates charged pursuant to the conspiracy and the rates charged prior to the conspiracy going into effect. <u>Id.</u> at 160. The Court dismissed the lawsuit identifying four reasons for its decision:

- First, the Court reasoned that the rates charged to the shipper were determined by the Interstate Commerce Commission to be "reasonable and nondiscriminatory," and it would be improper for the court to hold the carriers liable based upon approved legal rates. <u>Keogh</u>, 260 U.S. at 162-63.

- Second, the Court held that to permit the shipper to recover the difference between the rate charged and a hypothetical lower rate would defeat the purpose of Congress to prevent rate discrimination by "operat[ing] to give [the shipper] a preference over his trade competitors."[8] <u>Id.</u> at 163.

- Third, the Court found the shipper's injury was based upon hypothesis. <u>Id.</u> at 163. The Court explained:

> The burden resting upon the plaintiff would not be satisfied by proving that some carrier would, but for the illegal conspiracy, have maintained a rate lower than that published. It would be necessary for the plaintiff to prove, also, that the hypothetical lower rate would have conformed to the requirements of the Act to Regulate Commerce. For unless the lower rate was one which the carrier could have maintained legally, the changing of it could not conceivably give a cause of action. To be legal a rate must be nondiscriminatory.

---

[8]     The Court rejected the argument that to avoid discriminatory rates all shippers injured may sue to recover based upon the difference in rates. <u>Keogh</u>, 260 U.S. at 164. The Court reasoned that it was "highly improbable" all courts and juries would provide each shipper "the same measure of relief." <u>Id.</u>

But it is the Commission which must determine whether a rate is discriminatory; at least, in the first instance….But by no conceivable proceeding could the question whether a hypothetical lower rate would under conceivable conditions have been discriminatory, be submitted to the Commission for determination. And that hypothetical question is one with which plaintiff would necessarily be confronted at a trial.

Id. at 164.

- Fourth, the Court refused to award damages under those circumstances because the alleged damages, based upon a hypothetical rate that should have been charged, were "purely speculative." Id. at 164. The Court explained:

[R]ecovery cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted. These damages must be proved by facts from which their existence is logically and legally inferable. They cannot be supplied by conjecture.1 To make proof of such facts would be impossible in the case before us. It is not like those cases where a shipper recovers from the carrier the amount by which its exaction exceeded the legal rate. Southern Pacific Co. v. Darnell-Taenzar Co., 245 U. S. 531, 38 Sup. Ct. 186, 62 L. Ed. 451. Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers. Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate might not have benefited him. Every competitor was entitled to be put-and we must presume would have been put-on a parity with him. And for every article competing with excelsior and tow, like adjustment of the rate must have been made. Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him. The benefit might have gone to his customers, or conceivably, to the ultimate consumer.

Id. at 164-65.

The Court, based upon the foregoing rationale, affirmed the decision of the Court of Appeals for the Seventh Circuit dismissing the shipper's claims against the carriers. Id. at 165.

The Court applied the principles set forth in Keogh in Square D Co. v. Niagara Frontier

Tariff Bureau, Inc., 476 U.S. 409 (1986). In Square D, a class of shippers sued motor carriers and the ratemaking bureau for conspiring to fix rates for transporting freight. Square D, 476 U.S. at 412. The shippers requested treble damages measured by the difference between the rates they paid and rates they would have paid "in a freely competitive market." Id. at 413. The district court relied on Keogh and dismissed the shippers' claims for damages. Id. at 414. The court of appeals affirmed the district court's decision with respect to the filed rates. Id. The shippers appealed to the Supreme Court of the United States. Id. at 410. The Supreme Court declined to distinguish Keogh from the case before it based upon the rates that were charged to the shippers not being "challenged in a formal ICC hearing before they were allowed to go into effect." Id. at 417. The Court in Square D noted that the rates were "duly submitted, lawful rates under the Interstate Commerce Act in the same sense that the rates filed in Keogh were lawful," and the shippers under those circumstances were precluded from maintaining "a treble-damages antitrust action." Id. at 418.

In In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144, 1159 (3d Cir. 1993), the Third Circuit Court of Appeals held the filed rate doctrine does not preclude claims for damages **based upon non-rate anticompetitive conduct**. In that case, several groups of plaintiffs sued railroad companies alleging the railroad companies conspired "to eliminate competition and monopolize the transportation and handling of iron ore." Id. at 1152. The plaintiffs alleged:

> Railroad officials orally agreed that leases of railroad docks or facilities should be examined or modified to frustrate the efforts of non-railroad docks to handle ore from self-unloaders. They also agreed to refuse to provide competitively-priced inland rail service, i.e., to publish commodity line haul rates for moving ore from such docks. Finally, it was agreed that railroad docks should assess the same handling charges for unloading ore from bulkers as from self-unloaders, regardless of the extent of service performed.

To effectuate the goal of market preclusion, the railroads used coercion to enforce adherence to the agreement to foreclose competition from private docks. B & LE and its co-conspirators did indeed restrict the lease and sale of railroad-owned dock property and boycotted non-railroad docks. These activities eliminated much of the economic incentives to use self-unloaders. By impeding the progress of the private dock system, the railroads were also effective in foreclosing competition from trucks.

Id. at 1153. The issue before the court of appeals relevant to this case was whether the plaintiffs' claims for treble damages based upon allegations that the railroads "conspired to preclude competition in which ICC-approved rates played a role in thwarting market entry" were barred under Keogh and Square D. Id. at 1158.

With respect to the steel company-plaintiffs, the district court in Lower Lake Erie dismissed their claims for damages based upon rates filed by the railroads and "any damage claims that would require estimating what rates the ICC would have accepted, an estimation forbidden by *Keogh*." Lower Lake Erie, 998 F.2d at 1158. The district court permitted two of the steel company-plaintiffs' claims against the railroads to proceed. Id. The district court described those claims as follows:

"(1) [a claim] that [the steel companies] could have paid lower dock-handling rates (sooner) to the private docks than they did to the railroad docks if the railroads had not retarded the development of the self-unloader industry; and

(2) [a claim] that [the steel companies] could have paid lower land transport rates (sooner) to the truckers, had the railroads not restrained competition by that industry and monopolized linehauling from their docks."

Lower Lake Erie, 998 F.2d at 1158 (quoting In re Lower Lake Erie Iron Ore Antitrust Litig., 759 F.Supp. 219, 234 (E.D. Pa. 1991)). The district court reasoned that with respect to those claims, the "plaintiffs' damages [did] not depend on proof of price-fixing by defendants, which Keogh would bar, but **on proof that defendants conspired to exclude low cost competitors from the**

**market**, which does not implicate the ICC's exclusive jurisdiction and therefore is not barred by *Keogh*." Lower Lake Erie, 998 F.2d at 1158 (emphasis added). The district court also determined that one of the plaintiffs' "claims for damages emanating from the delay in the construction and use of [its] own dock facilities" was not barred under Keogh. Id. at 1159. The district court noted that to bar such a claim "would overextend *Keogh's* reach and could produce a rule that one who pays for services governed by ICC tariffs is foreclosed from asserting that antitrust violations prevented use of a less expensive, equivalent service." Id.

The Court of Appeals for the Third Circuit affirmed the decision of the district court with respect to the steel company-plaintiffs holding "the district court correctly characterized [the railroads'] anti-competitive activity as market preclusion, and Keogh's protective rule cannot apply to forbid recovery for the resulting economic detriment." Lower Lake Erie, 998 F.2d at 1159. The court of appeals held:

> As the Supreme Court has succinctly stated, *Keogh* merely prevents private shippers from sustaining an award of treble damages by claiming that ICC-approved rates were the product of an antitrust violation. *Square D*, 476 U.S. at 422, 106 S.Ct. at 1929. That statement of *Keogh's* protection does not preclude liability based on non-rate anticompetitive activity. Indeed, the steel companies' case involves damage claims **based on non-rate activity that targeted potential low-cost competitors.**

Lower Lake Erie, 998 F.2d at 1159 (emphasis added). The court acknowledged "that the success of anticompetitive non-rate activity would coincidentally implicate rates," but noted the rates charged by the railroad in that case were "ancillary" to the steel company-plaintiffs' claims. Id. The court instructed:

> It is fully consistent with *Keogh*…to accept these rates as lawful and nonetheless to conclude that through non-rate activities, particularly the restriction on the sale or lease of dock space and the refusal to deal with potential competitors, the railroads effectively retarded entry of lower cost competitors to the market. The instrument of damage to the steel companies was the absence of

the lower-cost combination. In contrast, the Supreme Court in *Keogh* made it clear that "the instrument by which *Keogh* is alleged to have been damaged is rates approved by the Commission." 260 U.S. at 161, 43 S.Ct. at 49.

Lower Lake Erie, 998 F.2d at 1159. The court stressed that the plaintiffs in Lower Lake Erie met their burden by showing "the railroads conspired to protect their stronghold in the ore transport market by blocking entry by low-cost competitors, not that the railroads charged an unlawful rate." Id. This was in contrast to the shipper's burden in Keogh—which the Court found the shipper could not meet—to prove that but for the conspiracy a carrier would have charged him a lower rate **and** the lower rate would have been approved by the ICC. Id.

The measure of damages in Lower Lake Erie was the difference between the approved rates charged by the railroads to the steel company-plaintiffs and the lower rates the steel company-plaintiffs could have paid to the railroads' lower-cost competitors, i.e., the privately owned docks and trucking companies whose rates were not subject to approval by a governmental agency. To calculate damages in Lower Lake Erie the court compared legally approved rates charged by the railroads with rates charged by unregulated docks and trucking companies. Under those circumstances, the steel company-plaintiffs were not required to prove what regulated entities would have charged but for the railroads' anticompetitive conduct and that the ICC would have approved those hypothetical rates. The court, therefore, was not required to engage in the ratemaking process, and the steel company-plaintiffs could sustain their burden of proving lower-cost options that were precluded by the railroads' anticompetitive conduct.

In Goldwasser v. Ameritech Corp., Civ. No. 97-6788, 1998 WL 60878 (N.D. Ill. Feb. 4, 1998), the plaintiffs alleged the defendant telephone service company, which controlled more than ninety percent of the relevant markets, "effectively fenced-out competitors from the local

30

telephone service market, thus preserving [the defendant's] monopoly power and its ability to extract supracompetitive prices from consumers." Goldwasser, 1998 WL 60878, at *5. The defendant argued, among other things, that the plaintiffs' claims were barred under Keogh because "no matter what the underlying conduct that [the plaintiffs] complain of, [the plaintiffs] are merely seeking recovery for [the defendant's] overcharge for local telephone services." Id. at *4. The plaintiffs cited to Lower Lake Erie and argued the filed rate doctrine did not bar their claims because they were based upon the defendant's non-rate anticompetitive activity. Id. at *5. The court rejected the plaintiffs' argument finding that rate making was implicated for the competitors and Lower Lake Erie was distinguishable on that basis. The court explained:

> In Lower Lake Erie, the alleged anticompetitive activity sought to exclude an entirely new alternative means of competition—shipping by truck instead of rail—which would have otherwise been available to the consumer steel company plaintiffs. The court explained that "the question of hypothetical lower rates [was] ancillary" since the excluded trucking competitors would not have been subjected to the same rate-setting regulatory review. Id. at 1160. Thus, the filed rates of the railroads were only relevant to the extent that consumers were constrained to pay them for lack of any other options.
>
> In stark contrast, the **competitors allegedly excluded** in this case are telephone companies, just like Ameritech, that **are governed by the same rate-filing requirements** in that industry. Unlike the steel companies in Lower Lake Erie, consumers in the local telephone market are captive to rates approved by the state PUCS. **Any measure of damages in this case would necessarily involve the Court's determination of a hypothetical lower rate that would have been approved by the various state PUCs—exactly the messy task which the filed rate doctrine seeks to avert.** Thus, since filed rates are necessarily implicated by Plaintiffs' claims, the distinction drawn by Lower Lake Erie is not relevant to the case at bar. See County of Stanislaus v. Pacific Gas & Elec. Co., 114 F.3d 858, 865 (9th Cir.1997) (similarly finding Lower Lake Erie 's distinction irrelevant where filed rates are unavoidable).

Id. at *5-6 (emphasis added).

### 3. Leitzinger's declaration

Cole's Wexford requests from Highmark the base rates approved by the PID and the

actual rates charged by Highmark from 1999 through 2001 and in 2014. Under Rule 26, Cole's

Wexford must show how that information is relevant to its claims and defenses in this case.

(ECF No. 403 at 6-7 (citing FED. R. CIV. P. 26(b)(1) advisory committee's note to 2015

amendment; Hon. Elizabeth D. Laporte & Jonathan M. Redgrave, *A Practical Guide to

Achieving Proportionality Under New Federal Rule of Civil Procedure 26*, 9 FED. CTS. L. REV.

19, 40 (2015); and <u>Floyd v. Olshefski</u>, Civ. Action No. 13-578, 2016 WL 738819, at *1 (M.D.

Pa. Feb. 22, 2016) ("The moving party must demonstrate the relevance of the information sought

to a particular claim or defense.").) Cole's Wexford attempted to show that the information it

requests from Highmark is relevant to its claims for damages via the declaration of Leitzinger.

As described above, Leitzinger's declaration provides that he will use the rates actually charged

by Highmark, which were filed rates, as a benchmark to show what HHIC would have charged

Cole's Wexford but for the alleged UPMC-Highmark conspiracy.

One treatise explains the benchmark or yardstick method of calculating damages for a

case based upon an overcharge theory as follows:

> The yardstick method of estimating damages was approved by the
> Supreme Court in 1946, in Bigelow v. RKO Radio Pictures, Inc. Under the
> yardstick method the plaintiff identifies some geographic market that is as similar
> as possible to the the cartelized market, but for the conspiracy. Obviously, the
> yardstick method has certain inherent limitations.
>
> …
>
> The ideal conspiracy for the yardstick approach is a local cartel where a
> nearby market can be found which has the same basic cost structure. Adjustments
> must probably be made for differences in taxes and regulatory fees, costs of
> transportation, and different wage and salary rates. However, if these differences
> can be isolated and quantified, an expert economist or accountant should be able
> to produce a "reconstructed" price that would have prevailed in the cartelized
> market if it had the same level of competition as exists in the yardstick market.
>
> A good illustration of the method in practice is Greenhaw v. Lubbock
> County Beverage Ass'n, which involved a price fixing conspiracy among liquor
> retailers in Lubbock County, Texas. In estimating damages the plaintiff's expert

compared prices in Lubbock County during the conspiracy period with those that prevailed in Dallas, which was presumably competitive. First, the expert developed a ratio that reflected cost differentials between the two markets, and from this ratio calculated what were described as "should have been" prices for the defendants' products during the conspiracy years. From these prices the expert was then able to estimate that the cartel overcharged purchases by about 7.74%. This percentage of the defendants' total sales during the conspiracy period equaled the aggregate monopoly overcharge.

HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE 894-95 (5th ed. 2016).

Here, Leitzinger in his declaration describes how he would use the actual regulated rates charged by Highmark to show the damages to Cole's Wexford in this case as follows:

> Because the amount of overcharge depends on these situationally specific circumstances, the primary focus in constructing the but for world, if possible, is to find a period in time during which the same market participants were competing in this same market environment free of the effects of the specific anticompetitive behavior at issue. One such a period is established the corresponding prices provide an extremely useful benchmark for prices that would have prevailed during the period associated with the antitrust violation but for the anticompetitive behavior after appropriate adjustments are made.

(ECF No. 408-2 at 32 ¶ 8.) Leitzinger's declaration is insufficient to prove that the regulated rates charged by Highmark from 1999 through 2001 are relevant in this case. Leitzinger declares that his benchmark methodology is based upon "find[ing] a period in time during which the ***same market participants*** were competing in this ***same market environment*** free of the effects of the specific anticompetitive behavior at issue." (Id. (emphasis added).)

According to Cole's Wexford's allegations in the third amended complaint, however, HHIC, the nonregulated entity, did not compete in the relevant market from 1999 through 2001, which is the timeframe in which Leitzinger wants to derive his benchmark. There are no allegations or evidence that *any* nonregulated entities were competing in the relevant market from 1999 through 2001. Leitzinger's declaration, therefore, does not show that Highmark's

regulated rates charged from 1999 through 2001 are relevant because 1999 through 2001 does not represent a period of time during which the ***same market participants*** that were competing in the ***same market environment*** free from the effects of anticompetitive behavior. In other words, Leitzinger in his declaration explains how rates charged during a period of time in which the ***same market participants*** were competing in the ***same market environment*** free of the effects of the anticompetitive behavior alleged in a case are relevant, but Cole's Wexford did not request from Highmark rates it charged during a period of time in which the ***same market participants*** were competing in the ***same market environment*** free of the effects of the anticompetitive behavior alleged in this case.

Even if Leitzinger's declaration was sufficient for the court to consider that the same market participants and environment existed during the class period and the 1999 through 2001 timeframe, Cole's Wexford still did not satisfy its burden to show that the requested regulated rate information is relevant to the claims or defenses in this case. Cole's Wexford did not present to the court any information about how Highmark's regulated rates during the 1999 through 2001 timeframe could be utilized that does not run afoul of the filed rate doctrine. The rates Highmark charged during the 1999 through 2001 timeframe were required to comply with the PID's rate-filing requirements and be approved by the PID as lawful rates. For the court to separate out the effects of the PID's rate-filing requirements to determine a competitive, nonregulated rate for the class period would necessitate the court to assess the rate-making of the PID, which runs afoul of the filed rate doctrine.

If the effects of the rate-filing requirements were not separated out from Highmark's regulated rates, this court's acceptance of Cole's Wexford's calculations based upon Highmark's regulated rates would in effect require the court to assess would have been a regulated rate

during the class period. That assessment would impugn the ratemaking authority of the PID and in effect involve the court in ratemaking. The court is not convinced that Cole's Wexford can utilize Highmark's regulated rates charged from 1999 through 2001 in a calculation to determine rates that would have been charged during the class period and avoid the implications of the filed rate doctrine by assigning the results of that calculation to a nonregulated entity, i.e., HHIC. For the foregoing reasons, Cole's Wexford failed to show via the declaration of Leitzinger that the regulated rates charged by Highmark from 1999 through 2001 are relevant in this case.

With respect to the actual regulated rates charged by Highmark in 2014, Leitzinger declares that those rates are relevant in relation to the actual regulated rates charged by Highmark from 1999 through 2001. Because Cole's Wexford did not satisfy its burden to show that the actual regulated rates charged by Highmark from 1999 through 2001 are relevant, the court cannot discern how the actual rates charged by Highmark in 2014 are relevant to Cole's Wexford's claims or defenses in this case.

With respect to the base rates approved for Highmark by the PID from 1999 through 2001 and in 2014, Cole's Wexford in its latest submission to the court conceded that information is relevant "only if (1) Plaintiff's experts have certain additional information for both the pre-conspiracy period and the class period, and (2) Highmark calculated and used base rates during the class period." (ECF No. 427 at 1.)[9] As the court explained on the record during the August 16, 2016, the discovery request properly before the special master and in issue in the amended report and recommendation no. 4 is Cole's Wexford's request for the actual rates charged by

---

[9]     If Cole's Wexford finds in discovery that HHIC used base rates calculated by the same method used by Highmark to establish the prior regulated rates, there may be a basis to reconsider this issue.

Highmark and the base rates from 1999 through 2001 and in 2014. Cole's Wexford, therefore, failed to show that the base rates—separate and apart from the actual rates charged during those timeframes—are relevant to its claims or defenses in this case.

### 4. Elhauge's declaration

Cole's Wexford attempted to show the actual rates charged by Highmark and the base rates approved by the PID from 1999 through 2001 are relevant via the declaration of Elhauge. Elhauge declared that the information sought by Cole's Wexford "can assist in understanding the relevant markets before, during, and after the alleged conspiracy period." (ECF No. 408-2 at 53 ¶ 7.) As the special master concluded, however, Elhauge's declaration is conclusory and Cole's Wexford does not "strenuously advance[]" his position to prove that the information it requests from Highmark is relevant in this case. (ECF No. 403 at 10 n.5.) Cole's Wexford does not sufficiently explain how regulated rates that are not subject to commentary by this court and are presumed to be reasonable, can aide Elhauge's analysis. Cole's Wexford did not, therefore, satisfy its burden to show that the information it requests from Highmark is relevant based upon Elhauge's declaration.

### C. Proportionality

Having determined that Cole's Wexford did not satisfy its burden to show that the information it requests from Highmark is relevant, the court is not required to analyze whether that request is proportional to this case. Even if this court found the information is relevant, the court has serious concerns about whether Cole's Wexford's request is proportional to this case. The special master did not address the proportionality of the discovery request before him.

### V. Conclusion

Subject to the foregoing analysis, the court will adopt the special master's amended

36

report and recommendation no. 4 to the extent it recommended that the court deny Cole's Wexford's discovery request for actual rates charged by Highmark and base rates approved by the PID from 1999 through 2001 and in 2014 because Cole's Wexford failed to satisfy its burden to show that information is relevant to its claims and defenses. The court rejects the part of the amended report and recommendation concerning the construction of the term "relevant." The court—as set forth on the record at the hearing held on August 16, 2016—will not adopt any portion of the report and recommendation that addresses discovery requests that were not properly before the special master. The denial of Cole's Wexford's discovery request is without prejudice to Cole's Wexford submitting to Highmark, and, if a dispute arises, to the special master, a specific discovery request about *exactly* the non-rate information it is seeking from Highmark. Accordingly, the objections (ECF No. 407) filed by Highmark to the amended report and recommendation no. 4 will be sustained, and the objections (ECF No. 408) to the amended report and recommendation no. 4 filed by Cole's Wexford will be denied.

Within fourteen days of the entry of this opinion and accompanying order, Cole's Wexford and Highmark must meet and confer with the special master to develop a revised discovery plan to address the close of phase I of discovery in this case, and, if there are disputes about discovery, whether Cole's Wexford intends to submit another discovery dispute to the special master.

Within twenty-one days of the entry of this opinion and accompanying order, Cole's Wexford and Highmark shall file with the court the revised discovery plan apprising the court of the procedure to be undertaken to address any remaining discovery disputes and the pertinent dates for the close of phase I discovery.

An appropriate order will be entered.

BY THE COURT,

Dated: September 20, 2016    <u>/s/ JOY FLOWERS CONTI</u>
             Joy Flowers Conti
             Chief United States District Judge