# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| COLE'S WEXFORD HOTEL, INC., on its own behalf and on behalf of all others similarly situated | ) ) ) ) | Civil Action No. 10-1609 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| HIGHMARK, INC., | ) ) | |
| Defendant. | ) ) | |

## OPINION

**CONTI, Chief District Judge**

### I.  Introduction

Pending before the court in this antitrust action is a motion for summary judgment (ECF No. 455) filed by defendant Highmark, Inc. ("Highmark"). According to Highmark, the undisputed facts of this case show that the injury complained about by plaintiff Cole's Wexford Hotel, Inc. ("Cole's Wexford") on its own behalf and on behalf of all others similarly situated "is the direct result of Highmark's constitutionally protected right to petition Pennsylvania legislative and regulatory bodies to be permitted to offer small group health plans through its affiliate,…[Highmark Health Insurance Company ("HHIC")], and the strictly qualified approvals that Highmark received from those governmental entities to offer those small group plans." (ECF No. 455 at 1.) Highmark argues that—under those circumstances—the court should grant summary judgment in its favor because Cole's Wexford's claims are barred by the <u>Noerr-Pennington</u> doctrine. (<u>Id.</u> (citing <u>United Mine</u>

Workers v. Pennington, 381 U.S. 657 (1965); E. Rr. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961).) Highmark argues that even if Cole's Wexford's claims are not barred by the Noerr-Pennington doctrine, the undisputed facts of this case show that "the filed rate doctrine prevents Cole's Wexford from recovering damages from July 1, 2010 through June 30, 2011." (ECF No. 455 at 1-2 (citing McCray v. Fid. Nat'l Title Ins. Co., 682 F.3d 229 (3d Cir. 2012).)

Based upon the court's review of Highmark's motion for summary judgment, the parties' submissions related to that motion, and the applicable law, Highmark is not entitled to summary judgment. First, Cole's Wexford in the third amended complaint does not allege that any of Highmark's constitutionally-protected conduct caused its injury. Under those circumstances, the Noerr-Pennington doctrine does not provide Highmark immunity from Cole's Wexford's antitrust claims. Second, the record does not show that the Pennsylvania Insurance Department ("PID") had ratemaking authority with respect to the rates HHIC charged to Cole's Wexford during the relevant timeframe. The filed rate doctrine, therefore, does not apply to bar Cole's Wexford's antitrust claims because using those rates to calculate damages will not infringe upon the ratemaking authority of the PID. For those reasons, which are explained fully in this opinion, Highmark's motion for summary judgment will be denied.

## II.    Procedural History

This contentious and litigious case has been pending for nearly seven years. The court set forth detailed recitations of the procedural history of this case in at least three other opinions resolving dispositive motions. (ECF Nos. 240, 284, 301.) The court in this opinion

will set forth only the procedural history pertinent to the resolution of the motion for summary judgment (ECF No. 455).

On October 1, 2014, Cole's Wexford filed a third amended complaint against Highmark and then-defendant UPMC.[1] (ECF No. 286.) Cole's Wexford set forth the following counts against Highmark:

– **Count I**—Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

– **Count II**—Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

– **Count IV**—Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and

– **Count VI**–Willful Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

(ECF No. 286.) Highmark and UPMC each filed a motion to dismiss the third amended complaint. (ECF Nos. 288, 290.) On September 1, 2015, the court denied the motion to dismiss filed by Highmark and granted in part and denied in part the motion to dismiss filed by UPMC. (ECF Nos. 301, 302.) The court permitted all claims against Highmark to proceed and denied the request to strike the class allegations from the third amended complaint. (ECF No. 301 at 61.) On November 16, 2015, Highmark filed an answer to the third amended complaint. (ECF No. 314.)

---

[1]     On July 28, 2016, the court: granted the motion to certify the settlement class (ECF No. 413) filed by Cole's Wexford; granted the motion for final approval of settlement between the settlement plaintiff class and UPMC (ECF No. 414); and issued a final judgment order with respect to UPMC on all claims against it for purposes of Federal Rule of Civil Procedure 58(a) (ECF No. 415). UPMC is, therefore, no longer a named defendant in this case.

On August 22, 2016, Highmark filed a motion for hearing and scheduling order for its motion for summary judgment. (ECF No. 424.) The court directed the parties to meet and confer with the special master appointed in this case to oversee, among other things, discovery, in order to develop a discovery plan with respect to Highmark's proposed motion for summary judgment. On November 17, 2016, Cole's Wexford and Highmark filed a joint notice of a proposed discovery schedule for summary judgment briefing. (ECF No. 449.)

On January 25, 2017, Highmark filed a motion for summary judgment, a brief in support of the motion, a statement of undisputed material facts, and exhibits in support of the motion. (ECF Nos. 455, 456, 457, 458, 459.)[2] On February 24, 2017, Cole's Wexford filed a brief in opposition to Highmark's motion, a response to Highmark's statement of undisputed material facts, its own statement of undisputed material facts, and exhibits in support of its response. (ECF Nos. 470, 471, 472, 473.)[3] On March 10, 2017, Highmark filed a reply brief in support of its motion for summary judgment. (ECF No. 485.) On March 20, 2017, the parties filed a combined concise statement of material facts. (ECF No. 487.)[4]

---

[2]     Highmark and Cole's Wexford each filed a motion to file under seal various submissions with respect to Highmark's motion for summary judgment. (ECF Nos. 454, 468.) The court granted those motions. (ECF Nos. 454, 469.) These citations are citations to the redacted versions of Highmark's filings, which are accessible to the public. The court in this opinion will cite to and quote from the under seal versions of these filings when appropriate.

[3]     These citations are citations to the redacted versions of Cole's Wexford's filings, which are accessible to the public. The court in this opinion will cite to and quote from the under seal versions of these filings when appropriate. See supra n.2.

[4]     This citation is to the redacted version of the parties' combined concise statement of material facts. The court herein when appropriate will cite to and quote from the combined concise statement of material facts that was filed under seal in this case. (ECF No. 488.)

III.    **Factual Background**

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

A.  **General Background About the Parties**

Highmark is a private, national diversified health care insurer serving members through its businesses in health insurance and through subsidiaries and affiliates which provide health insurance, dental insurance, vision care, and reinsurance. (Combined Concise Statement of Material Facts ("CCSMF") (ECF No. 488) ¶ 1.) Highmark is part of the Highmark Health enterprise, a diversified health and wellness system. (Id. ¶ 2.) Both Highmark and Highmark Health are Pennsylvania nonprofit corporations with principal places of business in Pittsburgh, Pennsylvania. (Id. ¶ 3.) Highmark is an independent licensee of the Blue Cross and Blue Shield Association that offers and administers health insurance benefit plans in Pennsylvania, West Virginia, and Delaware. (Id. ¶ 4.) One of Highmark's Pennsylvania product service areas is the Western Pennsylvania region, which is a 29-county area consisting of Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (part), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland counties. (Id. ¶ 5.) Highmark sells health insurance benefit plans to individuals, small groups, and large groups in Western Pennsylvania. (Id. ¶ 6.) Highmark's products include a variety of commercial indemnity and managed care health

insurance products, along with Medicare supplemental and Medicare Advantage products. (Id.¶ 7.) Highmark's Blue Cross plans operate as Hospital Plans, pursuant to 40 PA. CONS. STAT. §§ 6101-6127. (Id. ¶ 8.) Highmark's Blue Shield plans operate as Professional Health Service Plans, pursuant to 40 PA. CONS. STAT. §§ 6301-6335. (Id. ¶ 9.) HHIC was a "wholly owned Blue-branded subsidiary" of Highmark that was "domiciled and licensed as a life, accident and health insurer in Pennsylvania." (Cashion Decl., Ex. 7 (ECF No. 462-1) at 2; CCSMF (ECF No. 488) pl.'s ¶ 9.)[5] HHIC was a for-profit company. (Id. at pl.'s ¶ 10.)

Cole's Wexford is a Pennsylvania corporation with its principal place of business located in Wexford, Pennsylvania. (CCSMF (ECF No. 488) ¶ 10.) Cole's Wexford seeks to represent a class of those "who purchased small group health insurance coverage from, or otherwise paid any small group plan premiums or portion thereof to, Highmark Health Insurance Co., or a similar for-profit subsidiary of Highmark Inc., between approximately July 1, 2010 and approximately March 21, 2012." (Id. ¶ 11.) HHIC was Highmark's only subsidiary or affiliate that offered health insurance plans to small groups in Western Pennsylvania and was not subject to express statutory rate-filing requirements during the class period. (Id. ¶ 12.)

---

[5]     In the parties' combined concise statement of material facts, Highmark numbered its paragraphs starting on page five "1" through "126." (ECF No. 488 at 5-44.) Plaintiff in its separate statement of facts numbered its paragraphs "1" through "89" (id. at 45-65). The court to differentiate whether it is citing to Highmark's statement of facts in the combined concise statements or plaintiff's statement of facts in the combined concise statements will refer to Highmark's paragraphs by number alone, e.g., "(CCSMF (ECF No. 488) ¶ 16)" and plaintiff's paragraphs by inserting "pl.'s" before identifying the paragraph number, e.g., "(CCSMF (ECF No. 488) pl.'s ¶ 16)".

From at least 1998 until June 30, 2010, Cole's Wexford purchased small group health insurance from Highmark. (Id. ¶ 13.) From July 1, 2010, through June 30, 2012, Cole's Wexford purchased small group health insurance from HHIC. (Id. ¶ 14.) Cole's Wexford "exited the group health insurance market" beginning on July 1, 2012, and has not purchased small group insurance or insurance from Highmark or HHIC since that date. (Id. ¶ 15.)

### B. General Background About the Health Insurance Industry

The PID is an executive agency in the Commonwealth of Pennsylvania that oversees the insurance industry. (CCSMF (ECF No. 488) ¶ 16.) The PID regulated all policies that any insurer issued to *individual* subscribers in Pennsylvania during all relevant times. (Id. ¶ 17.) Prior to July 1, 2010, the PID regulated all Highmark's health insurance products in Western Pennsylvania, including those offered to *small groups*, because Highmark operated as a hospital plan corporation and professional health services plan corporation. (Id. ¶ 18.) Highmark was obligated to file base rates or rating formulas with the PID, and Highmark had the ability to charge specific rates within a fifteen percent band around those rate or rating formulas without filing those specific rates with the PID. (Id. ¶ 19; CCSMF (ECF No. 488) pl.'s ¶ 4.)

Medical underwriting is a process in which insurance companies use questionnaires regarding a subscriber's past medical history in order to classify the risk of the subscriber and adjust rates charged to that subscriber for health insurance. (Id. ¶ 23.) Highmark never filed with the PID rates that employed medical underwriting for small groups because the PID informed Highmark that it would not approve any rates that employed medical underwriting for small groups. (Id. ¶ 24.) The PID—as part of its rate-regulation—limited the weight that

Highmark could place on Highmark's prior claims experience with a given group, when setting renewal rates for existing small group business. (Id. ¶ 25.)

Prior to March 21, 2012:

- the PID did not have express statutory authority to regulate the rates for-profit commercial insurers charged to small-group subscribers of health insurance, and for-profit commercial insurers were not required to file small group rates with the PID (CCSMF (ECF No. 488) ¶ 26, pl.'s ¶ 5);

- the PID required for-profit health insurers to file with the PID and receive approval for the rates that they offered to individuals (id.¶ 27);

- the PID required only hospital plan corporations, professional health services plan corporations, and health maintenance organizations to file with the PID their small group rates (id.¶ 27);

- for-profit health insurers used medical underwriting and prior claims experience to identify a group whose risk profile suggested that the group would be costly to insure (id. ¶ 28);

- for-profit health insurers offered a higher rate to high-risk small groups to make it unlikely they would accept a for-profit insurer's proposed rates. (Declaration of William Cashion ("Cashion Decl.") (ECF No. 459) ¶ 16);

- because the PID did not regulate for-profit insurers' rates, the for-profit insurers could offer a low price to any one group without constraining what they could charge to any other group (Cashion Decl. (ECF No. 459) ¶ 15); and

- for Highmark—when regulated by the PID—to offer the healthiest small groups comparable rates to those offered by its commercial competitors, it would have had to offer lower rates to less healthy groups as well because of the PID's rate-regulation restrictions (id. ¶ 19).

## C. Highmark's Lobbying Efforts

Highmark lobbied the Pennsylvania legislature for uniform regulation of all small group insurers. (CCSMF (ECF No. 488) ¶¶ 32, pl.'s ¶ 6; Cashion Decl. (ECF No. 459) ¶ 23.)

On June 16, 2003, William Cashion ("Cashion"), Highmark's chief actuary, testified before the Pennsylvania Senate Banking and Insurance Committee. (CCSMF (ECF No. 488) ¶ 33.) During this testimony, he made clear that it was important that any regulation must apply uniformly to the rating and underwriting practices of all small group insurers. (Id.)

On April 5, 2005, Candy Gallaher ("Gallagher"), Highmark's then-Director of Regulatory Affairs, testified before the Pennsylvania House Insurance Committee and requested "small group reform legislation." (Cashion Decl., Ex. 2 (ECF No. 459-2) at 4.) During her testimony, she described what Highmark felt were the limitations that Pennsylvania's regulatory structure placed on Highmark's ability to offer competitive rates for the healthiest small groups, as well as the ability of its commercial for-profit competitors to price high-risk small groups at rates significantly higher than Highmark could charge. (Id. at 5-6.) She requested that the Pennsylvania legislature amend its regulatory framework so that the same set of rules and regulations applied to all insurers, nonprofit and for-profit alike. (Id. at 8.)

On August 9, 2005, Kenneth Melani ("Melani"), Highmark's then-president and chief executive officer, submitted to the Pennsylvania House Insurance Committee comments for the public record. (Cashion Decl., Ex. 3 (ECF No. 459-3) at 2-7.) Melani expressed his opposition to the "two-tiered small employer insurance market," explaining:

> House Bill 1741 does not help the vast majority of small businesses for several reasons. It will neither create more insurance choices for small companies nor expand competition. On the contrary, it will perpetuate the distorted, two-tiered small employer insurance market - one for small employers that have the good fortune of having workers in good health and one for small businesses that have the misfortune of having workers who have a random injury and/or illness.

(Cashion Decl., Ex. 3 (ECF No. 459-3) at 4.) Melani sought uniform regulation of all small group insurers. (CCSMF (ECF No. 488) ¶ 35.)

Highmark supported the testimony of Paul Fleischacker ("Fleischacker"), an actuarial consultant, before the Pennsylvania House Insurance Committee on August 30, 2005. (Cashion Decl., Ex. 4 (ECF No. 459-4).) Fleischaker testified, among other things, that:

> With the exceptions of Pennsylvania and Hawaii, all states have enacted some form of small group pricing reform.
>
> …
>
> As far as I know, all states (except Pennsylvania and Michigan) have a single uniform pricing law and guidelines applicable to all insurers (commercial insurers, Blues, HMOs, etc.) writing small group business in their states.
>
> …
>
> In summary, to achieve the goal of fair competition in market access and availability to all Pennsylvanians, it is important to control antiselection and to be able to manage the health care risk pool effectively and thus stabilize premiums to the extent possible. I believe this is only possible with a single, uniform rating law applicable to all carriers.

(Cashion Decl., Ex. 4 (ECF No. 459-4) at 4, 5, 14.)

On September 22, 2005, Deborah Rice-Johnson ("Rice-Johnson"), Highmark's then-senior vice president for regional markets, testified before the Pennsylvania House Insurance Committee. (CCSMF (ECF No. 488) ¶ 37.) Rice-Johnson's testimony supported the passage of House Bill 1240 as a step in the right direction toward requiring all insurers to follow the same rules in setting rates for small employers. (Id.)

On March 12, 2009, James Fawcett ("Fawcett"), Highmark's vice president for strategic and large markets, testified before the Pennsylvania House Insurance Committee. (Cashion Decl., Ex. 6 (ECF No. 459-6) at 4.) Fawcett—on behalf of Highmark—sought "passage of legislation to reform small group health insurance," and "to make insurance more affordable for more small employers." (Id.) Fawcett requested legislation that stabilized

insurance premiums, expanded choice of health insurance options for small companies, provided fairer market rules, i.e., "[a] common set of rules," and provided Pennsylvania employers "more competition and wider choices for all the risks in the smaller employer marker—not just the health risks." (Id. at 5-6.)

By 2009, Highmark's efforts to lobby the Pennsylvania legislature to require uniform regulation of all small group insurers in Pennsylvania were not successful. (Id. pl.'s ¶ 6.)

### D. Highmark's Plan of Withdrawal With Respect to Its Small Group Plans and Applications to the PID and Pennsylvania Department of Health to Operate as a Preferred Provider Organization

#### 1. The Plan of Withdrawal

On October 13, 2009, Highmark filed a Plan of Withdrawal (the "plan of withdrawal") and met with the PID. (Cashion Decl. (ECF No. 459) ¶ 25; Cashion Decl., Ex. 7 (ECF No. 462-1).) The job of the PID is to review an insurance provider's plan of withdrawal and determine whether it complies with Pennsylvania law. (Declaration of Darien M. Meyer ("Meyer Decl"), Ex. A (ECF No. 458-1) at 10-11.) Highmark informed the PID that it wanted to withdraw all but one of its small group plans, i.e., its Medicare complement product, and, instead, allow HHIC to offer plans to small groups as a for-profit entity. (Cashion Decl. (ECF No. 459) ¶ 26; CCSMF (ECF No. 488) ¶¶ 40, 42-43.)

HHIC's small group PPO products were designed to use the same network as Highmark's small group PPO products. (CCSMF (ECF No. 488) ¶ 45.) The plan of withdrawal Highmark submitted to the PID and the Pennsylvania Department of Health ("DOH") provided:

> Replacement coverage will be widely available. Small employers in western Pennsylvania will have the option of a variety of PPO/Drug, PPO HDHP,

11

EPO/Drug and Vision options available from HHIC. HMO options will continue to be available from KHPW and Medicare Complement products will continue to be available from HBCBS.

(Cashion Decl., Ex. 7 (ECF No. 462-1) at 7.)

## 2. Highmark's Applications to the PID and the DOH to Operate as a Preferred Provider Organization

Before a preferred provider organization ("PPO") may enter the market in Pennsylvania, it first must submit an application to the PID and the DOH and then wait sixty days, after which it "may commence operations," absent a finding of deficiencies by either agency. (Id. at pl.'s ¶ 17.) The PID's or the DOH's disapproval of a PPO application is appealable. (Id. at pl.'s ¶ 18.) The PID generated a standardized application form for companies to use when applying to operate a PPO. (CCSMF (ECF No. 488) pl.'s ¶ 14.) The application form provides that it is to be used as an "application for review and approval of a PPO under the provisions of 40 P .S. § 764a and 31 Pa. Code 152. l et seq." (Id. at pl.'s ¶ 15.)

On October 13, 2009—the same day on which Highmark filed its plan of withdrawal with the PID—Highmark submitted to the PID and the DOH two applications: one for HHIC to operate as a "risk-assuming PPO;" and one for HHIC to operate as an "ERISA-exempt PPO" (together with the application to operate as a risk-assuming PPO, "PPO applications"). (Cashion Decl., Ex. 9 (ECF No. 484-1) at 3, 6, 13.)

HHIC's PPO applications were submitted on the standardized application form. (Id. at pl.'s ¶ 16.) Highmark filed its PPO applications to procure the PID's and DOH's authorization for it to offer new products and for the purpose of implementing its plan to offer policies to small groups under a system where HHIC could more accurately price the plans to reflect the risk of the members. (CCSMF (ECF No. 488) ¶ 63; Cashion Decl. (ECF

No. 490) ¶ 31.) The purpose of HHIC's PPO application was not to effectuate any changes in any governing laws. (Id. at pl.'s ¶ 21.)

As a general matter, in 2009 through 2010, 31 PA. CODE § 152.4 governed the scope of the review of PPO Applications by the DOH. (CCSMF (ECF No. 488) at pl.'s ¶ 28.) The DOH reviewed PPO applications to determine whether the proposed PPO satisfied eight criteria. (Id. at pl.'s ¶ 29.) PPOs that were "governed and regulated under the Employee Retirement Income Security Act of 1974" ("EIRSA") were required to "file a certificate to that effect with the Commissioner and, to the extent that…[the PPO was] regulated under ERISA,…[it was] not subject to other provisions of…[that] chapter." (Id. at pl.'s ¶ 30.) Accordingly, PPOs that were governed under ERISA were not subject to 31 Pa. Code § 152.4. (Id. at pl.'s ¶ 31.)

HHIC's PPO application to operate as an ERISA-exempt PPO included a certificate providing that HHIC was governed and regulated under ERISA (the "ERISA certificate"). (Id. at pl.'s ¶ 32.) The ERISA certificate was specifically referred to in the section of the PPO application for an ERISA exempt PPO in which HHIC selected the "PPO type" for that application, i.e., ERISA Exempt. (Cashion Decl., Ex. 9 (ECF No. 484-1) at 13.) The DOH was not required to review HHIC's ERISA Exempt application because HHIC was governed and regulated under ERISA. (CCSMF (ECF No. 488) at pl.'s ¶ 33.) The DOH, however, did review HHIC's ERISA-Exempt application. (Id. at pl.'s ¶ 34.)

The PPO applications to the PID and DOH provided:

- "HHIC will operate as a member of the Highmark Inc. family of Blue Cross and Blue Shield branded companies in the 49-county service area of Highmark Inc. d/b/a Highmark Blue Cross Blue Shield, and d/b/a

13

Highmark Blue Shield. Business will begin migrating to HHIC on July 1, 2010, with the transfer of small group business to HHIC with July 1, 2010 renewals. New small group business will be offered products through that company beginning with July 1, 2010 effective dates" (Cashion Decl., Ex. 9 (ECF No. 484-1) at 8, 16);

− the difference in level of coverage between a network provider and non-network provider would not be greater than twenty-percent (CCSMF (ECF No. 488) 59); and

− its policies did not contain any provision or arrangements that would lead to the undertreatment or poor quality care of its subscribers (id. ¶ 60).

On December 2, 2009, the PID sent Highmark a letter providing that the PID concluded its review of Highmark's plan of withdrawal, and the PID wanted to be "informed of any issues" moving forward. (Cashion Decl., Ex. 8 (ECF No. 459-8) at 2.)

### 3. The DOH's Independent Review of HHIC's Applications

Even though Highmark submitted joint applications to the PID and the DOH, each agency conducted its own review of the applications. (CCSMF (ECF No. 488) ¶ 65.) The DOH conducted its review based upon its statutory mandate to ensure that the proposal would not result in "undertreatment or poor quality care," and, in doing so, focused on the viability of HHIC's proposed network to make sure that HHIC would provide its subscribers with sufficient options for their healthcare. (Id. ¶ 66.) The DOH reviewed the information that Highmark provided to its subscribers. (Id. ¶ 67.)

The DOH on two occasions asked for more information about the PPO applications. (CCSMF (ECF No. 488) at pl.'s ¶ 35.) First, the DOH asked for "confirmation that the application is for a PPO," an opportunity to "review a copy of the member materials before

they are finalized," and "information regarding Network Access." (Id. at pl.'s ¶ 36.) On February 12, 2010, HHIC responded to the DOH's inquiries. (Id.)

On March 15, 2010, the DOH asked HHIC questions on three other topics, which included co-payments, whether "under the network arrangements for HHIC that beneficiaries could go to a participating facility, yet still be billed by non-par providers," and whether "Act 4 of 2009 appl[ied]" regarding "coverage for children." (CCSMF (ECF No. 488) pl.'s ¶ 37.) Highmark is not aware of any other communications with the DOH about the HHIC's PPO applications. (Id. at pl.'s ¶ 38.) On February 12, 2010, and again on March 23, 2010, Highmark responded to questions from the DOH about the PPO applications. (Id. ¶ 68.)

On April 26, 2010, the DOH provided Highmark written approval of the PPO applications. (Id. ¶ 69.) The DOH's approval:

> "permit[ted] HM Health Insurance Company d/b/a Highmark Health Insurance Company (HHIC) to establish, operate and maintain a risk-assuming PPO under which it assumes traditional insurance-type financial risk regarding the provision of insured health benefits plans set forth in the application to insureds, and to provide preferred provider arrangements described therein."

 (CCSMF (ECF No. 488) ¶ 70 (quoting Cashion Decl., Ex. 35 (ECF No. 459-35) at 2.)

### 4.  The PID's Review of the PPO Applications

On November 25, 2009, the PID formally disapproved the PPO applications. (CCSMF (ECF No. 488) ¶ 72.) The PID informed Highmark that it needed to submit an individual conversion policy form for PID's review and approval. (Id. ¶ 73.) An individual conversion policy is an insurance policy that covers various circumstances in which a subscriber is no longer eligible for insurance under the small group policy, e.g., a situation in which the insurer discontinues the small group policy. (Id. ¶ 75.) At the relevant time, all

insurers that offered group policies, regardless whether they were commercial insurers, were required to offer individual conversion policies. (CCSMF (ECF No. 488) ¶ 75, pl.'s ¶ 47.) The PID had the authority to review and approve individual conversion policies and rates. (Id. at pl.'s ¶ 48.) HHIC was required to comply with the individual conversion policy requirements. (Id. at pl.'s ¶ 49.)[6]

---

[6] The individual conversion rates are not at issue in this case; rather, it is HHIC's small-group health insurance rates that form the basis for plaintiff's measure of damages. (ECF No. 474 at 19 ("Plaintiff's injury was not caused by any such review of individual conversion rates (or by the approval of [the] PPO application).")

Plaintiff in the third amended complaint alleges that it and the members of the putative class paid HHIC "small group plan premiums," and there are no allegations with respect to individual conversion policies. (ECF No. 286 ¶ 11.) As discussed above, the parties agree that the PID had the authority to review and approve individual conversion policies. (CCSMF (ECF No. 488) pl.'s ¶ 48.) Plaintiff in the third amended complaint sets forth the following factual allegations with respect to its injury:

> This discontinue-and-migrate strategy for small group plans harmed the Plaintiff class. Cole's and other purchasers of small group insurance coverage in the Plaintiff class paid artificially inflated, supracompetitive premiums to Highmark Health Insurance Co. (and possibly to other for-profit Highmark insurers), and **these premiums were not filed with the PID**. Once Highmark was free of both meaningful competition (as a result of its conspiracy with UPMC) and regulatory scrutiny (as a result of its migration strategy), it was able to charge supracompetitive premiums to its small group customers. But for the conspiracy, these purchasers of small group plans would have paid lower premiums to Highmark Health Insurance Co. or other Highmark entities whose small group premium amounts **were not subject to any rate filing requirement**.

(ECF No. 276 ¶ 242 (emphasis added).) Plaintiff claims injury based upon rates that were not subject to the PID's approval, and agrees that the individual conversion policies were subject to the review and approval of the PID. (Id.; CCSMF (ECF No. 488) pl.'s ¶ 48.) The individual conversion policies, therefore, do not form the basis of plaintiff's measure of damages in this case.

The PID's letter dated November 25, 2009, explained the deficiency in the PPO applications as follows:

> The Department has completed its review of this filing and has but one request. While the Group forms have been deregulated, Group Conversion forms are still considered Individual forms, and, therefore, must be filed for Department review. Please file the required Conversion forms under a separate filing, referencing this filing as the Group that the Conversion form is to be used with.

(Cashion Decl., Ex. 26 (ECF No. 459-26) at 2-3.) The PID in its letter dated November 25, 2009, did not identify any other deficiency with respect to the PPO applications. (CCSMF (ECF No. 488) pl.'s ¶ 51.)

On February 12, 2010, Highmark submitted to the PID its individual conversion plan rate application. (CCSMF (ECF No. 488) ¶ 76.) As part of this application, Highmark provided HHIC's proposed individual conversion plan rates, an actuarial memorandum describing each of the factors that it used to calculate HHIC's individual conversion plan rates, and information about the benefits included in HHIC's individual conversion plan policy. (Id.) On February 15, 2010, Highmark submitted an individual conversion policy form application to the PID. (Id. ¶ 90.) As part of this application, Highmark on behalf of HHIC provided copies of the policies and forms that described the coverage, network, and claims process for the individual conversion product. (Id.)

On February 22, 2010, the PID rejected the original individual conversion policy rate-filing. (Id. ¶ 77.) The PID requested that Highmark certify that it used the same process for developing HHIC's individual conversion plan rates as it used for developing its group rates, and requested information regarding the "methodology, starting data, trends used, benefit

17

relativity factors applied to medical and drug components, administrative expenses PMPM, retention-premium tax, risk charge, contingency charge and FIT percentages, and conversion contract distribution." (Id. ¶ 78.)

On March 9, 2010, Highmark submitted its revised individual conversion policy rate application. (Id. ¶ 79.) In this revised submission, Highmark explained that HHIC developed its rates based upon small group claim experience for the period of November 1, 2008, through October 31, 2009, with run-out through November 30, 2009. (Id. ¶ 80.) In setting the individual conversion policy rates, the fact that less healthy members were more likely to purchase conversion products because healthier members were unlikely to pay the full premium for an individual policy was considered. (Id. ¶ 81.) Highmark provided to the PID for approval HHIC's requested individual conversion policy rates. (Id. ¶ 82.) Highmark separated HHIC's rates for those policies that included only an individual subscriber, those that included a subscriber and a child, those that included a subscriber and children, those that included a subscriber and a spouse, those that included a subscriber, a spouse, and a child, and those that included a subscriber, a spouse, and children. (Id. ¶ 83.)

On March 12, 2010, the PID rejected the revised individual conversion plan rate-filing because HHIC used demographic information in rating the conversion pool. (Id. ¶ 84.) The PID informed Highmark that HHIC could not rate the conversion members as if they were their own rating pool and that HHIC could not use age as a rating factor for these individuals. (Id. ¶ 85.) The PID directed that HHIC rate its individual conversion plan policies using the same restrictions that the PID applied to Highmark's small groups. (Id. ¶

86.) On March 22, 2010, the PID rejected the form application and highlighted concerns it had with certain benefit coverage and the process for submitting claims. (Id. ¶ 91.)

On March 29, 2010, Highmark submitted a second revised individual conversion policy rate proposal to respond to the PID's concerns. (CCSMF (ECF No. 488) ¶¶ 87, 92.) In addition to responding to the PID's written comments, Highmark amended the deductible options for HHIC's plans. (Id.) The previous age rating factor was replaced with one that accounted only for the average age of the pool based upon Highmark's past small group experience. (Id. ¶ 88.) In its revised rate application, Highmark proposed for HHIC separate rates for Allegheny County and contiguous counties, Erie County and surrounding counties, and the Altoona-Johnstown area. (Id. ¶ 89.)

In late April 2010—at approximately the same time that the PID and the DOH approved HHIC's PPO applications—the PID approved the individual conversion plan rate-filing for HHIC. (Id. ¶ 93.)

### E. The PID's "Rating & Underwriting Questionnaire"

On February 16, 2010, the PID issued to the nine largest health insurers in Pennsylvania, including Highmark, a "Rating & Underwriting Questionnaire" ("the questionnaire"). (CCSMF (ECF No. 488) ¶ 96.) The reason for the questionnaire was, in part, the PID's concerns over the use of medical underwriting practices in the small group marketplace. (Id.) The questionnaire requested detailed information about rates the commercial insurers charged small groups. (Zappala Decl., Ex. L (ECF No. 477-12) at 6-11.)

On March 9, 2010, Highmark submitted a response to the questionnaire that included information about the different variables that Highmark considered when setting a small

group's premiums between 2008 and 2010. (Id. ¶ 97.) The main differences between Highmark's and HHIC's rating processes were that HHIC would not employ the same caps or limits on its ratings factors as those required to be used by Highmark, and HHIC intended to use medical questionnaires for new clients and fully incorporate prior claims experience information as part of its rating process for HHIC's rates. (Id. ¶ 98.)

On March 22, 2010, the PID requested that HHIC either clarify that the March 9, 2010, response covered HHIC's proposed rates—as opposed to Highmark's rates—or to submit an independent response—apart from Highmark's response—to the questionnaire. (CCSMF (ECF No. 488) ¶ 99.) On March 26, 2010, Highmark provided the following response to the PID:

> Highmark's Response to Sections A, B, and C of the Questionnaire were not intended to address HM Health Insurance Company ("HHIC") as such questions were expressly limited in scope to the time period of January 1, 2008 to the present. HHIC did not offer, and is not currently offering, any products in Pennsylvania during the relevant time period; therefore, Sections A, B, and C are not applicable to HHIC.
> …
> HHIC will be using medical questionnaires for new small group business and will not be using the same rating factor-caps or limits as those currently used by the Highmark Group.
> …
> Highmark, at this time, can not [sic] further respond on behalf of HHIC to Section B of the Questionnaire as no other determinations have been made to date regarding specific rating factors and ranges for HHIC's small group business.

(Cashion Decl., Ex. 19 (ECF No. 462-10) at 2-3.)

On March 31, 2010, the PID sent HHIC a series of requests for additional information. (CCSMF (ECF No. 488) ¶ 102.) The PID questioned: (1) whether HHIC intended to use health questionnaires for small groups; (2) what rating factors HHIC intended

to use; (3) whether HHIC intended to subdivide small groups for rating purposes; (4) whether HHIC planned to use medical loss ratio or other predictive modeling risk score factors in setting rates; (5) whether HHIC would offer any discounts, charges, or surcharges different from those charged by Highmark; and (6) how HHIC intended to use rate bands or other practices to vary small group rates. (Id.)

On April 7, 2010, Highmark informed the PID that—with respect to the requests for additional information dated March 31, 2010—it would be premature for Highmark to provide to the PID that information until its discussions with the PID commissioner about Highmark's "HHIC initiative" concluded. (Cashion Decl. (ECF No. 490) ¶ 50; Cashion Decl., Ex. 30 (ECF No. 459-30) at 2.)

The PID used information that it received in response to the questionnaire to support its legislative initiatives. (Meyer Decl., Ex. C (ECF No. 458-3) at 34.) The PID referenced Highmark's responses to the PID's questionnaire in its discussions with Highmark about HHIC. (Cashion Decl., Ex. 37 (ECF No. 462-24) at 5.) The PID as part of its negotiations with Highmark with respect to HHIC's PPO application wanted Highmark to support legislation similar to House Bill 746. (Meyer Decl., Ex. C (ECF No. 458-3) at 37, 39.)

**F. The PID's Efforts to Prohibit the Use of Health Status Underwriting and the Use of Medical Questionnaires by Health Insurance Companies in the Small Group Market**

From 2010 through 2014, then-PID commissioner, Joel Ario ("Ario"), attempted to eliminate in the small group health insurance market health status underwriting and the use of questionnaires by insurance companies. (Meyer Decl., Ex. C (ECF No. 458-3) at 17-19.) Health status was only one of multiple factors that HHIC considered when calculating small

group rates. (Id. at pl.'s ¶ 76.) Health status is an "adjustment to the base rate associated with the health status of the client." (Zappala Decl., Ex. A (ECF No. 477-1) at 180.) Small group rates were calculated by applying a number of factors against a "base rate" to generate a small group's specific rate. (Id. at pl.'s ¶ 77.) In additional to health status, the other factors applied against the base rate were: "affiliation," "age," "gender," "area," "benefits," "ClientSpecific l,"[7] "ClientSpecific2," "Graduated Deductible," "Industry," and Size." (Id. at pl.'s ¶ 78.)

The base rates for HHIC's small group plans were never submitted to the PID for review. (Zappala Decl., Ex. A (ECF No. 477-1) at 181.) HHIC submitted to the PID summary information that was sufficient for an actuary to use to reconstruct the range of rates HHIC was going to use. In other words, HHIC's provided to the PID "enough information for [the PID] to understand how…[HHIC] compare[d] to the other commercial carriers[.]" (Id. at 185-86.) The PID did not need to approve the summary information submitted by HHIC. (Id. at 186.)

Ario was of the view that insurers should not use medical underwriting practice questionnaires and health status factors when deciding whether to insure small group businesses. (Id. at 31-32.) The PID sought for the Pennsylvania legislature to adopt legislation that would constrain the use of medical underwriting techniques by all insurers.

---

[7] "ClientSpecific l" and "ClientSpecific2" factors were not necessarily related to health status, but for purposes of ensuring that HHIC did not exceed the 25% cap on health status factors, which HHIC agreed to in the agreement dated April 26, 2010, which is discussed below, HHIC considered these factors to be related to health status. (CCSMF (ECF No. 488) pl.'s ¶ 79.)

(CCSMF (ECF No. 488) ¶ 104.) The PID also actively supported legislation, i.e., House Bill 746, which would make all insurance carriers subject to PID-regulation. The PID wanted to wait to approve HHIC's PPO applications until that legislation was passed and in place. (CCSMF (ECF No. 488) ¶ 107; Meyer Decl., Ex. C (ECF No. 458-3) at 35-36.)

### G. The PID's and Highmark's Negotiations With Respect to HHIC's PPO Applications

The PID did not have statutory authority to mandate that all commercial small group insurers comply with rating restrictions. (Id. at pl.'s ¶ 58.) Highmark's corporate representative testified that the PID commissioner was "trying to get us to concede rating provisions that we intended to deploy, and he was trying to convince us not to do that." (Id. at pl.'s ¶ 59.) By March 2010, Highmark was in discussions with the PID regarding the PID commissioner's requests that HHIC agree to some rating restrictions. (Id. at pl.'s ¶ 60.) HHIC and the PID had numerous communications in March 2010 and April 2010 with respect to the PID's requests. (Id. at pl.'s ¶ 61.) The PID commissioner told the commercial insurers "you need to reach some agreement with me because I might let HHIC's application go forward." (Declaration of Melissa Felder Zappala ("Zappala Decl."), Ex. H (ECF No. 473-8) at 83.) The PID commissioner told HHIC: "you need to reach agreements with me because I may not let your application go forward and you won't be on a level playing field with commercials." (Id.)

On April 1, 2010, representatives from Highmark met with representatives from the PID and the governor's office to discuss HHIC's PPO applications. (CCSMF (ECF No. 488) ¶ 105.) During that meeting, Highmark expressed its concern that: (1) it could not raise its rates enough to compensate for the increasing cost and risk to certain groups; and (2) it could

not get its rates low enough to compete for new business. (Id.) Notes taken by a Highmark

employee at the April 20, 2010 meeting provide that Ario stated the purpose of the meeting

was to "discuss two principles." (Cashion Decl., Ex. 36 (ECF No. 462-23) at 3.) The notes

reflect the following with respect to the "two principles:"

> a. To do no further harm in the market as of March 23, 2010. No movement forward on the use of medical questionnaires/medical underwriting. The only other Blue that uses medical questionnaires is Blue Cross of Northeastern Pennsylvania.
>
> b. The phase out of experience rating and demographic rating. And the Commissioner wants to place rate caps on the commercials. He would like to see 15%, but thinks that he can get Sam Marshall and company to agree with a start of 25% and phase in lower caps.

(Cashion Decl., Ex. 36 (ECF No. 462-23) at 3.) Highmark expressed to Ario that it desired to

use the following for HHIC: (1) medical questionnaires; (2) health status for new business;

(3) health status for renewals; and (4) full demographics. (Id. at 4.) Ario told Highmark that

it did "not make sense" to create HHIC in light of pending health care reform that would take

place in 2014. (Id. at 3.) Highmark's notes from the April 1, 2010 meeting provide that

David O'Brien, a representative from Highmark, asked Ario: "Okay, what is the bottom line

here? Are you saying that you will prevent us from going downstream?" (Cashion Decl., Ex.

36 (ECF No. 462-23 at 5.) Ario responded:

> Yes to be transparent. The Governor supports [this] position. He will go to the legislature and have them draft legislation to stop Highmark from using medical questionnaires. He will issue an order blocking it. Or we may have to fight in court.

(Id.) Highmark understood from the meeting that the PID would not approve HHIC's PPO

application unless Highmark agreed upon certain rate limitations for HHIC. (Cashion Decl.

(ECF No. 490) ¶ 52.) Regardless whether PID had the "authority" to require HHIC to agree

to rate restrictions, HHIC claims it believed PID had the "ability" to effectively insist on such an agreement, such as by "delay[ing] .... our ability to enter the market with HHIC using these methods by withholding their approval of any of the applications." (CCSMF (ECF No. 488) at pl.'s ¶ 65.) It was unclear at the time to the PID and to Highmark whether the PID had the authority to deny HHIC's PPO application unless HHIC agreed to certain terms and conditions. (Zappala Decl., Ex. H (ECF No. 473-8) at 42-43.)

On April 20, 2010, Ario sent to Melani an email, which provided, among other things:

> Last Thursday…I found out that your folks didn't think it was workable to keep the downstream company under rate regulation even if we agreed to certain parameters like the 25% rate cap. This surprised me since I had said in every discussion that the flexibility we would have with rate review was the "grease" that could make a deal, but having heard your objection, I went back to the commercials and worked out a simpler deal, which I sent to Dave later Thursday night. The essence of the deal is to lock in the 25% renewal cap for everyone, and then Highmark gets out of rate regulation for the downstream company in exchange for agreeing not to use medical underwriting on new business.
>
> …
>
> In conclusion, the choice is yours. You can continue working toward a deal that is very close and that will get you the downstream flexibility you want, with reasonable parameters to prevent disruption between now and 2014. Or we can play it out in a more confrontational manner, where we have to look at your downstreaming proposal with the worst case assumptions (ie. [sic] that you won't accept any of the rate constraints that other Blues might agree to and therefore that we may end up with market disruptions and ultimately may have trouble with HHS over the "unreasonable" rate increases that they are charged with addressing between now and 2014). I hope you choose the former.

(Cashion Decl., Ex. 37 (ECF No. 462-24) at 2-3.)

Highmark sent the PID commissioner a letter dated April 12, 2010, in which it offered to have HHIC, among other things, discount up to 50% from the base rate utilized by Highmark, or impose a surcharge of up to 25% above the base rate utilized by Highmark.

(Cashion Decl., Ex. 21 (ECF No. 462-12) at 3.) Highmark proposed that: (1) HHIC could consider prior claims experience information in determining whether and how much to discount or surcharge a particular group's rates when setting renewal rates; and (2) beginning on January 1, 2011, HHIC could use medical underwriting to determine how much to charge new small groups. (CCSMF (ECF No. 488) ¶ 109.)

On April 13, 2010, the PID responded to Highmark's letter dated April 12, 2010, and identified at least two issues that "need[ed] more work." (CCSMF (ECF No. 488) ¶ 110.) The PID's letter dated April 12, 2010, provided:

> [T]he letter does not provide any context as to what the real agreement is, which is for the Insurance Dept [sic] and Highmark (and other insurers as well) to work with the legislature to achieve a transition plan which is best for individuals and small businesses in Pennsylvania. The fundamentals of that plan, as discussed, are that no insurer adopt new rating practices that further segment the market between now and 2014 (the changes we would allow under paragraph 4 would be an exception to this "status quo" principle) and that rate increases be capped and ideally ramped down between now and 2014.

(Cashion Decl., Ex. 22 (ECF No. 462-13) at 2.)

On April 23, 2010, Cashion, Ario and Randy Rohrbaugh ("Rohrbaugh") of the PID held a telephone conference to discuss the issues raised by Highmark's letter dated April 12, 2010, and the PID's response dated April 13, 2010. (CCSMF (ECF No. 488) ¶ 112.) As part of the negotiations between Highmark and the PID with respect to HHIC's PPO applications, the PID informed Highmark that it would be amenable to HHIC utilizing medical underwriting after 2010, if HHIC agreed to not use the health status rating factor to increase rates by more than twenty-five percent with respect to that factor. (Id. ¶ 113.)

On April 24, 2010, Cashion sent an email to Ario, among others. (Cashion Decl., Ex. 24 (ECF No. 462-13) at 2-3.) Cashion in the email expressed concerns about the flexibility of

the "25% cap" agreed to by Highmark and the PID. (Id.at 2.) Cashion proposed the following:

> HHIC has modified the agreement letter (copy attached) to agree to a 25% cap on the portion of a small group customer's renewal rate increase that is associated with a change in the health status factor used in the customer's renewal rate calculation. This would also apply to the rates offered to small group customers transitioning from Highmark Inc. This limitation would apply until July 1, 2011 effective dates. At that time HHIC would no longer be subject to this limitation, unless the Department were able to get all of the other 8 Major Health Insurers in PA to agree to this limitation, then HHIC will also agree to continue with the limitation beyond June 30, 2011.

(Cashion Decl., Ex. 24 (ECF No. 462-13) at 2.)

On April 26, 2010, HHIC and the PID signed their agreement with respect to the PID's approval of HHIC's PPO applications. (CCSMF (ECF No. 488) ¶ 115.) The April 26, 2010 agreement is entitled "CONFIDENTIAL" and provides:

> This constitutes Notice pursuant to Section 707 of the Pennsylvania Right-to-Know Law that this Letter contains Trade Secret and/or Confidential Proprietary Information. Therefore, Highmark Inc. or HM Health Insurance Company must, prior to the release of any portion of this Letter, be notified of any request by a third party for access to this document, and the Trade Secret and/or Confidential Proprietary Information identified by Highmark Inc. or HM Health Insurance Company should be redacted before release.

(ECF No. 462-16 at 2.) The agreement provided that the PID and DOH would approve HHIC's PPO application and individual conversion product filing, including the associated rates. (Id.) In exchange for these approvals, HHIC agreed to "limit the rate increases for renewing small group customers," including those that chose to transition from Highmark to HHIC, "for adjustments associated with health status." (Id. ¶ 116.) Specifically, "for any renewal rate increase, ... the portion of the renewal rate increase determined by a change in the given small group customer's health status factor used in HHIC's rate making formula

will be limited to no more than 25%" for all policies with an effective date from July 1, 2010, until July 1, 2011. (Id.) HHIC agreed that the 25% cap could remain in place after July 1, 2011, if the PID secured agreement from HHIC's commercial competitors that they would also accept the 25% cap. (Id. ¶ 117.) HHIC agreed that it would not use medical questionnaires for small group policies with effective dates from July 1, 2010, until July 1, 2011, and that it would not use "health status factors" for new small group policies from July 1, 2010, until July 1, 2011. (Id. ¶ 118.) Although HHIC did not have the right to use "health status factors" until July 1, 2011, the PID permitted HHIC to seek PID approval for its use of "health status factors" starting as early as January 1, 2011. (Id. ¶ 119.) The PID did not place any limits on HHIC's ability to adjust factors other than the health status factor. (Zappala Decl., Ex. A (ECF No. 477-1) at 187.) On April 26, 2010, the PID and DOH provided HHIC a joint letter approving HHIC's PPO application. (CCSMF (ECF No. 488) ¶ 120.)

### H. The PID's follow-up to Highmark and HHIC about the questionnaire

On June 18, 2010—after HHIC and the PID reached an agreement with respect to HHIC's PPO applications—Highmark sent to the PID its response to the follow-up questions to the questionnaire dated March 31, 2010. (Cashion Decl., Ex. 31 (ECF No. 462-19) at 2.) Highmark explained to the PID via a letter dated June 18, 2010, that it was "unable to provide a complete response of behalf of HHIC" because:

> HHIC had not yet made final decisions regarding specific rating factors and ranges it would utilize for HHIC's small group business…[and] was, at that point in time, in the midst of discussion with the [PID]…regarding the business and rating practices HHIC would implement when it would begin to offer products in Pennsylvania.

(Id.)

The parties dispute whether the questionnaire related to HHIC's PPO applications. (CCSMF (ECF No. 488) at pl.'s ¶ 81.) Christopher Monahan ("Monahan"), who was the director of the PID's Bureau of Market Actions at the time the questionnaire was received by Highmark, testified during his deposition that:

− he first reviewed the questionnaire in preparation for his deposition in this case (Zappala Decl., Ex. F (ECF No. 477-6) at 19);

− "when [his]…unit would conduct studies, [it]…would ask for information" (id. at 20);

− he "believe[d]…[the] information requested [in the questionnaire] was requested as part of an analysis study of the industry" (id.);

− the PID via the questionnaire was "looking for multiple use [sic] of information" (id. at 21);

− he could not recall whether the questionnaire "was limited to just HHIC" or if the PID was "asking other insurance companies the same or similar questions" (id. at 21-22);

− the kind of study associated with the kind of questionnaire at issue in this case "typically were aimed at industries not a particular company" (id. at 22);

− he knew "with a certain level of certainty that [the PID]…never conduct[s] studies on just a target entity....It's more of how is the industry handling changes to law or issues in [the]…market space" (id.);

− although he could not "guarantee [it]," it would be a "fair statement" that the "medical questionnaire rating factor analysis was most likely broader than just Highmark or HHIC" (id. at 22-23);

− he was not aware, i.e., he had no recollection, whether the questionnaire was "related to Highmark/HHIC's application for a PPO plan" (id. at 27);

− his "area of enforcement doesn't deal with PPO applications or approvals or anything like that" (id.);

− in March 2010, he would not have been involved in reviewing a PPO application (id.);

29

– based upon his review of the questionnaire, he did not "see anything linking [i]t to a PPO application" (id.);

– it is his understanding that the questionnaire "was a project separate and apart from any application process[,]" and "[t]he entire study whatever the questions may have been were not part of, at least from [his]…awareness, of any PPO application process" (id.);

– he was not the "individual within PID that Highmark would approach for help in passing a law;" (id. at 41);

– he was not the "right individual" to testify "about whether some part of PID was regulating or attempting to regulate HHIC's rates" (id. at 41); and

– he did not know whether "there was any effort to regulate HHIC's rates or use of a medical questionnaire" (id. at 42.)

Ario testified in his deposition that: "the PID used some of the information it got in its questionnaire to support some of the legislative initiatives it was trying to pass or supporting in the legislature to basically level the playing field in the small group marketplace." (Zappala Decl., Ex. H (ECF No. 477-8) at 91.)

The April 26, 2010 agreement did not prevent HHIC from raising a small group customer's rate more than 25% based on other non-health status factors or impose any restrictions on HHIC's ability to raise or lower rates based upon non-health status factors. (CCSMF (ECF No. 488) pl.'s ¶¶ 83-84.) Pursuant to the agreement, HHIC was not required to first receive the approval of the PID with respect to its actual rates. (Cashion Decl., Ex. 25 (ECF No. 462-16).) Ario testified at his deposition that the PID retained authority "to ask specific questions about a specific case." (Zappala Decl., Ex. H (ECF No. 473-8) at 57.) Ario explained:

They could never just say we're not telling you anything, but they didn't necessarily have to give us all the information either. And they certainly couldn't take one case and say, because we've got one case now, we want you to show us everything that you've done as if you had filed the rates with us originally for the whole block of business we're talking about. It would be a surgical kind of disclosure.

(Id.) Ario agreed that the PID's authority with respect to HHIC's actual rates could be described as the authority to investigate "the rates charged on the back end if PID received complaints." (Id. at 58.)

The PID—prior to rates being charged to consumers—did not review or approve the total rates charged to small groups by HHIC. (CCSMF (ECF No. 488) pl.'s ¶ 86.) The PID could not "determine, before rates [were] used, if the proposed rate increases [were]…excessive, inadequate, or unfairly discriminatory." (Zappala Decl., Ex. K (ECF No. 477-11) at 5.)

## I. Highmark's and HHIC's conduct beginning on July 1, 2010

Because HHIC was a for-profit entity, HHIC—if approved as a PPO—was not required to file any base rates or base formulas for small group health insurance products with the PID until March 21, 2012. (Id. at pl.'s ¶ 19.) HHIC filed rates only for its individual conversion product and a dental plan. (Id. at pl.'s ¶ 74.) Starting with renewals on July 1, 2010, Highmark did not offer health insurance options to small groups (other than its Medicare complement product). (CCSMF (ECF No. 488) ¶ 121.) During the next renewal period following July 1, 2010, small groups were able to choose a new policy through HHIC, or choose to purchase an HMO product from Keystone Health Plan West, Inc. or plans provided by other insurance companies offering small group plans in Western Pennsylvania. (Id. ¶ 122.) After June 2011, Highmark did not have any active small group policies other

than its Medicare complement product. (Id. ¶ 123.) Highmark did not convert any policy from Highmark to HHIC unless the small group itself had elected to do so during its renewal period. (Id. ¶ 124.) Highmark did not take any action in the marketplace relating to its plan of withdrawal until the PID confirmed that it had reviewed the plan or withdrawal. (Id. ¶ 125.) HHIC did not take any action in the marketplace relating to its new PPO product application until the PID and DOH approved the action. (Id. ¶ 126.)

### J. Plaintiffs' Allegations in the Third Amended Complaint

In the third amended complaint, Cole's Wexford alleges that Highmark, the largest health insurance provider in Western Pennsylvania, engaged in a conspiracy with UPMC, the largest provider of medical care in that same region, to monopolize their respective markets. (CCSMF (ECF No. 488) pl.'s ¶ 1.) Cole's Wexford alleges that, beginning in 2002, UPMC agreed to protect Highmark's dominant market position by, among other things: curtailing the extent to which UPMC offered its own insurance coverage that would have competed with Highmark; refusing to make its complete network available to competing health insurers; and refusing to sell its insurance subsidiary to actual or potential competitors of Highmark. In exchange, Highmark, among other things, agreed to stop supporting the West Penn Allegheny hospital system, i.e., UPMC's principal competitor for the provision of health care services in Western Pennsylvania, and to drop its "Community Blue" insurance coverage, which offered lower-cost insurance options that used West Penn Allegheny's network. (Id. at pl.'s ¶ 2.) Cole's Wexford alleges that beginning on July I, 2010, Highmark migrated its small group customers to HHIC, which was a for-profit subsidiary of Highmark and whose

premiums were not required to be filed with, reviewed by, or approved by the PID until March 21, 2012. (Id. at pl.'s ¶ 3.)

## IV.    Standard of Review

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Even then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. Id. at 248–49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255; Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Doe v. Cnty. of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir.2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). The summary judgment inquiry asks whether there is a need for trial—"whether, in

other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250.  In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150–51 (2000) (citing cases); <u>Liberty Lobby</u>, 477 U.S. at 248–49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. <u>Celotex</u>, 477 U.S. at 323; <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. <u>Marten v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007) (citing <u>Celotex</u>, 477 U.S. at 325).  A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. <u>Celotex</u>, 477 U.S. at 322–23.  Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. FED. R. CIV. P. 56(e); <u>see</u> <u>Liberty Lobby</u>, 477 U.S. at 247–48; <u>Celotex</u>, 477 U.S. at 323–25. If the evidence the nonmovant produces is "merely colorable, or is not

significantly probative," the moving party is entitled to judgment as a matter of law. <u>Liberty Lobby</u>, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" <u>Corliss v. Varner</u>, 247 Fed.Appx. 353, 354 (3d Cir. 2007) (quoting <u>Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir. 2002)).

## V. Analysis

The measure of damages set forth by plaintiff in the third amended complaint is the difference between the "unregulated" rates HHIC charged plaintiff from July 1, 2010, through March 21, 2012, and rates that HHIC would have charged the plaintiff but-for the alleged UPMC-Highmark conspiracy. Highmark argues in its motion for summary judgment that under the <u>Noerr-Pennington</u> doctrine it is immune from any liability for causing that injury. (ECF No. 460 at 12.) Highmark explains it "could not (and did not) offer any products through HHIC until the Commonwealth (including both the PID and DOH) approved its application to offer small group products through HHIC." (<u>Id.</u>) According to Highmark, under those circumstances, <u>Noerr-Pennington</u> bars plaintiff's claims in this case.

Plaintiff argues that it does not seek damages based upon the PID's approval of HHIC's PPO applications; rather, plaintiff seeks damages based upon Highmark's role in the alleged UPMC-Highmark conspiracy, which is not the direct result of any governmental action. According to plaintiff, "[t]he granting of the PPO Application merely made it possible for Plaintiff to recover the damages it suffered," which is "not sufficient to trigger the Noerr-Pennington doctrine." (ECF No. 474 at 5.) Secondly, plaintiff argues that Highmark did not engage in petitioning conduct falling within the ambit of the Noerr-Pennington doctrine. (Id. 474 at 14.)

Highmark also argues that—at the very least—it is entitled to summary judgment with respect to plaintiff's claims for alleged damages arising between July 1, 2010, and June 30, 2011,[8] because it had to "seek and obtain approval from the PID for the rates that HHIC charged during those 12 months." (ECF No. 460 at 15.) Highmark argues that it is, therefore, immune from any liability for charging those regulated rates under the Noerr-Pennington doctrine and because those rates were regulated by the PID, they cannot form the basis of antitrust damages under the filed rate doctrine. (Id.) Plaintiff argues in response that—at a minimum—"there is a dispute of material fact as to whether the PID 'reviewed and approved' HHIC's rates," which prevents the entry of summary judgment on plaintiff's claims arising between July 1, 2010, and June 30, 2011, based upon either the filed rate doctrine or the Noerr-Pennington doctrine. (Id. at 17-19.)

---

[8]     As discussed above, HHIC—pursuant to the agreement dated April 26, 2010—agreed to certain limitations with respect to its small group rates charged during this time period. (CCSMF (ECF No. 488) ¶¶ 115-20.) HHIC's small group rates were not statutorily required to be filed with the PID during that timeframe. 40 PA. CONS. STAT. § 3803(d) (2010).

Each of the parties' arguments, the evidence of record related to those arguments, and the applicable law will be addressed below.

## A. The Noerr-Pennington Doctrine

Individuals and corporations, or combinations thereof, who devise monopolies or other restraints on trade and competition are subject to liability under various antitrust laws, including the Sherman Act. The Noerr-Pennington doctrine limits that liability when an anticompetitive restraint or commercial environment is the product of "valid governmental action" rather than solely the conduct of private actors. E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961). When market participants attempt to influence the government to enact laws, regulations, or policies that produce anticompetitive effects, they are exempt from antitrust liability when government activity directly causes the alleged injuries. Id. The Noerr-Pennington doctrine is "rooted in the [Petition Clause[9] of the] First Amendment and fears about the threat of [antitrust] liability chilling political speech." A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 250 (3d Cir. 2001). This immunity prevents antitrust laws from intruding upon the ability of individuals and groups to participate in the activities of government, advocate desired changes, and contribute to the marketplace of ideas. The basic tenets of Noerr-Pennington immunity are established in the trilogy of Noerr, United Mine Workers of America v. Pennington, 381 U.S. 659 (1965), and California Motor Transit Co. v. Trucking Unlimited, 404 U.S. 508 (1972).

---

[9] "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the government for a redress of grievances." U.S. CONST. AMEND. I.

In Noerr, a group of railroad companies launched a publicity campaign aimed at discrediting trucking companies that they competed with for business in long-distance freight. Noerr, 365 U.S. at 129. The trucking companies alleged a conspiracy directed at "creat[ing] an atmosphere of distaste for the truckers among the general public," and depriving them of significant business by successfully persuading the Governor of Pennsylvania to veto a bill that would have allowed truckers to carry heavier loads on state roads. Id. at 129-30. The Supreme Court held that such campaigns to influence legislation do not violate the Sherman Act. Id. at 145. The Court distinguished actions typically held to violate the Sherman Act, such as "price-fixing agreements, boycotts, [and] market-division agreements," from "two or more persons [associating] together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." Id. at 136. The Court recognized that "[i]t is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." Id. at 139. The Court rejected extending antitrust liability for advocacy directed at government by reason of "the [constitutional] right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws." Id. The Court explained that imposing antitrust liability for petitioning government, even for advocating laws and policies with intended anticompetitive effects, is "depriv[ing] the government of a valuable source of information and, at the same time, depriv[ing] the people of their right to petition in the very instances in which that right may be of the most importance to them." Id.

Pennington involved a wage agreement between a miners' union and companies that provided coal to the Tennessee Valley Authority ("TVA"). Pennington, 381 U.S. at 659-60. A provision in that agreement called for the coal companies to pay royalties to the union's retirement fund. Id. at 659. The union sued the coal companies when they withheld some royalty payments. Id. at 659. The coal companies, in a counterclaim, alleged that the union, colluding with other large coal companies, negotiated the wages in this Department of Labor-approved agreement to be so high as to effectively exclude smaller coal companies from TVA contracts. Id. at 660. The Court criticized the lower courts' inadequate consideration of Noerr in evaluating this counterclaim. Id. at 669-71. The Court held that damages were unwarranted for alleged injuries stemming from the agreement's wages because the Secretary of Labor participated in the wage negotiations and approved the final agreement. Id. The Court explained: "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone, or as part of a broader scheme itself violative of the Sherman Act." Id. at 670. The Court held that the actions of the union and coal companies did not violate the Sherman Act; rather, the action setting the wages was that of "a public official who is not claimed to be a co-conspirator." Id. at 671.

In California Motor, a highway carrier initiated proceedings with a state regulatory agency to defeat a competing carrier's operating rights in that state. California Motor, 404 U.S. at 509, 511. The affected carrier alleged a "concerted action" to initiate those proceedings to preserve an anticompetitive advantage in transportation of goods. Id. at 509. The Supreme Court recognized that businesses' "use [of the] channels and procedures of state and federal

agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-á-vis* their competitors" was integral to First Amendment petition and association rights. Id. at 510-11. When a party petitions the government in such a way as to effectively "bar [its] competitors from meaningful access to adjudicatory tribunals and…usurp that decisionmaking process," however, Noerr-Pennington immunity does not exist. Id. at 511-12. The Court explained that the First Amendment "does not necessarily give [petitioners] immunity from the antitrust laws" because the rights it provides may be regulated "when they are used as an integral part of conduct which violates a valid statute." Id. at 513-14. The First Amendment "may not be used as the means or the pretext for achieving 'substantive evils'…which the legislature has the power to control." Id. at 515 (internal citation omitted). Although the Court in California Motor held that the defendant was not entitled to immunity in that case, the Court explained that "[t]he same philosophy [of Noerr and Pennington] governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. Certainly the right to petition extends to all departments of the Government." California Motor, 404 U.S. at 510.

Plaintiff in the third amended complaint alleges it was injured because the alleged UPMC-Highmark conspiracy led to inflated rates charged by HHIC. (ECF No. 286 ¶ 2.) "Plaintiff does not claim to be injured by either the PPO Application or its approval." (ECF No. 474 at 12.) Highmark in its motion for summary judgment argues that but-for the PID's and DOH's approval of the PPO applications, which permitted HHIC to act as a for-profit small-group health insurer, HHIC could not charge plaintiff those supracompetitive rates.

Highmark's argument oversimplifies the application of the Noerr-Pennington doctrine in this case.

The Supreme Court has held that in a case that involves "a mixture of private and public decisionmaking," a private party's conduct—despite being approved by a state agency—will be subject to the antitrust laws and not immune from liability when "the private party exercised sufficient freedom of choice" with respect to its conduct that caused antitrust injury. Cantor v. Detroit Edison Co., 428 U.S. 595, 593 (1976) (plurality).[10] In Cantor, the

---

[10]    In Cantor: Justice Stevens wrote for the plurality; Justices Stewart, Powell, and Rehnquest dissented from the plurality opinion; Chief Justice Berger concurred in the judgment and concurred in part; and Justice Blackmun concurred in the judgment. Cantor v. Detroit Edison Co., 428 U.S. 595, 593 (1976).

The Second Circuit Court of Appeals explained the division of the Court in Cantor as follows:

> In Cantor, the plurality held that a tariff filed by an electric utility could not evade scrutiny under the antitrust laws simply because it was filed in accordance with state law and approved by a state agency. The Cantor plurality stated that

>> nothing in the Noerr opinion implies that the mere fact that a state regulatory agency may approve a proposal included in a tariff, and thereby require that the proposal be implemented until a revised tariff is filed and approved, is a sufficient reason for conferring antitrust immunity on the proposed conduct.

> Id. Chief Justice Burger did not concur in that portion of the plurality's opinion discussing Noerr-Pennington, but his objection went to the plurality's construction of the "state action" exemption doctrine under Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and he said nothing in disagreement with the plurality's interpretation of Noerr. Justice Blackmun's concurrence also did not address Noerr, but rather would rely on "a rule of reason, taking it as a general proposition that state-sanctioned anticompetitive

plaintiff, "a retail druggist selling light bulbs," sued the defendant, a distributor of electricity and electric light bulbs, under §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act, 15 U.S.C. § 14. <u>Cantor</u>, 428 U.S. at 581. The defendant was "the sole supplier of electricity in the relevant market and supplied its consumers with "almost 50% of the standard-size light bulbs they use[d] most frequently." <u>Id.</u> at 582. Pursuant to the defendant's "light-bulb-exchange program," the defendant's "[c]ustomers [were] billed for the electricity they consume[d], but [paid] no separate charge for light bulbs." <u>Id.</u> The defendant's rates charged to its consumers for electricity pursuant to the light-bulb-exchange program were "approved by the Michigan Public Service Commission" (the "commission"). <u>Id.</u> The defendant was not permitted to abandon the light-bulb-exchange program or otherwise change its rates without the commission's approval. <u>Id.</u> The defendant's light-bulb-exchange program began in 1886; the commission began regulating electric utilities in the relevant market in 1909; and the commission first approved a rate filed by the defendant with respect to the light-bulb-exchange program in 1916. <u>Id.</u> at 583. The plaintiff argued that the defendant's light-bulb-exchange program "foreclose[d] competition in a substantial segment of the light-bulb market." <u>Id.</u> The Court noted in its recitation of the facts that light-bulb distribution was not regulated in the relevant market, and, therefore, the commission's "approval of [the defendant's] decision to maintain such a program [did] not, therefore, implement any statewide policy relating to light bulbs." <u>Id.</u> at 585.

activity must fall like any other if its potential harms outweigh its benefits."
428 U.S. at 610, 96 S.Ct. at 3127.

<u>Litton Systems, Inc. v. Am. Tel. and Tel. Co.</u>, 700 F.2d 785, 808 (2d Cir. 1983).

The district court and the court of appeals held that the commission's approval of the light-bulb-exchange program exempted the defendant's conduct from the federal antitrust laws. Cantor, 428 U.S. at 581. The issue presented to the Supreme Court, among others, was whether "private conduct required by state law is exempt from the Sherman Act." Id. at 592. The Court acknowledged that while the defendant could not maintain or abandon the light-bulb-exchange program without the approval of the commission, "the option to have, or not to have, such a program [was] primarily" the decision of the defendant and not of the commission. Id. at 594. The Court held that under those circumstances, the defendant's conduct was not exempt from the antitrust laws. Id. at 598.

The Ninth Circuit Court of Appeals in Sanders v. Brown, 504 F.3d 903 (9th Cir. 2007), distinguished Cantor and declined to follow the opinion in that case. In Sanders, the plaintiff, a cigarette smoker, filed a class action against the defendants, "the nation's largest tobacco companies," and the attorney general of the state of California, based upon a "Master Settlement Agreement" ("MSA") entered into by the defendants. Id. at 906. The court of appeals explained the MSA as follows:

> The MSA requires the four major tobacco companies—who, as the initial signatories of the MSA, are known as the "Original Participating Manufacturers"—to pay the states billions of dollars each year. The total annual payments are based on a formula that considers inflation and the total number of individual cigarettes sold in the fifty United States, the District of Columbia and Puerto Rico. Each Original Participating Manufacturer (or "OPM") must annually contribute a portion of the total payment that is equal to the OPM's share of that year's cigarette sales (the OPM's "market share"). For example, if an OPM's market share is 25 percent, that OPM must contribute 25 percent of that year's settlement payment.

Id. at 907. The California legislature—following the creation of the MSA—enacted two statutes implementing the MSA. Id. The plaintiff—on behalf of the putative class—alleged,

among other things, that "the MSA…spawned a 'cartel' because it let…the participating tobacco companies 'raise prices without fear of losing sales or market share,'" i.e., the cartel caused supracompetitive cigarettes prices, and that it "encouraged the states to pass anti-competitive laws protecting the alleged cartel from price competition." Id. at 908.

The defendants filed motions to dismiss arguing that their conduct was immune to antitrust liability under the Noerr-Pennington doctrine and the state action immunity doctrine. Sanders, 504 F.3d at 910. The district court granted the motions to dismiss and held, among other things, that "the defendants were entitled to Noerr–Pennington immunity because their acts of negotiating and entering into the MSA constituted protected speech." Id. The court of appeals began its analysis by explaining that the "act of negotiating a settlement with a state undoubtedly is a form of speech directed at a government entity." Id. at 913. The court then held: "Noerr–Pennington immunity protects a private party from liability for the act of negotiating a settlement with a state entity. Immunity thus protects the tobacco defendants from liability for the act of negotiating the MSA with the State of California." Id. The plaintiff, however, relied upon Cantor to argue that "even if Noerr–Pennington immunity protects the defendants from liability for the MSA itself, it does not protect the tobacco defendants from liability for increasing prices after the MSA." Id.

The Ninth Circuit Court of Appeals rejected the plaintiff's argument and declined to follow Cantor, which it described as a "fragmented opinion." 504 F.3d at 913. The court explained:

> Justice Blackmun, concurring separately, said he agreed with the plurality "insofar as it holds that the fact that anticompetitive conduct is sanctioned, or even required, by state law does not of itself put that conduct beyond the reach

of the Sherman Act." Id. at 605, 96 S.Ct. 3110 (Blackmun, J., concurring in the judgment).

Id. According to the court in Sanders, the Supreme Court in Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988), "undercut" its decision in Cantor. Sanders, 504 F.3d at 913-14. The court in Sanders explained:

> Subsequent cases cast doubt on the precedential value of this fragmented opinion. The Court itself undercut the Cantor plurality in Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), in which the Court stated that " 'where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." Id. at 499, 108 S.Ct. 1931 (quoting Noerr, 365 U.S. at 136, 81 S.Ct. 523) (internal alteration omitted).

Sanders, 504 F.3d at 913-14.

The court in Sanders analyzed a decision from the Fifth Circuit Court of Appeals that distinguished Cantor under similar facts. Sanders, 504 F.3d at 913 (citing Greenwood Utilities Com'n v. Mississippi Power Co., 751 F.2d 1484 (5th Cir. 1985). In Greenwood, the court did not "question the soundness of the decision in Cantor," but held that the decision was narrow and limited to circumstances in which the antitrust injury was caused by the private party's actions taken pursuant to an agreement. Id. at 1504. The court in Greenwood explained that the Noerr-Pennington doctrine extends immunity to a private party for antitrust injury caused by: (1) its constitutionally-protecting petitioning; *and* (2) the government's actions resulting from the private party's constitutionally-protected petitioning. Id. at 1504. The court explained that if a private party was not immune for governmental action taken as a result of the private party's constitutionally-protected petitioning, "First Amendment petitioning privileges would indeed be hollow" and the Noerr-Pennington

doctrine would be meaningless "in the context of agreements with the government." Id. at

1505.

The court in Sanders relied upon Greenwood to conclude that "Noerr–Pennington

immunity protects a private party from liability not only for the petition, but also for any

injuries that result 'directly' from valid government action taken on the petitioner's behalf."

Sanders, 504 F.3d at 914. The court held:

> This rule is dispositive of Sanders's case, to the extent the injury he
> alleges—supracompetitive cigarette prices—resulted directly from the action
> of the State of California, that is, from "the MSA and the Attorney General's
> enforcement of the escrow statute and contraband statute." **Although
> subsequent agreements by the defendants to engage in the "operation of
> an output cartel" might not be immune from liability under this rule**,
> Sanders's complaint does not allege any such subsequent agreement in restraint
> of trade. Therefore, because Sanders's complaint is based on injuries caused
> directly by government action, Noerr–Pennington immunity shields the
> tobacco defendants from liability for the alleged supracompetitive price
> increases. Since Sanders's claim against the tobacco defendants is predicated
> on these price increases, his claim against the tobacco defendants must fail.

Id. (emphasis added).

A review of Cantor, Sanders, and Greenwood shows that Cantor controls in this case,

and the Noerr-Pennington doctrine does not provide Highmark immunity from plaintiff's

antitrust claims. In Cantor and in this case, the plaintiff complained about injury caused by

the actions taken by the *private* defendant. In Cantor, the plaintiff complained about the

monopoly created by the imposition of the light-bulb exchange program by the private-

defendant, which had been approved by the government. Cantor, 428 U.S. at 594. In this

case, plaintiff complains about the allegedly supracompetitive prices HHIC charged for

small-group health insurance as a result of the alleged UPMC-Highmark conspiracy. In

Sanders and Greenwood, the plaintiffs complained about injury directly caused by actions of

46

the government. In <u>Sanders</u>, the plaintiff complained about supracompetitive cigarette prices caused by laws enacted and enforced by California, pursuant to the MSA. In <u>Greenwood</u>, the plaintiff complained about actions taken by the Southeastern Power Administration ("SEPA"), a division of the Mississippi Department of Energy. <u>Greenwood</u>, 751 F.2d at 1497 (noting that the plaintiff complained about "the activities of Mississippi Power and its affiliates in the Southern Company that caused SEPA to make its initial decision to market federal power exclusively in the Southern system's service area, allegedly giving rise to the bilateral monopoly described by Copeland and allegedly influencing SEPA's decision not to allocate power to Greenwood and the terms of its contract with Mississippi Power.).

The Supreme Court in <u>Cantor</u> instructed that when the injury complained about by the plaintiff is the result of a choice made by the *private* defendant, the defendant's conduct is not protected by <u>Noerr-Pennington</u> doctrine. <u>Cantor</u>, 428 U.S. at 593. The undisputed evidence of record in this case shows that Highmark—a private defendant—agreed to certain rating limitations in the agreement dated April 26, 2010.[11] Highmark was not required or forced to charge plaintiff any rates in accordance with that agreement. The decisions to

---

[11]    The undisputed evidence of record shows that: Highmark submitted its PPO applications to the PID and the DOH for their review; the PID and the DOH reviewed those applications; and Highmark engaged in negotiations with the PID with respect to its approval of those applications. It is not necessary for the court to determine as a matter of law whether Highmark's conduct in submitting the PPO applications to the PID and the DOH was constitutionally-protected petitioning because plaintiff does not claim any injury caused by that conduct. Plaintiff at trial, therefore, will not be permitted to argue to the jury that Highmark's submission of its PPO applications to the PID and the DOH and its negotiations with respect to the agreement dated April 26, 2010, with the PID constituted anticompetitive conduct in violation of the Sherman Act.

operate as a small-group health insurer and charge plaintiff allegedly supracompetitive rates were made "in the boardroom" by Highmark and HHIC and not at the PID or the DOH. Litton Systems, Inc. v. AT & T Co., 700 F.2d 785 (2d Cir.1983).[12] Highmark—like the defendant in Cantor—had sufficient "freedom of choice" to decide whether to act pursuant to that agreement, Cantor, 428 U.S. at 593, and plaintiff does not complain of any action taken by the PID or the DOH. Under those circumstances, Sanders and Greenwood are not applicable to this case, and Highmark is not entitled to Noerr-Pennington immunity with respect to plaintiff's remaining claims. Highmark's motion for summary judgment will be denied on that basis.

---

[12]    The Second Circuit Court of Appeals in Litton Systems, Inc. v. AT & T Co., 700 F.2d 785 (2d Cir.1983), explained:

> [I]n this case, as in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962), the Noerr-Pennington doctrine is "plainly inapposite" because AT & T was "engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws." **The decision to impose and maintain the interface tariff was made in the AT & T boardroom, not at the FCC**; AT & T's power to exclude Litton and other competitors from the telephone terminal equipment market resulted not from the FCC's regulatory authority but from AT & T's exclusive control of the telephone network. AT & T cannot cloak its actions in Noerr-Pennington immunity simply because it is required, as a regulated monopoly, to disclose publicly its rates and operating procedures. The fact that the FCC might ultimately set aside a tariff filing does not transform AT & T's independent decisions as to how it will conduct its business into a "request" for governmental action or an "expression" of political opinion. Similarly, the FCC's failure to strike down a tariff at the time of its filing does not make the conduct lawful, particularly where, as in this case, the agency specifically declines to rule on a tariff's legality.

Litton, 700 F.2d at 807-08 (emphasis added).

48

## B. The Filed Rate Doctrine[13]

---

[13] This court in three other opinions issued in this case applied the filed rate doctrine to claims asserted or proposed by plaintiff. (ECF Nos. 240, 284, 301.) One treatise noted that the court's opinions dated September 27, 2013, (ECF No. 240), and August 21, 2014, (ECF No. 284) applied the filed rate doctrine to claims in this case even though the "'state action' prongs [were]…not shown to be satisfied." PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 247 (Supp. 2017). "Under the state action doctrine, private entities participating in state-administered price regulation can assert antitrust immunity if, inter alia, 'the State provides active supervision of anticompetitive conduct undertaken by private actors.'" McCray v. Fidelity Nat'l Title Ins. Co., 682 F.3d 229, 238 n.6 (3d Cir. 2012). According to Areeda and Hovenkamp: "Extending the [filed rate] doctrine to state agencies raises the troublesome issues that rate filings may serve to confer an effective antitrust immunity in situations where antitrust's 'state action' doctrine would not apply." IA PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 247e (4th ed. 2013). Areeda and Hovenkamp explain that "[t]he most sensible approach would be to limit application of the filed rate doctrine as applied to state regulators only when the regulatory regime in question would qualify for state action immunity." Id.

This court is bound to follow the decisions of the Court of Appeals for the Third Circuit. In McCray, the court of appeals affirmed the decision of the district court to apply the filed rate doctrine to bar federal antitrust claims based upon rates filed with the Delaware Insurance Department, i.e., a state regulatory agency. The court of appeals did not analyze whether the state action doctrine applied to that case and explained:

> [T]here is no apparent requirement to reconcile the filed rate and state action doctrines, as courts have generally applied them independently. See, e.g., Trigen–Okla. City Energy Corp. v. Okla. Gas & Elec. Co., 244 F.3d 1220, 1224–25 (10th Cir.2001) (dismissing claims under state action doctrine and as a result declining to reach filed rate doctrine); City of Kirkwood v. Union Elec. Co., 671 F.2d 1173, 1182 (8th Cir.1982) (independently analyzing the filed rate doctrine and the state action doctrine). Moreover, the doctrines do not completely overlap because the filed rate doctrine, unlike the state action doctrine, does not provide complete immunity from antitrust liability. See Essential Commc'ns, 610 F.2d at 1121.

McCray, 682 F.3d at 238 n.6. Based upon the analysis in McCray, a court may apply the filed rate doctrine to federal antitrust claims arising from rates filed with a state regulatory agency without conducting an analysis of the state action doctrine.

## 1. The parties' arguments

Highmark argues that it is entitled to summary judgment "on plaintiff's claims from July 1, 2010 through June 30, 2011" because the measure of damages for that time period is barred by the filed rate doctrine. Highmark explains:

> Here, when the PID gave its approval for HHIC to operate as a PPO and sell small group plans, the PID indisputably knew how HHIC intended to set its rates, had access to HHIC's rates, set rate limitations in the April 26 agreement, and investigated any complaints about those rates that it received. Thus, the PID "in fact authorized" HHIC's rates.

(ECF No. 485 at 13.) Plaintiff argues that "[a]t a minimum, there is a dispute of material fact as to whether the PID 'reviewed and approved' HHIC's rates." (ECF No. 474 at 17.) According to plaintiff, the PID did not review and approve HHIC's rates, which were submitted to the PID after it approved HHIC's PPO applications. (Id. at 18.)

## 2. The filed rate doctrine, <u>Keogh v. Chicago & Northwestern Ry. Co.</u>, 260 U.S. 156 (1922)

The filed rate doctrine "'bars antitrust suits based on rates that have been filed and approved by federal agencies'" and state agencies.[14] <u>McCray v. Fidelity Nat'l Title Ins. Co.</u>,

---

[14] The court in <u>Borough of Landsdale v. PP & L, Inc.</u>, recognized:

> Numerous courts have held that the filed rate doctrine applies equally to rates filed with state agencies. <u>See</u> <u>Wegoland Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 20 (2d Cir.1994); <u>Taffet v. Southern Co.</u>, 967 F.2d 1483, 1494 (11th Cir.1992) (holding that the filed rate doctrine applies with equal force whether the rate at issue was set by a state or federal rate-making authority); <u>H.J., Inc. v. Northwestern Bell Tel. Co.</u>, 954 F.2d 485, 494 (8th Cir.1992) ("the rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency"). The filed rate doctrine can be a defense to both federal and state law actions based on the regulated rates. <u>See</u> <u>Ark. La. Gas Co. v. Hall</u>, 453 U.S. 571, 578, 101 S.Ct. 2925, 69 L.Ed.2d 856

682 F.3d 229, 236 (3d Cir. 2012) (quoting Utilimax.com, Inc. v. PPL Engery Plus, LLC, 378

F.3d 303, 306 (3d Cir. 2004)).

> When the filed rate doctrine applies, it is rigid and unforgiving. Indeed, some
> have argued that it is unjust. *See, e.g.,* Fax Telecommunicaciones Inc. v. AT &
> T, 138 F.3d 479, 491 (2d Cir.1998); Ting v. AT&T, 319 F.3d 1126, 1131 (9th
> Cir.2003). It does not depend on "the culpability of the defendant's conduct or
> the possibility of inequitable results," nor is it affected by "the nature of the
> cause of action the plaintiff seeks to bring." Marcus v. AT&T Corp., 138 F.3d
> 46, 58 (2d Cir.1998).

Simon v. Keyspan Corp., 694 F.3d 196, 205 (2d Cir. 2012).

The "explicit foundation" for the filed rate doctrine was set forth in Keogh v. Chicago

& Northwestern Ry. Co., 260 U.S. 156 (1922). See McCray v. Fidelity Nat'l Title Ins. Co.,

636 F.Supp.2d 332, 326 (D.Del. 2009). In Keogh, the Court held a shipper could not

maintain an antitrust lawsuit based upon rates charged by railroad carriers who allegedly

conspired together to fix freight transportation rates because "every rate complained of had

been duly filed by the several carriers with the Interstate Commerce Commission." Keogh,

260 U.S. at 160. The shipper argued that competition was eliminated pursuant to the

conspiracy, which caused the increase in his rates. Id. at 161. The shipper sought damages

measured by the difference between the rates charged pursuant to the conspiracy and the

rates charged prior to the conspiracy going into effect. Id. at 160. The Court dismissed the

lawsuit identifying four reasons for its decision:

> – First, the Court reasoned that the rates charged to the shipper were determined
>   by the Interstate Commerce Commission to be "reasonable and

(1981) (finding that under the filed rate doctrine, "courts lack authority to
impose a different rate than the one approved by the Commission").

Borough of Landsdale v. PP & L, Inc., 426 F.Supp.2d 264, 282-83 (E.D. Pa. 2006).

nondiscriminatory," and it would be improper for the court to hold the carriers liable based upon approved legal rates. Keogh, 260 U.S. at 162-63.

– Second, the Court held that to permit the shipper to recover the difference between the rate charged and a hypothetical lower rate would defeat the purpose of Congress to prevent rate discrimination by "operat[ing] to give [the shipper] a preference over his trade competitors."[15] Id. at 163.

– Third, the Court found the shipper's injury was based upon hypothesis. Id. at 163. The Court explained:

> The burden resting upon the plaintiff would not be satisfied by proving that some carrier would, but for the illegal conspiracy, have maintained a rate lower than that published. It would be necessary for the plaintiff to prove, also, that the hypothetical lower rate would have conformed to the requirements of the Act to Regulate Commerce. For unless the lower rate was one which the carrier could have maintained legally, the changing of it could not conceivably give a cause of action. To be legal a rate must be nondiscriminatory.
>
> …
>
> But it is the Commission which must determine whether a rate is discriminatory; at least, in the first instance….But by no conceivable proceeding could the question whether a hypothetical lower rate would under conceivable conditions have been discriminatory, be submitted to the Commission for determination. And that hypothetical question is one with which plaintiff would necessarily be confronted at a trial.

Id. at 164.

– Fourth, the Court refused to award damages under those circumstances because the alleged damages, based upon a hypothetical rate that should have been charged, were "purely speculative." Id. at 164. The Court explained:

> [R]ecovery cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of

---

[15] The Court rejected the argument that to avoid discriminatory rates all shippers injured may sue to recover based upon the difference in rates. Keogh, 260 U.S. at 164. The Court reasoned that it was "highly improbable" all courts and juries would provide each shipper "the same measure of relief." Id.

expression in figures resulted. These damages must be proved by facts from which their existence is logically and legally inferable. They cannot be supplied by conjecture. To make proof of such facts would be impossible in the case before us. It is not like those cases where a shipper recovers from the carrier the amount by which its exaction exceeded the legal rate. Southern Pacific Co. v. Darnell-Taenzar Co., 245 U. S. 531, 38 Sup. Ct. 186, 62 L. Ed. 451. Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers. Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate might not have benefited him. Every competitor was entitled to be put-and we must presume would have been put-on a parity with him. And for every article competing with excelsior and tow, like adjustment of the rate must have been made. Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him. The benefit might have gone to his customers, or conceivably, to the ultimate consumer.

Id. at 164-65.

The Court, based upon the foregoing rationale, affirmed the decision of the Court of Appeals for the Seventh Circuit dismissing the shipper's claims against the carriers. Id. at 165.

The Court applied the principles set forth in Keogh in Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409 (1986). In Square D, a class of shippers sued motor carriers and the ratemaking bureau for conspiring to fix rates for transporting freight. Square D, 476 U.S. at 412. The shippers requested treble damages measured by the difference between the rates they paid and rates they would have paid "in a freely competitive market." Id. at 413. The district court relied on Keogh and dismissed the shippers' claims for damages. Id. at 414. The court of appeals affirmed the district court's decision with respect to the filed rates. Id. The shippers appealed to the Supreme Court of the United States. Id. at 410. The Supreme Court declined to distinguish Keogh from the case

before it based upon the rates that were charged to the shippers not being "challenged in a formal ICC hearing before they were allowed to go into effect." Id. at 417. The Court in Square D noted that the rates were "duly submitted, lawful rates under the Interstate Commerce Act in the same sense that the rates filed in Keogh were lawful," and the shippers under those circumstances were precluded from maintaining "a treble-damages antitrust action." Id. at 418.

### 3. The PID's lack of authority to regulate the rates about which plaintiff complains

"The filed rate doctrine applies to rates 'properly filed with the appropriate ... regulatory authority.'" McCray, 682 F.3d at 239 (quoting Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577 (1981)). "It is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency that triggers the filed rate doctrine." Norwood, Mass. v. N. England Pwr. Co., 202 F.3d 408, 419 (1st Cir. 2000) (emphasis in original). In other words, "the rate must in fact be 'filed' before the immunity takes effect." IA PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 247 (4th ed. 2013). "The form or details of the filed rate are not relevant to the application of the filed rate doctrine; the rate need only be filed with an agency responsible for overseeing such rates." Borough of Landsdale v. PP &L, Inc., 426 F.Supp.2d 264, 283 (E.D. Pa. 2006) (citing Am. Tel. & Tel. Co. v. Cent. Office Tel., 524 U.S. 214, 222 (1998)). It is axiomatic, however, that "for a court to consider rates filed, and thus protected by the filed rate doctrine, the statutory scheme must provide the regulatory agency with authority to assess rates' compliance with statutory requirements for filed rates." In re Pa. Title Ins. Antitrust Litig., 648 F.Supp.2d 663, 674 (E.D. Pa. 2009); Arkansas

<u>Louisiana Gas Co. v. Hall</u>, 453 U.S. 571 (1981).[16]

One of the policies[17] underlying the filed rate doctrine is the policy of

---

[16]     In <u>Arkansas Louisiana Gas Co. v. Hall</u>, 453 U.S. 571 (1981), the court considered whether the filed rate doctrine "for[bade] a state court to calculate damages in a breach-of-contract action based on an assumption that had a higher rate been filed, the [Federal Energy Regulatory] Commission [("FERC")] would have approved it." <u>Id.</u> at 573. The plaintiffs in the trial court were the producers of natural gas, and the defendant was a customer who purchased the defendant's gas. <u>Id.</u> The parties entered into a contract for the sale of gas, which contained a favored nations clause. That clause provided that if the defendant purchased gas at a higher price from another seller, the plaintiffs were entitled to a higher price for their sales to the defendant. <u>Id.</u> at 573-74. The plaintiffs—as required by law—filed the contract and their rates with the FERC "and obtained from…[the FERC] a certificate authorizing the sale of gas at the rates specified in the contract." <u>Id.</u> at 574. At a later date, the defendant purchased gas from another seller at a higher rate than it agreed to in its contract with the plaintiffs and did not honor the favored nations clause in the contract. <u>Id.</u> The plaintiffs filed suit against the defendant seeking damages measured by  "an amount equal to the difference between the price they actually were paid in the intervening years and the price they would have been paid had the favored nations clause gone into effect." <u>Id.</u>
The Supreme Court in <u>Arkla</u> noted that during the pendency of the legal proceedings, the plaintiffs "gained 'small producer' status," which meant they were no longer required to make rate increase filings. <u>Arkla</u>, 453 U.S. at 575 n.4. The Court ultimately held that "the filed rate doctrine prohibits the award of damages for Arkla's breach during the period that respondents were subject to the…[FERC's] jurisdiction." <u>Id.</u> at 584. The Court, in a footnote inserted at the end of that sentence, explained: "There is no bar to damages for the period after respondents gained 'small producer status." <u>Id.</u> at 585 n.14. Accordingly, <u>Arkla</u> supports the notion that rates that are not subject to the authority of a regulator are also not subject to the filed rate doctrine.

[17]     The Third Circuit Court of Appeals recognizes that there are two policies underlying the filed rate doctrine, which are referred to as the "nondiscrimination strand" and the "nonjusticiability strand" of the filed rate doctrine. <u>In re N.J. Title Ins. Litig.</u>, 683 F.3d at 455-56.
The court of appeals has not recognized the two policies as "*elements* in determining whether to extend the [filed rate] doctrine to new areas[,]" but has analyzed whether the facts of a given case implicate *either* of the policies to determine whether the filed rate doctrine applies to bar claims based upon properly filed rates. <u>Id.</u> at 456-60 (emphasis added); <u>McCray</u>, 682 F.3d at 241-42.

The nondiscrimination strand is concerned with "'preventing carriers from engaging in price discrimination as between ratepayers,'" and "recognizes that 'victorious plaintiffs would wind up paying less than non-suing ratepayers.'" <u>Id.</u> (quoting <u>Wegoland Ltd. v.</u>

nonjusticiability, i.e., the preservation of the "'exclusive role of agencies in approving rates…by keeping courts out of the rate-making process,' a function that 'regulatory agencies are more competent to perform.'" In re N.J. Title Ins. Litig., 683 F.3d 451, 455 (3d Cir. 2012) (quoting Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d Cir. 1998)). Courts have recognized that:

> "(1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set ... rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." Sun City Taxpayers' Assoc. v. Citizens Utils. Co., 45 F.3d 58, 62 (2d Cir.1995).

McCray, 682 F.3d at 242 (quoting Sun City Taxpayers' Ass'n v. Citizens Utils. Co., 45 F.3d 58, 62 (2d Cir. 1995). The concept of nonjusticiability is not implicated in a case if the pertinent agency was not granted the legal authority to regulate rates because the court cannot infringe upon a rate-making authority that does not legally exist. Highmark did not cite to and the court did not find any decision in which a court applied the filed rate doctrine in the absence of a statutory scheme or other law providing the regulating agency the authority to regulate the rates about which the plaintiff complained; indeed, even though some courts in applying the filed rate doctrine have relaxed the requirement that rates be *literally* filed with a regulating agency, the courts maintain that the regulating agency must have the authority to regulate the rates and actually regulate those rates. See e.g., Wortman v.

---

NYNEX Corp., 27 F.3d 17, 21 (2d Cir. 1994)). The nondiscrimination strand is not implicated in this case because plaintiffs are suing defendants "on their own behalf and on behalf of all others similarly situated." (ECF No. 286 at 1); McCray, 682 F.3d at 242. It is, therefore, "unlikely that a victory would allow [plaintiffs] to pay less than other ratepayers." McCray, 682 F.3d at 242.

All Nippon Airways, 854 F.3d 606 (9th Cir. 2017) (discussing decisions in which the Court of Appeals for the Ninth Circuit applied "the filed rate doctrine to circumstances in which the relevant rates were not literally filed" but were regulated by agencies with authority to regulate the rates); Texas Commercial Energy v. TXU Energy, Inc., 413 F.3d 503, 509 (5th Cir. 2005) (holding the filed rate doctrine barred claims based upon market-based rates that were not literally filed but were regulated by the Public Utility Commission of Texas, which had the authority to regulate the rates); Utilimax.com, Inc. v. PPL Energy Plus, LLC, 378 F.3d 303 (3d Cir. 2004) (applying the filed rate doctrine to claims based upon market-based rates that were not filed with, but were regulated by, the Federal Energy Regulatory Commission, which had the authority to and actually regulated the rates); Borough of Landsdale, 426 F.Supp.2d at 283 (same as Utilimax).[18]

Here, Highmark did not point to any legal authority to show that the PID had the legal authority to regulate HHIC's rates for its small group customers during the relevant time period. The parties agree that under applicable law HHIC during the relevant timeframe was not required to file its rates for approval with the PID. The governing statutory provision

---

[18]     At least one treatise calls into question the soundness of the decisions relaxing the requirement that rates be literally filed with the regulating agency. IA PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 247b (4th ed. 2013).

> This seems to be an unwarranted extension of a doctrine that even the Supreme Court concedes is justified only by precedent. As weak as Keogh's rationales for the filed rate doctrine were when they were first formulated, they are virtually nonexistent when the rate in question is not subject to filing at all and the firm has unrestrained power to set its own rates.

Id.

provides:

> **(d) Certain group rates exempt.**—Except as provided in subsection (e), an insurer shall not be required to file with the department rates for accident and health insurance policies which it proposes to issue on a group, blanket or franchise basis in this Commonwealth.

40 PA. CONS. STAT. § 3803(d) (2010).[19] The court cannot conclude as a matter of law that the PID during the relevant timeframe had rate-making authority over HHIC's rates for its small-group customers. If the PID did not have rate-making authority over HHIC, a determination by the court about the rates charged by HHIC during the relevant timeframe could not infringe upon any applicable authority of the PID. The filed rate doctrine, therefore, does not apply to bar plaintiff's claims based upon rates HHIC charged plaintiff from July 1, 2010, through June 30, 2011.

Highmark argues regardless whether the PID had the statutory authority to regulate HHIC's rates, the PID actually did regulate HHIC's rates via the April 26, 2010 agreement, and, therefore, the filed rate doctrine should apply to bar claims based upon those rates. That argument is not persuasive to the court. Highmark's argument disregards that for the filed rate doctrine to apply, "the statutory scheme must provide the regulatory agency with authority to assess rates' compliance with statutory requirements for filed rates." In re Pa. Title Ins. Antitrust Litig., 648 F.Supp.2d at 674. As discussed above, Highmark did not point to any legal basis—statutory or otherwise—that provided the PID the authority to regulate HHIC's rates during the relevant time period. If HHIC was not statutorily required to submit

---

[19]     Highmark did not submit to the court any evidence to show that section 3803(e) applied to HHIC at the relevant time and required it to file its small-group health insurance rates with the PID.

its rates to the PID, the filed rate doctrine will not apply to bar a measure of damages based upon those claims. <u>Arkla</u>, 453 U.S. at 585 n.14.[20]

Based upon the foregoing, the court discerns no basis upon which to apply the filed rate doctrine to any claims remaining in this case. Highmark's motion for summary judgment with respect to the rates charged by HHIC from July 1, 2010, through June 30, 2011, will, therefore, be denied.[21]

---

[20]     Whether the PID had the authority to review and withhold its approval of the PPO applications is not in issue in this case and is an issue separate from whether the PID had the legal authority to regulate HHIC's rates. Another concern is that the record is not clear with respect to the import of the 25% cap on the health status factor, i.e., whether there existed a "calculable rate" based upon that limitation and the confidential agreement dated April 26, 2010. <u>McCray</u>, 682 F.3d at 240 (quoting <u>Whitaker v. Frito-Lay, Inc.</u>, 88 F.3d 952, 961 (11th Cir. 1996)). Even if the filed rate doctrine might apply the court cannot, based upon the record presented, assess whether the PID's actions constituted rate-regulation upon which the court may not infringe. Courts have held that when it is unclear whether there is a properly filed rate, and, therefore, whether the pertinent regulating agency had jurisdiction over the complained-of rates, summary judgment should be denied. <u>E. & J. Gallo Winery v. EnCana Corp.</u>, 503 F.3d 1027, 1045 (9th Cir. 2007) (affirming the district court's denial of the defendant's motion for summary judgment with respect to some of the plaintiff's claims based upon the filed rate doctrine because material issues of fact existed about whether the rates about which the plaintiff complained were properly filed rates within the jurisdiction of the regulating agency, i.e., the Federal Energy Regulatory Commission); <u>Florida Mun. Power Agnecy v. Florida Power & Light Co.</u>, 64 F.3d 614 (11th Cir. 1995) (remanding the motion for summary judgment for the district court to make a factual determination about whether the complained-about rates were subject to the jurisdiction of the regulating agency and, thus, filed rates).

[21]     Although not addressed by the parties, Highmark's arguments with respect to the filed rate doctrine could be unavailing for another reason, i.e., the undisputed evidence of record does not show that HHIC filed its small groups rates with the PID during the relevant timeframe.

     The filed rate doctrine "derives from the more general public utility rule that once a rate is filed with a regulatory agency, the company is forbidden to charge a different rate." IA PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 247 (4th ed. 2013). A review of decisions discussing the requirement of a filed rate shows that a filed rate is a rate submitted to the regulating agency, which is made available for *public view*, i.e., the published rate. <u>See e.g.</u>, <u>Brizendine v. Cotter & Co.</u>, 4 F.3d 457, 460 (7th Cir. 1993), <u>vacated</u>

on other grounds, 511 U.S. 1103 (1994); Maislin Indus., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126 (1990); Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577 (1981).

Here, Highmark argues that in connection with its negotiations with the PID with respect to its PPO applications, "the PID reviewed and approved HHIC's rate formulas for July 1, 2010 through June 30, 2011[,]" and "[t]he PID demanded extensive rate-related information prior to approving HHIC's new small group products, and refused to approve HHIC's new small group products until it was satisfied with the rate formulas that HHIC planned to use to charge small group rates." (ECF No. 460 at 17.) As discussed above, the applicability of the filed rate doctrine does not depend upon the extent of review conducted by the regulatory agency; rather, it is the *filing* of the rate that "triggers" the doctrine. McCray, 682 F.3d at 238-39 ("[T]he Supreme Court has never indicated that the filed rate doctrine requires a certain type of agency approval or level of regulatory review. Instead, the doctrine applies as long as the agency has in fact authorized the challenged rate."). Highmark did not submit to the court any evidence to show that HHIC's rates to be charged from July 1, 2010, through June 30, 2011, were properly filed with the PID and published or were otherwise made available for public view.

Highmark cannot rely upon the April 26, 2010 agreement as evidence that it filed its rates with the PID because the undisputed evidence of record shows that: (1) HHIC during the relevant timeframe was not statutorily required to file its rates with the PID; and (2) the April 26, 2010 agreement was confidential, i.e., not available for public view. Under those circumstances, it would be questionable whether the court could find as a matter of law that HHIC's rates for small group health insurance to be charged from July 1, 2010, through June 30, 2011, were *filed* rates, which may trigger the application of the filed rate doctrine.

As discussed above, courts in specific circumstances have not required that a rate be *literally* filed with the regulating agency in order to invoke the filed rate doctrine. Specifically, courts have held that (1) if a regulating agency has the authority to regulate rates, *and* (2) exercises its authority to regulate rates, the filed rate doctrine may apply to bar damages based upon those rates even if they were not technically filed with the regulating agency. See e.g., Wortman, 854 F.3d at 606 (discussing cases); Texas Commercial Energy, 413 F.3d at 509; Utilimax, 378 F.3d at 303; Borough of Landsdale, 426 F.Supp.2d at 283.

The parties agree that from July 1, 2010, through at least June 30, 2011, the PID did not have the statutory authority to regulate HHIC's small-group health insurance rates. Highmark argues that the PID regulated its rates via the April 26, 2010 agreement, but did not point to any authority to show that the PID had the authority to regulate those rates. There is evidence of record that if the PID received complaints about HHIC's rates, the PID had authority to investigate those rates. There is no evidence of record, however, that the PID exercised that authority with respect to the rates complained about in this case and actually investigated and regulated those rates. Those facts do not appear to satisfy the two-part test to determine whether rates that were not technically filed with a regulating agency trigger the application of the filed rate doctrine. Under those circumstances, the court would not be able to find as a matter of law that HHIC's rates were filed with the PID such that the filed rate

## VI.    Conclusion

Plaintiff does not complain that Highmark's constitutionally-protected conduct in connection with the PPO applications caused it injury; rather, plaintiff alleges it was harmed by by *Highmark's* action—as opposed to any action by the PID or the DOH—of having HHIC charge it allegedly supracompetitive rates, pursuant to the alleged UPMC-Highmark conspiracy. The court under those circumstances cannot conclude that Highmark is entitled to <u>Noerr-Pennington</u>-immunity in this case.

There is no evidence of record to show that the PID had rate-making authority with respect to the rates charged by HHIC during the relevant time period. Under those circumstances, the filed rate doctrine is not implicated, and the court cannot grant summary judgment to Highmark based upon application of the filed rate doctrine.

For the foregoing reasons, Highmark is not entitled to summary judgment on any of plaintiff's claims set forth in the third amended complaint. Highmark's motion for summary judgment (ECF No. 455) will be DENIED. An appropriate order will be entered.

BY THE COURT,

Dated: August 15, 2017                     <u>/s/ JOY FLOWERS CONTI</u>
                                           Joy Flowers Conti
                                           Chief United States District Judge

---

doctrine applies to bar any claim for damages based upon rates charged by HHIC from July 1, 2010, through June 30, 2011.